Questioned
As of: June 2, 2020 3:31 PM Z



# *Vitek v. Jones*

Supreme Court of the United States

December 3, 1979, Argued ; March 25, 1980, Decided

No. 78-1155

**Reporter**

445 U.S. 480 \*; 100 S. Ct. 1254 \*\*; 63 L. Ed. 2d 552 \*\*\*; 1980 U.S. LEXIS 31 \*\*\*\*

VITEK, CORRECTIONAL DIRECTOR, ET AL. v.
JONES

United States District Court for the District of Nebraska,
which found that the state was permanently enjoined
from transferring the inmate to a mental hospital.

**Prior History:** [\*\*\*\*1] APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF
NEBRASKA.

**Disposition:** Affirmed as modified.

## Core Terms

mental hospital, transferred, inmate, parole, moot,
liberty interest, due process, *confinement*, prison,
sentence, mental disease, notice, cases, mental illness,
mentally ill, injunction, due process protection,
*involuntary* transfer, ripeness, suffers, procedural
protections, circumstances, decisionmaker, deprivation,
*involuntary*, psychiatric, reasons, conditions of
*confinement*, psychiatric treatment, state mental
hospital

**Overview**

The state sought to remove the injunction that prohibited
it from transferring inmate to a mental hospital. The
court held that the case was not moot. The court found
that inmate had a liberty interest not to be transferred to
a mental hospital unless he suffered from a mental
disease that could not be adequately treated in prison.
The stigmatizing consequences of a transfer to a mental
hospital for *involuntary* psychiatric treatment, coupled
with the subjection of the inmate to mandatory behavior
modification as a treatment for mental illness,
constituted the kind of deprivations of liberty that
required procedural protections. The court held that
*Neb. Rev. Stat. § 83-180(1)* entitled the inmate to due
process before he was found to have a mental disease
and transferred to a mental hospital. Notice was
essential to afford the inmate an opportunity to
challenge the contemplated action and to understand
the nature of what was happening to him. The
independent decisionmaker that conducted the transfer
hearing was not required to come from outside the
prison or hospital administration.

## Case Summary

**Procedural Posture**

Intervenor inmate joined the action brought by other
prisoners against appellant state that challenged
procedures for transferring prisoners to mental
hospitals. Appellant state challenged the order of the

**Outcome**

The judgment of the district court was modified to reflect
the holding that the state was not required to furnish a
licensed attorney to aid the inmate and was affirmed.

445 U.S. 480, *480; 100 S. Ct. 1254, **1254; 63 L. Ed. 2d 552, ***552; 1980 U.S. LEXIS 31, ****1

See *Neb. Rev. Stat. § 83-180(1)*.

# LexisNexis® Headnotes

Civil Rights Law > Protection of Rights > Prisoner Rights > Transfers

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults

Criminal Law & Procedure > Sentencing > Mental Incapacity

## HN1[⤓] Prisoner Rights, Transfers

*Neb. Rev. Stat. § 83-176(2)* **(1976)** authorizes the Director of Correctional Services to designate any available, suitable, and appropriate residence facility or institution as a place of ***confinement*** for any state prisoner and to transfer a prisoner from one place of ***confinement*** to another. *Neb. Rev. Stat. § 83-180(1)* provides that when a designated physician or psychologist finds that a prisoner suffers from a mental disease or defect and cannot be given proper treatment in that facility, the director may transfer him for examination, study, and treatment to another institution within or without the Department of Correctional Services. Any prisoner so transferred to a mental hospital is to be returned to the department if, prior to the expiration of his sentence, treatment is no longer necessary. Upon expiration of sentence, if the state desires to retain the prisoner in a mental hospital, civil commitment proceedings must be promptly commenced. *Neb. Rev. Stat. § 83-180(3)*.

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

## HN2[⤓] Sentencing, Mental Incapacity

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Discharge & Release of Adults

## HN3[⤓] Sentencing, Mental Incapacity

See *Neb. Rev. Stat. § 83-180(3)*.

Constitutional Law > Substantive Due Process > Scope

Criminal Law & Procedure > ... > Probation > Revocation > Due Process

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > General Overview

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > ... > Probation > Revocation > General Overview

Criminal Law & Procedure > Postconviction Proceedings > Parole

## HN4[⤓] Constitutional Law, Substantive Due Process

State statutes may create liberty interests that are entitled to the procedural protections of the due process clause of *U.S. Const. amend. XIV*. There is no constitutional or inherent right to parole, but once a state grants a prisoner a conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to the decision to revoke parole. The same is true of the revocation of probation. A state-created right to good-time credits, which can be forfeited only for serious misbehavior, constitutes a liberty interest protected by the due process clause. Once a state has granted

06/02/2020  11:58 Martin & Associates  (FAX)8024795414  P.005/023
Case 1:20-cv-11200-WGY  Document 1-2  Filed 07/02/20  Page 3 of 125

Page 3 of 21
445 U.S. 480, *480; 100 S. Ct. 1254, **1254; 63 L. Ed. 2d 552, ***552; 1980 U.S. LEXIS 31, ****1

prisoners a liberty interest, due process protections are necessary to insure that the state-created right is not arbitrarily abrogated.

*Civil Rights Law > Protection of Rights > Prisoner Rights > Discipline*

*Criminal Law & Procedure > Postconviction Proceedings > Parole*

*Civil Rights Law > Protection of Rights > Prisoner Rights > Transfers*

*Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope*

*Criminal Law & Procedure > Postconviction Proceedings > Imprisonment*

**HN5[↓] Prisoner Rights, Discipline**

State statutes may grant prisoners liberty interests that invoke due process protections when prisoners are transferred to solitary **confinement** for disciplinary or administrative reasons. State law grants petitioners a sufficient expectancy of parole to entitle them to some measure of constitutional protection with respect to parole decisions.

*Civil Rights Law > Protection of Rights > Prisoner Rights > Transfers*

*Criminal Law & Procedure > Postconviction Proceedings > Imprisonment*

*Criminal Law & Procedure > Sentencing > Mental Incapacity*

*Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults*

**HN6[↓] Prisoner Rights, Transfers**

*Neb. Rev. Stat. § 83-180(1)* provides that if a designated physician finds that a prisoner suffers from a mental disease or defect that cannot be given proper treatment in prison, the Director of Correctional Services may transfer a prisoner to a mental hospital.

*Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection*

*Criminal Law & Procedure > ... > Probation > Revocation > General Overview*

**HN7[↓] Procedural Due Process, Scope of Protection**

If a state grants a prisoner a right or expectation that adverse action will not be taken against him except upon the occurrence of specified behavior, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed. These minimum requirements are a matter of federal law, and are not diminished by the fact that a state may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.

*Constitutional Law > Substantive Due Process > Scope*

*Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > Institutionalization*

*Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults*

*Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection*

*Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview*

*Public Health & Welfare Law > ... > Mental Health Services > Commitment > **Involuntary** Commitment of Adults*

*Public Health & Welfare Law > Social Services > Institutionalized Individuals > General*

06/02/2020 10:58 Martin & Associates (FAX)8024705414 P.006/023
Case 1:20-cv-11266-WGY Document 1-2 Filed 07/02/20 Page 4 of 125

Page 4 of 21
445 U.S. 480, *480; 100 S. Ct. 1254, **1254; 63 L. Ed. 2d 552, ***552; 1980 U.S. LEXIS 31, ****1

## Overview

### HN8[↧] Constitutional Law, Substantive Due Process

For an ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty, and in consequence requires due process protection. Among the historic liberties protected by the due process clause is the right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults

### HN9[↧] Procedural Due Process, Scope of Protection

A convicted felon is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital.

Constitutional Law > Substantive Due Process > Scope

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

### HN10[↧] Constitutional Law, Substantive Due Process

A valid criminal conviction and prison sentence extinguish a defendant's right to freedom from *confinement*. Such a conviction and sentence

sufficiently extinguish a defendant's liberty to empower a state to confine him in any of its prisons. Changes in the conditions of *confinement* having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the due process clause as long as the conditions or degree of *confinement* to which the prisoner is subjected is within the sentence imposed upon him.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > Sentencing > Mental Incapacity

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

Public Health & Welfare Law > ... > Mental Health Services > Commitment > *Involuntary* Commitment of Adults

Public Health & Welfare Law > Healthcare > Mental Health Services > Treatment

### HN11[↧] Prisoner Rights, Medical Treatment

*Involuntary* commitment to a mental hospital is not within the range of conditions of *confinement* to which a prison sentence subjects an individual. A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from *confinement* for the term of his sentence, but they do not authorize a state to classify him as mentally ill and to subject him to *involuntary* psychiatric treatment without affording him additional due process protections.



Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Patricia Lazarus

06/02/2020 10:59 Martin & Associates (FAX)8024705414 P.007/023
Case 1:20-cv-00100-WGY   Document 1-2   Filed 07/02/20   Page 5 of 125

Page 5 of 21

445 U.S. 480, *480; 100 S. Ct. 1254, **1254; 63 L. Ed. 2d 552, ***552; 1980 U.S. LEXIS 31, ****1

Civil Rights Law > Protection of Rights > Prisoner Rights > Transfers

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults

### HN12[🔽] Prisoner Rights, Medical Treatment

The stigmatizing consequences of a transfer to a mental hospital for *involuntary* psychiatric treatment, coupled with the subjection of a prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults

### HN13[🔽] Procedural Due Process, Scope of Protection

The interest of the state in segregating and treating mentally ill patients is strong. The interest of the prisoner in not being arbitrarily classified as mentally ill and subjected to unwelcome treatment is also powerful, however; and the risk of error in making the determinations required by *Neb. Rev. Stat. § 83-180* is substantial enough to warrant appropriate procedural safeguards against error.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Criminal Law & Procedure > Sentencing > Mental Incapacity

### HN14[🔽] Procedural Due Process, Scope of Protection

The question whether an individual is mentally ill and cannot be treated in prison turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists. The medical nature of the inquiry, however, does not justify dispensing with due process requirements. It is precisely the subtleties and nuances of psychiatric diagnoses that justify the requirement of adversary hearings.

Civil Rights Law > Protection of Rights > Prisoner Rights > Transfers

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults

### HN15[🔽] Prisoner Rights, Transfers

Notice is essential to afford a prisoner an opportunity to challenge a contemplated *involuntary* transfer to a mental hospital and to understand the nature of what is happening to him. The independent decisionmaker conducting the transfer hearing need not come from outside a prison or hospital administration.

Civil Rights Law > Protection of Rights > Prisoner Rights > Access to Courts

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Public Health & Welfare Law > Social Services > Legal Aid

Criminal Law & Procedure > Counsel > Assignment of Counsel

### HN16[🔽] Prisoner Rights, Access to Courts

Prisoners who are illiterate and uneducated have a greater need for assistance in exercising their rights. A prisoner thought to be suffering from a mental disease or defect requiring *involuntary* treatment probably has an even greater need for legal assistance, for such a prisoner is more likely to be unable to understand or exercise his rights. In these circumstances, it is appropriate that counsel be provided to indigent prisoners whom the State seeks to treat as mentally ill.

## Lawyers' Edition Display

### Decision

*Involuntary* transfer of state prisoner to state mental hospital without notice and adversary hearing, held violative of *due process clause of Fourteenth Amendment*.

### Summary

A Nebraska state prisoner who was transferred to a state mental hospital pursuant to a Nebraska statute authorizing the Director of Correctional Services to transfer a prisoner when a designated physician finds that the prisoner "suffers from a mental disease or defect" and "cannot be given proper treatment" in prison, intervened in a case pending in the United States District Court for the District of Nebraska which had been brought by other prisoners against the state challenging, on procedural due process grounds, the adequacy of the procedures by which Nebraska permits the transfer of a prisoner from a prison complex to a mental hospital. A three-judge District Court was convened and declared the statute unconstitutional as applied to the prisoner, holding that transferring him to a mental hospital without adequate notice and opportunity for a hearing deprived him of liberty without due process of law contrary to the *Fourteenth Amendment*, and that such transfers must be accompanied by adequate notice, an adversary hearing before an independent decisionmaker, a written statement by the factfinder of the evidence relied on and the reasons for the decision, and the availability of appointed counsel for indigent prisoners (*437 F Supp 569*). The District Court requested counsel to suggest appropriate relief, and, after learning that the prisoner had been transferred from the hospital to the psychiatric ward of the prison, the court entered its judgment in which the court

declared the statute unconstitutional as applied to the prisoner and permanently enjoined the state from transferring the prisoner to the mental hospital without following the procedures prescribed in its judgment. Thereafter, on direct appeal, the United States Supreme Court vacated the judgment of the District Court and remanded the case to that court for consideration of the question of mootness (*56 L Ed 2d 381*). Although the prisoner had been paroled on condition that he accept psychiatric treatment at a Veterans' Administration hospital, the District Court, on remand, found that the case was not moot because the prisoner was subject to, and was in fact under, the threat of being transferred to the state mental hospital pursuant to the state statute if the injunction was removed. The District Court then reinstated its original judgment.

On direct appeal, the United States Supreme Court affirmed, with modification. Although unable to agree on an opinion with regard to the portion of the District Court's judgment mandating the availability of appointed counsel for indigent prisoners, five members of the court agreed that a prisoner was entitled to qualified and independent assistance at an adversary hearing. In an opinion (part of which constituted the opinion of the court—parts I, II, III, IV-A, and V) by White, J., joined by Brennan, Marshall, Powell, and Stevens, JJ., it was held that (1) the decision of the District Court remained a live controversy and was not moot even though, after the decision had been appealed to the United States Supreme Court, the prisoner had been paroled on condition that he accept psychiatric treatment at a Veterans' Administration hospital, and then returned to prison for having violated that parole, it not being absolutely clear, absent the injunction, that the alleged wrongful behavior could not reasonably be expected to recur, (2) the *involuntary* transfer of a state prisoner to a mental hospital implicates a liberty interest that is protected by the *due process clause of the Fourteenth Amendment*, since under the state statute allowing for such transfers, a prisoner could reasonably expect that he would not be transferred to a mental hospital without a finding that he was suffering from a mental illness for which he could not secure adequate treatment in the prison, and since, independent of the statute, the stigmatizing consequences of a transfer to a mental hospital for *involuntary* psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that require procedural protections, and (3) the procedural protections required by the due process clause include a written notice of the transfer, an adversary hearing

before an independent decisionmaker, written findings, and effective and timely notice of such rights. White, J., joined by Brennan, Marshall, and Stevens, JJ., also expressed the view (part IV-B of the opinion) that it is appropriate that counsel be provided to indigent prisoners whom the state seeks to treat as mentally ill.

Powell, J., concurring in part, joined in the opinion of the court except with respect to a prisoner's entitlement to legal counsel, agreeing that qualified and independent assistance must be provided to an inmate who is threatened with *involuntary* transfer to a state mental hospital, but expressing the view that an inmate need not always be supplied with a licensed attorney.

Stewart, J., joined by Burger, Ch. J., and Rehnquist, J., dissented, expressing the view that the case at bar was moot, because there was no demonstrated probability that the prisoner would again be transferred to a state hospital in accord with the state statute.

Blackmun, J., dissenting, expressed the view that the case at bar was not ripe for adjudication, since the asserted injury, as well as any immediate threat that the injury would be suffered again, had disappeared, at the latest, when the prisoner was granted parole.

# Headnotes

LAW §528.5 > due process -- liberty interest -- transfer of prisoner to mental hospital -- > Headnote:
*LEdHN[1A]* [1A]*LEdHN[1B]* [1B]

The *involuntary* transfer of a state prisoner to a state mental hospital pursuant to state law implicates a liberty interest that is protected by the *due process clause of the Fourteenth Amendment*, where under the state law allowing for such transfers, a prisoner could reasonably expect that he would not be transferred to a mental hospital without a finding that he was suffering from a mental illness for which he could not secure adequate treatment in the correctional facility; independent of the state law, the stigmatizing consequences of a transfer to a mental hospital for *involuntary* psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that require procedural protection.

LAW §848 > due process -- transfer of prisoner to mental hospital -- procedural protection -- > Headnote:
*LEdHN[2A]* [2A]*LEdHN[2B]* [2B]

The *due process clause of the Fourteenth Amendment* requires certain procedural protections for state prisoners who may be transferred involuntarily to a state mental hospital for treatment of a mental disease or defect, such protections including written notice of the transfer, an adversary hearing before an independent decisionmaker, written findings, and effective and timely notice of such rights.

ERROR §1672 > LAW §848 > modification and affirmance of judgment -- due process -- assistance for prisoner being transferred to mental hospital -- > Headnote:
*LEdHN[3A]* [3A]*LEdHN[3B]* [3B]*LEdHN[3C]* [3C]

On review of a decision of a three-judge United States District Court holding that the *due process clause of the Fourteenth Amendment* requires that before a state prisoner is transferred involuntarily to a state mental hospital certain procedural protections are required, including the availability of legal counsel, furnished by the state, if the prisoner is financially unable to furnish his own, the United States Supreme Court will modify and affirm the judgment, where (1) four Justices of the Supreme Court are of the view that it is appropriate that counsel be provided to indigent prisoners whom the state seeks to treat as mentally ill, and (2) a fifth Justice of the Supreme Court is of the view that due process requires the provision of qualified and independent assistance to an inmate threatened with *involuntary* transfer to a mental hospital, but that an inmate need not always be supplied with a licensed attorney. [Per White, Brennan, Marshall, Stevens, and Powell, JJ.]

ERROR §1662 > mootness -- changes pending appeal -- parole and reimprisonment of prisoner -- > Headnote:
*LEdHN[4]* [4]

A case involving a decision of a three-judge United States District Court in which the court declares that a state statute authorizing the *involuntary* transfer of a

06/02/2020  11:59 Martin & Associates    Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 8 of 125   (FAX)8024795414   P.010/023

Page 8 of 21

445 U.S. 480, *480; 100 S. Ct. 1254, **1254; 63 L. Ed. 2d 552, ***552; 1980 U.S. LEXIS 31, ****1

state prisoner to a state mental hospital is unconstitutional as not providing prisoners procedural due process, and then permanently enjoins the state from transferring the prisoner to the hospital without following certain procedural protections, including notice and adversary hearing, remains a live controversy and is not moot--notwithstanding that after the decision has been appealed to the United States Supreme Court, the prisoner has been paroled on the condition that he accept psychiatric treatment at a Veterans' Administration hospital, and then had been returned to prison for violating that parole--where it is not absolutely clear, absent the injunction, that the alleged wrongful behavior could not reasonably be expected to recur. (Stewart, J., Burger, Ch. J., and Rehnquist, J., dissented from this holding.)

LAW §97 > right to parole -- revocation of parole or probation -- procedural protections -- > Headnote:
*LEdHN[5][*]* [5]

There is no constitutional or inherent right to parole, but once a state grants a prisoner the conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to the decision to revoke parole, and the same is true of the revocation of probation.

LAW §759 > due process -- federal employment -- deprivation of property interest -- > Headnote:
*LEdHN[6A][*]* [6A]*LEdHN[6B][*]* [6B]

While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such interest, once conferred, without appropriate procedural safeguards.

LAW §582 > due process -- deprivation of property interest -- > Headnote:
*LEdHN[7A][*]* [7A]*LEdHN[7B][*]* [7B]

The adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed

in constitutional terms of due process.

LAW §848 > due process -- actions against prisoners -- procedural protection -- > Headnote:
*LEdHN[8][*]* [8]

If a state grants a prisoner a right or expectation that adverse action will not be taken against him except upon the occurrence of specified behavior, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural process appropriate for the circumstances must be observed; such minimum requirements are a matter of federal law and are not diminished by the fact that the state may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.

LAW §528.3 > due process -- liberty interest -- commitment to mental hospital -- > Headnote:
*LEdHN[9][*]* [9]

For the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty and in consequence requires due process protection.

LAW §525 > due process -- protected liberties -- > Headnote:
*LEdHN[10][*]* [10]

Among the historic liberties protected by due process under the United States Constitution is the right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.

LAW §848 >  LAW §86 > conviction and prison sentence -- deprivation of liberty -- > Headnote:
*LEdHN[11][*]* [11]

A valid criminal conviction and prison sentence extinguish a defendant's right to freedom from

*confinement* and sufficiently extinguish a defendant's liberty interest for purposes of due process to empower the state to confine him to any of its prisons.

LAW §848 > due process -- changes in *confinement* --
> Headnote:
*LEdHN[12]* ⬇] [12]

Changes in the conditions of *confinement* having a substantial adverse impact on a prisoner are not alone sufficient to invoke the protections of due process as long as the conditions or degree of *confinement* to which the prisoner is subjected is within the sentence imposed upon him.

LAW §86 > sentence -- *involuntary* commitment to mental hospital -- > Headnote:
*LEdHN[13]* ⬇] [13]

*Involuntary* commitment to a mental hospital is not within the range of conditions of *confinement* to which a prison sentence subjects an individual.

LAW §848 > due process -- transfer of prisoner to mental hospital -- medical nature of inquiry -- > Headnote:
*LEdHN[14]* ⬇] [14]

The medical nature of the inquiry involved in determining whether or not to transfer an inmate to a mental hospital for treatment does not justify dispensing with due process requirements, it being precisely the subtleties and nuances of psychiatric diagnoses that justify the requirement of adversary hearings.

## Syllabus

Appellee, a convicted felon, was transferred from state prison to a mental hospital pursuant to a Nebraska statute (*§ 83-180 (1)*) which provides that if a

designated physician or psychologist finds that a prisoner "suffers from a mental disease or defect" that "cannot be given proper treatment" in prison, the Director of Correctional Services may transfer the prisoner to a mental hospital. In an action challenging the constitutionality of *§ 83-180 (1)* on procedural due process grounds, the District Court declared the statute unconstitutional as applied to appellee, holding that transferring him to the mental hospital without adequate notice and opportunity for a hearing deprived him of liberty without due process of law contrary to the *Fourteenth Amendment*, and that such transfers must be accompanied by adequate notice, an adversary hearing before an independent decisionmaker, a written statement by the factfinder of the evidence relied on and the reasons for the decision, and the availability of appointed counsel for indigent prisoners. The court permanently enjoined the State from [****2] transferring appellee (who meanwhile had been transferred back to prison) to the mental hospital without following the prescribed procedures. Subsequently, appellee was paroled on condition that he accept mental treatment, but he violated that parole and was returned to prison. Relying on appellee's history of mental illness and the State's representation that he was a serious threat to his own and others' safety, the District Court held that the parole and revocation thereof did not render the case moot because appellee was still subject to being transferred to the mental hospital.

*Held*: The judgment is affirmed as modified. Pp. 486-497; 497-500.

MR. JUSTICE WHITE delivered the opinion of the Court with respect to Parts I, II, III, IV-A, and V, concluding that:

1. The District Court properly found that the case is not moot. The reality of the controversy between appellee and the State has not been lessened by the cancellation of his parole and his return to prison, where he is protected from further transfer by the District Court's judgment and injunction. Under these circumstances, it is not "absolutely clear," absent the injunction, that the State's alleged wrongful behavior [****3] could not reasonably be expected to recur. Pp. 486-487.

2. The *involuntary* transfer of appellee to a mental hospital implicates a liberty interest that is protected by the *Due Process Clause of the Fourteenth Amendment*. Pp. 487-494.

(a) The District Court properly identified a liberty interest

rooted in _§ 83-180 (1)_, under which a prisoner could reasonably expect that he would not be transferred to a mental hospital without a finding that he was suffering from a mental illness for which he could not secure adequate treatment in prison. The State's reliance on the opinion of a designated physician or psychologist for determining whether the conditions warranting transfer exist neither removes the prisoner's interest from due process protection nor answers the question of what process is due under the Constitution. Pp. 488-491.

(b) The District Court was also correct in holding that, independently of _§ 83-180 (1)_, the transfer of a prisoner from a prison to a mental hospital must be accompanied by appropriate procedural protections. _Involuntary_ commitment to a mental hospital is not within the range of conditions of _**confinement**_ to which a prison sentence subjects an individual. [****4] While a conviction and sentence extinguish an individual's right to freedom from _**confinement**_ for the term of his sentence, they do not authorize the State to classify him as mentally ill and to subject him to _**involuntary**_ psychiatric treatment without affording him additional due process protections.    Here, the stigmatizing consequences of a transfer to a mental hospital for _**involuntary**_ psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections. Pp. 491-494.

3. The District Court properly identified and weighed the relevant factors in arriving at its judgment. Pp. 495-496.

(a) Although the State's interest in segregating and treating mentally ill patients is strong, the prisoner's interest in not being arbitrarily classified as mentally ill and subjected to unwelcome treatment is also powerful, and the risk of error in making the determinations required by _§ 83-180 (1)_ is substantial enough to warrant appropriate procedural safeguards against error. P. 495.

(b) The medical nature of the inquiry as to whether or not to [****5] transfer a prisoner to a mental hospital does not justify dispensing with due process requirements. P. 495.

(c) Because prisoners facing _**involuntary**_ transfer to a mental hospital are threatened with immediate deprivation of liberty interests and because of the risk of mistaken transfer, the District Court properly determined that certain procedural protections, including notice and an adversary hearing, were appropriate in the circumstances present in this case. Pp. 495-496.

MR. JUSTICE WHITE, joined by MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS, concluded in Part IV-B that it is appropriate that counsel be provided to indigent prisoners whom the State seeks to treat as mentally ill. Such a prisoner has an even greater need for legal assistance than does a prisoner who is illiterate and uneducated, because he is more likely to be unable to understand or exercise his rights. Pp. 496-497.

MR. JUSTICE POWELL concluded that although the State is free to appoint a licensed attorney to represent a prisoner who is threatened with _**involuntary**_ transfer to a mental hospital, it is not constitutionally required to do so, and that due process will be satisfied so [****6] long as such a prisoner is provided qualified and independent assistance. Pp. 497-500.

**Counsel:** Melvin Kent Kammerlohr, Assistant Attorney General of Nebraska, argued the cause for appellants. With him on the brief was Paul L. Douglas, Attorney General.

Thomas A. Wurtz, by appointment of the _Court, 441 U.S. 960_, argued the cause and filed a brief for appellee.

**Judges:** WHITE, J., announced the Court's judgment and delivered the opinion of the Court with respect to Parts I, II, III, IV-A, and V, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined, and an opinion with respect to Part IV-B, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part, post, p. 497. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, post, p. 500. BLACKMUN, J., filed a dissenting opinion, post, p. 501.

**Opinion by:** WHITE

# Opinion

[*482] [***558] [**1258]   MR. JUSTICE **WHITE** delivered the opinion of the Court, except as to Part IV-B.

*LEdHN[1A]* [1A] *LEdHN[2A]* [2A] *LEdHN[3A]* [3A]The question in this case is whether the *Due Process Clause of the Fourteenth Amendment* entitles a prisoner convicted and incarcerated in the State of Nebraska to certain procedural [*483] protections, [****7] including notice, an adversary hearing, and provision of counsel, before he is transferred involuntarily to a state mental hospital for treatment of a mental disease or defect.

I

*HN1* *Nebraska Rev. Stat. § 83-176 (2)* (1976) authorizes the Director of Correctional Services to designate any available, suitable, and appropriate residence facility or institution as a place of *confinement* for any state prisoner and to transfer a prisoner from one place of *confinement* to another. *Section 83-180 (1)*, however, provides that when a designated physician or psychologist finds that a prisoner "suffers from a mental disease or defect" and "cannot be given proper treatment in that facility," the director may transfer him for examination, study, and treatment to another institution within or without the Department of Correctional [**1259] Services. [1] Any prisoner so transferred [***559] to a mental hospital is to be returned to the Department if, prior to the expiration of his sentence, treatment is no longer necessary. Upon expiration of sentence, [*484] if the State desires to retain the prisoner in a mental hospital,

---

[1] *HN2* *Section 83-180 (1)* provides:

"When a physician designated by the Director of Correctional Services finds that a person committed to the department suffers from a physical disease or defect, or when a physician or psychologist designated by the director finds that a person committed to the department suffers from a mental disease or defect, the chief executive officer may order such person to be segregated from other persons in the facility. If the physician or psychologist is of the opinion that the person cannot be given proper treatment in that facility, the director may arrange for his transfer for examination, study, and treatment to any medical-correctional facility, or to another institution in the Department of Public Institutions where proper treatment is available. A person who is so transferred shall remain subject to the jurisdiction and custody of the Department of Correctional Services and shall be returned to the department when, prior to the expiration of his sentence, treatment in such facility is no longer necessary."

civil commitment proceedings must be promptly commenced. *§ 83-180 (3)*. [****8] [2]

[****9] On May 31, 1974, Jones was convicted of robbery and sentenced to a term of three to nine years in state prison. He was transferred to the penitentiary hospital in January 1975. Two days later he was placed in solitary *confinement*, where he set his mattress on fire, burning himself severely. He was treated in the burn unit of a private hospital. Upon his release and based on findings required by *§ 83-180* that he was suffering from a mental illness or defect and could not receive proper treatment in the penal complex, he was transferred to the security unit of the Lincoln Regional Center, a state mental hospital under the jurisdiction of the Department of Public Institutions.

Jones then intervened in this case, which was brought by other prisoners against the appropriate state officials (the State) challenging on procedural due process grounds the adequacy of the procedures by which the Nebraska statutes permit transfers from the prison complex to a mental hospital. [3] On August 17, 1976, a three-judge District Court, convened [*485] pursuant to *28 U. S. C. § 2281 (1970 ed.)*, [4] denied the State's motion for summary judgment and trial ensued. On September 12, 1977, the District [****10] Court

---

[2] *HN3* *Section 83-180 (3)* provides:

"When two psychiatrists designated by the Director of Correctional Services find that a person about to be released or discharged from any facility suffers from a mental disease or defect of such a nature that his release or discharge will endanger the public safety or the safety of the offender, the director shall transfer him to, or if he has already been transferred, permit him to remain in, a psychiatric facility in the Department of Public Institutions and shall promptly commence proceedings applicable to the civil commitment and detention of persons suffering from such disease or defect."

[3] After initially certifying this case as a class action, the District Court decertified the class, but permitted intervention by three individual plaintiffs, including Jones. The District Court subsequently dismissed the claims of all plaintiffs except Jones, who is the sole appellee in this Court.

[4] The statute authorizing the convening of a three-judge court, *28 U. S. C. § 2281 (1970 ed.)*, was repealed by Pub. L. 94-381, 90 Stat. 1119, effective for actions commenced after August 12, 1976. Because the instant action was filed on November 12, 1975, the three-judge court was properly convened.

445 U.S. 480, *485; 100 S. Ct. 1254, **1259; 63 L. Ed. 2d 552, ***559; 1980 U.S. LEXIS 31, ****10

declared _§ 83-180_ unconstitutional as applied to Jones, holding that transferring Jones to a mental hospital without adequate notice and opportunity [***560] for a hearing deprived him of liberty without due process of law contrary to the _Fourteenth Amendment_ and that such transfers must be accompanied by adequate notice, an adversary hearing before an independent decisionmaker, a written statement by the factfinder of the evidence relied on and the reasons for the decision, and the availability of appointed counsel for indigent prisoners. _Miller v. Vitek, 437 F.Supp. 569 (Neb. 1977)_. Counsel was requested to suggest appropriate relief.

[****11] In response to this request, Jones revealed that on May 27, 1977, prior to the [**1260] District Court's decision, he had been transferred from Lincoln Regional Center to the psychiatric ward of the penal complex but prayed for an injunction against further transfer to Lincoln Regional Center. The State conceded that an injunction should enter if the District Court was firm in its belief that the section was unconstitutional. The District Court then entered its judgment declaring _§ 83-180_ unconstitutional as applied to Jones and permanently enjoining the State from transferring Jones to Lincoln Regional Center without following the procedures prescribed in its judgment.

We noted probable jurisdiction _434 U.S. 1060 (1978)_. Meanwhile, Jones had been paroled, but only on condition that he accept psychiatric treatment at a Veterans' Administration Hospital. We vacated the judgment of the District Court and remanded the case to that court for consideration [*486] of the question of mootness. _Vitek v. Jones, 436 U.S. 407 (1978)_. Both the State and Jones at this juncture insisted that the case was not moot. The State represented that [****12] because "Jones' history of mental illness indicates a serious threat to his own safety, as well as to that of others . . . there is a very real expectation" that he would again be transferred if the injunction was removed. App. to Juris. Statement 24. Jones insisted that he was receiving treatment for mental illness against his will and that he was continuing to suffer from the stigmatizing consequences of the previous determination that he was mentally ill. On these representations, the District Court found that the case was not moot because Jones "is subject to and is in fact under threat of being transferred to the state mental hospital under _§ 83-180_." _Ibid._ The District Court reinstated its original judgment. We postponed consideration of jurisdiction to a hearing on the merits. _441 U.S. 922 (1979)_. Meanwhile, Jones had violated his parole, his parole had been revoked, and he had been reincarcerated in the penal complex.

II

_LEdHN[4][↑]_ [4]We agree with the parties in this case that a live controversy exists and that the case is not moot. Jones was declared to be mentally ill pursuant to _§ 83-180_ and was transferred to a mental hospital and treated. He was later [****13] paroled but only on condition that he accept mental treatment. He violated that parole and has been returned to the penal complex. On our remand to consider mootness, the District Court, relying on Jones' history of mental illness and the State's representation that he represented a serious threat to his own safety as well as to that of others, found that Jones [***561] "is in fact under threat of being transferred to the state mental hospital under _§ 83-180_." We see no reason to disagree with the District Court's assessment at that time, and the reality of the controversy between Jones and the State has not been lessened by the cancellation of his parole and his return to the state prison, [*487] where he is protected from further transfer by the outstanding judgment and injunction of the District Court. The State, believing that the case is not moot, wants the injunction removed by the reversal of the District Court's judgment. Jones, on the other hand, insists that the judgment of the District Court be sustained and the protection against transfer to a mental hospital, except in accordance with the specified procedures, be retained.

Against this background, it is not [****14] "absolutely clear," absent the injunction, "that the allegedly wrongful behavior could not reasonably be expected to recur." _United States v. Phosphate Export Assn., 393 U.S. 199, 203 (1968); County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979); United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953)_. [5] Furthermore, as the [**1261] matter now stands, the _§ 83-180_ determination that Jones suffered from mental illness has been declared infirm by the District Court. Vacating the District Court's judgment as moot would not only vacate the injunction against transfer but also the declaration that the procedures employed by the State afforded an inadequate basis for declaring Jones to be mentally ill. In the posture of the case, it is not moot.

---

[5] Because Jones has not completed serving his sentence, he remains subject to the transfer procedures he challenges, unlike the plaintiff in _Weinstein v. Bradford, 423 U.S. 147 (1975)_, where a challenge to parole procedures was held to be moot because plaintiff had completed his sentence and there was no longer any likelihood whatsoever that he would again be subjected to the parole procedures he challenged.

445 U.S. 480, *487; 100 S. Ct. 1254, **1261; 63 L. Ed. 2d 552, ***561; 1980 U.S. LEXIS 31, ****14

[****15] III

LEdHN[1B][↑] [1B]On the merits, the threshold question in this case is whether the *involuntary* transfer of a Nebraska state prisoner to a mental hospital implicates a liberty interest that is protected by the Due Process Clause. The District Court held that it did and offered two related reasons for its conclusion. The District Court first identified a liberty interest rooted in [*488] *§ 83-180 (1)*, under which a prisoner could reasonably expect that he would not be transferred to a mental hospital without a finding that he was suffering from a mental illness for which he could not secure adequate treatment in the correctional facility. Second, the District Court was convinced that characterizing Jones as a mentally ill patient and transferring him to the Lincoln Regional Center had "some stigmatizing" consequences which, together with the mandatory behavior modification treatment to which Jones would be subject at the Lincoln Center, constituted a major change in the conditions of *confinement* amounting to a "grievous loss" that should not be imposed without the opportunity for notice and an adequate hearing. We agree with the District Court in both respects.

A

LEdHN[5][↑] [5]We have repeatedly held [****16] that [***562] HN4[↑] state statutes may create liberty interests that are entitled to the procedural protections of the *Due Process Clause of the Fourteenth Amendment*. There is no "constitutional or inherent right" to parole, *Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979)*, but once a State grants a prisoner the conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to the decision to revoke parole. *Morrissey v. Brewer, 408 U.S. 471 (1972)*. The same is true of the revocation of probation. *Gagnon v. Scarpelli, 411 U.S. 778 (1973)*. In *Wolff v. McDonnell, 418 U.S. 539 (1974)*, we held that a state-created right to good-time credits, which could be forfeited only for serious misbehavior, constituted a liberty interest protected by the Due Process Clause. We also noted that the same reasoning could justify extension of due process protections to a decision to impose "solitary" *confinement* because "[it] represents a major change in the conditions of *confinement* and is normally imposed only when it is claimed and proved [****17] that there has been a major act of misconduct." *Id., at 571-572, n. 19*. Once a State has [*489] granted prisoners a liberty interest, we held that due process protections are necessary "to insure that the state-created right is not

arbitrarily abrogated." *Id., at 557*.

In *Meachum v. Fano, 427 U.S. 215 (1976)*, and *Montanye v. Haymes, 427 U.S. 236 (1976)*, we held that the transfer of a prisoner from one prison to another does not infringe a protected liberty interest. But in those cases transfers were discretionary with the prison authorities, and in neither case did the prisoner possess any right or justifiable expectation that he would not be transferred except for misbehavior or upon the occurrence of other specified events. Hence, "the predicate for invoking the protection of the *Fourteenth Amendment* as construed and [**1262] applied in *Wolff v. McDonnell* [was] totally nonexistent." *Meachum v. Fano, supra, at 226-227*.

Following *Meachum* v. *Fano* and *Montanye* v. *Haymes*, we continued to recognize that HN5[↑] state statutes may grant prisoners liberty [****18] interests that invoke due process protections when prisoners are transferred to solitary *confinement* for disciplinary or administrative reasons. *Enomoto v. Wright, 434 U.S. 1021 (1978)*, summarily aff'd *462 F.Supp. 397 (ND Cal. 1976)*. Similarly, in *Greenholtz v. Nebraska Penal Inmates, supra*, we held that state law granted petitioners a sufficient expectancy of parole to entitle them to some measure of constitutional protection with respect to parole decisions.

We think the District Court properly understood and applied these decisions. HN6[↑] *Section 83-180 (1)* provides that if a designated physician finds that a prisoner "suffers from a mental disease or defect" that "cannot be given proper treatment" in prison, the Director of Correctional Services may transfer a [***563] prisoner to a mental hospital. The District Court also found that in practice prisoners are transferred to a mental hospital only if it is determined that they suffer from a mental disease or defect that cannot adequately be treated within the penal complex. This "objective expectation, firmly fixed in state law and official Penal Complex practice," [****19] that [*490] a prisoner would not be transferred unless he suffered from a mental disease or defect that could not be adequately treated in the prison, gave Jones a liberty interest that entitled him to the benefits of appropriate procedures in connection with determining the conditions that warranted his transfer to a mental hospital. Under our cases, this conclusion of the District Court is unexceptionable.

LEdHN[6A][↑] [6A]LEdHN[7A][↑] [7A]LEdHN[8][↑]

[8]Appellants maintain that any state-created liberty interest that Jones had was completely satisfied once a physician or psychologist designated by the director made the findings required by § 83-180 (1) and that Jones was not entitled to any procedural protections. [6] But HN7[↑] if the State grants a prisoner [*491] a right or expectation that adverse action will not be taken against him except upon the occurrence of specified behavior, "the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due [**1263] process appropriate for the circumstances must be observed." Wolff v. McDonnell, 418 U.S., at 558.These minimum requirements being a matter of federal law, they are not diminished by the [****20] fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official

action. In Morrissey, Gagnon, and Wolff, the States had adopted their own procedures for determining whether conditions warranting revocation of parole, probation, or good-time credits [***564] had occurred; yet we held that those procedures were constitutionally inadequate. In like manner, Nebraska's reliance on the opinion of a designated physician or psychologist for determining whether the conditions warranting a transfer exist neither removes the prisoner's interest from due process protection nor answers the question of what process is due under the Constitution.

LEdHN[6B][↑] [6B] LEdHN[7B][↑] [7B]

[****21] B

The District Court was also correct in holding that independently of § 83-180 (1), the transfer of a prisoner from a prison to a mental hospital must be accompanied by appropriate procedural protections. The issue is whether after a conviction for robbery, Jones retained a residuum of liberty that would be infringed by a transfer to a mental hospital without complying with minimum requirements of due process.

LEdHN[9][↑]    [9]LEdHN[10][↑]    [10]We have recognized that HN8[↑] for the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty," Humphrey v. Cady, 405 U.S. 504, 509 (1972), and in [*492] consequence "requires due process protection." Addington v. Texas, 441 U.S. 418, 425 (1979);O'Connor v. Donaldson, 422 U.S. 563, 580 (1975) (BURGER, C. J., concurring). The loss of liberty produced by an *involuntary* commitment is more than a loss of freedom from *confinement*. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[whether] we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur [****22] and that it can have a very significant impact on the individual." Addington v. Texas, supra, at 425-426. See also Parham v. J. R., 442 U.S. 584, 600 (1979). Also, "[among] the historic liberties" protected by the Due Process Clause is the "right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673 (1977). Compelled treatment in the form of mandatory behavior modification programs, to which the District Court found Jones was exposed in this case, was a proper factor to be weighed by the District Court. Cf. Addington v. Texas, supra, at 427.

---

[6] A majority of the Justices rejected an identical position in Arnett v. Kennedy, 416 U.S. 134, 166-167 (1974) (opinion of POWELL, J., joined by BLACKMUN, J.), 177-178 (opinion of WHITE, J.), 210-211 (opinion of MARSHALL, J., joined by Douglas and BRENNAN, JJ.). As MR. JUSTICE POWELL's opinion observed:

"The plurality opinion evidently reasons that the nature of appellee's interest in continued federal employment is necessarily defined and limited by the statutory procedures for discharge and that the constitutional guarantee of procedural due process accords to appellee no procedural protections against arbitrary or erroneous discharge other than those expressly provided in the statute. The plurality would thus conclude that the statute governing federal employment determines not only the nature of appellee's property interest, but also the extent of the procedural protections to which he may lay claim. It seems to me that this approach is incompatible with the principles laid down in [Board of Regents v.] Roth[, 408 U.S. 564 (1972)] and [Perry v. Sindermann[, 408 U.S. 593 (1972)]. Indeed, it would lead directly to the conclusion that whatever the nature of an individual's statutorily created property interest, deprivation of that interest could be accomplished without notice or a hearing at any time. This view misconceives the origin of the right to procedural due process. That right is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. As our cases have consistently recognized, the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms. Goldberg v. Kelly, 397 U.S. 254 (1970); Bell v. Burson. 402 U.S. 535 (1971); Board of Regents v. Roth, supra; Perry v. Sindermann, supra." Id., at 166-167.

445 U.S. 480, *492; 100 S. Ct. 1254, **1263; 63 L. Ed. 2d 552, ***564; 1980 U.S. LEXIS 31, ****22

The District Court, in its findings, was sensitive to these concerns:

"[The] fact of greater limitations on freedom of action at the Lincoln Regional Center, the fact that a transfer to the Lincoln Regional Center has some stigmatizing consequences, and the fact that additional mandatory behavior modification systems are used at the Lincoln Regional Center combine to make the transfer a 'major change in the conditions of *confinement*' amounting to a 'grievous loss' [****23] to the inmate." *Miller v. Vitek, 437 F.Supp., at 573*.

Were an ordinary citizen to be subjected involuntarily to these consequences, it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause. [*493] We conclude that *HN9*[↑] a convicted felon [***565] also is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital.

*LEdHN[11]*[↑]   [11]*LEdHN[12]*[↑]   [12]Undoubtedly, *HN10*[↑] a valid criminal conviction and prison sentence extinguish a [**1264] defendant's right to freedom from *confinement*. *Greenholtz v. Nebraska Penal Inmates, 442 U.S., at 7*. Such a conviction and sentence sufficiently extinguish a defendant's liberty "to empower the State to confine him in any of its prisons." *Meachum v. Fano, 427 U.S., at 224* (emphasis deleted). It is also true that changes in the conditions of *confinement* having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause "[as] long as the conditions or degree of *confinement* [****24] to which the prisoner is subjected is within the sentence imposed upon him." *Montanye v. Haymes, 427 U.S., at 242*.

*LEdHN[13]*[↑] [13]Appellants maintain that the transfer of a prisoner to a mental hospital is within the range of *confinement* justified by imposition of a prison sentence, at least after certification by a qualified person that a prisoner suffers from a mental disease or defect. We cannot agree. None of our decisions holds that conviction for a crime entitles a State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime. Our cases recognize as much and reflect an understanding that *HN11*[↑] *involuntary* commitment to a mental hospital is not within the range of conditions of *confinement* to which a prison sentence subjects an individual. *Baxstrom v. Herold, 383 U.S. 107 (1966)*; *Specht v. Patterson, 386 U.S. 605 (1967)*; *Humphrey v. Cady, 405 U.S. 504 (1972)*; [****25] *Jackson v. Indiana, 406 U.S. 715, 724-725 (1972)*. A criminal conviction and sentence of imprisonment extinguish an individual's [*494] right to freedom from *confinement* for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to *involuntary* psychiatric treatment without affording him additional due process protections.

In light of the findings made by the District Court, Jones' *involuntary* transfer to the Lincoln Regional Center pursuant to *§ 83-180*, for the purpose of psychiatric treatment, implicated a liberty interest protected by the Due Process Clause. Many of the restrictions on the prisoner's freedom of action at the Lincoln Regional Center by themselves might not constitute the deprivation of a liberty interest retained by a prisoner, see *Wolff v. McDonnell, 418 U.S., at 572, n. 19*; cf. *Baxter v. Palmigiano, 425 U.S. 308, 323 (1976)*. But here, *HN12*[↑] the stigmatizing consequences of a transfer to a mental hospital for *involuntary* psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment [****26] for mental illness, constitute the [***566] kind of deprivations of liberty that requires procedural protections.

IV

The District Court held that to afford sufficient protection to the liberty interest it had identified, the State was required to observe the following minimum procedures before transferring a prisoner to a mental hospital:

"A. Written notice to the prisoner that a transfer to a mental hospital is being considered;

"B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;

"C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except [*495] upon a finding, not arbitrarily made, of good cause for

06/02/2020   13:02  Martin & Associates   (FAX)802 4795414   P.018/023
Case 2:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 16 of 125

Page 16 of 21
445 U.S. 480, *495; 100 S. Ct. 1254, **1264; 63 L. Ed. 2d 552, ***566; 1980 U.S. LEXIS 31, ****26

not permitting such presentation, confrontation, or cross-examination;

" [**1265] D. An independent decisionmaker;

"E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

"F. Availability of legal counsel, furnished [****27] by the state, if the inmate is financially unable to furnish his own; and

"G. Effective and timely notice of all the foregoing rights." 437 F.Supp., at 575.

A

*LEdHN[2B]*[⬆] [2B]We think the District Court properly identified and weighed the relevant factors in arriving at its judgment. Concededly *HN13*[⬆] the interest of the State in segregating and treating mentally ill patients is strong. The interest of the prisoner in not being arbitrarily classified as mentally ill and subjected to unwelcome treatment is also powerful, however; and as the District Court found, the risk of error in making the determinations required by § 83-180 is substantial enough to warrant appropriate procedural safeguards against error.

*LEdHN[14]*[⬆] [14]We recognize that the inquiry involved in determining whether or not to transfer an inmate to a mental hospital for treatment involves a question that is essentially medical. *HN14*[⬆] The question whether an individual is mentally ill and cannot be treated in prison "turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington v. Texas, 441 U.S., at 429.*The medical nature of the inquiry, however, does not justify [****28] dispensing with due process requirements. It is precisely "[the] subtleties and nuances of psychiatric diagnoses" that justify the requirement of adversary hearings. *Id., at 430.*

Because prisoners facing *involuntary* transfer to a mental hospital are threatened with immediate deprivation of liberty [*496] interests they are [***567] currently enjoying and because of the inherent risk of a mistaken transfer, the District Court properly determined that procedures similar to those required by the Court in *Morrissey v. Brewer, 408 U.S. 471 (1972),* were appropriate in the circumstances present here.

The notice requirement imposed by the District Court no more than recognizes that *HN15*[⬆] notice is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him. *Wolff v. McDonnell, supra, at 564.* Furthermore, in view of the nature of the determinations that must accompany the transfer to a mental hospital, we think each of the elements of the hearing specified by the District Court are appropriate. The interests of the State in avoiding disruption [****29] was recognized by limiting in appropriate circumstances the prisoner's right to call witnesses, to confront and cross examine. The District Court also avoided unnecessary intrusion into either medical or correctional judgments by providing that the independent decisionmaker conducting the transfer hearing need not come from outside the prison or hospital administration. *437 F.Supp., at 574.*

B *

*LEdHN[3B]*[⬆] [3B]The District Court did go beyond the requirements imposed by prior cases by holding that counsel must be made available to inmates facing transfer hearings if they are financially unable to furnish their own. We have not required the automatic appointment of counsel for indigent prisoners facing other deprivations of liberty, *Gagnon v. Scarpelli, 411 U.S., at 790;* [**1266] *Wolff v. McDonnell, supra, at 569-570;* but we have recognized that *HN16*[⬆] prisoners who are illiterate [****30] and uneducated have a greater need for assistance in exercising their rights. *Gagnon v. Scarpelli, supra, at 786-787;Wolff v. McDonnell, supra, at 570.* A prisoner thought to be suffering from a [*497] mental disease or defect requiring *involuntary* treatment probably has an even greater need for legal assistance, for such a prisoner is more likely to be unable to understand or exercise his rights. In these circumstances, it is appropriate that counsel be provided to indigent prisoners whom the State seeks to treat as mentally ill.

V

Because MR. JUSTICE POWELL, while believing that Jones was entitled to competent help at the hearing, would not require the State to furnish a licensed

---

* This part is joined only by MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS.

445 U.S. 480, *497; 100 S. Ct. 1254, **1266; 63 L. Ed. 2d 552, ***567; 1980 U.S. LEXIS 31, ****30

attorney to aid him, the judgment below is affirmed as modified to conform with the separate opinion filed by MR. JUSTICE POWELL.

*So ordered.*

**Concur by: POWELL (In Part)**

# Concur

[***568] MR. JUSTICE **POWELL**, concurring in part.

*LEdHN[3C]*[⊞] [3C]I join the opinion of the Court except for Part IV-B. I agree with Part IV-B insofar as the Court holds that qualified and independent assistance must be provided to an inmate who is threatened with *involuntary* transfer to a state mental [****31] hospital. I do not agree, however, that the requirement of independent assistance demands that a licensed attorney be provided. [1]

[****32] [*498] I

In *Gagnon v. Scarpelli, 411 U.S. 778 (1973)*, my opinion for the Court held that counsel is not necessarily required at a probation revocation hearing. In reaching this decision the Court recognized both the effects of providing counsel to each probationer and the likely benefits to be derived from the assistance of counsel. "The introduction of counsel into a revocation

[1] I also agree with the Court's holding that this case is not moot. The question is whether appellee faces a substantial threat that he will again be transferred to a state mental hospital. See *Doran v. Salem Inn, Inc., 422 U.S. 922, 930-932 (1975)*; *Steffel v. Thompson, 415 U.S. 452, 458-460 (1974)*; *Doe v. Bolton, 410 U.S. 179, 188 (1973)*. He was involuntarily transferred from the prison complex to a mental institution, and thereafter paroled upon condition that he continue to receive psychiatric treatment. When he violated parole, he was returned to prison. The State advises us that appellee's "history of mental illness indicates a serious threat to his own safety, as well as to that of others," and "there is a very real expectation" of transfer if the District Court injunction were removed. App. to Juris. Statement 24. The District Court concluded that appellee is under threat of transfer. In these circumstances it is clear that a live controversy remains in which appellee has a personal stake. See *Seatrain Shipbuilding Corp.* v. *Shell Oil Co., 444 U.S. 572, 581-583 (1980)*.

proceeding [would] alter significantly the nature of the proceeding," *id., at 787*, because the hearing would inevitably become more adversary. We noted that probationers would not always need counsel because in most hearings the essential facts are undisputed. In lieu of a *per se* rule we held that the necessity of providing counsel should be determined on a case-by-case basis. In particular, we stressed that factors governing the decision to provide counsel include (i) the existence of factual disputes or issues which are "complex or otherwise difficult to develop or present," and (ii) "whether the probationer appears to be capable of speaking effectively for himself." *Id., at 790, 791*.

Consideration of these factors, and particularly [****33] the capability of the inmate, persuades me that the Court is correct that independent assistance must be provided to an inmate before he may be transferred involuntarily to a mental hospital. The essence of the issue in an *involuntary* commitment proceeding will be the mental health of the inmate. The resolution of factual disputes will be less important than the ability to understand and analyze expert psychiatric testimony that is often expressed in language relatively incomprehensible to laymen. It is unlikely that an inmate threatened with *involuntary* transfer [**1267] to mental hospitals will possess the competence [***569] or training to protect adequately his own interest in these state-initiated proceedings. And the circumstances of being imprisoned without normal access to others who may assist him places an additional handicap upon an inmate's ability to represent himself. I therefore agree [*499] that due process requires the provision of assistance to an inmate threatened with *involuntary* transfer to a mental hospital.

II

I do not believe, however, that an inmate must always be supplied with a licensed attorney. "[Due] Process is flexible and calls for such [****34] procedural protections as the particular situation demands." *Morrissey v. Brewer, 408 U.S. 471, 481 (1972)*. See *Mathews v. Eldridge, 424 U.S. 319, 334-335 (1976)*. Our decisions defining the necessary qualifications for an impartial decisionmaker demonstrate that the requirements of due process turn on the nature of the determination which must be made. "Due Process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer." *Parham v. J.R., 442 U.S. 584, 607 (1979)*. In that case, we held that due process is

satisfied when a staff physician determines whether a child may be voluntarily committed to a state mental institution by his parents. That holding was based upon recognition that the issues of civil commitment "are essentially medical in nature," and that "'neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments.'" *Id., at 607, 609*, quoting *In re Roger S., 19 Cal. 3d 921, 942, 569 P. 2d 1286, 1299 (1977)* (Clark, [****35] J., dissenting). See also *Morrissey v. Brewer, supra, at 489*; *Goldberg v. Kelly, 397 U.S. 254, 271 (1970)*.

In my view, the principle that due process does not always require a law-trained decisionmaker supports the ancillary conclusion that due process may be satisfied by the provision of a qualified and independent adviser who is not a lawyer. As in *Parham v. J. R.*, the issue here is essentially medical. Under state law, a prisoner may be transferred only if he "suffers from a mental disease or defect" and "cannot be given proper treatment" in the prison complex. *Neb. Rev. [*500] Stat. § 83-180 (1)* (1976). The opinion of the Court allows a nonlawyer to act as the impartial decisionmaker in the transfer proceeding. *Ante*, at 496. [2]

[****36] The essence of procedural due process is a fair hearing. I do not think that the fairness of an informal hearing designed to determine a medical issue requires participation by lawyers. Due process merely requires that the State provide an inmate with qualified and independent assistance. Such assistance may be provided by a licensed psychiatrist or other mental health professional. Indeed, in view of the nature of the issue involved in the transfer hearing, a person possessing such professional [***570] qualifications normally would be preferred. As the Court notes, "[the] question whether an individual is mentally ill and cannot be treated in prison 'turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.'" *Ante*, at 495, quoting *Addington v. Texas, 441 U.S. 418, 429 (1979)*. I would not exclude, however, the possibility that the required assistance may be rendered by competent laymen in some cases. The essential requirements are that the person provided by the State be competent and independent, and that he be free to act solely in the inmate's best interest.

[***1268] In sum, although the State [****37] is free to appoint a licensed attorney to represent an inmate, it is not constitutionally required to do so. Due process will be satisfied so long as an inmate facing *involuntary* transfer to a mental hospital is provided qualified and independent assistance.

**Dissent by: STEWART; BLACKMUN**

# Dissent

MR. JUSTICE **STEWART**, with whom THE CHIEF JUSTICE and MR. JUSTICE **REHNQUIST** join, dissenting.

It seems clear to me that this case is now moot. Accordingly, I would vacate the judgment and remand the case to [*501] the District Court with directions to dismiss the complaint. *United States v. Munsingwear, Inc., 340 U.S. 36*.

As the Court points out, this is not a class action, and the appellee is now incarcerated in the Nebraska Penal and Correctional Complex with an anticipated release date in March 1982. See *ante*, at 485-487, and n. 3. In that status, the appellee is simply one of thousands of Nebraska prisoners, with no more standing than any other to attack the constitutionality of *Neb. Rev. Stat. § 83-180 (1)* (1976) on the sole basis of the mere possibility that someday that statute might be invoked to transfer him to another institution.

Although the appellee was once transferred [****38] in accord with *§ 83-180 (1)*, there is no demonstrated probability that that will ever happen again. *Weinstein v. Bradford, 423 U.S. 147*. And this case is not one that by its nature falls within the ambit of the "capable of repetition, yet evading review" exception to established principles of mootness. See *Southern Pacific Terminal Co. v. ICC, 219 U.S. 498*; *Super Tire Engineering Co. v. McCorkle, 416 U.S. 115*. If the appellee should again be threatened with transfer under the allegedly infirm statute, there will be ample time to reach the merits of his claim.

"To adjudicate a cause which no longer exists is a proceeding which this Court uniformly has declined to entertain.' *Brownlow v. Schwartz, 261 U.S. 216, 217-218*." *Oil Workers v. Missouri, 316 U.S. 363, 371*.

---

[2] The District Court specifically held that "a judicial officer is not required, and the decisionmaker need not be from outside the prison or hospital administration." *Miller v. Vitek, 437 F.Supp. 569, 574 (Neb. 1977)* (three-judge court).

445 U.S. 480, *501; 100 S. Ct. 1254, **1268; 63 L. Ed. 2d 552, ***570; 1980 U.S. LEXIS 31, ****38

MR. JUSTICE BLACKMUN, dissenting.

I agree with MR. JUSTICE STEWART that this case is not properly before us. I write separately to express my own reasons for reaching that conclusion.

The claimed harm that gave birth to this lawsuit was the alleged deprivation of liberty attending appellee's transfer [****39] to the Lincoln Regional Center. It is clear to me that that asserted injury disappeared, at the [***571] latest, when appellee was [*502] granted parole. [1] Cf. _Preiser v. Newkirk, 422 U.S. 395 [**1269] (1975)_. So did any immediate threat that that injury would be suffered again. Appellee has been returned to custody, however, and the [*503] parties agree that his reincarceration, coupled with his history of mental problems, has brought the controversy back to life.

[****40] Given these facts, the issue is not so much one of mootness as one of ripeness. At most, although I think otherwise, it is a case presenting a "mixed question" of ripeness and mootness, hinging on the possibility that the challenged procedures will be applied again to appellee. This Court has confronted mixed questions of this kind in cases presenting issues "capable of repetition, yet evading review," see, e. g., _Nebraska Press Assn._ v. _Stuart, 427 U.S. 539 (1976)_, and _Sosna v. Iowa, 419 U.S. 393 (1975)_, and in cases concerning the cessation of challenged conduct during the pendency of litigation, see, e. g., _Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43 (1944)_. In those contexts, the Court has lowered the [***572] ripeness threshold so as to preclude manipulation by the parties or the mere passage of time from frustrating judicial review. MR. JUSTICE STEWART correctly observes, and the Court apparently concedes, however, that the "capable of repetition" doctrine does not apply here. Neither does the liberal rule applied in "voluntary cessation" cases, since the current state of affairs is in no [****41] way the product of the appellants' voluntary discontinuation of their challenged conduct. [2] Certainly it is not the result of any effort on the part of the appellants to avoid review by this Court. Thus, since these mixed mootness/ripeness rules are inapplicable, this case presents for me nothing more than a plain, old-fashioned question of ripeness. [3]

---

[1] The Court does not appear to share this view. It states that, even while at the Veterans' Administration Hospital, appellee Jones "insisted that he was receiving treatment for mental illness against his will." _Ante_, at 486. It adds that appellee was "paroled, but only on condition that he accept psychiatric treatment." _Ibid_. The Court does not identify the precise import of these facts, but a fair inference is that they are meant to suggest that this case — even during the time of appellee's parole — might properly have been pursued on the theory that the appellee was continuing to feel the effects of the alleged deprivation of constitutional rights in receiving in-patient care at the Veterans' Administration Hospital.

I cannot accept this suggestion. First, its premise appears to be faulty. The District Court did not find, and it does not appear clearly in the record, that the parole board's offer or appellee's acceptance of parole was in any way related to his prior transfer to the Lincoln Regional Center. Appellee chose to accept conditional parole. Moreover, at the time appellee elected to go on parole, he was being housed at the penal complex, not at the Lincoln Regional Center. Thus, it is not surprising that the District Court based its finding of nonmootness solely on its conclusion that appellee — notwithstanding his conditioned release — was "under threat of being transferred to the state mental hospital under _§ 83-180_." App. to Juris. Statement 24. Second, the "continuing injury" theory seems to me to be incorrect as a matter of law. Appellee did not seek or evince any interest in seeking release from the Veterans' Administration Hospital, and a declaration that his initial transfer had been illegal would have neither justified nor predictably led to appellee's removal from that facility. In other words, after accepting the conditional grant of parole, appellee could no longer show, as required by the case-or-controversy requirement, "that he personally would benefit in a tangible way from the court's intervention." _Warth v. Seldin, 422 U.S. 490, 508 (1975)_.

The Court also finds some support for its holding in the fact that vacating the District Court's order would remove the declaration that the challenged procedures "afforded an inadequate basis for declaring Jones to be mentally ill." _Ante_,

at 487. If the Court, by this statement, means to imply that appellee's suit is somehow mootness-proof due to the continuing stigma resulting from the transfer to the mental hospital, I cannot accept that sweeping proposition. The Court has never suggested that the "collateral consequences" doctrine of _Sibron v. New York, 392 U.S. 40 (1968)_, which saves an action challenging the validity of a conviction after a prisoner has served his sentence, also saves a challenge to a commitment by a patient who has been released from a mental hospital. Nor does the logic of _Sibron_ — focusing on tangible and remediable collateral consequences, such as use of a prior conviction to enhance a sentence for a later crime, or to impeach credibility if one appears as a witness — comfortably extend to the claim of a former mental patient. See _id., at 55_ (referring to "adverse collateral legal consequences").

[2] The decisions to award and revoke parole were made by the Nebraska Parole Board, not by appellants.

[3] It is not clear whether the Court views this as a "voluntary

06/02/2020    12:03  Martin & Associates                    (FAX)8024795414                P.022/023
Case 1:20-cv-11266-WGY    Document 1-2    Filed 07/02/20    Page 20 of 125

Page 20 of 21

445 U.S. 480, *503; 100 S. Ct. 1254, **1269; 63 L. Ed. 2d 552, ***572; 1980 U.S. LEXIS 31, ****41

[****42] [*504]    The Court's cases lay down no mechanistic test for determining whether a dispute [**1270] is ripe for adjudication. But past formulations are uniformly more rigorous than the one the Court now applies. The Court has observed that "[past] exposure to illegal conduct does not in itself show a present case or controversy," *O'Shea v. Littleton, 414 U.S. 488, 495 (1974),* and that "general assertions or inferences" that illegal conduct will recur do not render a case ripe. *Id., at 497.* "A hypothetical threat is not enough." *Public Workers v. Mitchell, 330 U.S. 75, 90 (1947).* There must be "actual present or immediately threatened injury resulting from unlawful governmental action." *Laird v. Tatum, 408 U.S. 1, 15 (1972).* See *Linda R. S.* v. *Richard D., 410 U.S. 614, 617 (1973)* (requiring "some threatened or actual injury"); *Massachusetts v. Mellon, 262 U.S. 447, 488 (1923)* (requiring that the litigant "has sustained or is immediately in danger of sustaining some direct injury"). A "substantial controversy, between parties having adverse [****43] legal interests, of sufficient immediacy and reality" is required. *Golden v. Zwickler, 394 U.S. 103, 108 (1969),* quoting *Maryland Casualty Co.* v. *Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941).*

[*505]    Applying these principles, I have [***573] difficulty in perceiving an existing "case or controversy" here. Since our remand, the state officials have indicated nothing more than that they have a general right to apply their statute, and to apply it to appellee if necessary. [4] They have not expressed a present intent

or desire to transfer appellee to a mental facility pursuant to the challenged provisions. Nor have they suggested that they may transfer appellee to the Lincoln Regional Center now on the basis of the diagnosis made five years ago. And they have not suggested that they would subject appellee immediately to a "fresh" psychiatric evaluation if the District Court's injunction were lifted. The appellee has represented that he "does not reside in the psychiatric unit of the Nebraska Penal and Correctional Complex, nor is he receiving or accepting psychiatric treatment." Brief for Appellee 11-12. The brief containing [****44] that statement was filed some six months ago and some nine months after the revocation of appellee's parole.

In sum, for all that appears, appellee has been assimilated once again into the general prison population, and appellants, at least at this time, are content to leave him where he is. [5] Given these facts, determining whether prison officials within two years again will seek to send appellee to a mental institution [*506] "takes us into the area of speculation and conjecture." *O'Shea v. Littleton, 414 U.S., at 497.* [****45] Cf. *Longshoremen v. Boyd, 347 U.S. 222 (1954).*

It is for these reasons that I would vacate the judgment of the District Court and remand the case to that court with directions to dismiss the complaint.

## References

5 Am Jur 2d, Appeal and Error 761-763; 32 Am Jur 2d,

---

[4] Appellants, to be sure, have announced their intention to continue to use the challenged procedures. That fact, however, is of small, if any, significance, for it is hardly surprising to hear state officials say that they plan to abide by the State's own laws. See *Public Workers v. Mitchell, 330 U.S. 75, 91 (1947)* ("the existence of the law and the regulations" does not alone render a suit ripe). Cf. *Poe v. Ullman, 367 U.S. 497 (1961)* (desuetude statute).

[5] I do not go so far as MR. JUSTICE STEWART does when he says that appellee is "simply one of thousands of Nebraska prisoners." *Ante,* at 501. For purposes of the "case or controversy" requirement, appellee differs from his fellow inmates in two relevant respects: he has a recent history of perceived psychiatric problems, and in fact he was previously transferred pursuant to the challenged statutes. Cf. *O'Shea v. Littleton, 414 U.S., at 496* ("Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury").

---

cessation" case. It nowhere expressly relies on the doctrine and does not explain what factors might justify characterizing appellee's present situation as the result of voluntary cessation of illegal conduct by appellants. On the other hand, each of the three decisions cited by the Court to support its application of a "creampuff" ripeness standard, *County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979); United States v. Phosphate Export Assn., 393 U.S. 199, 203 (1968); United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953),* pivoted on the presence of "voluntary cessation." It is therefore unclear whether the Court deems this a "voluntary cessation" case (without explaining why) or deems the "no reasonable expectation of recurrence" standard -- to date a litmus carefully confined by a policy-tailored and principled "voluntary cessation" rule -- applicable to an amorphous cluster of facts having nothing to do with parties' artful dodging of well-founded litigation. In either event, the Court's analysis invites the criticism, increasingly voiced, that this Court's decisions on threshold issues "are concealed decisions on the merits of the underlying constitutional claim." Tushnet, The New Law of Standing: A Plea for Abandonment, 62 Cornell L. Rev. 663 (1977).

06/02/2020  12:04 Martin & Associates  Case 1:20-cv-11266-WGY  Document 1-2  Filed 07/02/20  Page 21 of 125  (FAX)8024795414  P.023/023

Page 21 of 21

445 U.S. 480, *506; 100 S. Ct. 1254, **1270; 63 L. Ed. 2d 552, ***573; 1980 U.S. LEXIS 31, ****45

Federal Practice and Procedure 302; 60 Am Jur 2d,
Penal and Correctional Institutions 52


22 Am Jur Trials 1, Prisoners Rights Litigation


USCS, [****46] *Constitution, 14th Amendment*


US L Ed Digest, Appeal and Error 1662; Constitutional
Law 528.5, 848


L Ed Index to Annos, Due Process of Law; Moot
Questions; Prisons and Prisoners


ALR Quick Index, Due Process of Law; Moot Case;
Prisons and Convicts


Federal Quick Index, Due Process of Law; Moot and
Abstract Questions; Prisons and Prisoners


   Annotation References:


Supreme Court's views as to concept of "liberty" under
*due process clauses of Fifth* and *Fourteenth
Amendment*. *47 L Ed 2d 975*.


What circumstances render civil case, or issues arising
therein, moot so as to preclude Supreme Court's
consideration of their merits. *44 L Ed 2d 745*.

---

End of Document

Caution
As of: June 7, 2020 8:29 PM Z

# *Riggins v. Nevada*

Supreme Court of the United States

January 15, 1992, Argued ; May 18, 1992, Decided

No. 90-8466

**Reporter**
504 U.S. 127 *; 112 S. Ct. 1810 **; 118 L. Ed. 2d 479 ***; 1992 U.S. LEXIS 2701 ****; 60 U.S.L.W. 4374; 92 Cal. Daily Op.
Service 4236; 92 Daily Journal DAR 6670; 6 Fla. L. Weekly Fed. S 237

DAVID RIGGINS, PETITIONER v. NEVADA

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEVADA.

**Disposition:** *107 Nev. 178, 808 P. 2d 535,* reversed and remanded.

## Core Terms

*medication*, drugs, antipsychotic, side effect, demeanor, fair trial, Psychiatric, incompetent, appearance, unwanted, courts, liberty interest, *involuntary*, trial court, deprived, antipsychotic *medication*, psychiatrist, reversal, rights, proceedings, detainees, patient, cases, *involuntary medication*, due process, milligrams, avoiding, sentence, inmate, dose

## Case Summary

### Procedural Posture
Defendant sought certiorari review of the judgment of the Supreme Court of Nevada, which affirmed his murder and robbery convictions although defendant was involuntarily under the influence of an antipsychotic drug during trial.

### Overview
Following arrest, defendant was placed on an antipsychotic drug. Defendant was found competent to stand trial, although one psychiatrist testified that he was not competent. Defendant filed a motion to be taken off the drug until after trial, and the trial court denied the motion without explaining its rationale. Defendant was convicted of murder and robbery, and the state supreme court affirmed his convictions. The U.S. Supreme Court reversed, holding that once defendant filed a motion to terminate administration of antipsychotic *medication*, the State became obligated to establish the need for the drug and the medical appropriateness of the drug. The Court found that the trial court erred by allowing administration of the drug to continue without making any determination of the need for this course or any findings about reasonable alternatives. The Court also found that it was possible that the side effects had an impact upon defendant's outward appearance, the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel. Thus, defendant's *U.S. Const. amends. VI* and *XIV* rights were violated.

### Outcome
The Court reversed defendant's convictions and remanded as the Nevada courts failed to make sufficient findings to support forced administration of an antipsychotic drug during defendant's trial.

504 U.S. 127, *127; 112 S. Ct. 1810, **1810; 118 L. Ed. 2d 479, ***479; 1992 U.S. LEXIS 2701, ****1

Proceedings > Imprisonment

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Due Process

## LexisNexis® Headnotes

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > Substantive Due Process > Scope

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

*HN1*[⤓] **Prisoner Rights, Medical Treatment**

A prisoner's interest in avoiding *involuntary* administration of antipsychotic drugs is protected under the *Fourteenth Amendment's Due Process Clause*. The forcible injection of *medication* into a nonconsenting person's body represents a substantial interference with that person's liberty.

Constitutional Law > Substantive Due Process > Scope

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Public Health & Welfare Law > Healthcare > Mental Health Services > Treatment

*HN2*[⤓] **Constitutional Law, Substantive Due Process**

Due process allows a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.

Constitutional Law > Substantive Due Process > Scope

Criminal Law & Procedure > Postconviction

*HN3*[⤓] **Constitutional Law, Substantive Due Process**

Forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The *Fourteenth Amendment* affords at least as much protection to persons the State detains for trial.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Criminal Law & Procedure > Trials > Prison Attire & Restraints

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Due Process

*HN4*[⤓] **Prisoner Rights, Medical Treatment**

Like the consequences of compelling a defendant to wear prison clothing, or of binding and gagging an accused during trial, the precise consequences of forcing antipsychotic *medication* upon a defendant during trial cannot be shown from a trial transcript.

## Lawyers' Edition Display

### Decision

Nevada court's judgment upholding conviction reversed and remanded, where defendant claimed that forced administration of antipsychotic drug during trial violated rights under *Sixth* and *Fourteenth Amendments*.

### Summary

After being taken into custody on a homicide charge, a defendant complained to a psychiatrist about hearing voices in his head and having trouble sleeping. The psychiatrist prescribed an antipsychotic drug, with which the defendant had been successfully treated in the past, and an antiepileptic drug. Following a determination by

504 U.S. 127, *127; 112 S. Ct. 1810, **1810; 118 L. Ed. 2d 479, ***479; 1992 U.S. LEXIS 2701, ****1

the District Court of Clark County, Nevada, that the defendant was competent to stand trial, the defense moved for an order suspending administration of both drugs until the end of the defendant's trial, on the grounds that (1) continued administration of these drugs infringed on his freedom; (2) the effect on his demeanor and mental state during trial would deny him due process; and (3) because he intended to offer an insanity defense at trial, he had a right to show jurors his true mental state. The District Court held an evidentiary hearing at which one psychiatrist testified that taking the defendant off the *medication* would not render him incompetent to stand trial or noticeably alter his behavior; another psychiatrist concurred as to competence and stated that the effects of the antipsychotic drug would not be noticeable to jurors if *medication* continued; a third psychiatrist expressed the view that the antipsychotic drug made the defendant calmer and more relaxed, that an excessive dose would cause drowsiness, and that the defendant's behavior if taken off the drug was unpredictable; and a fourth psychiatrist maintained that the defendant was incompetent to stand trial, and would likely regress into manifest psychosis and become very difficult to manage if taken off the antipsychotic drug. The District Court denied the motion to terminate *medication* in a one-page order which gave no indication of the court's rationale. At the close of a trial in which the defendant presented expert testimony about the effect of the antipsychotic drug on his demeanor, the jury found the defendant guilty of murder and robbery and sentenced him to death. In affirming the conviction and sentence, the Supreme Court of Nevada held that (1) the expert testimony at trial was sufficient to inform the jury of the effects of the antipsychotic drug on the defendant's demeanor and testimony; and (2) thus, while the defendant's demeanor was relevant to his insanity defense, the denial of his motion to terminate *medication* was neither an abuse of discretion nor a violation of the defendant's trial rights (*808 P2d 535*).

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by O'Connor, J., joined by Rehnquist, Ch. J., and White, Blackmun, Stevens, and Souter, JJ., it was held that reversal was required because the state courts had failed to make findings sufficient to justify the forced administration of the drug to the defendant during his trial--given that the trial court had made no determination concerning the need for the drug or its medical appropriateness and had made no findings about reasonable alternatives--and this error may have violated the defendant's rights under the *Federal Constitution's Sixth* and *Fourteenth*

*Amendments*, including his right to a full and fair trial and his due process liberty interest in freedom from unwanted antipsychotic drugs, since (1) it was possible that potential drug side effects testified to by experts at the hearing on the defendant's motion impacted not only his outward appearance, but also the content of his testimony on direct or cross-examination, his ability to follow the proceedings, or the substance of his communication with counsel; (2) efforts to prove or disprove actual prejudice from the record before the Supreme Court would be futile, and guesses whether the outcome of the trial might have been different if the motion had been granted would be purely speculative; (3) even though the defendant was allowed at trial to present expert testimony about the effect of the drug on his demeanor, an unacceptable risk of trial prejudice remained; and (4) as the record contained no finding that might support a conclusion that administration of antipsychotic *medication* was necessary to accomplish an essential state policy, there was no basis for saying that the substantial probability of trial prejudice in the case at hand was justified.

Kennedy, J., concurred in the judgment, expressing the view that (1) absent an extraordinary showing by the state, the due process clause prohibits prosecuting officials from administering *involuntary* doses of antipsychotic medicines for purposes of rendering an accused competent for trial in most cases; and (2) it is doubtful that such a showing can be made given the present understanding of the properties of these drugs.

Thomas, J., joined in part (except as to point 3 below) by Scalia, J., dissented, expressing the view that (1) the defendant's inability to introduce evidence of his mental condition by appearing at trial in an unmedicated state did not render his trial fundamentally unfair; (2) it could not be concluded that the defendant had had less than a full and fair trial merely because of the possibility that the antipsychotic drug had side effects, where the defendant had no claim of legal incompetence and had failed to allege specific facts to support a claim that he could not participate effectively in his defense; (3) the defendant could not complain about a deprivation of his liberty interest in avoiding unwanted *medication*, because (a) the record contained no finding of fact with respect to his claim that the *medication* was *involuntary*, (b) he did not raise this claim below, and (c) the Supreme Court had granted certiorari to determine whether forced *medication* during trial violated the right to a full and fair trial, not whether the state courts had made the necessary findings to support forced *medication*; and (4) the precedent establishing

such a liberty interest involved a civil action for damages and injunctive relief, and ought not to be expanded to include the remedy of reversing a criminal conviction.

# Headnotes

APPEAL §1677 > CONSTITUTIONAL LAW §854 > CRIMINAL LAW §46 > due process -- fair trial -- forced *medication* of defendant -- reversal -- remand -- insufficient findings -- > Headnote:
*LEdHN[1A][⬇]* [1A]*LEdHN[1B][⬇]* [1B]*LEdHN[1C][⬇]* [1C]*LEdHN[1D][⬇]* [1D]

The United States Supreme Court will reverse and remand a judgment by a state's highest court upholding a homicide defendant's conviction and death sentence-- where an antipsychotic drug, with which the defendant previously had been treated successfully, was prescribed for the defendant during pretrial detention after he complained of hearing voices in his head and having sleep problems, but the defendant unsuccessfully moved the state trial court to terminate administration of the drug during trial so that it would not affect his demeanor and mental state at the trial, in which he intended to present an insanity defense-- because the state courts failed to make findings sufficient to justify the forced administration of the drug to the defendant during trial, given that the trial court made no determination concerning the need for the drug or its medical appropriateness and made no findings about reasonable alternatives, and this error may have violated the defendant's rights under the *Federal Constitution's Sixth* and *Fourteenth Amendments*, including his right to a full and fair trial and his due process liberty interest in freedom from unwanted antipsychotic drugs, since (1) it is possible that potential drug side effects testified to by experts at a hearing on the defendant's motion--which side effects included making the defendant "uptight," drowsy, or confused-- impacted not only his outward appearance, but also the content of his testimony on direct or cross-examination, his ability to follow the proceedings, or the substance of his communication with counsel; (2) efforts to prove or disprove actual prejudice from the record before the Supreme Court would be futile, and guesses whether the outcome of the trial might have been different if the motion had been granted would be purely speculative; (3) the fact that the defendant was allowed at trial to present expert testimony about the effect of the drug on his demeanor does nothing to cure the possibility that

the substance of his testimony, his interaction with counsel, or his comprehension at trial were compromised by forced administration of the drug, and an unacceptable risk of trial prejudice remains; and (4) as the record contains no finding that might support a conclusion that administration of antipsychotic *medication* was necessary to accomplish an essential state policy, there is no basis for saying that the substantial probability of trial prejudice in the case at hand was justified. (Thomas and Scalia, JJ., dissented from this holding.)

APPEAL §806.5.> criminal case -- findings by state court -- Supreme Court review -- > Headnote:
*LEdHN[2][⬇]* [2]

The United States Supreme Court, in reviewing on certiorari a decision by a state's highest court that the state did not violate the rights of a homicide defendant by forcing him to take an antipsychotic drug during trial, will adhere to the state court's understanding that the *medication* was *involuntary* and forced, given (1) the parties' position that once the state trial court denied the defendant's motion to terminate the *medication*, subsequent administration of the drug was *involuntary*, and (2) the absence of any record evidence to the contrary. (Thomas, J., dissented from this holding.)

APPEAL §1289 > presumption -- *medication* -- > Headnote:
*LEdHN[3][⬇]* [3]

The United States Supreme Court, in reviewing on certiorari a decision by a state's highest court that the state did not violate the rights of a homicide defendant by forcing him to take an antipsychotic drug during trial, will presume that administration of the drug was medically appropriate, where, although defense counsel stressed that the defendant had received a very high dose of the drug, at no point did counsel suggest to the state courts that administration of the drug was medically improper treatment for his client.

APPEAL §431 > failure to raise issue -- in state's highest court -- in petition for certiorari -- > Headnote:

06/08/2020  12:08 Martin & Associates  Case 1:20-cv-11266-WGY  Document 1-2  Filed 07/02/20  (FAX)8024795414  Page 26 of 125  P.007/021

Page 5 of 19

504 U.S. 127, *127; 112 S. Ct. 1810, **1810; 118 L. Ed. 2d 479, ***479; 1992 U.S. LEXIS 2701, ****1

*LEdHN[4][↓] [4]*

The United States Supreme Court, in reviewing on certiorari a decision by a state's highest court that the state did not violate the rights of a homicide defendant by forcing him to take an antipsychotic drug during trial, will not address the defendant's claim under the *Federal Constitution's Eighth Amendment* that administration of the drug denied him an opportunity to show jurors his true mental condition at his sentencing hearing, because that argument was presented neither to the state court nor in the defendant's petition for certiorari.

CONSTITUTIONAL LAW §853 > due process -- prisoner -- drug treatment -- > Headnote:
*LEdHN[5][↓] [5]*

Forcing antipsychotic drugs on a convicted state prisoner is impermissible, under the due process clause of the *Federal Constitution's Fourteenth Amendment*, absent a finding of overriding justification and a determination of medical appropriateness.

CONSTITUTIONAL LAW §854 > due process -- criminal defendant -- *involuntary* drug treatment -- > Headnote:
*LEdHN[6][↓] [6]*

Forcing antipsychotic drugs on persons the state detains for trial is impermissible, under the due process clause of the *Federal Constitution's Fourteenth Amendment*, absent a finding of overriding justification and a determination of medical appropriateness; thus, once a state homicide defendant--for whom an antipsychotic drug with which he previously had been treated successfully was prescribed during pretrial detention after he complained of hearing voices in his head and having sleep problems--moves to terminate administration of antipsychotic *medication* until the end of his trial so that it will not affect his demeanor and mental state at trial, the prosecution becomes obligated to establish the need for the drug and its medical appropriateness. (Thomas and Scalia, JJ., dissented in part from this holding.)

CONSTITUTIONAL LAW §854 > due process -- criminal defendant -- *involuntary* drug treatment -- > Headnote:
*LEdHN[7][↓] [7]*

A state can satisfy the due process clause of the *Federal Constitution's Fourteenth Amendment*, with regard to the denial of a homicide defendant's motion to terminate administration of antipsychotic *medication* until the end of the trial so that it will not affect the defendant's demeanor and mental state at trial, if the prosecution demonstrates, and the state trial court finds, that treatment with antipsychotic *medication* is medically appropriate and, considering less intrusive alternatives, essential for the sake of the defendant's safety or the safety of others.

CRIMINAL LAW §46 > rights of accused -- prejudice -- > Headnote:
*LEdHN[8][↓] [8]*

Prejudice during a criminal trial to the rights of a defendant can sometimes be justified by an essential state interest.

## Syllabus

When petitioner Riggins, while awaiting a Nevada trial on murder and robbery charges, complained of hearing voices and having sleep problems, a psychiatrist prescribed the antipsychotic drug Mellaril. After he was found competent to stand trial, Riggins made a motion to suspend the Mellaril's administration until after his trial, arguing that its use infringed upon his freedom, that its effect on his demeanor and mental state during trial would deny him due process, and that he had the right to show jurors his true mental state when he offered an insanity defense. After hearing the testimony of doctors who had examined Riggins, the trial court denied the motion with a one-page order giving no indication of its rationale. At Riggins' trial, he presented his insanity defense [****2] and testified, was convicted, and was sentenced to death. In affirming, the State Supreme Court held, *inter alia*, that expert testimony presented at trial was sufficient to inform the jury of the Mellaril's effect on Riggins' demeanor and testimony.

06/08/2020  12:08 Martin & Associates  Case 1:20-cv-11266-WGY  Document 1-2  Filed 07/02/20  (FAX)8024795414  Page 27 of 125  P.008/021

Page 6 of 19

504 U.S. 127, *127; 112 S. Ct. 1810, **1810; 118 L. Ed. 2d 479, ***479; 1992 U.S. LEXIS 2701, ****2

*Held:* The forced administration of antipsychotic **_medication_** during Riggins' trial violated rights guaranteed by the _Sixth_ and _Fourteenth Amendments._ Pp. 133-138.

(a) The record narrowly defines the issues in this case. Administration of Mellaril was **_involuntary_** once Riggins' motion to terminate its use was denied, but its administration was medically appropriate. In addition, Riggins' _Eighth Amendment_ argument that the drug's administration denied him the opportunity to show jurors his true mental condition at the sentencing hearing was not raised below or in the petition for certiorari and, thus, will not be considered by this Court. P. 133.

(b) A pretrial detainee has an interest in avoiding **_involuntary_** administration of antipsychotic drugs that is protected under the Due Process Clause. Cf. _Washington v. Harper, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028; Bell v. Wolfish, 441 U.S. 520, 545, 60 L. Ed. 2d 447, 99 S. Ct. 1861._ Once Riggins moved to terminate his treatment, **[****3]** the State became obligated to establish both the need for Mellaril and its medical appropriateness. Cf. _Harper, supra, at 227._ Due process certainly would have been satisfied had the State shown that the treatment was medically appropriate and, considering less intrusive alternatives, essential for Riggins' own safety or the safety of others. The State also might have been able to justify the treatment, if medically appropriate, by showing that an adjudication of guilt or innocence could not be obtained by using less intrusive means. However, the trial court allowed the drug's administration to continue without making *any* determination of the need for this course or *any* findings about reasonable alternatives, and it failed to acknowledge Riggins' liberty interest in freedom from antipsychotic drugs. Pp. 133-137.

(c) There is a strong possibility that the trial court's error impaired Riggins' constitutionally protected trial rights. Efforts to prove or disprove actual prejudice from the record before this Court would be futile, and guesses as to the trial's outcome had Riggins' motion been granted would be speculative. While the precise consequences of forcing Mellaril upon **[****4]** him cannot be shown from a trial transcript, the testimony of doctors who examined Riggins establishes the strong possibility that his defense was impaired. Mellaril's side effects may have impacted not only his outward appearance, but also his testimony's content, his ability to follow the proceedings, or the substance of his communication with counsel. Thus, even if the expert testimony presented at trial allowed jurors to assess Riggins'

demeanor fairly, an unacceptable risk remained that forced **_medication_** compromised his trial rights. Pp. 137-138.

(d) While trial prejudice can sometimes be justified by an essential state interest, the record here contains no finding to support a conclusion that administration of antipsychotic **_medication_** was necessary to accomplish an essential state policy. P. 138.

**Counsel:** Mace J. Yampolsky argued the cause for petitioner. With him on the briefs were Jay Topkis, Neal H. Klausner, and Steven C. Herzog.

James Tufteland argued the cause for respondent. With him on the brief was Rex Bell. [*]

**Judges:** O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, and SOUTER, JJ., joined. KENNEDY, J., filed an opinion concurring in the judgment, post, p. 138. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined except as to Part II-A, post, p. 146.

**Opinion by:** O'CONNOR

## Opinion

**[*129]**  **[***485]**  **[**1812]**  JUSTICE O'CONNOR delivered the opinion of **[****5]** the Court.

---

[*] Briefs of amici curiae urging reversal were filed for the Coalition for Fundamental Rights of Equality of Ex-patients by Peter Margulies, Herbert Semmel, and Patrick Reilly; for the National Association of Criminal Defense Lawyers by David M. Eldridge; and for Nevada Attorneys for Criminal Justice by Kevin M. Kelly.

Briefs of amici curiae were filed for the State of Louisiana et al. by William J. Guste, Jr., Attorney General of Louisiana, and M. Patricia Jones and Kathleen E. Petersen, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: Charles M. Oberly III of Delaware and Michael .E. Carpenter of Maine; and for the American Psychiatric Association by Richard G. Taranto and Joel I. Klein.

06/08/2020    12:08 Martin & Associates    Case 1:20-cv-11266-WGY    Document 1-2    Filed 07/02/20    (FAX)8024795414    Page 28 of 125    P.009/021

Page 7 of 19

504 U.S. 127, *129; 112 S. Ct. 1810, **1812; 118 L. Ed. 2d 479, ***485; 1992 U.S. LEXIS 2701, ****5

*LEdHN[1A]* [1A]Petitioner David Riggins challenges his murder and robbery convictions on the ground that the State of Nevada unconstitutionally forced an antipsychotic drug upon him during trial. Because the Nevada courts failed to make findings sufficient to support forced administration of the drug, we reverse.

I

During the early hours of November 20, 1987, Paul Wade was found dead in his Las Vegas apartment. An autopsy revealed that Wade died **[***486]** from multiple stab wounds, including wounds to the head, chest, and back. David Riggins was arrested for the killing 45 hours later.

A few days after being taken into custody, Riggins told Dr. R. Edward Quass, a private psychiatrist who treated patients at the Clark County Jail, about hearing voices in his head and having trouble sleeping. Riggins informed Dr. Quass that he had been successfully treated with Mellaril in the past. Mellaril is the trade name for thioridazine, an antipsychotic drug. After this consultation, Dr. Quass prescribed Mellaril at a level of 100 milligrams per day. Because Riggins continued to complain of voices and sleep problems in the following months, Dr. Quass gradually increased the Mellaril prescription to 800 milligrams **[****6]** per day. Riggins also received a prescription for Dilantin, an antiepileptic drug.

In January 1988, Riggins successfully moved for a determination of his competence to stand trial. App. 6. Three **[*130]** court-appointed psychiatrists performed examinations during February and March, while Riggins was taking 450 milligrams of Mellaril daily. Dr. William O'Gorman, a psychiatrist who had treated Riggins for anxiety in 1982, and Dr. Franklin Master concluded that Riggins was competent to stand trial. The third psychiatrist, Dr. Jack Jurasky, found that Riggins was incompetent. The Clark County District Court determined that Riggins was legally sane and competent to stand trial, *id.*, at 13, so preparations for trial went forward.

In early June, the defense moved the District Court for an order suspending administration of Mellaril and Dilantin until the end of Riggins' trial. *Id.*, at 20. Relying on both the *Fourteenth Amendment* and the Nevada Constitution, Riggins argued that continued administration of these drugs infringed upon his freedom and that the drugs' effect on his demeanor and mental state during trial would deny him due process. Riggins also asserted that, because he would offer **[****7]** an insanity defense at trial, he had a right to show jurors his "true mental state." *Id.*, at 22. In response, the State noted that Nevada law prohibits the trial of incompetent persons, see *Nev. Rev. Stat. § 178.400* (1989), and **[**1813]** argued that the court therefore had authority to compel Riggins to take *medication* necessary to ensure his competence. App. 31-32.

On July 14, 1988, the District Court held an evidentiary hearing on Riggins' motion. At the hearing, Dr. Master "guessed" that taking Riggins off *medication* would not noticeably alter his behavior or render him incompetent to stand trial. Record 412. Dr. Quass testified that, in his opinion, Riggins would be competent to stand trial even without the administration of Mellaril, but that the effects of Mellaril would not be noticeable to jurors if *medication* continued. *Id.*, at 443-445. Finally, Dr. O'Gorman told the court that Mellaril made the defendant calmer and more relaxed **[*131]** but that an excessive dose would cause drowsiness. *Id., at 464-466.* Dr. O'Gorman was unable to predict how Riggins might behave if taken off antipsychotic *medication*, yet he questioned the need to give Riggins the high dose he was receiving. *Id., [****8] at 474-476.* The court also had before it a written report in which Dr. Jurasky held to his earlier view that Riggins was incompetent to stand trial and predicted **[***487]** that if taken off Mellaril the defendant "would most likely regress to a manifest psychosis and become extremely difficult to manage." App. 19.

The District Court denied Riggins' motion to terminate *medication* with a one-page order that gave no indication of the court's rationale. *Id.*, at 49. Riggins continued to receive 800 milligrams of Mellaril each day through the completion of his trial the following November.

At trial, Riggins presented an insanity defense and testified on his own behalf. He indicated that on the night of Wade's death he used cocaine before going to Wade's apartment. Riggins admitted fighting with Wade, but claimed that Wade was trying to kill him and that voices in his head said that killing Wade would be justifiable homicide. A jury found Riggins guilty of murder with use of a deadly weapon and robbery with use of a deadly weapon. After a penalty hearing, the same jury set the murder sentence at death.

Riggins presented several claims to the Nevada Supreme Court, among them that forced administration **[****9]** of Mellaril denied him the ability to assist in his own defense and prejudicially affected his attitude,

06/08/2020  12:09 Martin & Associates  Document 1-2  Filed 07/02/20  Page 29 of 125
Case 1:20-cv-11266-WGY  (FAX)8024795414  P.010/021

Page 8 of 19

504 U.S. 127, *131; 112 S. Ct. 1810, **1813; 118 L. Ed. 2d 479, ***487; 1992 U.S. LEXIS 2701, ****9

appearance, and demeanor at trial. This prejudice was not justified, Riggins said in his opening brief, because the State neither demonstrated a need to administer Mellaril nor explored alternatives to giving him 800 milligrams of the drug each day. Record 1020. Riggins amplified this claim in his reply brief, objecting that the State intruded upon his constitutionally protected liberty [*132] interest in freedom from antipsychotic drugs without considering less intrusive options. Riggins argued:

> "In *United States v. Bryant, 670 F. Supp. 840, 843 (Minn. 1987)*[,] the court, in reference to medicating prisoners against their will, stated that 'courts have recognized a *protectable liberty interest* . . . in the freedom to avoid unwanted *medication* with such drugs.' The court in so stating cited *Bee v. Greaves, 744 F.2d 1387 (10th Cir. 1984)*[,] which addressed the issue of medicating pre-trial detainees and stated that 'less restrictive alternatives, such as segregation or the use of less controversial drugs like tranquilizers or sedatives, should be ruled out before resorting to [****10] antipsychotic drugs.' In the case at bar, no less restrictive alternatives were utilized, considered or even proposed." Record 1070-1071 (emphasis in original).

The Nevada Supreme Court affirmed Riggins' convictions and death sentence. *107 Nev. 178, 808 P.2d 535 (1991)*. With respect to administration of Mellaril, the court held that expert testimony presented at trial "was sufficient to inform the jury of the effect of the Mellaril on Riggins' demeanor and testimony." *Id., at 181, 808 P.2d at 538*. Thus, although Riggins' demeanor was relevant to his insanity defense, the court held that denial [**1814] of the defense's motion to terminate *medication* was neither an abuse of discretion nor a violation of Riggins' trial rights. In a concurring opinion, Justice Rose suggested that the District Court should have determined whether administration of Mellaril during trial was "absolutely necessary" by ordering a pretrial suspension of *medication*. *Id., at 185, 808 P.2d at 540* (concurring opinion). Justice Springer dissented, arguing that antipsychotic drugs may never [***488] be forced on a criminal defendant solely to allow prosecution. *Id., at 186, 808 P.2d at 541*.

[****11] We granted certiorari, *502 U.S. 807 (1991)*, to decide whether forced administration of antipsychotic *medication* [*133] during trial violated rights guaranteed by the *Sixth* and *Fourteenth Amendments*.

II

*LEdHN[2][↑]* [2]The record in this case narrowly defines the issues before us. The parties have indicated that once the District Court denied Riggins' motion to terminate use of Mellaril, subsequent administration of the drug was *involuntary*. See, e. g., Brief for Petitioner 6 (*medication* was "forced"); Brief for Respondent 14, 22, 28 (describing *medication* as "unwanted," "over objection," and "compelled"). This understanding accords with the determination of the Nevada Supreme Court. See *107 Nev. at 181;808 P.2d at 537* (describing *medication* as "*involuntary*" and "forced"). Given the parties' positions on this point and the absence of any record evidence to the contrary, we adhere to the understanding of the State Supreme Court.

*LEdHN[3][↑]* [3]We also presume that administration of Mellaril was medically appropriate. Although defense counsel stressed that Riggins received a very high dose of the drug, at no point did he suggest to the Nevada courts that administration of Mellaril was medically [****12] improper treatment for his client.

*LEdHN[4][↑]* [4]Finally, the record is dispositive with respect to Riggins' *Eighth Amendment* claim that administration of Mellaril denied him an opportunity to show jurors his true mental condition at the sentencing hearing. Because this argument was presented neither to the Nevada Supreme Court nor in Riggins' petition for certiorari, we do not address it here.

*LEdHN[1B][↑]* [1B]With these considerations in mind, we turn to Riggins' core contention that *involuntary* administration of Mellaril denied him "a full and fair trial." Pet. for Cert. i. Our discussion in *Washington v. Harper, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990)*, provides useful background for evaluating this claim. In *Harper*, a prison inmate alleged that the State of Washington and various individuals violated his right to due process by giving him Mellaril and other antipsychotic drugs against his will. Although the inmate did not prevail, we agreed that [*134] *HN1[↑]* his interest in avoiding *involuntary* administration of antipsychotic drugs was protected under the *Fourteenth Amendment's Due Process Clause*. "The forcible injection of *medication* into a nonconsenting person's body," we said, "represents a substantial interference with that [****13] person's liberty." *Id., at 229*. In the case of antipsychotic drugs like Mellaril, that interference is particularly severe:

06/08/2020    12:00 Martin & Associates    (FAX)8024795414    P.011/021

"The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. One such side effect identified by the trial court is acute dystonia, a severe *involuntary* [***489] spasm of the upper body, tongue, throat, or eyes. The trial court found that it may be treated and reversed within a few minutes through use of the *medication* Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a [**1815] relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by *involuntary*, uncontrollable movements of various muscles, especially around the face. . . . [****14] The proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%. According to the American Psychiatric Association, studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe." *Id., at 229-230* (citations omitted).

Taking account of the unique circumstances of penal confinement, however, we determined that *HN2*[⬆] due process allows a [*135] mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id., at 227*.

*LEdHN[5]*[⬆] [5]*LEdHN[6]*[⬆] [6]Under *Harper*, *HN3*[⬆] forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The *Fourteenth Amendment* affords at least as much protection to persons the State detains for trial as it does convicted prisoners. See *Bell v. Wolfish, 441 U.S. 520, 545, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979)* ("Pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted [****15] prisoners"); *O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 96 L. Ed. 2d 282, 107 S. Ct. 2400 (1987)* ("Prison regulations . . . are

judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights"). Thus, once Riggins moved to terminate administration of antipsychotic *medication*, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug.

*LEdHN[7]*[⬆] [7]Although we have not had occasion to develop substantive standards for judging administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic *medication* was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. See *Harper, supra, at 225-226*; cf. *Addington v. Texas, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979)* (Due Process Clause allows civil commitment of individuals shown by clear and convincing evidence to be mentally ill and dangerous). Similarly, the State might have been able to justify medically appropriate, [*****16] *involuntary* treatment with the drug by establishing that it could not obtain [***490] an adjudication of Riggins' guilt or innocence by using less intrusive means. See *Illinois v. Allen, 397 U.S. 337, 347, 25 L. Ed. 2d 353, 90 S. Ct. 1057 [*136] (1970)* (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace"). We note that during the July 14 hearing Riggins did not contend that he had the right to be tried without Mellaril if its discontinuation rendered him incompetent. See Record 424-425, 496, 500. The question whether a competent criminal defendant may refuse antipsychotic *medication* if cessation of *medication* would render him incompetent at trial is not before us.

*LEdHN[1C]*[⬆] [1C]Contrary to the dissent's understanding, we do not "adopt a standard of strict scrutiny." *Post*, at 156. We have no occasion to finally prescribe such substantive standards as mentioned above, since the District Court allowed administration of Mellaril to continue without making *any* determination of the need for this course or *any* findings [**1816] about reasonable alternatives. The court's laconic order denying Riggins' motion did not adopt the [*****17] State's view, which was that continued administration of Mellaril was required to ensure that the defendant could be tried; in fact, the hearing testimony casts

504 U.S. 127, *136; 112 S. Ct. 1810, **1816; 118 L. Ed. 2d 479, ***490; 1992 U.S. LEXIS 2701, ****17

considerable doubt on that argument. See *supra, at 130-131*. Nor did the order indicate a finding that safety considerations or other compelling concerns outweighed Riggins' interest in freedom from unwanted antipsychotic drugs.

Were we to divine the District Court's logic from the hearing transcript, we would have to conclude that the court simply weighed the risk that the defense would be prejudiced by changes in Riggins' outward appearance against the chance that Riggins would become incompetent if taken off Mellaril, and struck the balance in favor of *involuntary medication*. See Record 502 ("That he was nervous and so forth . . . can all be brought out [through expert testimony]. And when you start weighing the consequences of taking him off his *medication* and possibly have him revert into an incompetent situation, I don't think that that is a good experiment"). **[*137]** The court did not acknowledge the defendant's liberty interest in freedom from unwanted antipsychotic drugs.

This error may well have impaired the constitutionally **[****18]** protected trial rights Riggins invokes. At the hearing to consider terminating *medication*, Dr. O'Gorman suggested that the dosage administered to Riggins was within the toxic range, *id., at 483*, and could make him "uptight," *id., at 484*. Dr. Master testified that a patient taking 800 milligrams of Mellaril each day might suffer from drowsiness or confusion. *Id., at 416*. Cf. Brief for American Psychiatric Association as *Amicus Curiae* 10-11 ("In extreme cases, the sedationlike effect [of antipsychotic *medication*] may be severe enough (akinesia) to affect thought processes"). It is clearly possible that such side effects had an impact upon not just Riggins' outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel.

Efforts to prove or disprove actual **[***491]** prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different if Riggins' motion had been granted would be purely speculative. We accordingly reject the dissent's suggestion that Riggins should be required to demonstrate how the trial would have proceeded **[****19]** differently if he had not been given Mellaril. See *post*, at 149-150. *HN4*[⬆] Like the consequences of compelling a defendant to wear prison clothing, see *Estelle v. Williams, 425 U.S. 501, 504-505, 48 L. Ed. 2d 126, 96 S. Ct. 1691 (1976)*, or of binding and gagging an accused during trial, see *Allen, supra, at 344*, the

precise consequences of forcing antipsychotic *medication* upon Riggins cannot be shown from a trial transcript. What the testimony of doctors who examined Riggins establishes, and what we will not ignore, is a strong possibility that Riggins' defense was impaired due to the administration of Mellaril.

We also are persuaded that allowing Riggins to present expert testimony about the effect of Mellaril on his demeanor **[*138]** did nothing to cure the possibility that the substance of his own testimony, his interaction with counsel, or his comprehension at trial were compromised by forced administration of Mellaril. Even if (as the dissent argues, *post*, at 147-149) the Nevada Supreme Court was right that expert testimony allowed jurors to assess Riggins' demeanor fairly, an unacceptable risk of prejudice remained. See *107 Nev. at 181, 808 P.2d at 537-538*.

*LEdHN[1D]*[⬆] [1D]*LEdHN[8]*[⬆] [8]To be sure, trial prejudice can sometimes **[****20]** be justified by an essential state interest. See *Holbrook v. Flynn, 475 U.S. 560, 568-569, 89 L. Ed. 2d 525, 106 S. Ct. 1340 (1986)*; *Allen, supra, at 344* (binding and gagging the accused permissible only in extreme situations **[**1817]** where it is the "fairest and most reasonable way" to control a disruptive defendant); see also *Williams, supra, at 505* (compelling defendants to wear prison clothing at trial furthers no essential state policy). Because the record contains no finding that might support a conclusion that administration of antipsychotic *medication* was necessary to accomplish an essential state policy, however, we have no basis for saying that the substantial probability of trial prejudice in this case was justified.

The judgment of the Nevada Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

**Concur by:** KENNEDY

# Concur

JUSTICE KENNEDY, concurring in the judgment.

The medical and pharmacological data in the *amicus*

504 U.S. 127, *138; 112 S. Ct. 1810, **1817; 118 L. Ed. 2d 479, ***491; 1992 U.S. LEXIS 2701, ****20

briefs and other sources indicate that *involuntary medication* with antipsychotic drugs poses a serious threat to a defendant's right to a fair trial. In the case before us, there was no hearing or well-developed [****21] record on the point, and the whole subject of treating incompetence to stand trial by drug *medication* is somewhat new to the law, if not to medicine. On the sparse record before us, we cannot [***492] give full consideration to the issue. I file this separate opinion, however, to express [*139] my view that absent an extraordinary showing by the State, the Due Process Clause prohibits prosecuting officials from administering *involuntary* doses of antipsychotic medicines for purposes of rendering the accused competent for trial, and to express doubt that the showing can be made in most cases, given our present understanding of the properties of these drugs.

At the outset, I express full agreement with the Court's conclusion that one who was medicated against his will in order to stand trial may challenge his conviction. When the State commands *medication* during the pretrial and trial phases of the case for the avowed purpose of changing the defendant's behavior, the concerns are much the same as if it were alleged that the prosecution had manipulated material evidence. See *Brady v. Maryland, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)* (suppression by the prosecution of material evidence favorable to the accused violates due process); *Arizona v. [****22] Youngblood, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988)* (bad-faith failure to preserve potentially useful evidence constitutes a due process violation). I cannot accept the premise of JUSTICE THOMAS' dissent that the *involuntary medication* order comprises some separate procedure, unrelated to the trial and foreclosed from inquiry or review in the criminal proceeding itself. To the contrary, the allegations pertain to the State's interference with the trial. Thus, review in the criminal proceeding is appropriate.

I also agree with the majority that the State has a legitimate interest in attempting to restore the competence of otherwise incompetent defendants. Its interest derives from the State's right to bring an accused to trial and from our holding in *Pate v. Robinson. 383 U.S. 375, 378, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966)*, that conviction of an incompetent defendant violates due process. Unless a defendant is competent, the State cannot put him on trial. Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of

counsel, [*140] the rights to summon, to confront, and to cross-examine witnesses, and the right to [****23] testify on one's own behalf or to remain silent without penalty for doing so. *Drope v. Missouri, 420 U.S. 162, 171-172, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975)*. Although the majority is correct that this case does not require us to address the question whether a defendant may waive his right to be tried while competent, in my view a general rule permitting waiver would not withstand scrutiny under the Due Process Clause, given our holdings in *Pate* and *Drope*. A defendant's waiver of the right to be tried while competent would [**1818] cast doubt on his exercise or waiver of all subsequent rights and privileges through the whole course of the trial.

The question is whether the State's interest in conducting the trial allows it to ensure the defendant's competence by *involuntary medication*, assuming of course there is a sound medical basis for the treatment. The Court's opinion will require further proceedings on remand, but there seems to be little discussion about what is to be considered. The Court's failure to address [***493] these issues is understandable in some respects, for it was not the subject of briefing or argument; but to underscore my reservations about the propriety of *involuntary* [****24] *medication* for the purpose of rendering the defendant competent, and to explain what I think ought to be express qualifications of the Court's opinion, some discussion of the point is required.

This is not a case like *Washington v. Harper, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990)*, in which the purpose of the *involuntary medication* was to ensure that the incarcerated person ceased to be a physical danger to himself or others. The inquiry in that context is both objective and manageable. Here the purpose of the *medication* is not merely to treat a person with grave psychiatric disorders and enable that person to function and behave in a way not dangerous to himself or others, but rather to render the person competent to stand trial. It is the last part of the State's objective, medicating the person for the purpose of bringing him to trial, that causes most [*141] serious concern. If the only question were whether some bare level of functional competence can be induced, that would be a grave matter in itself, but here there are even more far reaching concerns. The avowed purpose of the *medication* is not functional competence, but competence to stand trial. In my view elementary protections against state [****25] intrusion require the State in every case to make a showing that there is no

significant risk that the *medication* will impair or alter in any material way the defendant's capacity or willingness to react to the testimony at trial or to assist his counsel. Based on my understanding of the medical literature, I have substantial reservations that the State can make that showing. Indeed, the inquiry itself is elusive, for it assumes some baseline of normality that experts may have some difficulty in establishing for a particular defendant, if they can establish it at all. These uncertainties serve to underscore the difficult terrain the State must traverse when it enters this domain.

To make these concerns concrete, the effects of antipsychotic drugs must be addressed. First introduced in the 1950's, antipsychotic drugs such as Mellaril have wide acceptance in the psychiatric community as an effective treatment for psychotic thought disorders. See American Psychiatric Press Textbook of Psychiatry 770-774 (J. Talbott, R. Hales, & S. Yodofsky eds. 1988) (Textbook of Psychiatry); Brief for American Psychiatric Association as *Amicus Curiae* 6-7. The *medications* restore normal thought processes [****26] by clearing hallucinations and delusions. Textbook of Psychiatry 774. See also Brief for American Psychiatric Association as *Amicus Curiae* 9 ("The mental health produced by antipsychotic *medication* is no different from, no more inauthentic or alien to the patient than, the physical health produced by other *medications*, such as penicillin for pneumonia"). For many patients, no effective alternative exists for treatment of their illnesses. *Id.*, at 7, and n. 3.

[*142] Although these drugs have changed the lives of psychiatric patients, they can have unwanted side effects. We documented some of the more serious side effects in *Washington v. Harper, supra, at 229-230,* and they are mentioned again in the majority [***494] opinion. More relevant to this case are side effects that, it appears, can compromise the right of a medicated criminal defendant to receive a fair trial. The drugs can prejudice the accused in two [**1819] principal ways: (1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and (2) by rendering him unable or unwilling to assist counsel.

It is a fundamental assumption of the adversary system that the trier of fact observes the accused [****27] throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. *Taylor v. United States, 414 U.S.*

*17, 19, 38 L. Ed. 2d 174, 94 S. Ct. 194 (1973) (per curiam).* At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. If the defendant takes the stand, as Riggins did, his demeanor can have a great bearing on his credibility and persuasiveness, and on the degree to which he evokes sympathy. The defendant's demeanor may also be relevant to his confrontation rights. See *Coy v. Iowa, 487 U.S. 1012, 1016-1020, 101 L. Ed. 2d 857, 108 S. Ct. 2798 (1988)* (emphasizing the importance of the face-to-face encounter between the accused and the accuser).

The side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the defense. Serious due process concerns are implicated when the State manipulates the evidence in this [****28] way. The defendant may be restless and unable to sit still. Brief for American Psychiatric Association as *Amicus Curiae* 10. The drugs can induce [*143] a condition called parkinsonism, which, like Parkinson's disease, is characterized by tremor of the limbs, diminished range of facial expression, or slowed functions, such as speech. *Ibid.* Some of the side effects are more subtle. Antipsychotic drugs such as Mellaril can have a "sedationlike effect" that in severe cases may affect thought processes. *Ibid.* At trial, Dr. Jurasky testified that Mellaril has "a tranquilizer effect." Record 752. See also *ibid.* ("If you are dealing with someone very sick then you may prescribe up to 800 milligrams which is the dose he had been taking which is very, very high. I mean you can tranquilize an elephant with 800 milligrams"). Dr. Jurasky listed the following side effects of large doses of Mellaril: "Drowsiness, constipation, perhaps lack of alertness, changes in blood pressure. . . . Depression of the psychomotor functions. If you take a lot of it you become stoned for all practical purposes and can barely function." *Id.*, at 753.

These potential side effects would be disturbing for any patient; but when [****29] the patient is a criminal defendant who is going to stand trial, the documented probability of side effects seems to me to render *involuntary* administration of the drugs by prosecuting officials unacceptable absent a showing by the State that the side effects will not alter the defendant's reactions or diminish his capacity to assist counsel. As the American Psychiatric Association points out:

[***495] "By administering *medication*, the State

504 U.S. 127, *143; 112 S. Ct. 1810, **1819; 118 L. Ed. 2d 479, ***495; 1992 U.S. LEXIS 2701, ****29

may be creating a prejudicial negative demeanor in the defendant -- making him look nervous and restless, for example, or so calm or sedated as to appear bored, cold, unfeeling, and unresponsive. . . . That such effects may be subtle does not make them any less real or potentially influential." Brief for American Psychiatric Association as *Amicus Curiae* 13.

As any trial attorney will attest, serious prejudice could result if *medication* inhibits the defendant's capacity to react [*144] and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and [****30] his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative [**1820] of whether the offender lives or dies. See Geimer & Amsterdam, Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases, 15 Am. J. Crim. L. 1, 51-53 (1987-1988).

Concerns about *medication* extend also to the issue of cooperation with counsel. We have held that a defendant's right to the effective assistance of counsel is impaired when he cannot cooperate in an active manner with his lawyer. *Massiah v. United States, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964)*; *Geders v. United States, 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330 (1976)* (trial court order directing defendant not to consult with his lawyer during an overnight recess held to deprive him of the effective assistance of counsel). The defendant must be able to provide needed information to his lawyer and to participate in the making of decisions on his own behalf. The side effects of antipsychotic drugs can hamper the attorney-client relation, preventing effective communication and rendering the defendant less able or willing to take part in his defense. The State interferes with this [****31] relation when it administers a drug to dull cognition. See Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 42 ("The chemical flattening of a person's will can also lead to the defendant's loss of self-determination undermining the desire for self-preservation which is necessary to engage the defendant in his own defense in preparation for his trial").

It is well established that the defendant has the right to testify on his own behalf, a right we have found

essential to our adversary system. *In re Oliver, 333 U.S. 257, 273, 92 L. Ed. 682, 68 S. Ct. 499 (1948)*. We have found the right implicit as well in the Compulsory [*145] Process Clause of the *Sixth Amendment*. *Rock v. Arkansas, 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987)*. In *Rock*, we held that a state rule excluding all testimony aided or refreshed by hypnosis violated the defendant's constitutional right to take the stand in her own defense. We observed that barring the testimony would contradict not only the right of the accused to conduct her own defense, but also her right to make this defense in person: "'It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the [***496] witnesses [****32] against him," and who must be accorded "compulsory process for obtaining witnesses in his favor."'" *Id., at 52*, quoting *Faretta v. California, 422 U.S. 806, 819, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975)*. We gave further recognition to the right of the accused to testify in his or her own words, and noted that this in turn was related to the *Fifth Amendment* choice to speak "in the unfettered exercise of his own will." *Rock, supra, at 53*. In my view *medication* of the type here prescribed may be for the very purpose of imposing constraints on the defendant's own will, and for that reason its legitimacy is put in grave doubt.

If the State cannot render the defendant competent without *involuntary medication*, then it must resort to civil commitment, if appropriate, unless the defendant becomes competent through other means. If the defendant cannot be tried without his behavior and demeanor being affected in this substantial way by *involuntary* treatment, in my view the Constitution requires that society bear this cost in order to preserve the integrity of the trial process. The state of our knowledge of antipsychotic drugs and their side effects is evolving and may one day produce effective drugs that [****33] have only minimal side effects. Until that day comes, we can permit their use only when the State can show that *involuntary* treatment does not cause alterations raising the concerns enumerated in this separate opinion.

With these observations, I concur in the judgment reversing the conviction.

**Dissent by:** THOMAS

# Dissent

Patricia Lazarus

06/08/2020  12:11 Martin & Associates                    (FAX)8024795414           P.016/021
Case 1:20-cv-11266-WGY  Document 1-2  Filed 07/02/20  Page 35 of 125

Page 14 of 19
504 U.S. 127, *145; 112 S. Ct. 1810, **1820; 118 L. Ed. 2d 479, ***496; 1992 U.S. LEXIS 2701, ****33

[*146]  [***1821]  JUSTICE THOMAS, with whom JUSTICE SCALIA joins except as to Part II-A, dissenting.

Petitioner David Edward Riggins killed Paul William Wade by stabbing him 32 times with a knife. He then took cash, drugs, and other items from Wade's home. A Nevada jury convicted Riggins of first-degree murder and robbery with a deadly weapon and sentenced him to death. The Nevada Supreme Court affirmed. _107 Nev. 178, 808 P.2d 535 (1991)._ This Court reverses the conviction, holding that Nevada unconstitutionally deprived Riggins of his liberty interest in avoiding unwanted _medication_ by compelling him to take an antipsychotic drug. I respectfully dissent.

The Court's opinion, in my view, conflates two distinct questions: whether Riggins had a full and fair criminal trial and whether Nevada improperly forced Riggins to take _medication._ In this criminal case, Riggins is asking, and may ask, only for the [****34] reversal of his conviction and sentence. He is not seeking, and may not seek, an injunction to terminate his medical treatment or damages for an infringement of his personal rights. I agree with the positions of the majority and concurring opinions in the Nevada Supreme Court: Even if the State truly forced Riggins to take _medication,_ and even if this _medication_ deprived Riggins of a protected liberty interest in a manner actionable in a different legal proceeding, Riggins nonetheless had the fundamentally fair criminal trial required by the Constitution. I therefore would affirm his conviction.

[***497]  I

Riggins contended in the Nevada Supreme Court that he did not have a "'full and fair' trial" for two reasons, the first relating to exclusion of evidence of his mental condition and the second concerning his ability to assist in his defense. Record 1018. To the extent that Riggins' arguments below involved federal constitutional issues, I believe that the Nevada Supreme Court correctly rejected them.

[*147] A

Riggins first argued that the trial court improperly prevented him from presenting relevant evidence of his demeanor. As the Court notes, Riggins suffers from a mental illness and raised insanity [****35] as a defense at trial. When Riggins killed Wade, he was not using any antipsychotic _medication._ During his trial, however, Riggins was taking large doses of the antipsychotic drug Mellaril. Riggins believed that this drug would make his appearance at trial different from his appearance when he attacked Wade and that this difference might cause the jury to misjudge his sanity. To show his mental condition as it existed at the time of the crime, Riggins requested permission to appear before the jury in an unmedicated state. App. 20-24, 42-47. The trial court denied the request, and the Nevada Supreme Court affirmed.

This Court has no power to decide questions concerning the admissibility of evidence under Nevada law. _Estelle v. McGuire, 502 U.S. 62, 67-68, 116 L. Ed. 2d 385, 112 S. Ct. 475 (1991)._ We therefore may conduct only a limited review of a Nevada court's decision to exclude a particular form of demeanor evidence. Except in cases involving a violation of a specific constitutional provision such as the _Confrontation Clause,_ see, e. g., _Ohio v. Roberts, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980),_ this Court may not reverse a state "trial judge's action in the admission of evidence" unless the evidentiary ruling "so [****36] infuse[s] the trial with unfairness as to deny due process of law." _Lisenba v. California, 314 U.S. 219, 228, 86 L. Ed. 166, 62 S. Ct. 280 (1941)._ See also _Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 74 L. Ed. 2d 646, 103 S. Ct. 843 (1983); Burgett v. Texas, 389 U.S. 109, 113-114, 19 L. Ed. 2d 319, 88 S. Ct. 258 (1967)._ In this case, I see no basis for concluding that Riggins had less than a full and fair trial.

The Court declines to decide whether Mellaril actually affected Riggins' appearance. [***1822] On the basis of some pretrial psychiatric testimony it speculates only that Riggins might have looked less uptight, drowsy, or confused if he had not taken the drug. Ante, at 137. Other evidence casts doubt [*148] on this possibility. At least one psychiatrist believed that a jury would not "be able to notice whether or not [Riggins] was on Mellaril as compared to the period of the time when he was not medicated by that drug." Record 445. Yet, even if Mellaril noticeably affected Riggins' demeanor, the Court fails to explain why the _medication_'s effects rendered Riggins' trial fundamentally unfair.

The trial court offered Riggins the opportunity to prove his mental condition as it existed at the time of the crime through testimony instead of his appearance in court [****37] in an [***498] unmedicated condition. Riggins took advantage of this offer by explaining to the jury the history of his mental health, his usage of Mellaril, and

504 U.S. 127, *148; 112 S. Ct. 1810, **1822; 118 L. Ed. 2d 479, ***498; 1992 U.S. LEXIS 2701, ****37

the possible effects of Mellaril on his demeanor. *Id., at 739-740*. Riggins also called Dr. Jack A. Jurasky, a psychiatrist, who testified about Riggins' condition after his arrest and his likely mental state at the time of the crime. *Id., at 747-748*. Dr. Jurasky also explained Riggins' use of Mellaril and how it might be affecting him. *Id., at 752-753, 760-761*.

The Nevada Supreme Court concluded that this "testimony was sufficient to inform the jury of the effect of the Mellaril on Riggins' demeanor and testimony." *107 Nev. at 181, 808 P.2d at 538*. Its analysis comports with that of other state courts that also have held that expert testimony may suffice to clarify the effects of an antipsychotic drug on a defendant's apparent demeanor. See *State v. Law, 270 S.C. 664, 673, 244 S.E.2d 302, 306 (1978)*; *State v. Jojola, 89 N.M. 489, 493, 553 P.2d 1296, 1300 (1976)*. Cf. *In re Pray, 133 Vt. 253, 257-258, 336 A.2d 174, 177 (1975)* (reversing a conviction because no expert testimony explained how [****38] antipsychotic medicine affected the defendant's appearance). Having reviewed the record as a whole, I see no reason to disturb the conclusion of the Nevada Supreme Court. On the facts of this case, Riggins' inability to introduce evidence of his mental condition as he desired did not render his trial fundamentally unfair. See *Rock v. Arkansas, 483 U.S. 44, 55, 97 L. Ed. 2d 37, 107 S. Ct. 2704, [*149] n. 11 (1987)*; *id., at 64-65* (REHNQUIST, C. J., dissenting).

B

Riggins also argued in the Nevada Supreme Court, although not in his briefs to this Court, that he did not have a "'full and fair' trial" because Mellaril had side effects that interfered with his ability to participate in his defense. Record 1018. He alleged, in particular, that the drug tended to limit his powers of perception. The Court accepts this contention, stating: "It is clearly *possible* that such side effects had an impact upon . . . the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." *Ante*, at 137 (emphasis added). I disagree. We cannot conclude that Riggins had less than a full and fair trial merely because of the possibility that Mellaril [****39] had side effects.

All criminal defendants have a right to a full and fair trial, and a violation of this right may occur if a State tries a defendant who lacks a certain ability to comprehend or participate in the proceedings. We have said that "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial," *Spencer v.*

*Texas, 385 U.S. 554, 563-564, 17 L. Ed. 2d 606, 87 S. Ct. 648 (1967)*, and have made clear that "conviction of an accused person while he is legally incompetent violates due process," *Pate v. Robinson, 383 U.S. 375, 378, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966)*.

Riggins has no claim of legal incompetence in this case. The trial court specifically found him competent while he was taking Mellaril under a statute requiring him to [**1823] have "sufficient mentality to be able to understand the nature of the criminal charges against him, and . . . [***499] to aid and assist his counsel in the defense interposed upon the trial." *Nev. Rev. Stat. § 178.400(2)* (1989). Riggins does not assert that due process imposes a higher standard.

The record does not reveal any other form of unfairness relating to the purported side effects of Mellaril. Riggins has failed to allege specific facts to support his claim that he [*150] could [****40] not participate effectively in his defense. He has not stated how he would have directed his counsel to examine or cross-examine witnesses differently. He has not identified any testimony or instructions that he did not understand. The record, moreover, does not even support his assertion that Mellaril made him worse off. As Justice Rose noted in his concurring opinion below: "Two psychiatrists who had prescribed Mellaril for Riggins, Dr. Quass and Dr. O'Gorman, testified that they believed it was helpful to him. Additional psychiatric testimony established that Mellaril may have increased Riggins' cognitive ability . . . ." *107 Nev. at 185, 808 P.2d at 540*. See also *State v. Hayes, 118 N.H. 458, 461, 389 A.2d 1379, 1381 (1978)* (holding a defendant's perception adequate because "all the expert evidence supported the conclusion that the *medication* had a beneficial effect on the defendant's ability to function"). [1] Riggins' competence, moreover, tends to confirm that he had a fair trial. See *State v. Jojola, supra, at 492, 553 P.2d at 1299* (presuming, absent other evidence, that the side effects of an antipsychotic drug did not render a competent defendant [****41] unable to participate fully in his trial). I thus see no basis for reversing the Nevada Supreme Court.

_____

[1] We previously have noted that "'psychotropic *medication* is widely accepted within the psychiatric community as an extraordinarily effective treatment for both acute and chronic psychoses, particularly schizophrenia.'" *Washington v. Harper, 494 U.S. 210, 226, n. 9, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990)* (quoting Brief for American Psychiatric Association et al. as *Amici Curiae*, O. T. 1989, No. 88-599, pp. 10-11).

II

Riggins also argues for reversal on the basis of our holding in _Washington v. Harper, 494 U.S. 210, 221, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990)_, that the Due Process Clause protects a substantive "liberty interest" in avoiding unwanted _medication_. Riggins asserts that Nevada unconstitutionally deprived him of this liberty interest by forcing him to take Mellaril. The Court agrees, ruling [*151] that "the Nevada courts failed to make findings sufficient to support forced administration of the drug" in this case. Ante, at 129. I consider reversal on this [****42] basis improper.

A

Riggins may not complain about a deprivation of the liberty interest that we recognized in _Harper_ because the record does not support his version of the facts. Shortly after his arrest, as the Court notes, Riggins told a psychiatrist at his jail that he was hearing voices and could not sleep. The psychiatrist prescribed Mellaril. When the prescription did not eliminate the problem, Riggins sought further treatment and the psychiatrist increased the dosage. Riggins thus began taking the drug voluntarily. Ante, at 129.

[***500] The Court concludes that the _medication_ became _involuntary_ when the trial court denied Riggins' motion for permission not to take the drug during the trial. Ante, at 133. I disagree. Although the court denied Riggins' motion, it did not order him to take any _medication_. [2] Moreover, even though [**1824] Riggins _alleges_ that the _state physicians_ forced him to take the _medication_ after the court's order, the record contains no finding of fact with respect to this allegation. The Court admits that it merely assumes that the physicians drugged him, and attempts to justify its assumption by observing that the Nevada Supreme Court also assumed that [****43] _involuntary medication_ occurred. Ibid. The Nevada Supreme Court,

however, may have made its assumption for the purpose of argument; the assumption, in its view, did [*152] not change the result of the case. The Court cannot make the same assumption if it requires reversal of Riggins' conviction.

Riggins also cannot complain about a violation of _Harper_ because he did not argue below for reversal of his conviction on the ground that Nevada had deprived him of a liberty interest. Riggins consistently maintained in the [****44] Nevada courts that he did not have a "full and fair trial" because the _medication_ deprived him of the opportunity to present his demeanor to the jury and to participate in his defense. App. 20-24 (trial court motion); _id., at 42-47_ (trial court reply); Record 1018-1021 (appellate brief); _id., at 1068-1071_ (appellate reply brief). As counsel for Nevada put it at oral argument: "The way this issue was initially presented to the trial court was really a question of trial strategy. There was never an indication in this case that Mr. Riggins was a _Harper_-type defendant who did not want to be medicated." Tr. of Oral Arg. 23. [3]

[****45] Because the claims that Riggins raised below have no merit, Riggins has altered his theory of the case. The Court, therefore, should not condemn the Nevada courts because they "did not acknowledge the defendant's liberty interest in freedom from unwanted antipsychotic drugs." Ante, at 137. The Nevada courts had no reason to consider an argument that Riggins did not make. We have said quite recently that "in reviewing the judgments of state courts under the jurisdictional grant of _28 U. S. C. § 1257_, the Court has, with very rare exceptions, refused to consider petitioners' [*153] claims that [***501] were not raised or addressed below." _Yee v. Escondido, 503 U.S. 519, 533, 118 L. Ed. 2d 153, 112 S. Ct. 1522 (1992)_. Although "we have expressed inconsistent views as to whether this rule is jurisdictional or prudential in cases arising from state courts," ibid., the Court does not attempt to justify its departure here.

---

[2] Riggins' counsel confirmed this interpretation of the order at oral argument:

"QUESTION: . . . Did the court ever go further than saying I will not order the State to stop administering the _medication_? . . . It simply said . . . I won't intervene and enjoin the administration of this _medication_[.]

"MR. YAMPOLSKY: Yes . . . .

"QUESTION: So if [Riggins] had then said, well, I'm not going to take it, he wouldn't be in violation of the court order? . . .

"Mr. YAMPOLSKY: Apparently not." Tr. of Oral Arg. 10.

---

[3] Riggins noted in his reply brief before the Nevada Supreme Court that the courts in _United States v. Bryant, 670 F. Supp. 840, 843 (Minn. 1987)_, and _Bee v. Greaves, 744 F.2d 1387 (CA10 1984)_, had recognized a personal liberty interest in avoiding unwanted _medication_. Record 1070-1071. Yet, Riggins never asked for reversal because of a deprivation of this interest. He argued for reversal in that brief only on grounds that the _medication_ "violated [his] right to a 'full and fair' trial because it denied him the ability to assist in his defense, and prejudiced his demeanor, attitude, and appearance to the jury." _Id., at 1068_.

Finally, we did not grant certiorari to determine whether the Nevada courts had made the findings required by *Harper* to support forced administration of a drug. We took this case to decide "whether forced *medication* during trial violates a defendant's constitutional right to a full [****46] and fair trial." Pet. for Cert. The Court declines to answer this question one way or the other, stating only that a violation of *Harper* "may well have impaired the constitutionally protected trial rights Riggins invokes." *Ante*, at 137. As we have stated, "we ordinarily do not consider questions outside those presented in the petition for certiorari." *Yee v. Escondido, supra, at 535.* I believe that we should refuse to consider Riggins' *Harper* argument.

**B**

The *Harper* issue, in any event, does not warrant reversal of Riggins' conviction. The Court correctly states that Riggins, as a detainee awaiting trial, had at least the same [**1825] liberty interest in avoiding unwanted *medication* that the inmate had in *Harper*. This case, however, differs from *Harper* in a very significant respect. When the inmate in *Harper* complained that physicians were drugging him against his will, he sought damages and an injunction against future *medication* in a civil action under *42 U. S. C. § 1983*. See *494 U.S. at 217*. Although Riggins also complains of forced *medication*, he is seeking a reversal of his criminal conviction. I would not expand *Harper* to [****47] include this remedy.

We have held that plaintiffs may receive civil remedies for all manner of constitutional violations under *§ 1983*. See [*154] *Dennis v. Higgins, 498 U.S. 439, 443-451, 112 L. Ed. 2d 969, 111 S. Ct. 865 (1991)*. This Court, however, has reversed criminal convictions only on the basis of two kinds of constitutional deprivations: those "which occur during the presentation of the case" to the trier of fact, and those which cause a "structural defect affecting the framework" of the trial. *Arizona v. Fulminante, 499 U.S. 279, 307, 310, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991)*. The Court does not reveal why it considers a deprivation of a liberty interest in avoiding unwanted *medication* to fall into either category of reversible error. Even if Nevada failed to make the findings necessary to support forced administration of Mellaril, this failure, without more, would not constitute a trial error or a flaw in the trial mechanism. See *107 Nev. at 185, 808 P.2d at 540* (Rose, J., concurring). Although Riggins might be entitled to other remedies, he has no

right to have his conviction reversed. [4]

[*155] [****48] [***502] We applied a similar analysis in *Estelle v. Williams, 425 U.S. 501, 48 L. Ed. 2d 126, 96 S. Ct. 1691 (1976)*. In that case, a prisoner challenged his conviction on grounds that the State had required him to wear prison garb before the jury. In reviewing the challenge, we did not ask whether the State had violated some personal right of the defendant to select his attire. Instead, we considered only whether the prison clothing had denied him a "fair trial" by making his appearance less favorable to the jury. *Id., at 503.* Although we ultimately declined to reach the merits because the prisoner had waived the issue at trial, *id., at 512*, we observed that lower courts had held that "a showing of actual prejudice must be made by a defendant seeking to have his conviction overturned on this ground," *id., at 504, n. 1.* In my view, just as the validity of the conviction in *Estelle* v. *Williams* would depend on whether the prisoner had a fair trial, so does the validity of Riggins' conviction.

The need for requiring actual unfairness in this case (either in the form of a structural defect or an error in the presentation of evidence) becomes apparent when one considers how the Court might apply its [****49] decision to other cases. A State could violate *Harper* by

---

[4] A State, however, might violate a defendant's due process right to a fundamentally fair trial if its administration of *medication* were to *diminish* substantially the defendant's mental faculties during the trial, even if he were not thereby rendered incompetent. See 3 E. Coke, Institutes *34 (1797) ("If felons come in judgement to answer, . . . they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason, nor them constrain to answer, but at their free will"); Resolutions of the Judges upon the Case of the Regicides, Kelyng's Report of Divers Cases in Pleas of the Crown 10 (1708) (Old Bailey 1660) ("It was resolved that when Prisoners come to the Bar to be tryed, their Irons ought to be taken off, so that they be not in any Torture while they make their defense, be their Crime never so great"), reprinted in 5 How. St. Tr. 971, 979-980 (1816); *Trial of Christopher Layer*, 16 How. St. Tr. 94, 100 (1812) [K. B. 1722] ("The authority is that [the defendant] is not to be 'in vinculis' during his trial, but should be so far free, that he should have the use of his reason, and all advantages to clear his innocence"); see also *State v. Williams, 18 Wash. 47, 49-51, 50 P. 580, 581 (1897)* ("'The condition of the prisoner in shackles may, to some extent, deprive him of the free and calm use of all his faculties'") (quoting *State v. Kring, 64 Mo. 591 (1877)*). Riggins has not made (much less proved) any such allegation in this Court; indeed, the record indicates that Riggins' mental capacity was *enhanced* by his administration of Mellaril.

forcibly administering *any* kind of ***medication*** [**1826]
to a criminal defendant. Yet, the Court surely would not
reverse a criminal conviction for a *Harper* violation
involving ***medications*** such as penicillin or aspirin.
Perhaps Mellaril, in general, has a greater likelihood of
affecting a person's appearance and powers of
perceptions than these substances. As noted above,
however, we have no indication in this case, considering
the record as a whole, that Mellaril unfairly prejudiced
Riggins.

I do not mean in any way to undervalue the importance
of a person's liberty interest in avoiding forced
***medication*** or to suggest that States may drug
detainees at their whim. Under *Harper*, detainees have
an interest in avoiding unwanted ***medication*** that the
States must respect. In appropriate instances, detainees
may seek damages or injunctions [*156] against
further ***medication*** in civil actions either under § *1983*,
as in *Harper*, or under state law. Yet, when this Court
reviews a state-court criminal conviction of a defendant
who has taken ***medication***, it cannot undo any violation
that already [***503] has occurred or punish those
responsible. It [****50] may determine only whether the
defendant received a proper trial, free of the kinds of
reversible errors that we have recognized. Because
Riggins had a full and fair trial in this case, I would affirm
the Nevada Supreme Court.

C

For the foregoing reasons, I find it unnecessary to
address the precise standards governing the forced
administration of drugs to persons such as Riggins.
Whether or not Nevada violated these standards, I
would affirm Riggins' conviction. I note, however, that
the Court's discussion of these standards poses
troubling questions. Although the Court purports to rely
on *Washington* v. *Harper*, the standards that it applies in
this case differ in several respects.

The Court today, for instance, appears to adopt a
standard of strict scrutiny. It specifically faults the trial
court for failing to find either that the "continued
administration of Mellaril was *required* to ensure that the
defendant could be tried," *ante*, at 136 (emphasis
added), or that "other *compelling* concerns outweighed
Riggins' interest in freedom from unwanted
antipsychotic drugs," *ibid.* (emphasis added). We
specifically rejected this high standard of review in
*Harper*. [****51] In that case, the Washington Supreme
Court had held that state physicians could not
administer ***medication*** to a prisoner without showing

that it "was both necessary and effective for furthering a
compelling state interest." *494 U.S. at 218*. We
reversed, holding that the state court "erred in refusing
to apply the standard of reasonableness." *Id., at 223*.

The Court today also departs from *Harper* when it says
that the Nevada Supreme Court erred by not
"considering [*157] less intrusive alternatives." *Ante*, at
135. The Court presumably believes that Nevada could
have treated Riggins with smaller doses of Mellaril or
with other kinds of therapies. In *Harper*, however, we
imposed no such requirement. In fact, we specifically
ruled that "the alternative means proffered by [the
prisoner] for accommodating his interest in rejecting the
forced administration of antipsychotic drugs do not
demonstrate the invalidity of the State's policy." *494
U.S. at 226*.

This case differs from *Harper* because it involves a
pretrial detainee and not a convicted prisoner. The
standards for forcibly medicating inmates well may differ
from those for persons awaiting trial. The Court,
however, does not rely [****52] on this distinction in
departing from *Harper;* instead, it purports to be
applying *Harper* to detainees. *Ante*, at 135. Either the
Court is seeking to change the *Harper* standards or it is
adopting different standards for detainees without
stating its reasons. I cannot accept either interpretation
of the Court's opinion. For all of these reasons, I
respectfully dissent.

# References

*21A Am Jur 2d, Criminal Law 646-651*

8 Federal Procedure, L Ed, Criminal Procedure 22:331-
22:336

40 Am Jur Proof of Facts 2d 171, Defendant's
Competency to Stand Trial

7 Am Jur Trials 477, Homicide; 27 Am Jur Trials 1,
Representing the Mentally Disabled Criminal Defendant

USCS, *Constitution, Amendments 6*, *14*

L Ed Digest, Appeal 1677, 1692.1; Constitutional Law
854; Criminal Law 46

504 U.S. 127, *157; 112 S. Ct. 1810, **1826; 118 L. Ed. 2d 479, ***503; 1992 U.S. LEXIS 2701, ****52

L Ed Index, Drugs and Narcotics; Fair and Impartial
Proceeding; Incompetent or Insane Persons; Mental
Capacity or Condition

Index to Annotations, Appeal and Error; Drugs and
Narcotics; Due Process; Fair and Impartial [****53]
Trial; Incompetent and Insane Persons; Mental
Condition or Capacity

Annotation References:

Supreme Court's view as to concept of "liberty" under
*due process clauses of Fifth* and *Fourteenth*
*Amendments. 47 L Ed 2d 975.*

What issues will the Supreme Court consider, though
not, or not properly, raised by the parties. *42 L Ed 2d*
*946.*

Right of state prison authorities to administer neuroleptic
or antipsychotic drugs to prisoner without his or her
consent—state cases. *75 ALR4th 1124.*

Power of courts or other public agencies, in the absence
of statutory authority, to order compulsory medical care
for adult. *9 ALR3d 1391.*

**End of Document**

Patricia Lazarus

*Conditions of Confinement*

Questioned
As of: June 2, 2020 3:34 PM Z

# *Youngberg v. Romeo*

Supreme Court of the United States

January 11, 1982, Argued ; June 18, 1982, Decided

No. 80-1429

**Reporter**

457 U.S. 307 *; 102 S. Ct. 2452 **; 73 L. Ed. 2d 28 ***; 1982 U.S. LEXIS 128 ****; 50 U.S.L.W. 4681

YOUNGBERG, SUPERINTENDENT, PENNHURST STATE SCHOOL AND HOSPITAL, ET AL. v. ROMEO, AN INCOMPETENT, BY HIS MOTHER AND NEXT FRIEND, ROMEO

**Prior History:** [****1] CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.

**Disposition:** *644 F.2d 147*, vacated and remanded.

## Core Terms

training, skills, habilitation, liberty interest, conditions, mentally retarded, self-care, ***confinement***, ***due process*** clause, residents, courts, rights, involuntarily committed, constitutional right, Fourteenth Amendment, professional judgment, state institution, programs, retarded, bodily restraint, decisions, care and treatment, ***due process***, training program, duty to provide, retarded person, state law, Eighth Amendment, articulated, violence

## Case Summary

**Procedural Posture**

Petitioner institution administrators appealed from the

judgment of the United States Court of Appeals for the Third Circuit, which reversed and remanded a district court's judgment for petitioners in an action by respondent institutionalized individual against petitioners for violation of his constitutional rights under the Civil Rights Act of 1871, *42 U.S.C.S. § 1983*.

**Overview**

Pursuant to *42 U.S.C.S. § 1983*, an action was filed on behalf of respondent individual, who was involuntarily committed to a state institution for the mentally retarded, against petitioner institution administrators that alleged a violation of his constitutional rights. The district court entered judgment for petitioners, and the court of appeals reversed and remanded. Petitioners appealed. Respondent alleged that he had a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution; and that petitioners infringed these rights by failing to provide constitutionally required conditions of ***confinement***. The Court vacated the judgment, holding that respondent had substantive rights under the *Due Process Clause of the Fourteenth Amendment* to safe conditions of ***confinement***, freedom from bodily restraints, and training or "habilitation." The State was under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints. The Court remanded for a determination of whether such training had been provided.

Patricia Lazarus

457 U.S. 307, *307; 102 S. Ct. 2452, **2452; 73 L. Ed. 2d 28, ***28; 1982 U.S. LEXIS 128, ****1

**Outcome**

The Court vacated the judgment and remanded, holding that respondent institutionalized individual had substantive rights under the *Due Process Clause of the Fourteenth Amendment* to safe conditions of *confinement*, freedom from bodily restraints, and, training or "habilitation."

# LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > General Overview

Constitutional Law > Substantive *Due Process* > General Overview

*HN1[⤓]* **Fundamental Rights, Procedural Due Process**

See U.S. Const. amend. XIV, § 1.

Constitutional Law > Substantive *Due Process* > Scope

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

*HN2[⤓]* **Constitutional Law, Substantive Due Process**

The mere fact that a person is committed under proper procedures does not deprive him of all substantive liberty interests under the *Fourteenth Amendment of the United States Constitution, U.S. Const. amend. XIV*.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Public Health & Welfare Law > Social Services > Institutionalized

Individuals > *Confinement* Conditions

Constitutional Law > Substantive *Due Process* > Scope

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

*HN3[⤓]* **Fundamental Rights, Cruel & Unusual Punishment**

The right to personal security constitutes a "historic liberty interest" protected substantively by the *Due Process* Clause. And that right is not extinguished by lawful *confinement*, even for penal purposes. It is unconstitutional to confine the involuntarily committed - who may not be punished at all - in unsafe conditions.

Constitutional Law > Substantive *Due Process* > Scope

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

*HN4[⤓]* **Constitutional Law, Substantive Due Process**

Liberty from bodily restraint always has been recognized as the core of the liberty protected by the *Due Process* Clause from arbitrary governmental action. This interest survives criminal conviction and incarceration. Similarly, it must also survive *involuntary* commitment.

Constitutional Law > Substantive *Due Process* > Scope

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

*HN5[⤓]* **Constitutional Law, Substantive Due Process**

As a general matter, a State is under no constitutional duty to provide substantive services for those within its border. When a person is institutionalized and wholly dependent on the State, a duty to provide certain services and care does exist, although even then a

457 U.S. 307, *307; 102 S. Ct. 2452, **2452; 73 L. Ed. 2d 28, ***28; 1982 U.S. LEXIS 128, ****1

State necessarily has considerable discretion in determining the nature and scope of its responsibilities. Nor must a State choose between attacking every aspect of a problem or not attacking the problem at all.

Constitutional Law > Substantive **_Due Process_** > Scope

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > Institutionalization

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

### _HN6_[⬇] Constitutional Law, Substantive Due Process

An involuntarily committed person's liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint. It is not feasible to define or identify the type of training that may be required in every case. A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case. A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State. Because the facts in cases of **_confinement_** of mentally retarded patients vary widely, it is essential to focus on the facts and circumstances of the case before a court.

Constitutional Law > Substantive **_Due Process_** > Scope

### _HN7_[⬇] Constitutional Law, Substantive Due Process

In determining whether a substantive right protected by the **_Due Process_** Clause has been violated, it is necessary to balance the liberty of the individual and the demands of an organized society.

Constitutional Law > Substantive **_Due Process_** > Scope

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > Institutionalization

Public Health & Welfare Law > ... > Mental Health Services > Commitment > **_Involuntary_** Commitment of Adults

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

### _HN8_[⬇] Constitutional Law, Substantive Due Process

Whether a state institutionalized respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests. If there is to be any uniformity in protecting these interests, this balancing cannot be left to the unguided discretion of a judge or jury. The proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded is articulated as follows: the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.

Constitutional Law > Substantive **_Due Process_** > Scope

Public Health & Welfare Law > Social Services > Institutionalized Individuals > **_Confinement_** Conditions

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

### _HN9_[⬇] Constitutional Law, Substantive Due Process

Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of **_confinement_** than criminals whose conditions of **_confinement_** are designed to punish.

457 U.S. 307, *307; 102 S. Ct. 2452, **2452; 73 L. Ed. 2d 28, ***28; 1982 U.S. LEXIS 128, ****1

Constitutional Law > Substantive *Due Process* > Scope

Public Health & Welfare Law > Social Services > Institutionalized Individuals > *Confinement* Conditions

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

**HN10[⬇]  Constitutional Law, Substantive Due Process**

An involuntarily committed person is entitled to minimally adequate training. The minimally adequate training required by the United States Constitution is such training as may be reasonable in light of the committed person's liberty interests in safety and freedom from unreasonable restraints. In determining what is "reasonable" courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized.

Constitutional Law > Substantive *Due Process* > Scope

Public Health & Welfare Law > Social Services > Institutionalized Individuals > *Confinement* Conditions

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

**HN11[⬇]  Constitutional Law, Substantive Due Process**

Adequate food, shelter, clothing, and medical care are the essentials of care that the State must provide to an institutionalized resident. The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution. And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training.

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

**HN12[⬇]  Social  Services,  Institutionalized Individuals**

In determining whether the State has met its obligations to institutionalized individuals, decisions made by the appropriate professional are entitled to a presumption of correctness.

# Lawyers' Edition Display

### Decision

Involuntarily committed retarded person, held to have *due process* liberty interests requiring state to provide minimally adequate training to ensure safety and freedom from undue restraint.

### Summary

The mother of a mentally retarded person, who was involuntarily committed to a Pennsylvania state institution upon her petition and who was injured on numerous occasions while a patient at the institution, filed a complaint, as her son's next friend, in the United States District Court for the Eastern District of Pennsylvania under *42 USCS 1983*, seeking damages against the institution's officials, and alleging that these officials knew, or should have known, that her son was suffering injuries and that they failed to institute appropriate preventive procedures, thereby violating his rights under the *Eighth* and *Fourteenth Amendments*. A second amended complaint was filed, alleging that the officials were restraining her son for prolonged periods on a routine basis, and claiming damages for the official's failure to provide him with appropriate treatment or programs for his mental retardation. At the close of trial, the District Court instructed the jury on the assumption that the proper standard of liability was that of the *Eighth Amendment*, and verdict was returned for the officials. The United States Court of Appeals for the Third Circuit reversed and remanded for a new trial, holding that the *Eighth Amendment* was not an appropriate source for determining the rights of the

involuntarily committed, but that the *Fourteenth Amendment*, and the liberty interest protected therein, provided the proper constitutional basis for these rights (*644 F2d 147*).

On certiorari, the United States Supreme Court vacated and remanded. In an opinion by Powell, J., joined by Brennan, White, Marshall, Blackmun, Rehnquist, Stevens, and O'Connor, JJ., it was held that the mentally retarded individual has liberty interests under the *due process clause of the Fourteenth Amendment* which require the state to provide him minimally adequate or reasonable training to ensure safety and freedom from undue restraint, and that the state is under a duty to provide him with such training as an appropriate professional would consider reasonable to ensure him safety and to facilitate his ability to function free from bodily restraints.

Blackmun, J., joined by Brennan and O'Connor, JJ., concurred, expressing the view that the court properly left unresolved, because of the less-than-fully developed record, the issues as to the constitutionality of a state's total failure to provide treatment to an individual committed under state law for care and treatment, and as to an involuntarily-committed mentally retarded person's independent court claim, grounded in the *due process clause of the Fourteenth Amendment*, to that habilitation or training necessary to preserve those self-care skills he possessed when he first entered the state institution.

Burger, Ch. J., concurred in the judgment, stating that a mentally retarded person, involuntarily committed to a state institution, has no constitutional right to training, or habilitation, per se.

## Headnotes

LAW §528.3 > *due process* — liberty interests — involuntarily committed mentally retarded person — > Headnote:
*LEdHN[1A]*[⬇] [1A]*LEdHN[1B]*[⬇] [1B]*LEdHN[1C]*[⬇] [1C]*LEdHN[1D]*[⬇] [1D]

A mentally retarded person, involuntarily committed to a state institution, has liberty interests, under the *due process clause of the Fourteenth Amendment*, which require the state to provide minimally adequate or reasonable training to ensure safety and freedom from

undue restraint; the minimally adequate training required by the Constitution is such training as may be reasonable in light of the involuntarily-committed mentally retarded person's liberty interests in safety and freedom from unreasonable restraints, and, in determining what is reasonable in any case presenting a claim for such training by a state, the courts must show deference to the judgment exercised by a qualified professional, in that the state is under a duty to provide the mentally retarded person with such training as an appropriate professional would consider reasonable to ensure that person's safety and to facilitate his ability to function free from bodily restraints.

LAW §528.3 > *due process* — liberty interests — commitment under proper procedures — > Headnote:
*LEdHN[2]*[⬇] [2]

The mere fact that an involuntarily committed mentally retarded person has been committed under proper procedures, as established by state law, does not deprive him of all substantive liberty interests under the *due process clause of the Fourteenth Amendment*.

LAW §525 > *due process* — liberty interest — personal security of involuntarily committed — > Headnote:
*LEdHN[3]*[⬇] [3]

The right to personal security constitutes an historic liberty interest protected substantively by the *due process clause of the Fourteenth Amendment*; that right is not extinguished by lawful *confinement*, even for penal purposes, and, it is similarly unconstitutional to confine the involuntarily committed, who may not be punished at all, in unsafe conditions.

LAW §528.3 > *due process* — freedom from bodily restraint — *involuntary* commitment — > Headnote:
*LEdHN[4]*[⬇] [4]

The right to freedom from bodily restraint not only survives criminal conviction and incarceration, but also survives *involuntary* commitment.

06/02/2020 12:20 Martin & Associates Case 1:20-cv-11268-WGY Document 1-2 Filed 07/02/20 Page 46 of 125 (FAX)8024795414 P.008/020

Page 6 of 18

457 U.S. 307, *307; 102 S. Ct. 2452, **2452; 73 L. Ed. 2d 28, ***28; 1982 U.S. LEXIS 128, ****1

POSSESSIONS §4 > state's duty to provide services --
> Headnote:
*LEdHN[5][⭳] [5]*

A state is under no constitutional duty to provide substantive services for those within its border.

LAW §528.3 > liberty interests -- involuntarily committed mentally retarded person -- minimally adequate training --
> Headnote:
*LEdHN[6A][⭳] [6A]LEdHN[6B][⭳] [6B]*

Although it is not feasible for the United States Supreme Court to define or identify the type of training that may be required in every case, a court properly may start with the generalization that a mentally retarded person, involuntarily committed in a state institution, has the right to minimally adequate training, the basic requirement of adequacy, in terms more familiar to courts, being that training which is reasonable in light of identifiable liberty interests and the circumstances of the case.

COURTS §261 > federal court -- constitutional predicate --
> Headnote:
*LEdHN[7A][⭳] [7A]LEdHN[7B][⭳] [7B]*

A federal court must identify a constitutional predicate for the imposition of any affirmative duty on a state.

LAW §528.3 > *due process* -- rights of mentally retarded persons -- balancing liberty interests against state interests --
> Headnote:
*LEdHN[8][⭳] [8]*

In determining whether a substantive right protected by the *due process clause of the Fourteenth Amendment* has been violated, it is necessary to balance the liberty of the individual and the demands of an organized society; whether the constitutional rights of a mentally retarded person, involuntarily committed to a state

institution, have been violated must be determined by balancing his liberty interests against the relevant state interests.

LAW §528.3 > persons involuntarily committed -- treatment and conditions of *confinement* -- > Headnote:
*LEdHN[9][⭳] [9]*

Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of *confinement* than criminals whose conditions of *confinement* are designed to punish.

LAW §528.3 > liberty interests -- decisions by professional -- presumption of correctness -- liability of professional --
> Headnote:
*LEdHN[10A][⭳] [10A]LEdHN[10B][⭳] [10B]*

In determining whether the state has met its obligations in providing a mentally retarded person, involuntarily committed to a state institution, with his constitutionally protected liberty interests in conditions of reasonable care and safety, reasonably non-restrictive *confinement* conditions, and such training as may be required by these interests, decisions made by the appropriate professional, in determining what is reasonable, are entitled to a presumption of correctness and validity; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment, although, in an action for damages against a professional in his individual capacity, the professional will not be liable if he is unable to satisfy his normal professional standards because of budgetary constraints.

## Syllabus

Respondent, who is mentally retarded, was involuntarily committed to a Pennsylvania state institution.

Subsequently, after becoming concerned about injuries which respondent had suffered at the institution, his mother filed an action as his next friend in Federal District Court for damages under *42 U. S. C. § 1983* against petitioner institution officials. She claimed that respondent had constitutional rights to safe conditions of **confinement**, freedom from bodily restraint, and training and "habilitation" and that petitioners knew, or should have known, about his injuries but failed to take appropriate preventive procedures, thus violating his rights under the *Eighth* and *Fourteenth Amendments*. In the ensuing jury trial, the District Court instructed the jury on the assumption that the *Eighth Amendment* was the proper standard of liability, and a verdict was returned for petitioners, on which judgment was entered. The Court of Appeals reversed and remanded for a new trial, holding that the Fourteenth, rather than the *Eighth, Amendment* provided the proper constitutional [****2] basis for the asserted rights.

*Held:* Respondent has constitutionally protected liberty interests under the **Due Process Clause of the Fourteenth Amendment** to reasonably safe conditions of **confinement**, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably may be required by these interests. Whether respondent's constitutional rights have been violated must be determined by balancing these liberty interests against the relevant state interests. The proper standard for determining whether the State has adequately protected such rights is whether professional judgment in fact was exercised. And in determining what is "reasonable," courts must show deference to the judgment exercised by a qualified professional, whose decision is presumptively valid. Pp. 314-325.

**Counsel:** David H. Allshouse, Deputy Attorney General of Pennsylvania, argued the cause for petitioners. With him on the briefs were Leroy S. Zimmerman, Attorney General, and Robert B. Hoffman and Allen C. Warshaw, Deputy Attorneys General.

Edmond A. Tiryak argued the cause for respondent. With him on the brief were Ralph J. Moore, Jr., and William F. Sheehan. *

---

*A brief for the State of Connecticut et al. as amici curiae urging reversal was filed by Carl R. Ajello, Attorney General of Connecticut, and Hugh Barber, Richard T. Couture, and Francis J. Mac Gregor, Assistant Attorneys General, Charles A. Graddick, Attorney General of Alabama, and R. Emmett Poundstone III, Assistant Attorney General, Robert K. Corbin,

[****3]

**Judges:** POWELL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which BRENNAN and O'CONNOR, JJ., joined, post, p. 325. BURGER, C. J., filed an opinion concurring in the judgment, post, p. 329.

**Opinion by:** POWELL

## Opinion

[*309] [***32] [**2454] JUSTICE POWELL delivered the opinion of the Court.

*LEdHN[1A]* [1A]The question presented is whether respondent, involuntarily committed to a state institution

Attorney General of Arizona, and Anthony B. Ching, Assistant Attorney General, Steve Clark, Attorney General of Arkansas, and Robert R. Ross, Deputy Attorney General, Jim Smith, Attorney General of Florida, Linley E. Pearson, Attorney General of Indiana, Robert T. Stephan, Attorney General of Kansas, William J. Guste, Jr., Attorney General of Louisiana, James E. Tierney, Attorney General of Maine, Frank J. Kelley, Attorney General of Michigan, Paul L. Douglas, Attorney General of Nebraska, Gregory H. Smith, Attorney General of New Hampshire, James R. Zazzali, Attorney General of New Jersey, Robert O. Wefald, Attorney General of North Dakota, William J. Brown, Attorney General of Ohio, David B. Frohnmayer, Attorney General of Oregon, Dennis J. Roberts II, Attorney General of Rhode Island, Daniel R. McLeod, Attorney General of South Carolina, Marshall Coleman, Attorney General of Virginia, Kenneth O. Eikenberry, Attorney General of Washington, and Chauncey H. Browning, Jr., Attorney General of West Virginia.

Briefs of amici curiae urging affirmance were filed by Margaret F. Ewing, Paul R. Friedman, and Jane Bloom Yohalem for the American Orthopsychiatric Association et al.; and by Dan Stormer and Mary Burdick for Mental Health Advocacy Services et al.

H. Bartow Farr III filed a brief for the American Psychiatric Association as amicus curiae.

for the mentally retarded, has substantive rights under the *Due Process Clause of the Fourteenth Amendment* to (i) safe conditions of *confinement*; [***33] (ii) freedom from bodily restraints; and (iii) training or "habilitation." [1] Respondent sued under *42 U. S. C. § 1983* three administrators of the institution, claiming damages for the alleged breach of his constitutional rights.

[****4] I

Respondent Nicholas Romeo is profoundly retarded. Although 33 years old, he has the mental capacity of an 18-month-old child, with an I. Q. between 8 and 10. He cannot talk and lacks the most basic self-care skills. Until he was 26, respondent lived with his parents in Philadelphia. But after the death of his father in May 1974, his mother was unable to care for him. Within two weeks of the father's death, respondent's mother sought his temporary admission to a nearby Pennsylvania hospital.

[**2455] Shortly thereafter, she asked the Philadelphia County Court of Common Pleas to admit Romeo to a state facility on a permanent basis. Her petition to the court explained that she was unable to care for Romeo or control his violence. [2] As part of the commitment *process*, Romeo was examined by a physician and a psychologist. They both certified that respondent [*310] was severely retarded and unable to care for himself. App. 21a-22a and 28a-29a. On June 11, 1974, the Court of Common Pleas committed respondent to the Pennhurst State School and Hospital, pursuant to the applicable *involuntary* commitment provision of the Pennsylvania Mental Health and Mental Retardation Act, [****5] *Pa. Stat. Ann., Tit. 50, § 4406(b)* (Purdon 1969).

At Pennhurst, Romeo was injured on numerous

occasions, both by his own violence and by the reactions of other residents to him. Respondent's mother became concerned about these injuries. After objecting to respondent's treatment several times, she filed this complaint on November 4, 1976, in the United States District Court for the Eastern District of Pennsylvania as his next friend. The complaint alleged that "[during] the period July, 1974 to the present, plaintiff has suffered injuries on at least sixty-three occasions." The complaint originally sought damages and injunctive relief from Pennhurst's director and two supervisors; [3] it alleged that these [****6] officials knew, or should have known, that Romeo was suffering injuries and that they failed to institute appropriate preventive procedures, [***34] thus violating his rights under the *Eighth* and *Fourteenth Amendments*.

Thereafter, in late 1976, Romeo was transferred from his ward to the hospital for treatment of a broken arm. While in the infirmary, and by order of a doctor, he was physically restrained during portions of each day. [4] These restraints were ordered by Dr. Gabroy, not a defendant here, to protect [*311] Romeo and others in the hospital, some of whom were in [****7] traction or were being treated intravenously. 7 Tr. 40, 49, 76-78. Although respondent normally would have returned to his ward when his arm healed, the parties to this litigation agreed that he should remain in the hospital *due* to the pending lawsuit. 5 *id.*, at 248; 6 *id.*, at 57-58 and 137. Nevertheless, in December 1977, a second amended complaint was filed alleging that the defendants were restraining respondent for prolonged periods on a routine basis. The second amended complaint also added a claim for damages to compensate Romeo for the defendants' failure to provide him with appropriate "treatment or programs for his mental retardation." [5] All claims for injunctive relief were dropped prior to trial because respondent is a

---

[1] The American Psychiatric Association explains: "The word 'habilitation,' . . . is commonly used to refer to programs for the mentally-retarded because mental retardation is . . . a learning disability and training impairment rather than an illness. [The] principal focus of habilitation is upon training and development of needed skills." Brief for American Psychiatric Association as *Amicus Curiae* 4, n. 1.

[2] Mrs. Romeo's petition to the Court of Common Pleas stated: "Since my husband's death I am unable to handle him. He becomes violent -- Kicks, punches, breaks glass; He can't speak -- wants to express himself but can't. He is [a] constant 24 hr. care. [Without] my husband I am unable to care for him." App. 18a.

[3] Petitioner Duane Youngberg was the Superintendent of Pennhurst; he had supervisory authority over the entire facility. Petitioner Richard Matthews was the Director of Resident Life at Pennhurst. Petitioner Marguerite Conley was Unit Director for the unit in which respondent lived. According to respondent, petitioners are administrators, not medical doctors. See Brief for Respondent 2. Youngberg and Matthews are no longer at Pennhurst.

[4] Although the Court of Appeals described these restraints as "shackles," "soft" restraints, for the arms only, were generally used. 7 Tr. 53-55.

[5] Respondent uses "treatment" as synonymous with "habilitation" or "training." See Brief for Respondent 21-23.

457 U.S. 307, *311; 102 S. Ct. 2452, **2455; 73 L. Ed. 2d 28, ***34; 1982 U.S. LEXIS 128, ****7

member of the class seeking such relief in another action. [6]

[****8] An 8-day jury trial was held in April 1978. Petitioners introduced evidence that respondent participated in several programs teaching basic self-care skills. [7] A [**2456] comprehensive behavior-modification program was designed by staff members to reduce Romeo's aggressive behavior, [8] [****9] but that program was never implemented because of his mother's objections. [9] [*312] Respondent introduced evidence of his injuries and of conditions in his unit. [10]

At the close of the trial, the court instructed the jury that "if any or all of the defendants were aware of [***35] and failed to take all reasonable steps to prevent repeated attacks upon Nicholas Romeo," such failure deprived him of constitutional rights. App. 73a. The jury also was instructed that if the defendants shackled Romeo or denied him treatment "as a punishment for filing this lawsuit," his constitutional rights were violated under the *Eighth Amendment*. *Id., at 73*a-75a. Finally, the jury was instructed that only if they found the defendants "[deliberately] [indifferent] to the serious medical [and psychological] [****10] needs" of Romeo

could they find that his *Eighth* and *Fourteenth Amendment* rights had been violated. *Id., at 74*a-75a. [11] The jury returned a verdict for the defendants, on which judgment was entered.

The Court of Appeals for the Third Circuit, sitting en banc, reversed and remanded for a new trial. *644 F.2d 147 (1980)*. The court held that the *Eighth Amendment*, prohibiting cruel and unusual punishment of those convicted of crimes, was not an appropriate source for determining the rights of the involuntarily committed. Rather, the *Fourteenth Amendment* and [****11] the liberty interest protected by that Amendment provided the proper constitutional basis for these rights. In applying [*313] the *Fourteenth Amendment*, the court found that the involuntarily committed retain liberty interests in freedom of movement and in personal security. These were "fundamental liberties" that can be limited only by an "overriding, non-punitive" state interest. *Id., at 157-158* (footnote omitted). It further found that the involuntarily committed have a liberty interest in habilitation designed to "treat" their mental retardation. *Id., at 164-170*. [12]

The en banc court did not, however, agree on the relevant standard to be used in determining whether Romeo's rights had been violated. [13] [****13] Because physical restraint [**2457] [****12] "raises a presumption of a punitive sanction," the majority of the

---

[6] *Pennhurst State School and Hospital v. Halderman, 451 U.S. 1 (1981)* (remanded for further proceedings).

[7] Prior to his transfer to Pennhurst's hospital ward, Romeo participated in programs dealing with feeding, showering, drying, dressing, self-control, and toilet training, as well as a program providing interaction with staff members. Defendants' Exhibit 10; 3 Tr. 69-70; 5 *Id., at 44-56, 242-250*; 6 *id., at 162-166*; 7 *Id., at 41-48*.

Some programs continued while respondent was in the hospital, 5 *Id., at 227, 248, 256*; 6 *id., at 50, 162-166*; 6 *id., at 32, 34, 41-48*, and they reduced respondent's aggressive behavior to some extent, 7 *Id., at 45*.

[8] 2 *Id., at 7*; 5 *id., at 88-90*; 6 *id., at 88, 200-203*; Defendants' Exhibit 1, p. 9. The program called for short periods of separation from other residents and for use of "muffs" on plaintiff's hands for short periods of time, *i. e.*, five minutes, to prevent him from harming himself or others.

[9] 1 Tr. 53; 4 *id., at 25*; 6 *id., at 204*.

[10] The District Judge refused to allow testimony by two of Romeo's witnesses -- trained professionals -- indicating that Romeo would have benefited from more or different training programs. The trial judge explained that evidence of the advantages of alternative forms of treatment might be relevant

to a malpractice suit, but was not relevant to a constitutional claim under *§ 1983*. App. to Pet. for Cert. 101.

[11] The "deliberate indifference" standard was adopted by this Court in *Estelle v. Gamble, 429 U.S. 97, 104 (1976)*, a case dealing with prisoners' rights to punishment that is not "cruel and unusual" under the *Eighth Amendment*. Although the District Court did not refer to *Estelle v. Gamble* in charging the jury, it erroneously used the deliberate-indifference standard articulated in that case. See App. 45a, 75a.

[12] The Court of Appeals used "habilitation" and "treatment" as synonymous, though it regarded "habilitation" as more accurate in describing treatment needed by the mentally retarded. See *644 F.2d, at 165*, and n. 40.

[13] The existence of a qualified immunity defense was not at issue on appeal. The defendants had received instructions on this defense, App. 76a, and it was not challenged by respondent. *644 F.2d, at 173, n. 1*. After citing *Pierson v. Ray, 386 U.S. 547 (1967)*, and *Scheuer v. Rhodes, 416 U.S. 232 (1974)*, the majority of the Court of Appeals noted that such instructions should be given again on the remand. *644 F.2d, at 171-172*.

457 U.S. 307, *313; 102 S. Ct. 2452, **2457; 73 L. Ed. 2d 28, ***35; 1982 U.S. LEXIS 128, ****12

Court of Appeals concluded that it can be justified only by "compelling necessity." *Id., at 159-160* (footnote omitted). A somewhat different standard was appropriate for the failure to provide for a resident's safety. The majority considered that such a failure must be justified by a showing of "substantial necessity." *Id., at 164*. Finally, the majority held that when treatment has been administered, those responsible are liable only if the treatment is not "acceptable in [***36] the light of present medical or other scientific knowledge." *Id., at 166-167* and 173. [14]

[*314] Chief Judge Seitz, concurring in the judgment, considered the standards articulated by the majority as indistinguishable from those applicable to medical malpractice claims. In Chief Judge Seitz' view, the Constitution [****14] "only requires that the courts make certain that professional judgment in fact was exercised." *Id., at 178*. He concluded that the appropriate standard was whether the defendants' conduct was "such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment." *Ibid.* [15]

---

[14] Actually, the court divided the right-to-treatment claim into three categories and adopted three standards, but only the standard described in text is at issue before this Court. The Court of Appeals also stated that if a jury finds that *no* treatment has been administered, it may hold the institution's administrators liable unless they can provide a compelling explanation for the lack of treatment, *id., at 165, 173*, but respondent does not discuss this precise standard in his brief and it does not appear to be relevant to the facts of this case. In addition, the court considered "least intrusive" analysis appropriate to justify severe intrusions on individual dignity, such as permanent physical alteration or surgical intervention, *id., at 165-166* and 173, but respondent concedes that this issue is not present in this case.

[15] Judge Aldisert joined Chief Judge Seitz' opinion, but wrote separately to emphasize the nature of the difference between the majority opinion and that of the Chief Judge. On a conceptual level, Judge Aldisert thought that the court erred in abandoning the common-law method of deciding the case at bar rather than articulating broad principles unconnected with the facts of the case and of uncertain meaning. *Id., at 182-183*. And, on a pragmatic level, Judge Aldisert warned that neither juries nor those administering state institutions would receive guidance from the "amorphous constitutional law tenets" articulated in the majority opinion. *Id., at 184*. See *id., at 183-185*.

[****15] We granted the petition for certiorari because of the importance of the question presented to the administration of state institutions for the mentally retarded. *451 U.S. 982 (1981)*.

II

We consider here for the first time the substantive rights of involuntarily committed mentally retarded persons under the *Fourteenth Amendment to the Constitution*. [16] In this [*315] case, respondent has been committed under the laws of Pennsylvania, and he does not challenge the commitment. Rather, he argues that he has a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution; and that petitioners infringed these rights by failing to provide constitutionally required conditions of *confinement*.

[****16] *LEdHN[2]*[⬆] [2]*HN2*[⬆] The mere fact that Romeo has been committed under proper procedures does not deprive him of all substantive liberty interests under the *Fourteenth Amendment*. See, e. g., *Vitek v. Jones, 445 U.S. 480, 491-494 (1980)*. Indeed, the State concedes that respondent has a right to adequate [***37] food, shelter, clothing, and medical [**2458] care. [17] We must decide whether liberty interests also exist in safety, freedom of movement, and training. If such interests do exist, we must further decide whether they have been infringed in this case.

A

*LEdHN[3]*[⬆] [3]Respondent's first two claims involve

---

Judge Garth also joined Chief Judge Seitz' opinion, and wrote separately to criticize the majority for addressing issues not raised by the facts of this case. *Id., at 186*.

[16] *HN1*[⬆] In pertinent part, that Amendment provides that a State cannot deprive "any person of life, liberty, or property, without *due process* of law . . . ." U.S. Const., Amdt. 14, § 1.

Respondent no longer relies on the *Eighth Amendment* as a direct source of constitutional rights. See Brief for Respondent 13, n. 12.

[17] Brief for Petitioners 8, 11, 12, and n. 10; Brief for Respondent 15-16. See also Brief for State of Connecticut et al. as *Amici Curiae* 8. Petitioners argue that they have fully protected these interests.

457 U.S. 307, *315; 102 S. Ct. 2452, **2458; 73 L. Ed. 2d 28, ***37; 1982 U.S. LEXIS 128, ****16

liberty interests recognized by prior decisions of this Court, interests that *involuntary* commitment proceedings do not extinguish. [18] The first is a claim to safe conditions. In the past, this Court [****17] has noted that *HN3*[⬆] the right to personal security constitutes a "historic liberty interest" protected substantively by the *Due Process* Clause. *Ingraham v. Wright, 430 U.S. 651, 673 (1977)*. And that right is not extinguished by lawful *confinement*, even for penal purposes. See *Hutto v. Finney, 437 U.S. 678 (1978)*. If it is cruel and unusual punishment to [*316] hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed — who may not be punished at all — in unsafe conditions.

*LEdHN[4]*[⬆] [4]Next, respondent claims a right to freedom from bodily restraint. In other contexts, the existence of such an interest is clear in the prior decisions of this Court. Indeed, *HN4*[⬆] "[liberty] from bodily restraint always has been recognized as the core of the liberty protected by the *Due Process* Clause from arbitrary governmental action." *Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 18 (1979)* [****18] (POWELL, J., concurring in part and dissenting in part). This interest survives criminal conviction and incarceration. Similarly, it must also survive *involuntary* commitment.

**B**

Respondent's remaining claim is more troubling. In his words, he asserts a "constitutional right to minimally adequate habilitation." Brief for Respondent 8, 23, 45. This is a substantive *due process* claim that is said to be grounded in the liberty component of the *Due Process Clause of the Fourteenth Amendment*. [19] [****19] The term "habilitation," used in psychiatry, is

[18] Petitioners do not appear to argue to the contrary. See Brief for Petitioners 27-31.

[19] Respondent also argues that because he was committed for care and treatment under state law he has a state substantive right to habilitation, which is entitled to substantive, not procedural, protection under the *Due Process Clause of the Fourteenth Amendment*. But this argument is made for the first time in respondent's brief to this Court. It was not advanced in the courts below, and was not argued to the Court of Appeals as a ground for reversing the trial court. Given the uncertainty of Pennsylvania law and the lack of any guidance on this issue from the lower federal courts, we decline to consider it now.

not defined precisely or consistently in the [***38] opinions below or in the briefs of the parties or the *amici*. [20] As [*317] noted previously in n. 1, *supra*, the term refers to "training and development of needed skills." Respondent emphasizes that the right he asserts is for "minimal" training, see Brief for Respondent 34, and he would leave the type and extent of training to be determined on [**2459] a case-by-case basis "in light of present medical or other scientific knowledge," *id., at 45.*

*LEdHN[5]*[⬆] [5]In addressing the asserted right to training, we start from established principles. *HN5*[⬆] As a general matter, a State is under no constitutional duty to provide substantive services for those within its border. See *Harris v. McRae, 448 U.S. 297, 318 (1980)* (publicly funded abortions); *Maher v. Roe, 432 U.S. 464, 469 (1977)* [****20] (medical treatment). When a person is institutionalized — and wholly dependent on the State — it is conceded by petitioners that a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities. See *Richardson v. Belcher, 404 U.S. 78, 83-84 (1971)*; *Dandridge v. Williams, 397 U.S. 471, 478 (1970)*. Nor must a State "choose between attacking every aspect of a problem or not attacking the problem at all." *Id., at 486-487.*

Respondent, in light of the severe character of his retardation, concedes that no amount of training will make possible his release. And he does not argue that

See *Dothard v. Rawlinson, 433 U.S. 321, 323, n. 1 (1977)*; *Duignan v. United States, 274 U.S. 195, 200 (1927)*; *Old Jordan Milling Co. v. Societe Anonyme des Mines, 164 U.S. 261, 264-265 (1896)*.

[20] Professionals in the habilitation of the mentally retarded disagree strongly on the question whether effective training of all severely or profoundly retarded individuals is even possible. See, e. g., Favell, Risley, Wolfe, Riddle, & Rasmussen, The Limits of Habilitation: How Can We Identify Them and How Can We Change Them?, 1 Analysis and Intervention in Developmental Disabilities 37 (1981); Bailey, Wanted: A Rational Search for the Limiting Conditions of Habilitation in the Retarded, 1 Analysis and Intervention in Developmental Disabilities 45 (1981); Kauffman & Krouse, The Cult of Educability: Searching for the Substance of Things Hoped for; The Evidence of Things Not Seen, 1 Analysis and Intervention in Developmental Disabilities 53 (1981).

06/02/2020   12:33   Martin & Associates   Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 52 of 125   (FAX)8024795414   P.014/020

Page 12 of 18

457 U.S. 307, *317; 102 S. Ct. 2452, **2459; 73 L. Ed. 2d 28, ***38; 1982 U.S. LEXIS 128, ****20

if he were still at home, the State would have an obligation to provide training at its expense. See Tr. of Oral Arg. 33. The record reveals that respondent's primary needs are bodily safety and a minimum of physical restraint, and respondent clearly claims [*318] training related to these needs. [21] [****22] As we have recognized that there is a constitutionally protected liberty interest in safety and freedom from restraint, [****21] *supra, at 315-316*, training may be necessary to avoid unconstitutional infringement of those rights. On the basis of the record before us, it is quite uncertain whether respondent seeks any "habilitation" or training unrelated to safety and freedom from bodily restraints. In his brief to this Court, Romeo indicates that even the self-care programs he seeks are needed to reduce his aggressive behavior. See Brief for Respondent 21-22, 50. And in his offer of proof to the trial court, respondent repeatedly indicated that, if allowed to testify, his experts would show that additional training programs, including self-care programs, were needed [***39] to reduce his aggressive behavior. App. to Pet. for Cert. 98a-104a. [22] If, as seems the case, respondent seeks only training related to safety and freedom from restraints, this case does not present the difficult question whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training *per se*, even when no type or amount of training would lead to freedom. [23]

*LEdHN[1B][↑]* [1B] *LEdHN[6A][↑]* [6A] *LEdHN[7A][↑]* [7A]Chief Judge Seitz, in language apparently adopted by respondent, observed:

"I believe that the plaintiff has a constitutional right to

---

[21] See, e. g., description of complaint, *supra, at 310.*

[22] See also Brief for Appellant in No. 78-1982, pp. 11-14, 20-21, and 24 (CA3).

[23] In the trial court, respondent asserted that "state officials at a state mental hospital have a duty to provide residents . . . with such treatment as will afford them a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as their capacities permit." App. to Pet. for Cert. 94a-95a. But this claim to a sweeping *per se* right was dropped thereafter. In his brief to this Court, respondent does not repeat it and, at oral argument, respondent's counsel explicitly disavowed any claim that respondent is constitutionally entitled to such treatment as would enable him "to achieve his maximum potential." Tr. of Oral Arg. 46-48.

minimally adequate care and treatment. The existence [*319] of a constitutional right to care and treatment is no longer a novel legal proposition." *644 F.2d, at 176.*

Chief Judge Seitz [****23] did not identify or otherwise define -- beyond the right to reasonable safety and freedom from physical restraint -- the "minimally adequate care and treatment" that appropriately may be required [**2460] for this respondent. [24] In the circumstances presented by this case, and on the basis of the record developed to date, we agree with his view and conclude that *HN6[↑]* respondent's liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint. In view of the kinds of treatment sought by respondent and the evidence of record, we need go no further in this case. [25]

*LEdHN[6B][↑]* [6B] *LEdHN[7B][↑]* [7B]

[****24] III

A

We have established that Romeo retains liberty interests in safety and freedom from bodily restraint.

---

[24] Chief Judge Seitz used the term "treatment" as synonymous with training or habilitation. See *644 F.2d, at 181.*

[25] It is not feasible, as is evident from the variety of language and formulations in the opinions below and the various briefs here, to define or identify the type of training that may be required in every case. A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case. A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State.

Because the facts in cases of *confinement* of mentally retarded patients vary widely, it is essential to focus on the facts and circumstances of the case before a court. Judge Aldisert, in his concurring opinion in the court below, was critical of the "majority's abandonment of incremental decision-making in favor of promulgation of broad standards . . . [that] [lack] utility for the groups most affected by this decision." *Id., at 183-184.* Judge Garth agreed that reaching issues not presented by the case requires a court to articulate principles and rules of law in "the absence of an appropriate record . . . and without the benefit of analysis, argument, or briefing" on such issues. *Id., at 186.*

Yet these interests [*320] are not absolute; [***40] indeed to some extent they are in conflict. In operating an institution such as Pennhurst, there are occasions in which it is necessary for the State to restrain the movement of residents — for example, to protect them as well as others from violence. [26] Similar restraints may also be appropriate in a training program. And an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement. The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate *due process*.

*LEdHN[8]*[↑] [8]*HN7*[↑] In determining whether a substantive right protected by the *Due Process* Clause has been violated, [****25] it is necessary to balance "the liberty of the individual" and "the demands of an organized society." *Poe v. Ullman, 367 U.S. 497, 542 (1961)* (Harlan, J., dissenting). In seeking this balance in other cases, the Court has weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty. In *Bell v. Wolfish, 441 U.S. 520 (1979)*, for example, we considered a challenge to pretrial detainees' *confinement* conditions. We agreed that the detainees, not yet convicted of the crime charged, could not be punished. But we upheld those restrictions on liberty that were reasonably related to legitimate government objectives and not tantamount to punishment. [27] See *id., at 539*. We have taken a [*321] [**2461] similar approach in deciding procedural *due process* challenges to civil commitment

[26] In Romeo's case, there can be no question that physical restraint was necessary at times. See n. 2, *supra*.

[27] See also *Jackson v. Indiana, 406 U.S. 715, 738 (1972)* (holding that an incompetent pretrial detainee cannot, after a competency hearing, be held indefinitely without either criminal *process* or civil commitment; *due process* requires, at a minimum, some rational relation between the nature and duration of commitment and its purpose). This case differs in critical respects from *Jackson*, a procedural *due process* case involving the validity of an *involuntary* commitment. Here, respondent was committed by a court on petition of his mother who averred that in view of his condition she could neither care for him nor control his violence. N. 2, *supra*. Thus, the purpose of respondent's commitment was to provide reasonable care and safety, conditions not available to him outside of an institution.

proceedings. In *Parham v. J. R., 442 U.S. 584 (1979)*, for example, we considered a challenge to state procedures for commitment of a minor with parental consent. In determining that *procedural due process* did not mandate an adversarial hearing, we weighed [****26] the liberty interest of the individual against the legitimate interests of the State, including the fiscal and administrative burdens additional procedures would entail. [28] *Id., at 599-600*.

[****27] Accordingly, *HN8*[↑] whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the [***41] relevant state interests. If there is to be any uniformity in protecting these interests, this balancing cannot be left to the unguided discretion of a judge or jury. We therefore turn to consider the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded.

B

*LEdHN[9]*[↑] [9]We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *644 F.2d, at 178*. *HN9*[↑] Persons who have been involuntarily [*322] committed are entitled to more considerate treatment and conditions of *confinement* [****28] than criminals whose conditions of *confinement* are designed to punish. Cf. *Estelle v. Gamble, 429 U.S. 97, 104 (1976)*. At the same time, this standard is lower than the "compelling" or "substantial" necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety. We think this requirement would place an undue burden on the administration of institutions such as Pennhurst and

[28] See also *Addington v. Texas, 441 U.S. 418 (1979)*. In that case, we held that the State must prove the need for commitment by "clear and convincing" evidence. See *id., at 431-432*. We reached this decision by weighing the individual's liberty interest against the State's legitimate interests in *confinement*.

06/02/2020  13:33 Marbin & Associates  Case 1:20-cv-01266-WGY  Document 1-2  Filed 07/02/20  Page 54 of 125  FAX 8024795414  P.016/020

Page 14 of 18

457 U.S. 307, *322; 102 S. Ct. 2452, **2461; 73 L. Ed. 2d 28, ***41; 1982 U.S. LEXIS 128, ****28

also would restrict unnecessarily the exercise of professional judgment as to the needs of residents.

*LEdHN[1C][↑]* [1C] *LEdHN[10A][↑]* [10A]Moreover, we agree that *HN10[↑]* respondent is entitled to minimally adequate training. In this case, the minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints. In determining what is "reasonable" -- in this and in any case presenting a claim for training by a State -- we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary [****29] with the internal operations of these institutions should be minimized. 29 [****30] [***42] Moreover, [**2462] there certainly [*323] is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions. See *Parham v. J. R., supra, at 607; Bell v. Wolfish, supra, at 544* (Courts should not "'second-guess the expert administrators on matters on which they are better informed'"). For these reasons, the decision, if made by a professional, 30 is

---

29 See *Parham v. J. R., 442 U.S. 584, 608, n. 16 (1979)* (In limiting judicial review of medical decisions made by professionals, "it is incumbent on courts to design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems"). See also *Rhodes v. Chapman, 452 U.S. 337, 352 (1981)* ("[Courts] cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system . . ."); *Bell v. Wolfish, 441 U.S. 520, 539 (1979)* (In the context of conditions of *confinement* of pretrial detainees, "[courts] must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility"); *Wolff v. McDonnell, 418 U.S. 539, 556 (1974)* (In considering a procedural *due process* claim in the context of prison, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application"). See also Townsend & Mattson, The Interaction of Law and Special Education: Observing the Emperor's New Clothes, 1 Analysis and Intervention in Developmental Disabilities 75 (1981) (judicial resolution of rights of the handicapped can have adverse as well as positive effects on social change).

30 By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to

presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment. 31 In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability. See n. 13, *supra.*

**[*324] IV**

*LEdHN[1D][↑]* [1D]In deciding this case, we have weighed those postcommitment [****31] interests cognizable as liberty interests under the *Due Process Clause of the Fourteenth Amendment* against legitimate state interests and in light of the constraints under which most state institutions necessarily operate. We repeat that the State concedes a duty to provide *HN11[↑]* adequate food, shelter, clothing, and medical care. These are the essentials of the care that the State must provide. The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution. And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training. In this case, therefore, the State is under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints. It may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the

---

make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care -- including decisions that must be made without delay -- necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

31 All members of the Court of Appeals agreed that respondent's expert testimony should have been admitted. This issue was not included in the questions presented for certiorari, and we have no reason to disagree with the view that the evidence was admissible. It may be relevant to whether petitioners' decisions were a substantial departure from the requisite professional judgment. See *supra*, this page.

06/02/2020 12:34 Martin & Associates Document 1-2 Filed 07/02/20 (FAX)8024795414 P.017/020
Case 1:20-cv-11206-WGY Document 1-2 Filed 07/02/20 Page 55 of 125

Page 15 of 18

457 U.S. 307, *324; 102 S. Ct. 2452, **2462; 73 L. Ed. 2d 28, ***42; 1982 U.S. LEXIS 128, ****31

likelihood of violence.

**LEdHN[10B]**  [10B]Respondent thus enjoys constitutionally protected interests in conditions of reasonable care and [***43] safety, reasonably [****32] nonrestrictive *confinement* conditions, and such training as may be required by these interests. Such conditions of *confinement* would comport fully with the purpose of respondent's commitment. Cf. *Jackson v. Indiana, 406 U.S. 715, 738 (1972);* see n. 27, *supra.* **HN12**  In determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. [**2463] Such a presumption is necessary to enable institutions of this type — often, unfortunately, overcrowded and understaffed — to continue to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and particularly [*325] professional personnel, should not be required to make each decision in the shadow of an action for damages.

In this case, we conclude that the jury was erroneously instructed on the assumption that the proper standard of liability was that of the *Eighth Amendment*. We vacate the decision of the Court of Appeals and remand for further proceedings consistent with this [****33] decision.

*So ordered.*

**Concur by: BLACKMUN; BURGER**

# Concur

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE O'CONNOR join, concurring.

I join the Court's opinion. I write separately, however, to make clear why I believe that opinion properly leaves unresolved two difficult and important issues.

The first is whether the Commonwealth of Pennsylvania could accept respondent for "care and treatment," as it did under the Pennsylvania Mental Health and Mental Retardation Act of 1966, *Pa. Stat. Ann., Tit. 50, §*

*4406(b)* (Purdon 1969), and then constitutionally refuse to provide him any "treatment," as that term is defined by state law. Were that question properly before us, in my view there would be a serious issue whether, as a matter of *due process,* the State could so refuse. I therefore do not find that issue to be a "frivolous" one, as THE CHIEF JUSTICE does, *post,* at 330, n. [1]

[****34] In *Jackson v. Indiana, 406 U.S. 715 (1972)*, this Court, by a unanimous vote of all participating Justices, suggested a constitutional standard for evaluating the conditions of a civilly committed person's *confinement:* "At the least, *due process* requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id., at 738.* Under this standard, [*326] a State could accept a person for "safekeeping," then constitutionally refuse to provide him treatment. In such a case, commitment without treatment would bear a reasonable [***44] relation to the goal for which the person was confined.

If a state court orders a mentally retarded person committed for "care *and* treatment," however, I believe that *due process* might well bind the State to ensure that the conditions of his commitment bear some reasonable relation to each of those goals. In such a case, commitment without any "treatment" whatsoever would not bear a reasonable relation to the purposes of the person's *confinement.*

In respondent's case, the majority and principal concurring opinions in the Court of Appeals [****35] agreed that "[by] basing [respondent's] deprivation of liberty at least partially upon a promise of treatment, the state ineluctably has committed the community's resources to providing minimal treatment." *644 F.2d 147, 168 (CA3 1980).* [2] Neither opinion clarified,

---

[1] See also Garvey, Freedom and Choice in Constitutional Law, 94 Harv. L. Rev. 1756, 1787-1791 (1981); *Welsch v. Likins, 550 F.2d 1122, 1126, and n. 6 (CA8 1977); Wyatt v. Aderholt, 503 F.2d 1305 (CA5 1974),* aff'g *Wyatt v. Stickney, 325 F.Supp. 781, 785 (MD Ala. 1971).*

[2] In the principal concurring opinion, Chief Judge Seitz, for himself and three other judges, stated:

"The state does not contest that it has placed the [respondent] in Pennhurst to provide basic care and treatment. Indeed, he has a right to treatment under state law, . . . and the fact that Pennhurst has programs and staff to treat patients is indicative of such a purpose. I believe that when the purpose of confining a mentally retarded person is to provide care and

however, whether respondent in fact had been totally denied "treatment," as that term is defined under Pennsylvania law. To the extent that the [**2464] majority addressed the question, it found that "the evidence in the record, although somewhat contradictory, suggests not so much a total failure to treat as an inadequacy of treatment." Ibid.

[****36] This Court's reading of the record, ante, at 311-312, and n. 7, supports that conclusion. Moreover, the Court today finds that respondent's entitlement to "treatment" under Pennsylvania law was not properly raised below. See ante, [*327] at 316, n. 19. Given this uncertainty in the record, I am in accord with the Court's decision not to address the constitutionality of a State's total failure to provide "treatment" to an individual committed under state law for "care and treatment."

The second difficult question left open today is whether respondent has an independent constitutional claim, grounded in the *Due Process Clause of the Fourteenth Amendment*, to that "habilitation" or training necessary to *preserve* those basic self-care skills he possessed when he first entered Pennhurst -- for example, the ability to dress himself and care for his personal hygiene. In my view, it would be consistent with the Court's reasoning today to include within the "minimally adequate training required by the Constitution," ante, at 322, such training as is reasonably necessary to prevent a person's pre-existing self-care skills from *deteriorating* because of his commitment.

[****37] The Court makes clear, ante, at 315-316 and 324, that even after a person is committed to a state institution, he is entitled to such training as is necessary to prevent unreasonable losses of additional liberty as a result of his **confinement** -- for example, unreasonable bodily restraints or unsafe institutional conditions. If [***45] a person could demonstrate that he entered a state institution with minimal self-care skills, but lost those skills after commitment because of the State's unreasonable refusal to provide him training, then, it seems to me, he has alleged a loss of liberty quite distinct from -- and as serious as -- the loss of safety and freedom from unreasonable restraints. For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know.

Although respondent asserts a claim of this kind, I agree with the Court that "[on] the basis of the record before us, it is quite uncertain whether respondent [in fact] seeks any [*328] 'habilitation' or training unrelated to safety and freedom from bodily restraints." [****38] [3] Ante, at 318. Since the Court finds respondent constitutionally entitled at least to "such training as may be reasonable in light of [his] liberty interests in safety and freedom from unreasonable restraints," ante, at 322, I accept its decision [**2465] not to address respondent's additional claim.

[****39] If respondent actually seeks habilitation in self-care skills not merely to reduce his aggressive tendencies, but also to maintain those basic self-care skills necessary to his personal autonomy within Pennhurst, I believe he is free on remand to assert that claim. Like the Court, I would be willing to defer to the judgment of professionals as to whether or not, and to what extent, institutional training would preserve respondent's [*329] pre-existing skills. Cf. ante, at 321-

---

[3] At trial, respondent's attorney requested a jury instruction that

"[under] the *Eighth* and *Fourteenth Amendments*, state officials at a state mental hospital have a duty to provide residents of such institutions with such treatment as will afford them a reasonable opportunity to acquire *and maintain* those life skills necessary to cope as effectively as their capacities permit." App. to Pet. for Cert. 94a-95a (emphasis added).

In this Court, respondent again argued that

"without minimal habilitative efforts -- basic training in fundamental life skills -- institutionalized retarded persons not only will fail to develop such skills independently *but also will lose the skills they may have brought with them into the institution*. . . . Indeed, putting aside increased risks of physical harm, if a retarded individual loses all of his previously acquired skills through prolonged institutional neglect, then the State has worked positive injury . . . . Once [retarded persons] have been confined they have no one but the State to turn to for help in gaining additional skills or, *at least, preserving whatever skills and abilities they have*." Brief for Respondent 22-23 (emphasis added).

Respondent's description of the expert testimony to be offered on remand, however, suggests that he seeks training in self-care skills primarily to ensure his personal safety and the safety of others. See, e. g., App. to Pet. for Cert. 100a (respondent's offer of proof that "when mentally retarded individuals learn alternative behavior, such as toilet training and dressing and so forth, [their] aggression decreases"); Brief for Respondent 22 (training in self-care skills is necessary to prevent development of "a variety of inappropriate, aggressive and self-destructive behaviors").

---

treatment, as is undoubtedly the case here, it violates the **due process** clause to fail to fulfill that purpose." 644 F.2d, at 176.

Patricia Lazarus

323. As the Court properly notes, "[professionals] in the habilitation of the mentally retarded disagree strongly on the question whether effective training of all severely or profoundly retarded individuals is even possible." *Ante*, at 316, n. 20.

If expert testimony reveals that respondent was so retarded when he entered the institution that he had no basic self-care skills to preserve, or that institutional training would [***46] not have preserved whatever skills he did have, then I would agree that he suffered no additional loss of liberty even if petitioners failed to provide him training. But if the testimony establishes that respondent possessed certain basic self-care skills when he [****40] entered the institution, and was sufficiently educable that he could have maintained those skills with a certain degree of training, then I would be prepared to listen seriously to an argument that petitioners were constitutionally required to provide that training, even if respondent's safety and mobility were not imminently threatened by their failure to do so.

The Court finds it premature to resolve this constitutional question on this less than fully developed record. Because I agree with that conclusion, I concur in the Court's opinion.

CHIEF JUSTICE BURGER, concurring in the judgment.

I agree with much of the Court's opinion. However, I would hold flatly that respondent has no constitutional right to training, or "habilitation," *per se*. The parties, and the Court, acknowledge that respondent cannot function outside the state institution, even with the assistance of relatives. Indeed, even now neither respondent nor his family seeks his discharge from state care. Under these circumstances, the State's provision of food, shelter, medical care, and living conditions as safe as the inherent nature of the institutional environment reasonably allows, serves to justify the [****41] State's custody of respondent. The State did not seek custody of respondent; his family understandably sought the State's aid to meet a serious need.

[*330] I agree with the Court that some amount of self-care instruction may be necessary to avoid unreasonable infringement of a mentally retarded person's interests in safety and freedom from restraint; but it seems clear to me that the Constitution does not otherwise place an affirmative duty on the State to provide any particular kind of training or habilitation — even such as might be encompassed under the essentially standardless rubric "minimally adequate

training," to which the Court refers. See *ante*, at 319, and n. 24. Cf. *644 F.2d 147, 176 (CA3 1980)* (Seitz, C. J., concurring in judgment). Since respondent asserts a right to "minimally adequate" habilitation "[quite] apart from its relationship to decent care," Brief for Respondent 23, unlike the Court I see no way to avoid the issue. * Cf. *ante*, at 318.

[*****42] [**2466] I also point out that, under the Court's own standards, it is largely irrelevant whether respondent's experts were of the opinion that "additional training programs, including [***47] self-care programs, were needed to reduce [respondent's] aggressive behavior," *ibid.* — a prescription far easier for "spectators" to give than for an institution to implement. The training program devised for respondent by petitioners and other professionals at Pennhurst was, according to the Court's opinion, "presumptively valid"; and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." [*331] *Ante*, at 323. Thus, even if respondent could demonstrate that the training programs at Pennhurst were inconsistent with generally accepted or prevailing professional practice -- if indeed there be such -- this would not avail him so long as his training regimen was actually prescribed by the institution's professional staff.

Finally, it is worth noting that the District Court's [****43] instructions in this case were on the whole consistent with the Court's opinion today; indeed, some instructions may have been overly generous to respondent. Although the District Court erred in giving an instruction incorporating an *Eighth Amendment* "deliberate indifference" standard, the court also instructed, for example, that petitioners could be held liable if they "were aware of and failed to take all reasonable steps to

---

* Indeed, in the trial court respondent asserted a broad claim to such "treatment as [would] afford [him] a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as [his] capacities permit." App. to Pet. for Cert. 94a.

Respondent also maintains that, because state law purportedly creates a right to "care and treatment," he has a *federal substantive* right under the *Due Process* Clause to enforcement of this state right. See *ante*, at 316, n. 19. This contention is obviously frivolous; were every substantive right created by state law enforceable under the *Due Process* Clause, the distinction between state and federal law would quickly be obliterated.

*Neither mentally ill nor a danger to society nor myself*

Caution
As of: June 2, 2020 3:37 PM Z

# *Foucha v. Louisiana*

Supreme Court of the United States

November 4, 1991, Argued ; May 18, 1992, Decided

No. 90-5844

**Reporter**
504 U.S. 71 *; 112 S. Ct. 1780 **; 118 L. Ed. 2d 437 ***; 1992 U.S. LEXIS 2703 ****; 60 U.S.L.W. 4359; 92 Cal. Daily Op. Service 4185; 92 Daily Journal DAR 6854; 6 Fla. L. Weekly Fed. S 221

TERRY FOUCHA, PETITIONER v. LOUISIANA

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE SUPREME COURT OF LOUISIANA.

**Disposition:** 563 So. 2d 1138, reversed.

## Core Terms

*confinement*, insanity, insanity acquittee, mental illness, acquittee, incarceration, sanity, mentally ill, mental institution, indefinite, guilty by reason, sane, criminal act, detention, insanity defense, beyond a reasonable doubt, trial court, *due process*, criminal conduct, burden of proof, mental disease, criminal law, clear and convincing evidence, fundamental rights, strict scrutiny, state law, convicted, recovered, invalid, substantive *due process*

## Case Summary

### Procedural Posture

Petitioner sought review of a decision of the Supreme Court of Louisiana affirming the denial of petitioner's release from a mental institution. The institutionalization resulted from a previous action in which petitioner was found not guilty of criminal actions by reason of insanity.

### Overview

Petitioner was acquitted of criminal charges by reason of insanity and committed to a mental institution for an indefinite period of time. After several years, it was recommended that petitioner be discharged or released. A release panel determined petitioner was no longer mentally ill. The trial court appointed a sanity commission that was unable to certify whether petitioner would be a menace to society. The trial court denied petitioner's release and the district court and state supreme court affirmed. On appeal, the U.S. Supreme Court reversed and remanded, reasoning petitioner's rights under the *Due Process Clause, U.S. Const. amend. XIV*, were violated. The Court reasoned petitioner could only be detained as long as he was mentally ill or posed a danger to society. The Court held the prosecution failed to establish by clear and convincing evidence that petitioner was a danger to society and, therefore, he was entitled to release.

### Outcome

Judgment of the lower court reversed, because the prosecution failed to meet its burden of proving petitioner was a danger to society and the period of time during which petitioner could be held in a mental institution was measured by whether or not he was mentally ill or dangerous.

Patricia Lazarus

06/02/2020   12:07 Martin & Associates   Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 59 of 125   (FAX)8024795414   P.004/035

Page 2 of 33

504 U.S. 71, *71; 112 S. Ct. 1780, **1780; 118 L. Ed. 2d 437, ***437; 1992 U.S. LEXIS 2703, ****1

## LexisNexis® Headnotes

Criminal Law &
Procedure > Defenses > Insanity > Insanity Defense

### *HN1*[⬇] Insanity, Insanity Defense

See *La. Rev. Stat. Ann. § 14:14* (1986).

Constitutional Law > Equal Protection > Disability

Evidence > Inferences & Presumptions > General Overview

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > Institutionalization

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > General Overview

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > Scope of Protection

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Discharge & Release of Adults

### *HN2*[⬇] Equal Protection, Disability

To commit an individual to a mental institution in a civil proceeding, the state is required by the *Due Process Clause, U.S. Const. amend. XIV,* to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his own welfare and protection of others. Proof beyond a reasonable doubt was not required, but proof by preponderance of the evidence falls short of satisfying *due process.*

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Discharge & Release of Adults

### *HN3*[⬇] Sentencing, Mental Incapacity

A psychiatrists' opinion is reliable enough to permit the courts to base civil commitments on clear and convincing medical evidence that a person is mentally ill and dangerous and to base release decisions on qualified testimony that the person is no longer mentally ill or dangerous. It is also reliable enough for the state not to punish a person who by a preponderance of the evidence is found to have been insane at the time he committed a criminal act, to say nothing of not trying a person who is at the time found incompetent to understand the proceedings.

Criminal Law & Procedure > Defenses > Insanity > Burdens of Proof

Criminal Law & Procedure > Defenses > Insanity > General Overview

Criminal Law & Procedure > Defenses > Insanity > Insanity Defense

Criminal Law & Procedure > Sentencing > Mental Incapacity

### *HN4*[⬇] Insanity, Burdens of Proof

When a person charged with having committed a crime is found not guilty by reason of insanity, a state may commit that person without satisfying the Addington burden with respect to mental illness and dangerousness. Such a verdict, establishes two facts: (1) the defendant committed an act that constitutes a criminal offense, and (2) he committed the act because of mental illness.

Criminal Law & Procedure > Sentencing > Mental Incapacity

504 U.S. 71, *71; 112 S. Ct. 1780, **1780; 118 L. Ed. 2d 437, ***437; 1992 U.S. LEXIS 2703, ****1

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Discharge & Release of Adults

*HN5[*] Sentencing, Mental Incapacity*

The period of time during which an insanity acquittee may be held in a mental institution is not measured by the length of a sentence that might have been imposed had he been convicted; rather, the acquittee may be held until he is either not mentally ill or not dangerous.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Criminal Law & Procedure > Sentencing > Cruel & Unusual Punishment

*HN6[*] Fundamental Rights, Cruel & Unusual Punishment*

The states have wide discretion in determining punishment for convicted offenders, but the *Eighth Amendment, U.S. Const. amend. VIII*, ensures that discretion is not unlimited.

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > Scope of Protection

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > Institutionalization

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Discharge & Release of Adults

Criminal Law & Procedure > Sentencing > Mental Incapacity

*HN7[*] Procedural Due Process, Scope of Protection*

As a matter of *due process* it is unconstitutional for a state to continue to confine a harmless, mentally ill person, even if the initial commitment is permissible, it cannot constitutionally continue after that basis no longer exists.

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Institutional Transfers for Adults

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > Scope of Protection

Public Health & Welfare Law > ... > Mental Health Services > Commitment > *Involuntary* Commitment of Adults

*HN8[*] Sentencing, Mental Incapacity*

A convicted felon serving his sentence has a liberty interest, not extinguished by his *confinement* as a criminal, in not being transferred to a mental institution and hence classified as mentally ill without appropriate procedures to prove that he is mentally ill.

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > Scope of Protection

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

*HN9[*] Procedural Due Process, Scope of Protection*

The loss of liberty produced by an *involuntary* commitment is more than a loss of freedom from *confinement*. *Due process* requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed.

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > Scope of Protection

Criminal Law & Procedure > Preliminary Proceedings > Pretrial Motions & Procedures > Competency to Stand Trial

Criminal Law & Procedure > Sentencing > Mental

Incapacity

## HN10[⬇] Procedural Due Process, Scope of Protection

The state is entitled to hold a person for being incompetent to stand trial only long enough to determine if he could be cured and become competent. If he is to be held longer, the state is required to afford the protections constitutionally required in a civil commitment proceeding.

Criminal Law & Procedure > Sentencing > Mental Incapacity

## HN11[⬇] Sentencing, Mental Incapacity

There is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments.

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > General Overview

Constitutional Law > Substantive *Due Process* > Scope

## HN12[⬇] Fundamental Rights, Procedural Due Process

The *Due Process Clause, U.S. Const. amend. XIV*, contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > General Overview

Constitutional Law > Substantive *Due Process* > Scope

## HN13[⬇] Fundamental Rights, Procedural Due Process

Freedom from bodily restraint has always been at the core of the liberty protected by the *Due Process Clause, U.S. Const. amend. XIV*, from arbitrary

governmental action. It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires *due process* protection.

Constitutional Law > Substantive *Due Process* > Scope

Governments > Police Powers

## HN14[⬇] Constitutional Law, Substantive Due Process

A state, pursuant to its police power, may of course imprison convicted criminals for the purposes of deterrence and retribution. But there are constitutional limitations on the conduct that a state may criminalize.

Evidence > Inferences & Presumptions > General Overview

Governments > Police Powers

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > Institutionalization

## HN15[⬇] Evidence, Inferences & Presumptions

A state may confine a mentally ill person if it shows by clear and convincing evidence that the individual is mentally ill and dangerous.

Governments > Police Powers

## HN16[⬇] Governments, Police Powers

In certain narrow circumstances persons who pose a danger to others or to the community may be subject to limited *confinement*.

Criminal Law & Procedure > Sentencing > Mental Incapacity

Public Health & Welfare Law > ... > Mental Health Services > Commitment > Discharge & Release of Adults

Criminal Law &

Procedure > Sentencing > Supervised Release

### *HN17*[⤢] Sentencing, Mental Incapacity

Freedom from physical restraint being a fundamental right, the state must have a particularly convincing reason for discrimination against insanity acquittees who are no longer mentally ill.

Criminal Law & Procedure > Sentencing > Mental Incapacity

Evidence > Burdens of Proof > Clear & Convincing Proof

Constitutional Law > ... > Fundamental Rights > Procedural *Due Process* > Scope of Protection

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

Evidence > Inferences & Presumptions > General Overview

### *HN18*[⤢] Sentencing, Mental Incapacity

In civil commitment proceedings the state must establish the grounds of insanity and dangerousness permitting *confinement* by clear and convincing evidence. Similarly, the state must establish insanity and dangerousness by clear and convincing evidence in order to confine an insane convict beyond his criminal sentence, when the basis for his original *confinement* no longer exists.

## Lawyers' Edition Display

### Decision

Louisiana statute, permitting indefinite detention of insanity acquittees who are not mentally ill but who do not prove they would not be dangerous, held to violate *Fourteenth Amendment's due process clause*.

### Summary

A criminal defendant was found by a Louisiana trial court to have been insane at the time of the offense, and accordingly the court ruled that he was not guilty by reason of insanity. The person was committed to a psychiatric facility until such time as doctors recommended that he be released, and until further order of the court. When the superintendent of the facility and a three-member panel at the facility recommended that the person be conditionally discharged, the trial judge appointed a commission of two doctors, who reported that the person was in remission from mental illness, but that he had an antisocial personality, and that this condition was not a mental disease but was untreatable. One of the doctors testified that the person had been involved in several altercations at the facility and that the doctor would not feel comfortable in certifying that the person would not be a danger to himself or to other people. After it was stipulated that the other doctor would have given essentially the same testimony, the court ruled that the person was dangerous to himself and to others and ordered him returned to the facility. The Court of Appeals of Louisiana refused supervisory writs. The Supreme Court of Louisiana, affirming, held that (1) neither the *due process* clause nor the *equal protection clause* of the *Federal Constitution's Fourteenth Amendment* was violated by a Louisiana statutory provision under which an insanity acquittee who has been committed to a mental hospital, but whose release from the hospital has been recommended by a hospital review panel, may be returned to the hospital after a court hearing, regardless of whether the acquittee is then mentally ill, if the acquittee fails to prove that the acquittee is not dangerous; and (2) the person had not carried the burden of proving that he was not dangerous (*563 So 2d 1138*).

On certiorari, the United States Supreme Court reversed. In that portion of the opinion by White, J., joined by Blackmun, Stevens, O'Connor, and Souter, JJ., which constituted the opinion of the court, it was held that (1) the Louisiana statute, insofar as it permitted the indefinite detention of insanity acquittees who were not mentally ill but who did not prove that they would not be dangerous, violated the *due process* clause; and (2) under the circumstances, the state was not entitled to perpetuate the *confinement* of the person in question solely on the basis of his antisocial personality, given that (a) even if such continued *confinement* were constitutionally permissible, keeping the person against his will in a mental institution was improper absent a determination in civil commitment proceedings of a current mental illness and dangerousness, (b) if the person could no longer be held as an insanity acquittee

504 U.S. 71, *71; 112 S. Ct. 1780, **1780; 118 L. Ed. 2d 437, ***437; 1992 U.S. LEXIS 2703, ****1

in a mental hospital, he was entitled to constitutionally adequate procedures to establish the grounds for his **_confinement_**, (c) the state had no punitive interest in imprisoning the person for the purposes of deterrence and retribution, and (d) the state had not explained why, if the person had committed criminal acts while at the psychiatric facility, the state's interest would not be vindicated by other permissible ways of dealing with patterns of criminal conduct. Also, White, J., joined by Blackmun, Stevens, and Souter, JJ., expressed the view that the Louisiana statute discriminated against the person in violation of the _equal protection clause_.

O'Connor, J., concurring in part and concurring in the judgment, (1) agreed that Louisiana could not, consistent with the **_due process_** clause, indefinitely confine the person in a mental facility on the ground that the person, although not mentally ill, might be dangerous to himself or to others if released; and (2) expressed the view that (a) it might be permissible for Louisiana to confine an insanity acquittee who had regained sanity if, unlike the situation in the case at hand, the nature and duration of detention were tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness, (b) the court's holding placed no new restriction on the states' freedom to determine whether and to what extent mental illness should excuse criminal behavior, and (c) it was unnecessary for the court to reach equal protection issues on the facts presented.

Kennedy, J., joined by Rehnquist, Ch. J., dissenting, expressed the view that (1) the conditions for incarceration imposed by Louisiana were in accord with legitimate and traditional state interests, vindicated after full and fair procedures; and (2) the majority impermissibly conflated the standards for civil and criminal commitment.

Thomas, J., joined by Rehnquist, Ch. J., and Scalia, J., dissenting, expressed the view that nothing in the Constitution, the Supreme Court's precedents, or society's traditions authorized the court to invalidate the Louisiana scheme either (1) on the ground that the scheme provided for the continued **_confinement_** of insanity acquittees who, although still dangerous, have recovered their sanity, or (2) on the ground that the scheme provided for the indefinite **_confinement_** of sane insanity acquittees in a mental facility.

## Headnotes

CONSTITUTIONAL LAW §528.3 > **_due process_** -- indefinite **_confinement_** -- insanity acquittee -- dangerousness -- > Headnote:
_LEdHN[1A]_ [1A]_LEdHN[1B]_ [1B]_LEdHN[1C]_ [1C]_LEdHN[1D]_ [1D]_LEdHN[1E]_ [1E]_LEdHN[1F]_ [1F]_LEdHN[1G]_ [1G]

A state statute, under which persons who have been found not guilty of a crime by reason of insanity may be indefinitely detained in a mental institution if such persons are not mentally ill but do not prove that they would not be dangerous to others, violates the **_due process_** clause of the _Federal Constitution's Fourteenth Amendment_; thus, a state violates an insanity acquittee's **_due process_** liberty interest in being freed from indefinite **_confinement_** in a mental facility, where (1) at a trial court hearing to determine whether the acquittee should be discharged from the facility, it is established that (a) the acquittee has an antisocial personality, (b) the acquittee's condition, though not a mental disease, is untreatable, and (c) the acquittee had been involved in several altercations at the psychiatric facility, and (2) a doctor testifies at the hearing that he is unable to certify that the acquittee would not be dangerous, but (3) the state does not contend that the acquittee was mentally ill at the time of the hearing; under such circumstances, the state is not entitled to perpetuate the acquittee's **_confinement_** solely on the basis of his antisocial personality, given that (1) even if such continued **_confinement_** were constitutionally permissible, keeping the acquittee against his will in a mental institution is improper absent a determination in civil commitment proceedings of a current mental illness and dangerousness, (2) if the person in question can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his **_confinement_**, (3) the state has no punitive interest in imprisoning the acquittee for the purposes of deterrence and retribution, since the acquittee was not convicted but was exempted from criminal responsibility by reason of his acquittal, and (4) the state has not explained why, if the acquittee committed criminal acts while at the psychiatric facility, the state's interest would not be vindicated by the ordinary criminal **_processes_** involving charge and conviction, the use of enhanced sentences for recidivists, and other permissible ways of dealing with patterns of criminal conduct. (Kennedy, J., Rehnquist, Ch. J., and Thomas and Scalia, JJ., dissented from this holding.)

504 U.S. 71, *71; 112 S. Ct. 1780, **1780; 118 L. Ed. 2d 437, ***437; 1992 U.S. LEXIS 2703, ****1

CONSTITUTIONAL LAW §528.3 > *due process* --
commitment for insanity -- burden of proof -- > Headnote:
*LEdHN[2A]*[⬇] [2A]*LEdHN[2B]*[⬇] [2B]*LEdHN[2C]*[⬇]
[2C]*LEdHN[2D]*[⬇] [2D]

Although a state, in order to commit an individual to a mental institution in a civil proceeding, is required by the *due process* clause of the *Federal Constitution's Fourteenth Amendment* to prove by clear and convincing evidence that the person is mentally ill and that the person requires hospitalization for the person's own welfare and protection of others, a state may, consistent with the *due process* clause, commit a person without satisfying such a burden with respect to mental illness and dangerousness where the person is charged with having committed a crime and is found not guilty by reason of insanity, given that it may be properly inferred that at the time of the verdict, the person is still mentally ill and dangerous; for *due process* purposes, the period of time during which an insanity acquittee may properly be held in a mental institution is not measured by the length of a sentence that might have been imposed had the acquittee been convicted; rather, the acquittee may be held until the acquittee is either not mentally ill or not dangerous. (Kennedy, J., Rehnquist, Ch. J., and Thomas and Scalia, JJ., dissented in part from this holding.)

EVIDENCE §649 > psychiatric opinion -- mental illness --
> Headnote:
*LEdHN[3A]*[⬇] [3A]*LEdHN[3B]*[⬇] [3B]

Although psychiatry may not be an exact science and psychiatrists may widely disagree on what constitutes a mental illness, psychiatric opinion is reliable enough to permit the courts (1) to base civil commitments on clear and convincing medical evidence that a person is mentally ill and dangerous, and (2) to base release decisions on qualified testimony that the committed person is no longer mentally ill or dangerous.

EVIDENCE §650 > psychiatric opinion -- insanity of accused -
- > Headnote:
*LEdHN[4A]*[⬇] [4A]*LEdHN[4B]*[⬇] [4B]

Although psychiatry may not be an exact science and psychiatrists may widely disagree on what constitutes a mental illness, psychiatric opinion is reliable enough (1) for the state not to punish a person who, by a preponderance of the evidence, is found to have been insane at the time that the person committed a criminal act, and (2) for the state not to try a person who is, at the time, found incompetent to understand the proceedings.

CRIMINAL LAW §70 > punishment -- validity -- > Headnote:
*LEdHN[5A]*[⬇] [5A]*LEdHN[5B]*[⬇] [5B]

Although the states have wide discretion in determining punishment for convicted offenders, the *Federal Constitution's Eighth Amendment* insures that such discretion is not unlimited.

CONSTITUTIONAL LAW §525 > *due process* -- commitment
-- > Headnote:
*LEdHN[6A]*[⬇] [6A]*LEdHN[6B]*[⬇] [6B]

Commitment for any purpose constitutes a significant deprivation of liberty that requires *due process* protection under the Federal Constitution; *due process* requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed.

CONSTITUTIONAL LAW §514 > substantive *due process* --
> Headnote:
*LEdHN[7]*[⬇] [7]

The *due process* clause of the *Federal Constitution's Fourteenth Amendment* contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement such actions.

CONSTITUTIONAL LAW §921 > police powers -- crimes --
> Headnote:

Patricia Lazarus

*LEdHN[8][↓]* [8]

A state may, pursuant to its police power, imprison convicted criminals for the purposes of deterrence and retribution.

CRIMINAL LAW §1 > constitutional limits — > Headnote:
*LEdHN[9][↓]* [9]

There are federal constitutional limitations on the conduct that a state may criminalize.

CONSTITUTIONAL LAW §853.4 > *due process* — pretrial detention — > Headnote:
*LEdHN[10][↓]* [10]

For purposes of *due process* under the Federal Constitution, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.

CRIMINAL LAW §53 > commitment as mentally ill — > Headnote:
*LEdHN[11A][↓]* [11A]*LEdHN[11B][↓]* [11B]

A convicted criminal may not be held as a mentally ill person where the requirements for civil commitment, which requirements would not permit further detention based on the criminal's dangerousness alone, are not followed. (Kennedy, J., Rehnquist, Ch. J., and Thomas and Scalia, JJ., dissented from this holding.)

## Syllabus

Under Louisiana law, a criminal defendant found not guilty by reason of insanity may be committed to a psychiatric hospital. If a hospital review committee thereafter recommends that the acquittee be released, the trial court must hold a hearing to determine whether he is dangerous to himself or others. If he is found to be

dangerous, he may be returned to the hospital whether or not he is then mentally ill. Pursuant to this statutory scheme, a state court ordered petitioner Foucha, an insanity acquittee, returned to the mental institution to which he had been committed, ruling that he was dangerous on the basis of, *inter alia*, a doctor's testimony that he had recovered from the drug induced psychosis from which he suffered upon commitment and was "in good shape" mentally; that he had, however, an antisocial [****2] personality, a condition that is not a mental disease and is untreatable; that he had been involved in several altercations at the institution; and that, accordingly, the doctor would not "feel comfortable in certifying that he would not be a danger to himself or to other people." The State Court of Appeal refused supervisory writs, and the State Supreme Court affirmed, holding, among other things, that *Jones v. United States, 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043*, did not require Foucha's release and that the *Due Process Clause of the Fourteenth Amendment* was not violated by the statutory provision permitting *confinement* of an insanity acquittee based on dangerousness alone.

*Held:* The judgment is reversed.

JUSTICE WHITE delivered the opinion of the Court with respect to Parts I and II, concluding that the Louisiana statute violates the *Due Process* Clause because it allows an insanity acquittee to be committed to a mental institution until he is able to demonstrate that he is not dangerous to himself and others, even though he does not suffer from any mental illness. Although *Jones, supra,* acknowledged that an insanity acquittee could be committed, [****3] the Court also held that, as a matter of *due process*, he is entitled to release when he has recovered his sanity or is no longer dangerous, *id., at 368,* i. e., he may be held as long as he is both mentally ill and dangerous, but no longer. Here, since the State does not contend that Foucha was mentally ill at the time of the trial court's hearing, the basis for holding him in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis. There are at least three difficulties with the State's attempt to perpetuate his *confinement* on the basis of his antisocial personality. First, even if his continued *confinement* were constitutionally permissible, keeping him against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness. *Vitek v. Jones, 445 U.S. 480, 492, 63 L. Ed. 2d 552, 100 S. Ct. 1254. Due process* requires that the nature of commitment bear some reasonable

relation to the purpose for which the individual is committed. See, e. g., _Jones v. United States, supra, at 368._ Second, if he can no longer be held [****4] as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his **confinement**. _Jackson v. Indiana, 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845._ Third, the substantive component of the **Due Process** Clause bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them. _Zinermon v. Burch, 494 U.S. 113, 125, 108 L. Ed. 2d 100, 110 S. Ct. 975._ Although a State may imprison convicted criminals for the purposes of deterrence and retribution, Louisiana has no such interest here, since Foucha was not convicted and may not be punished. _Jones, 463 U.S. at 369._ Moreover, although the State may confine a person if it shows by clear and convincing evidence that he is mentally ill and dangerous, _id., at 362,_ Louisiana has not carried that burden here. Furthermore, _United States v. Salerno, 481 U.S. 739, 95 L. Ed. 2d 697, 107 S. Ct. 2095_ -- in which this Court held that in certain narrow circumstances pretrial detainees who pose a danger to others or the community may be subject to limited **confinement** -- does not save the state statute. [****5] Unlike the sharply focused statutory scheme at issue in _Salerno,_ the Louisiana scheme is not carefully limited. Pp. 75-85.

**Counsel:** James P. Manasseh argued the cause for petitioner. With him on the briefs was Martin E. Regan, Jr.

Pamela S. Moran argued the cause for respondent. With her on the brief was Harry F. Connick. *

**Judges:** WHITE, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which BLACKMUN, STEVENS, O'CONNOR, and SOUTER, JJ., joined, and an opinion with respect to Part III, in which BLACKMUN, STEVENS, and SOUTER, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, post, p. 86. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, post, p. 90. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, post, p.

---

*Briefs of amici curiae urging reversal were filed for the American Orthopsychiatric Association et al. by James W. Ellis and Barbara E. Bergman; and for the American Psychiatric Association by Joel I. Klein.

102.

**Opinion by:** WHITE

## Opinion

[*73] [***443] [**1781]   JUSTICE WHITE delivered the opinion [****6] of the Court, except as to Part III.

_LEdHN[1A]_ [1A]When a defendant in a criminal case pending in Louisiana is found not guilty by reason of insanity, he is committed to a psychiatric hospital unless he proves that he is not dangerous. This is so whether or not he is then insane. [**1782] After commitment, if the acquittee or the superintendent begins release proceedings, a review panel at the hospital makes a written report on the patient's mental condition and whether he can be released without danger to himself [***444] or others. If release is recommended, the court must hold a hearing to determine dangerousness; the acquittee has the burden of proving that he is not dangerous. If found to be dangerous, the acquittee may be returned to the mental institution whether or not he is then mentally ill. Petitioner contends that this scheme denies him **due process** and equal protection because it allows a person acquitted by reason of insanity to be committed to a mental institution until he is able to demonstrate that he is not dangerous to himself and others, even though he does not suffer from any mental illness.

[****7] I

Petitioner Terry Foucha was charged by Louisiana authorities with aggravated burglary and illegal discharge of a firearm. Two medical doctors were appointed to conduct a pretrial examination of Foucha. The doctors initially reported, and the trial court initially found, that Foucha lacked mental capacity to proceed, App. 8-9, but four months later the trial court found Foucha competent to stand trial, _id.,_ at 4-5. The doctors reported that Foucha was unable to distinguish [*74] right from wrong and was insane at the time of the offense. [1] On October 12, 1984, the trial court ruled that

---

[1] Louisiana law provides: _HN1_ "If the circumstances indicate that because of a mental disease or mental defect the

06/02/2020    12:10 Martin & Associates    Case 1:20-cv-11266-WGY    Document 1-2    Filed 07/02/20    Page 67 of 125    (FAX)802 795414    P.012/035

Page 10 of 33

504 U.S. 71, *74; 112 S. Ct. 1780, **1782; 118 L. Ed. 2d 437, ***444; 1992 U.S. LEXIS 2703, ****7

Foucha was not guilty by reason of insanity, finding that he "is unable to appreciate the usual, natural and probable consequences of his acts; that he is unable to distinguish right from wrong; that he is a menace to himself and others; and that he was insane at the time of the commission of the above crimes and that he is presently insane." *Id.*, at 6. He was committed to the East Feliciana Forensic Facility until such time as doctors recommend that he be released, and until further order of the court. In 1988, the superintendent of Feliciana recommended that Foucha be discharged [****8] or released. A three-member panel was convened at the institution to determine Foucha's current condition and whether he could be released or placed on probation without being a danger to others or himself. On March 21, 1988, the panel reported that there had been no evidence of mental illness since admission and recommended that Foucha be conditionally discharged. [2] The trial judge appointed a two-member sanity commission made up of the same two doctors who had conducted the pretrial examination. Their written report stated that Foucha "is presently in remission from mental illness [but] we cannot certify that he would not constitute [*75] a menace to himself or others if released." *Id.*, at 12. One of [***445] the doctors testified at a hearing that upon commitment Foucha probably suffered from a drug induced psychosis but that he had recovered from that temporary condition; that he evidenced no signs of psychosis or neurosis and was in "good shape" mentally; that he had, however, an antisocial personality, a condition that is not a mental disease and that is untreatable. The doctor also testified that Foucha had been involved in several altercations at Feliciana and [****9] that he, the doctor, would not "feel

---

offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." *La. Rev. Stat. Ann. § 14:14* (West 1986). JUSTICE KENNEDY disregards the fact that the State makes no claim that Foucha was criminally responsible or that it is entitled to punish Foucha as a criminal.

[2] The panel unanimously recommended that petitioner be conditionally discharged with recommendations that he (1) be placed on probation; (2) remain free from intoxicating and mind-altering substances; (3) attend a substance abuse clinic on a regular basis; (4) submit to regular and random urine drug screening; and (5) be actively employed or seeking employment. App. 10-11.

Although the panel recited that it was charged with determining dangerousness, its report did not expressly make a finding in that regard.

comfortable in [***1783] certifying that [Foucha] would not be a danger to himself or to other people." *Id.*, at 18.

[****10] After it was stipulated that the other doctor, if he were present, would give essentially the same testimony, the court ruled that Foucha was dangerous to himself and others and ordered him returned to the mental institution. The Court of Appeal refused supervisory writs, and the State Supreme Court affirmed, holding that Foucha had not carried the burden placed upon him by statute to prove that he was not dangerous, that our decision in *Jones v. United States, 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983)*, did not require Foucha's release, and that neither the *Due Process* Clause nor the *Equal Protection Clause* was violated by the statutory provision permitting **confinement** of an insanity acquittee based on dangerousness alone.

Because the case presents an important issue and was decided by the court below in a manner arguably at odds with prior decisions of this Court, we granted certiorari. *499 U.S. 946 (1991).*

II

*LEdHN[2A][↑]* [2A]*LEdHN[3A][↑]* [3A]*LEdHN[4A][↑]* [4A]*Addington v. [****11] Texas, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979)*, held that *HN2[↑]* to commit an individual to a mental institution in a civil proceeding, the State is required by the *Due Process* Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his [*76] own welfare and protection of others. Proof beyond a reasonable doubt was not required, but proof by preponderance of the evidence fell short of satisfying **due process**. [3]

---

[3] JUSTICE THOMAS in dissent complains that Foucha should not be released based on psychiatric opinion that he is not mentally ill because such opinion is not sufficiently precise -- because psychiatry is not an exact science and psychiatrists widely disagree on what constitutes a mental illness. That may be true, but such *HN3[↑]* opinion is reliable enough to permit the courts to base civil commitments on clear and convincing medical evidence that a person is mentally ill and dangerous and to base release decisions on qualified testimony that the person is no longer mentally ill or dangerous. It is also reliable enough for the State not to punish a person who by a preponderance of the evidence is found to have been insane at the time he committed a criminal act, to say nothing of not trying a person who is at the time found incompetent to

*LEdHN[2C]*[⬆] [2C] *LEdHN[5B]*[⬆] [5B]

[****13]

*LEdHN[3B]*[⬆] [3B]*LEdHN[4B]*[⬆] [4B]

[****12] *LEdHN[2B]*[⬆] [2B]*LEdHN[5A]*[⬆] [5A]*HN4*[⬆] When a person charged with having committed a crime is found not guilty by reason of insanity, however, a State may commit [***446] that person without satisfying the *Addington* burden with respect to mental illness and dangerousness. *Jones v. United States, supra.* Such a verdict, we observed in *Jones,* "establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness," *463 U.S. at 363,* an illness that the defendant adequately proved in this context by a preponderance of the evidence. From these two facts, it could be properly inferred that at the time of the verdict, the defendant was still mentally ill and dangerous and hence could be committed. [4]

[*77] [**1784] *LEdHN[1B]*[⬆] [1B]We held, however, that "the committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous," *id., at 368;l. e.,* the acquittee may be held as long as he is both mentally ill and dangerous, but no longer. We relied on *O'Connor v. Donaldson, 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975),* which held *HN7*[⬆] as a matter of *due process* that it was unconstitutional for a State to continue to confine a harmless, mentally ill person. Even if the initial commitment was permissible, "it could not constitutionally continue after that basis no longer existed." *Id., at 575.* In the summary of our holdings in our opinion we stated that "the Constitution permits the Government, on the basis of the insanity judgment, [*78] to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones, 463 U.S. at 368, 370.* [5] The court below was in error [***447] in

---

understand the proceedings. And more to the point, medical predictions of dangerousness seem to be reliable enough for JUSTICE THOMAS to permit the State to continue to hold Foucha in a mental institution, even where the psychiatrist would say no more than that he would hesitate to certify that Foucha would not be dangerous to himself or others.

[4] JUSTICE KENNEDY'S assertion that we overrule the holding of *Jones* described in the above paragraph is fanciful at best. As that paragraph plainly shows, we do not question and fully accept that insanity acquittees may be initially held without complying with the procedures applicable to civil committees. As is evident from the ensuing paragraph of the text, we are also true to the further holding of *Jones* that both JUSTICE THOMAS and JUSTICE KENNEDY reject: that *HN5*[⬆] the period of time during which an insanity acquittee may be held in a mental institution is not measured by the length of a sentence that might have been imposed had he been convicted; rather, the acquittee may be held until he is either not mentally ill or not dangerous. Both Justices would permit the indefinite detention of the acquittee, although the State concedes that he is not mentally ill and although the doctors at the mental institution recommend his release, for no reason other than that a psychiatrist hesitates to certify that the acquittee would not be dangerous to himself or others.

JUSTICE KENNEDY asserts that we should not entertain the proposition that a verdict of not guilty by reason of insanity differs from a conviction. *Post,* at 94. *Jones,* however, involved a case where the accused had been "found, beyond a reasonable doubt, to have committed a criminal act." *463 U.S.*

---

at 364. We did not find this sufficient to negate any difference between a conviction and an insanity acquittal. Rather, we observed that a person convicted of crime may of course be punished. But "different considerations underlie commitment of an insanity acquittee. As he was not convicted, he may not be punished." *Id., at 369.*

JUSTICE KENNEDY observes that proof beyond reasonable doubt of the commission of a criminal act permits a State to incarcerate and hold the offender on any reasonable basis. There is no doubt that *HN6*[⬆] the States have wide discretion in determining punishment for convicted offenders, but the *Eighth Amendment* ensures that discretion is not unlimited. The Justice cites no authority, but surely would have if it existed, for the proposition that a defendant convicted of a crime and sentenced to a term of years may nevertheless be held indefinitely because of the likelihood that he will commit other crimes.

[5] JUSTICE THOMAS, dissenting, suggests that there was no issue of the standards for release before us in *Jones.* The issue in that case, however, was whether an insanity acquittee "must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted," *463 U.S. at 356;* and in the course of deciding that issue in the negative, we said that the detainee could be held until he was no longer mentally ill or no longer dangerous, regardless of how long a prison sentence might have been. We noted in footnote 11 that Jones had not sought a release based on nonillness or nondangerousness, but as

06/02/2020    A2:10 Martin & Associates    Case 1:20-cv-11266-WGY    Document 1-2    Filed 07/02/20    IFAX)8024795414    Page 69 of 125    P.014/035

Page 12 of 33

504 U.S. 71, *78; 112 S. Ct. 1780, **1784; 118 L. Ed. 2d 437, ***447; 1992 U.S. LEXIS 2703, ****13

characterizing the above language from *Jones* as merely an interpretation of the pertinent statutory [****14] law in the District of Columbia and as having no constitutional significance. In this case, Louisiana does not contend that Foucha was mentally ill at the time of the trial court's hearing. Thus, the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis. *O'Connor, supra, at 574-575.*

[****15] *LEdHN[1C]*[⬆] [1C] *LEdHN[6A]*[⬆] [6A]The State, however, seeks to perpetuate Foucha's ***confinement*** at Feliciana on the basis of his antisocial personality which, as evidenced by his conduct at the facility, the court found rendered him a danger to himself or others. There are at least three difficulties with this position. First, even if his continued ***confinement*** were constitutionally permissible, keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness. In *Vitek v. Jones, 445 U.S. 480, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980),* we held that *HN8*[⬆] a convicted felon serving his sentence has a liberty interest, not extinguished by his ***confinement*** as a criminal, in not being transferred to a mental institution and hence classified as mentally [*79] ill without appropriate [**1785] procedures to prove that he was mentally ill. "*HN9*[⬆] The loss of liberty produced by an ***involuntary*** commitment is more than a loss of freedom from ***confinement***." *Id., at 492.* ***Due*** [****16] ***process*** requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed. *Jones, supra, at 368; Jackson v. Indiana, 406 U.S. 715, 738, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972).* Here, according to the testimony given at the hearing in the trial court, Foucha is not suffering from a mental disease or illness. If he is to be held, he should not be held as a mentally ill person. See *Jones, supra, at 368; Jackson, supra, at 738.* Cf. *United States v. Salerno, 481 U.S. 739, 747-748, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987); Schall v. Martin, 467 U.S. 253, 270, 81 L. Ed. 2d 207, 104 S. Ct. 2403 (1984).*

*LEdHN[1D]*[⬆] [1D]Second, if Foucha can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to

establish the grounds for his ***confinement***. *Jackson v. Indiana, supra,* indicates as much. There, a person under criminal charges was found incompetent to stand trial and was committed until he regained his sanity. It was later determined that nothing could be done to cure [****17] the detainee, who was a deaf mute. The [***448] state courts refused to order his release. We reversed, holding that *HN10*[⬆] the State was entitled to hold a person for being incompetent to stand trial only long enough to determine if he could be cured and become competent. If he was to be held longer, the State was required to afford the protections constitutionally required in a civil commitment proceeding. We noted, relying on *Baxstrom v. Herold, 383 U.S. 107, 15 L. Ed. 2d 620, 86 S. Ct. 760 (1966),* that a convicted criminal who allegedly was mentally ill was entitled to release at the end of his term unless the State committed him in a civil proceeding. "*HN11*[⬆] 'There is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments.'" *Jackson v. Indiana, supra, at 724,* quoting *Baxstrom, supra, at 111-112.*

[*80] *LEdHN[6B]*[⬆] [6B]*LEdHN[7]*[⬆] [7]*HN12*[⬆] Third, "the ***Due Process*** Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless [****18] of the fairness of the procedures used to implement them.'" *Zinermon v. Burch, 494 U.S. 113, 125, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990).*See also *HN13*[⬆] *Salerno, supra, at 746; Daniels v. Williams, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986).* Freedom from bodily restraint has always been at the core of the liberty protected by the ***Due Process*** Clause from arbitrary governmental action. *Youngberg v. Romeo, 457 U.S. 307, 316, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982).* "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires ***due process*** protection." *Jones, supra, at 361* (internal quotation marks omitted). We have always been careful not to "minimize the importance and fundamental nature" of the individual's right to liberty. *Salerno, supra, at 750.*

*LEdHN[1E]*[⬆] [1E]*LEdHN[8]*[⬆] [8]*LEdHN[9]*[⬆] [9]*HN14*[⬆] A State, pursuant to its police power, may of course imprison convicted criminals for the purposes of deterrence and retribution. [****19] But there are

indicated in the text, we twice announced the outside limits on the detention of insanity acquittees. The Justice would "wish" away this aspect of *Jones,* but that case merely reflected the essence of our prior decisions.

constitutional limitations on the conduct that a State may criminalize. See, e. g., _Brandenburg v. Ohio, 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969)_; _Robinson v. California, 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962)_. Here, the State has no such punitive interest. As Foucha was not convicted, he may not be punished. _Jones, supra, at 369_. Here, Louisiana has by reason of his acquittal exempted Foucha from criminal responsibility as _La. Rev. Stat. Ann. § 14:14_ (West 1986) requires. See n. 1, _supra_.

[**1786]  _LEdHN[2D]_[⬆]  [2D]_HN15_[⬆] The State may also confine a mentally ill person if it shows "by clear and convincing evidence that the individual is mentally ill and dangerous," _Jones, 463 U.S. at 362_. Here, the State has not carried that burden; indeed, the State does not claim that Foucha is now mentally ill.

We have also held that _HN16_[⬆] in certain narrow circumstances persons who pose a danger to others or to the community may be subject to limited **_confinement_** and it is on these cases, particularly _United States v. Salerno, supra_, that the State relies in this [****20] case.

[*81]  _Salerno_, unlike this case, involved pretrial detention. We observed in _Salerno_ that the "government's interest [***449] in preventing crime by arrestees is both legitimate and compelling," _id., at 749_, and that the statute involved there was a constitutional implementation of that interest. The statute carefully limited the circumstances under which detention could be sought to those involving the most serious of crimes (crimes of violence, offenses punishable by life imprisonment or death, serious drug offenses, or certain repeat offenders), _id., at 747_, and was narrowly focused on a particularly acute problem in which the government interests are overwhelming, _id., at 750_. In addition to first demonstrating probable cause, the Government was required, in a "full-blown adversary hearing," to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person, _i. e._, that the "arrestee presents an identified and articulable threat to an individual or the community." _Id., at 751_. Furthermore, the duration of **_confinement_** under the Bail Reform Act [****21] of 1984 (Act) was strictly limited. The arrestee was entitled to a prompt detention hearing and the maximum length of pretrial detention was limited by the "stringent time limitations of the Speedy Trial Act." _Id., at 747_. If the arrestee were convicted, he would be confined as a criminal proved guilty; if he were acquitted, he would go free. Moreover, the Act required that detainees be housed, to the extent practicable, in a facility separate from persons awaiting or serving sentences or awaiting appeal. _Id., at 747-748_.

_LEdHN[1F]_[⬆]  [1F]_Salerno_ does not save Louisiana's detention of insanity acquittees who are no longer mentally ill. Unlike the sharply focused scheme at issue in _Salerno_, the Louisiana scheme of **_confinement_** is not carefully limited. Under the state statute, Foucha is not now entitled to an adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community. Indeed, the State need prove nothing to justify continued detention, [*82] for the statute places the burden on the detainee to prove that he is not dangerous. At the [****22] hearing which ended with Foucha's recommittal, no doctor or any other person testified positively even in his opinion Foucha would be a danger to the community, let alone gave the basis for such an opinion. There was only a description of Foucha's behavior at Feliciana and his antisocial personality, along with a refusal to certify that he would not be dangerous. When directly asked whether Foucha would be dangerous, Dr. Ritter said only, "I don't think I would feel comfortable in certifying that he would not be a danger to himself or to other people." App. 18. This, under the Louisiana statute, was enough to defeat Foucha's interest in physical liberty. It is not enough to defeat Foucha's liberty interest under the Constitution in being freed from indefinite **_confinement_** in a mental facility.

Furthermore, if Foucha committed criminal acts while at Feliciana, such as assault, the State does not explain why its interest would not be vindicated by the ordinary criminal **_processes_** involving charge and conviction, the use of enhanced sentences for recidivists, and other permissible [***450] ways of dealing with patterns of criminal conduct. These are the normal means of dealing with [****23] [**1787] persistent criminal conduct. Had they been employed against Foucha when he assaulted other inmates, there is little doubt that if then sane he could have been convicted and incarcerated in the usual way.

It was emphasized in _Salerno_ that the detention we found constitutionally permissible was strictly limited in duration. _481 U.S. at 747_; see also _Schall, 467 U.S. at 269_. Here, in contrast, the State asserts that because

504 U.S. 71, *82; 112 S. Ct. 1780, **1787; 118 L. Ed. 2d 437, ***450; 1992 U.S. LEXIS 2703, ****23

Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of any convicted [*83] criminal, even though he has completed his prison term. It would also be only a step away from substituting *confinements* for dangerousness for our present system which, with only narrow exceptions and aside from permissible *confinements* for mental illness, incarcerates only those who are proved beyond reasonable [****24] doubt to have violated a criminal law.

**LEdHN[1G]**[↑] [1G]**LEdHN[10]**[↑] [10]**LEdHN[11A]**[↑] [11A]"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno, supra, at 755.*The narrowly focused pretrial detention of arrestees permitted by the Bail Reform Act was found to be one of those carefully limited exceptions permitted by the *Due Process* Clause. We decline to take a similar view of a law like Louisiana's, which permits the indefinite detention of insanity acquittees who are not mentally ill but who do not prove they would not be dangerous to others. [6]

---

[6] JUSTICE THOMAS' dissent firmly embraces the view that the State may indefinitely hold an insanity acquittee who is found by a court to have been cured of his mental illness and who is unable to prove that he would not be dangerous. This would be so even though, as in this case, the court's finding of dangerousness is based solely on the detainee's antisocial personality that apparently has caused him to engage in altercations from time to time. JUSTICE THOMAS, however, does not challenge the holding of our cases that a convicted criminal may not be held as a mentally ill person without following the requirements for civil commitment, which would not permit further detention based on dangerousness alone. Yet it is surely strange to release sane but very likely dangerous persons who have committed a crime knowing precisely what they were doing but continue to hold indefinitely an insanity detainee who committed a criminal act at a time when, as found by a court, he did not know right from wrong. JUSTICE THOMAS' rationale for continuing to hold the insanity acquittee would surely justify treating the convicted felon in the same way, and if put to it, it appears that he would permit it. But as indicated in the text, this is not consistent with our present system of justice.

JUSTICE THOMAS relies heavily on the American Law Institute's (ALI) Model Penal Code and Commentary. However, his reliance on the Model Code is misplaced and his quotation from the Commentary is importantly incomplete. JUSTICE THOMAS argues that the Louisiana statute follows "the current provisions" of the Model Penal Code, but he fails to mention that § 4.08 is "current" only in the sense that the Model Code has not been amended since its approval in 1962, and therefore fails to incorporate or reflect substantial developments in the relevant decisional law during the intervening three decades. Thus, although this is nowhere noted in the dissent, the Explanatory Notes expressly concede that related and similarly "current" provisions of Article 4 are unconstitutional. See, e. g., ALI, Model Penal Code § 4.06(2), Explanatory Note (1985) (noting that § 4.06(2), permitting indefinite commitment of a mentally incompetent defendant without the finding required for civil commitment, is unconstitutional in light of *Jackson v. Indiana, 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972)*, and other decisions of this Court). Nor indeed does JUSTICE THOMAS advert to the 1985 Explanatory Note to § 4.08 itself, even though that note directly questions the constitutionality of the provision that he so heavily relies on; it acknowledges, as JUSTICE THOMAS does not, that "it is now questionable whether a state may use the single criterion of dangerousness to grant discharge if it employs a different standard for release of persons civilly committed." JUSTICE THOMAS also recites from the Commentary regarding § 4.08. However, the introductory passage that JUSTICE THOMAS quotes prefaces a more important passage that he omits. After explaining the rationale for the questionable provision, the Commentary states: "Constitutional doubts . . . exist about the criterion of dangerousness. If a person committed civilly must be released when he is no longer suffering mental illness, it is questionable whether a person acquitted on grounds of mental disease or defect excluding responsibility can be kept in custody solely on the ground that he continues to be dangerous." *Id.*, § 4.08, Comment 3, p. 260. Thus, while JUSTICE THOMAS argues that the Louisiana statute is not a relic of a bygone age, his principal support for this assertion is a 30-year-old provision of the Model Penal Code whose constitutionality has since been openly questioned by the ALI reporters themselves.

Similarly unpersuasive is JUSTICE THOMAS' claim regarding the number of States that allow *confinement* based on dangerousness alone. First, this assertion carries with it an obvious but unacknowledged corollary -- that vast majority of States do not allow *confinement* based on dangerousness alone. Second, JUSTICE THOMAS' description of these state statutes also is importantly incomplete. Even as he argues that a scheme of *confinement* based on dangerousness alone is not a relic of a bygone age, JUSTICE THOMAS neglects to mention that two of the statutes he relies on have been amended, as JUSTICE O'CONNOR notes. Nor does JUSTICE THOMAS acknowledge that at least two of the other statutes

504 U.S. 71, *83; 112 S. Ct. 1780, **1787; 118 L. Ed. 2d 437, ***450; 1992 U.S. LEXIS 2703, ****24

*LEdHN[11B]*[⬆] [11B]

[****25] [*84] [***451] [**1788]   III

It should be apparent from what has been said earlier in this opinion that the Louisiana statute also discriminates [*85] against the *Equal Protection Clause of the Fourteenth Amendment. Jones* established that insanity acquittees may be treated differently in some respects from those persons subject to civil commitment, but Foucha, who is not now thought to be insane, can no longer be so classified. The State nonetheless insists on holding him indefinitely because he at one time committed a criminal act and does not now prove he is not dangerous. Louisiana law, however, does not provide for similar *confinement* for other classes of persons who have committed criminal acts and who cannot later prove they would not be dangerous. Criminals who have completed their prison terms, or are about to do so, are an obvious and large category of such [***452] persons. Many of them will likely suffer from the same sort of personality disorder that Foucha exhibits. However, state law does not allow for their continuing *confinement* based merely on dangerousness. Instead, the State controls the behavior of these similarly [****26] situated citizens by relying on other means, such as punishment, deterrence, and supervised release. [*86] *HN17*[⬆] Freedom from physical restraint being a fundamental right, the State must have a particularly convincing reason, which it has not put forward, for such discrimination against insanity acquittees who are no longer mentally ill.

---

he lists as permitting *confinement* based on dangerousness alone have been given a contrary construction by highest state courts, which have found that the interpretation for which JUSTICE THOMAS cites them would be impermissible. See *State v. Fields, 77 N.J. 282, 390 A.2d 574 (1978)*; *In re Lewis, 403 A.2d 1115, 1121 (Del. 1979)*, quoting *Mills v. State, 256 A.2d 752, 757, n. 4 (Del. 1969)* ("By necessary implication, the danger referred to must be construed to relate to mental illness for the reason that dangerousness without mental illness could not be a valid basis for indeterminate *confinement* in the State hospital"). See also ALI, Model Penal Code, *supra*, at 260 (although provisions may on their face allow for *confinement* based on dangerousness alone, in virtually all actual cases the questions of dangerousness and continued mental disease are likely to be closely linked). As the widespread rejection of the standard for *confinement* that JUSTICE THOMAS and JUSTICE KENNEDY argue for demonstrates, States are able to protect both the safety of the public and the rights of the accused without challenging foundational principles of American criminal justice and constitutional law.

Furthermore, *HN18*[⬆] in civil commitment proceedings the State must establish the grounds of insanity and dangerousness permitting *confinement* by clear and convincing evidence. *Addington, 441 U.S. at 425-433.* Similarly, the State must establish insanity and dangerousness by clear and convincing evidence in order to confine an insane convict beyond his criminal sentence, when the basis for his original *confinement* no longer exists. See *Jackson, 406 U.S. at 724; Baxstrom, 383 U.S. at 111-112.* Cf. *Humphrey v. Cady, 405 U.S. 504, 510-511, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972).* However, the State now claims that it may continue to confine Foucha, who is not now considered to be mentally ill, solely because [**1789] he is deemed dangerous, but without assuming the burden of proving even this ground for *confinement* by clear and convincing [****27] evidence. The court below gave no convincing reason why the procedural safeguards against unwarranted *confinement* which are guaranteed to insane persons and those who have been convicted may be denied to a sane acquittee, and the State has done no better in this Court.

For the foregoing reasons the judgment of the Louisiana Supreme Court is reversed.

*So ordered.*

**Concur by: O'CONNOR (In Part)**

---

# Concur

---

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

Louisiana asserts that it may indefinitely confine Terry Foucha in a mental facility because, although not mentally ill, he might be dangerous to himself or to others if released. For the reasons given in Part II of the Court's opinion, this contention should be rejected. I write separately, however, to emphasize that the Court's opinion addresses only the specific statutory scheme before us, which broadly permits indefinite [*87] *confinement* of sane insanity acquittees in psychiatric facilities. This case does not require us to pass judgment on more narrowly drawn laws that provide for detention of insanity acquittees, or on statutes that provide for punishment of persons who commit crimes while mentally ill.

I do [****28] not understand the Court to hold that Louisiana may never confine dangerous insanity acquittees after they regain mental health. Under Louisiana law, defendants who carry the burden of proving insanity by a preponderance of the evidence will "escape punishment," but this [***453] affirmative defense becomes relevant only after the prosecution establishes beyond a reasonable doubt that the defendant committed criminal acts with the required level of criminal intent. *State v. Marmillion, 339 So. 2d 788, 796 (La. 1976).* Although insanity acquittees may not be incarcerated as criminals or penalized for asserting the insanity defense, see *Jones v. United States, 463 U.S. 354, 368-369, 77 L. Ed. 2d 694, 103 S. Ct. 3043, and n. 18 (1983),* this finding of criminal conduct sets them apart from ordinary citizens.

We noted in *Jones* that a judicial determination of criminal conduct provides "concrete evidence" of dangerousness. *Id., at 364.* By contrast, "'the only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment . . . .'" *Id., at 365, n. 13* (quoting [****29] *Greenwood v. United States, 350 U.S. 366, 375, 100 L. Ed. 412, 76 S. Ct. 410 (1956)).* Given this uncertainty, "courts should pay particular deference to reasonable legislative judgments" about the relationship between dangerous behavior and mental illness. *Jones, supra, at 365, n. 13.* Louisiana evidently has determined that the inference of dangerousness drawn from a verdict of not guilty by reason of insanity continues even after a clinical finding of sanity, and that judgment merits judicial deference.

It might therefore be permissible for Louisiana to confine an insanity acquittee who has regained sanity if, unlike the situation in this case, the nature and duration of detention [*88] were tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness. See *United States v. Salerno, 481 U.S. 739, 747-751, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987); Schall v. Martin, 467 U.S. 253, 264-271, 81 L. Ed. 2d 207, 104 S. Ct. 2403 (1984); Jackson v. Indiana, 406 U.S. 715, 738, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972).* Although the dissenters apparently disagree, see *post,* at 100 (opinion of KENNEDY, J.); [****30] *post,* at 125 (opinion of THOMAS, J.), I think it clear that acquittees could not be confined as mental patients absent some [**1790] medical justification for doing so; in such a case the necessary connection between the nature and purposes of **confinement** would be absent. See *Vitek v. Jones, 445 U.S. 480, 491-494, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980)* (discussing infringements upon liberty

unique to commitment to a mental hospital); *Jones, supra, at 384-385* (Brennan, J., dissenting) (same). Nor would it be permissible to treat all acquittees alike, without regard for their particular crimes. For example, the strong interest in liberty of a person acquitted by reason of insanity but later found sane might well outweigh the governmental interest in detention where the only evidence of dangerousness is that the acquittee committed a nonviolent or relatively minor crime. Cf. *Salerno, supra, at 750* (interest in pretrial detention is "overwhelming" where only individuals arrested for "a specific category of extremely serious offenses" are detained and "Congress specifically found that these individuals are far more likely to be responsible for [***454] dangerous [****31] acts in the community after arrest"). Equal protection principles may set additional limits on the **confinement** of sane but dangerous acquittees. Although I think it unnecessary to reach equal protection issues on the facts before us, the permissibility of holding an acquittee who is not mentally ill longer than a person convicted of the same crimes could be imprisoned is open to serious question.

The second point to be made about the Court's holding is that it places no new restriction on the States' freedom to determine whether, and to what extent, mental illness should excuse criminal behavior. The Court does not indicate [*89] that States must make the insanity defense available. See *Idaho Code § 18-207(a)* (1987) (mental condition not a defense to criminal charges); *Mont. Code Ann. § 46-14-102* (1991) (evidence of mental illness admissible to prove absence of state of mind that is an element of the offense). It likewise casts no doubt on laws providing for prison terms after verdicts of "guilty but mentally ill." See, e. g., *Del. Code Ann., Tit. 11, § 408(b)* (1987); Ill. Rev. Stat., ch. 38, P1005-2-6 (1989); *Ind. Code § 35-36-2-5* (Supp. 1991). If a State concludes [****32] that mental illness is best considered in the context of criminal sentencing, the holding of this case erects no bar to implementing that judgment.

Finally, it should be noted that the great majority of States have adopted policies consistent with the Court's holding. JUSTICE THOMAS claims that 11 States have laws comparable to Louisiana's, see *post,* at 112-113, n. 9, but even this number overstates the case. Two of the States JUSTICE THOMAS mentions have already amended their laws to provide for the release of acquittees who do not suffer from mental illness but may be dangerous. See *Cal. Penal Code Ann. § 1026.2* (West Supp. 1992) (effective Jan. 1, 1994); *Va. Code Ann. § 19.2-182.5* (Supp. 1991) (effective July 1, 1992).

06/02/2020    12:12 Martin & Associates    Case 1:20-cv-11266-WGY    Document 1-2    Filed 07/02/20    Page 74 of 125    FAX No. 8024795414    P. 019/035

Page 17 of 33

504 U.S. 71, *89; 112 S. Ct. 1780, **1790; 118 L. Ed. 2d 437, ***454; 1992 U.S. LEXIS 2703, ****32

Three others limit the maximum duration of criminal commitment to reflect the acquittee's specific crimes and hold acquittees in facilities appropriate to their mental condition. See _N. J. Stat. Ann. §§ 2C:4-8(b)(3)_ (West 1982), 30:4-24.2 (West 1981); _Wash. Rev. Code §§ 10.77.020(3), 10.77.110(1)_ (1990); _Wis. Stat. §§ 971.17(1), (3)(c)_ (Supp. 1991). I do not understand the Court's opinion to render such laws necessarily invalid.

Of the remaining six States, [****33] two do not condition commitment upon proof of every element of a crime. _Kan. Stat. Ann. § 22-3428(1)_ (Supp. 1990) ("A finding of not guilty by reason of insanity shall constitute a finding that the acquitted person committed an act constituting the offense charged . . ., except that the person did not possess the requisite [*90] criminal intent"); _Mont. Code Ann. § 46-14-301(1)_ (1991) (allowing commitment of persons "found not guilty for the reason that _due_ to a mental disease or defect the defendant could not have a particular state of mind that is an essential element of the offense charged"). Such laws might well fail even under the dissenters' theories. See [**1791] _post_, at 91-94 (KENNEDY, J., dissenting); _post_, at 103 (THOMAS, J., dissenting).

Today's holding follows directly from our precedents and leaves the States appropriate latitude to care [***455] for insanity acquittees in a way consistent with public welfare. Accordingly, I concur in Parts I and II of the Court's opinion and in the judgment of the Court.

**Dissent by:** KENNEDY; THOMAS

# Dissent

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins, dissenting.

As incarceration of persons is the most common and [****34] one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that freedom from this restraint is essential to the basic definition of liberty in the _Fifth_ and _Fourteenth Amendments of the Constitution_. I agree with the Court's reaffirmation of this first premise. But I submit with all respect that the majority errs in its failure to recognize that the conditions for incarceration imposed by the State in this case are in accord with legitimate and traditional state interests, vindicated after full and fair procedures. The error

results from the majority's primary reliance on cases, such as _O'Connor v. Donaldson, 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975)_, and _Addington v. Texas, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979)_, which define the _due process_ limits for _involuntary_ civil commitment. The majority relies on these civil cases while overruling without mention one of the holdings of our most recent and significant precedent from the criminal context, _Jones v. United States, 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983)_.

This is a criminal case. It began one day when petitioner, [****35] brandishing a .357 revolver, entered the home of a married couple, intending to steal. Brief for Respondent 1. He [*91] chased them out of their home and fired on police officers who confronted him as he fled. _Id._, at 1-2. Petitioner was apprehended and charged with aggravated burglary and the illegal use of a weapon in violation of _La. Rev. Stat. Ann. §§ 14:60_ and _14:94_ (West 1986). _563 So. 2d 1138, 1138-1139 (La. 1990)_. There is no question that petitioner committed the criminal acts charged. Petitioner's response was to deny criminal responsibility based on his mental illness when he committed the acts. He contended his mental illness prevented him from distinguishing between right and wrong with regard to the conduct in question.

Mental illness may bear upon criminal responsibility, as a general rule, in either of two ways: First, it may preclude the formation of _mens rea_, if the disturbance is so profound that it prevents the defendant from forming the requisite intent as defined by state law; second, it may support an affirmative plea of legal insanity. See W. LaFave & A. Scott, Jr., 1 Substantive Criminal Law § 4.1(b), pp. 429-430 (1986) (hereinafter LaFave & [****36] Scott). Depending on the content of state law, the first possibility may implicate the State's initial burden, under _In re Winship, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970)_, to prove every element of the offense beyond a reasonable doubt, while the second possibility does not. _Patterson v. New York, 432 U.S. 197, 206, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977)_; _Leland v. Oregon, 343 U.S. 790, 795-796, 96 L. Ed. 1302, 72 S. Ct. 1002 (1952)_.

The power of the States to determine the existence of criminal insanity following the establishment of the underlying offense is well established. [***456] In _Leland_ v. _Oregon_, we upheld a state law that required the defendant to prove insanity beyond a reasonable doubt, observing that this burden had no effect on the

06/02/2020  12:12 Martin & Associates  Case 1:20-cv-11206-WGY  Document 1-2  Filed 07/02/20  Page 75 of 125  1(FAX)8024795414  P.020/035

Page 18 of 33
504 U.S. 71, *91; 112 S. Ct. 1780, **1791; 118 L. Ed. 2d 437, ***456; 1992 U.S. LEXIS 2703, ****36

State's initial burden to prove every element of the underlying criminal offense.

"The burden of proof of guilt, and of all the necessary elements of guilt, was placed squarely upon the State. As the jury was told, this burden did not shift, but rested upon the State throughout the trial, just as, according [*92] to the instructions, appellant was presumed to be innocent until [****37] the [**1792] jury was convinced beyond a reasonable doubt that he was guilty. The jurors were to consider separately the issue of legal sanity *per se* -- an issue set apart from the crime charged, to be introduced by a special plea and decided by a special verdict." *Id., at 795-796* (footnotes omitted).

As then-JUSTICE REHNQUIST explained the reasoning of *Leland*, "the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime." *Mullaney v. Wilbur, 421 U.S. 684, 706, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975)* (concurring opinion); see also *Patterson v. New York, supra, at 206* (defense of insanity considered only after the facts constituting the crime have been proved beyond a reasonable doubt); *Rivera v. Delaware, 429 U.S. 877, 50 L. Ed. 2d 160, 97 S. Ct. 226 (1976)* (dismissing challenge to a *Leland* instruction for want of a substantial federal question).

Louisiana law follows the pattern in *Leland* with clarity and precision. Pursuant to *La. Code Crim. Proc. Ann., Art. 552* (West 1981), the petitioner entered a dual plea of not guilty and [****38] not guilty by reason of insanity. The dual plea, which the majority does not discuss or even mention, ensures that the *Winship* burden remains on the State to prove all the elements of the crime. The Louisiana Supreme Court confirms this in a recent case approving the following jury instruction on the defense of insanity:

"'In this case the accused has entered a dual plea of not guilty and not guilty by reason of insanity. As a consequence of such a plea, you must first determine whether or not the accused committed a crime [on which you have been instructed]. If you are convinced beyond a reasonable doubt that the accused did commit any of these crimes, any one of these crimes, then you must proceed to a determination of whether he was sane at the time the crime was committed and thereby criminally [*93] responsible for committing it.'" *State v.*

*Marmillion, 339 So. 2d 788, 796 (1976).*

The State's burden is unaffected by an adjudication without trial, such as occurred here, because state law requires the trial court to determine, before accepting the plea, that there is a factual basis for it. *La. Code Crim. Proc. Ann., Art. 558.1* (West Supp. 1992). [****39] There is no dispute that the trial court complied with state law and made the requisite findings.

Compliance with the standard of proof beyond a reasonable doubt is the defining, central feature in criminal adjudication, unique to the criminal law. *Addington, 441 U.S. at 428.* [***457] Its effect is at once both symbolic and practical, as a statement of values about respect and confidence in the criminal law, *Winship, 397 U.S. at 364*, and an apportionment of risk in favor of the accused, *id., at 369-372* (Harlan, J., concurring). We have often subjected to heightened *due process* scrutiny, with regard to both purpose and duration, deprivations of physical liberty imposed before a judgment is rendered under this standard. See, e. g., *United States v. Salerno, 481 U.S. 739, 750-751, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987)*; *Jackson v. Indiana, 406 U.S. 715, 738, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972)*; cf. *Jones v. United States, 463 U.S. at 363-364*, and n. 12 ("The proof beyond a reasonable doubt that the acquittee committed a criminal act distinguishes this case from *Jackson v. Indiana, 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972)* [****40] . . . . In *Jackson* there never was any affirmative proof that the accused had committed criminal acts . . ."). The same heightened *due process* scrutiny does not obtain, though, once the State has met its burden of proof and obtained an adjudication. It is well settled that upon compliance with *In re Winship*, the State may incarcerate on any reasonable basis. *Chapman v. United States, 500 U.S. 453, 465, 114 L. Ed. 2d 524, 111 S. Ct. 1919 [**1793] (1991)*; *Williams v. Illinois, 399 U.S. 235, 243, 26 L. Ed. 2d 586, 90 S. Ct. 2018 (1970)*.

As JUSTICE THOMAS observes in his dissent, the majority errs by attaching "talismanic significance" to the fact that petitioner has been adjudicated "not guilty by reason of insanity." [*94] *Post*, at 118, n. 13. A verdict of not guilty by reason of insanity is neither equivalent nor comparable to a verdict of not guilty standing alone. We would not allow a State to evade its burden of proof by replacing its criminal law with a civil system in which there is no presumption of innocence and the defendant has the burden of proof. Nor should we entertain the proposition that this case differs from a conviction of guilty [****41] because petitioner has been adjudged

504 U.S. 71, *94; 112 S. Ct. 1780, **1793; 118 L. Ed. 2d 437, ***457; 1992 U.S. LEXIS 2703, ****41

"not guilty by reason of insanity," rather than "guilty but insane." Petitioner has suggested no grounds on which to distinguish the liberty interests involved or procedural protections afforded as a consequence of the State's ultimate choice of nomenclature. The *due process* implications ought not to vary under these circumstances. This is a criminal case in which the State has complied with the rigorous demands of *In re Winship*.

The majority's failure to recognize the criminal character of these proceedings and its concomitant standards of proof leads it to conflate the standards for civil and criminal commitment in a manner not permitted by our precedents. *O'Connor v. Donaldson, 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975)*, and *Addington v. Texas, supra*, define the *due process* limits of *Involuntary* civil commitment. Together they stand for the proposition that in civil proceedings the *Due Process* Clause requires the State to prove both insanity and dangerousness by clear and convincing evidence. See *O'Connor, supra, at 575; Addington, supra, at 433*. Their precedential value in the civil context is beyond [****42] [***458] question. But it is an error to apply these precedents, as the majority does today, to criminal proceedings. By treating this criminal case as a civil one, the majority overrules a principal holding in *Jones v. United States, 463 U.S. at 354*.

In *Jones* we considered the system of criminal commitment enacted by Congress for the District of Columbia. *Id., at 356-358.* Congress provided for acquittal by reason of insanity only after the Government had shown, beyond a reasonable [*95] doubt, that the defendant had committed the crimes charged. *Id., at 363-364*, and n. 12. In cases of acquittal by reason of insanity, District law provided for automatic commitment followed by periodic hearings, where the insanity acquittee was given the opportunity to prove that he was no longer insane or dangerous. *Id., at 357-358*, and n. 3. Petitioner in *Jones* contended that *Addington* and *O'Connor* applied to criminal proceedings as well as civil, requiring the Government to prove insanity and dangerousness by clear and convincing evidence before commitment. We rejected that contention. In *Jones* we distinguished criminal from civil commitment, holding [****43] that the *Due Process* Clause permits automatic incarceration after a criminal adjudication and without further *process*. *Id., at 366*. The majority today in effect overrules that holding. It holds that "keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental

illness and dangerousness." *Ante*, at 78; see also *ante*, at 80, 85-86. Our holding in *Jones* was clear and to the contrary. We should not so disregard controlling precedent.

Our respect for the Court's opinion in *Jones* should be informed by the recognition that its distinction between civil and criminal commitment is both sound and consistent with long-established precedent. First, as described above, the procedural protections afforded in a criminal commitment surpass those in a civil commitment; indeed, these procedural protections are the most stringent [**1794] known to our law. Second, proof of criminal conduct in accordance with *In re Winship* eliminates the risk of incarceration "for mere 'idiosyncratic behavior,' [because a] criminal act by definition is not 'within a range of conduct that is generally acceptable.'" [****44] *Jones, supra, at 367*, quoting *Addington, supra, at 426-427*. The criminal law defines a discrete category of conduct for which society has reserved its greatest opprobrium and strictest sanctions; past or future dangerousness, as ascertained [*96] or predicted in civil proceedings, is different in kind. Third, the State presents distinct rationales for these differing forms of commitment: In the civil context, the State acts in large part on the basis of its *parens patriae* power to protect and provide for an ill individual, while in the criminal context, the State acts to ensure the public safety. See *Addington, 441 U.S. at 426*; S. Brakel, J. Parry, & B. Weiner, The Mentally Disabled and the Law 24-25 (3d ed. 1985). A dismissive [***459] footnote, see *ante*, at 76-77, n. 4, cannot overcome these fundamental defects in the majority's opinion.

The majority's opinion is troubling at a further level, because it fails to recognize or account for profound differences between clinical insanity and state-law definitions of criminal insanity. It is by now well established that insanity as defined by the criminal law has no direct analog in medicine or science. "The [****45] divergence between law and psychiatry is caused in part by the legal fiction represented by the words 'insanity' or 'insane,' which are a kind of lawyer's catchall and have no clinical meaning." J. Biggs, The Guilty Mind 117 (1955); see also 2 J. Bouvier, Law Dictionary 1590 (8th ed. 1914) ("The legal and the medical ideas of insanity are essentially different, and the difference is one of substance"). Consistent with the general rule that the definition of both crimes and defenses is a matter of state law, see *Patterson v. New York, 432 U.S. at 210*, the States are free to recognize and define the insanity defense as they see fit.

06/02/2020 12:13 Martin & Associates (FAX)8024795414 P.022/035
Case 1:20-cv-11266-WGY Document 1-2 Filed 07/02/20 Page 77 of 125

Page 20 of 33
504 U.S. 71, *96; 112 S. Ct. 1780, **1794; 118 L. Ed. 2d 437, ***459; 1992 U.S. LEXIS 2703, ****45

"Nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms . . . . It is simply not yet the time to write into the Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers." *Powell v. Texas, 392 U.S. 514, 536-537, 20 L. Ed. 2d 1254, 88 S. Ct. 2145 (1968)* (plurality opinion).

See also *id., at 545* (the Constitution does not impose on the States any particular test of criminal responsibility) [****46] (Black, J., concurring).

[*97] As provided by Louisiana law, and consistent with both federal criminal law and the law of a majority of the States, petitioner was found not guilty by reason of insanity under the traditional *M'Naghten* test. See *La. Rev. Stat. Ann. § 14:14* (West 1986); *18 U. S. C. § 17*; *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843); 1 LaFave & Scott § 4.2, at 436. Louisiana law provides a traditional statement of this test: "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." *La. Rev. Stat. Ann. § 14:14* (West 1986).

Because the *M'Naghten* test for insanity turns on a finding of criminal irresponsibility at the time of the offense, it is quite wrong to place reliance on the fact, as the majority does, that Louisiana does not contend that petitioner is now insane. See *ante*, at 78. This circumstance should come as no surprise, since petitioner was competent at the time of his plea, *563 So. 2d at 1139*, and indeed could not have entered [****47] a plea otherwise, see *Drope v. Missouri, 420 U.S. 162, 171, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975)*. Present sanity would have relevance if petitioner had been committed as a consequence of civil proceedings, in which dangerous [**1795] conduct in the past was used to predict similar conduct in the future. It has no relevance here, however. Petitioner has not been confined based on predictions about future behavior [***460] but rather for past criminal conduct. Unlike civil commitment proceedings, which attempt to divine the future from the past, in a criminal trial whose outcome turns on *M'Naghten*, findings of past insanity and past criminal conduct possess intrinsic and ultimate significance.

The system here described is not employed in all jurisdictions. Some have supplemented the traditional

*M'Naghten* test with the so-called "irresistible impulse" test, see 1 LaFave & Scott § 4.1, at 427-428; others have adopted a test proposed as part of the Model Penal Code, see *ibid.;* and still [*98] others have abolished the defense altogether, see *Idaho Code § 18-207(a)* (1987); *Mont. Code Ann. § 46-14-102* (1992). Since it is well accepted that the States [****48] may define their own crimes and defenses, see *supra, at 96*, the point would not warrant further mention, but for the fact that the majority loses sight of it. In describing our decision in *Jones*, the majority relies on our statement that a verdict of not guilty by reason of insanity establishes that the defendant "'committed the act because of mental illness.'" *Ante*, at 76, quoting *Jones, 463 U.S. at 363*. That was an accurate statement in *Jones* but not here. The defendant in *Jones* was acquitted under the *Durham* test for insanity, which excludes from punishment criminal conduct that is the product of a mental disease or defect. See *Bethea v. United States, 365 A.2d 64, 69, n. 11 (1976)*; see also *Durham v. United States, 94 U.S. App. D.C. 228, 240-241, 214 F.2d 862, 874-875 (1954)*. In a *Durham* jurisdiction, it would be fair to say, as the Court did in *Jones*, that a defendant acquitted by reason of insanity "committed the act because of mental illness." *Jones, supra, at 363*. The same cannot be said here, where insanity under *M'Naghten* proves only that the defendant could not have distinguished between right and wrong. It is [****49] no small irony that the aspect of *Jones* on which the majority places greatest reliance, and indeed cites as an example of its adherence to *Jones*, has no bearing on the Louisiana statute at issue here. See *ante*, at 76, and n. 4.

The establishment of a criminal act and of insanity under the *M'Naghten* regime provides a legitimate basis for **confinement**. Although Louisiana has chosen not to punish insanity acquittees, the State has not surrendered its interest in incapacitative incarceration. The Constitution does not require any particular model for criminal **confinement**, *Harmelin v. Michigan, 501 U.S. 957, 999, 115 L. Ed. 2d 836, 111 S. Ct. 2680 (1991)* (KENNEDY, J., concurring in judgment) ("The federal and state criminal systems have accorded different weights at different times [*99] to the penological goals of retribution, deterrence, incapacitation, and rehabilitation"); *Williams v. New York, 337 U.S. 241, 246, 93 L. Ed. 1337, 69 S. Ct. 1079 (1949)*, and upon compliance with *In re Winship*, the State may incarcerate on any reasonable basis, see *supra, at 93*. Incapacitation for the protection of society is not an unusual ground for incarceration. [****50] "Isolation of the dangerous has always been considered

06/02/2020  12:13 Martin & Associates    (FAX)8024795414    P.023/035
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 78 of 125

Page 21 of 33
504 U.S. 71, *99; 112 S. Ct. 1780, **1795; 118 L. Ed. 2d 437, ***460; 1992 U.S. LEXIS 2703, ****50

an important function of the criminal law," _Powell v. Texas, 392 U.S. 514, 539, 20 L. Ed. 2d 1254, 88 S. Ct. 2145 (1968)_ (Black, J., concurring), **[\*\*\*461]** and insanity acquittees are a special class of offenders proved dangerous beyond their own ability to comprehend. The wisdom of incarceration under these circumstances is demonstrated by its high level of acceptance. Every State provides for discretionary or mandatory incarceration of insanity acquittees, 1 LaFave & Scott § 4.6(a), at 510, and as JUSTICE THOMAS observes in his dissent, provisions like those in Louisiana, predicated on dangerousness alone, have been endorsed by the Model Penal Code and adopted by the legislatures **[\*\*1796]** of no fewer than 11 other States. See _post_, at 111-112, and nn. 8 and 9.

It remains to be seen whether the majority, by questioning the legitimacy of incapacitative incarceration, puts in doubt the **_confinement_** of persons other than insanity acquittees. Parole release provisions often place the burden of proof on the prisoner to prove his lack of dangerousness. To use a familiar example, under the federal parole system in **[\*\*\*\*51]** place until the enactment of the Sentencing Guidelines, an inmate could not be released on parole unless he established that his "release would not jeopardize the public welfare." _18 U. S. C. § 4206(a)(2) (1982 ed.)_, repealed 98 Stat. 2027; see also _28 CFR § 2.18 (1991)_. This requirement reflected "the incapacitative aspect of the use of imprisonment which has the effect of denying the opportunity for future criminality, at least for a time." U.S. Dept. of Justice, United States Parole Commission Rules and Procedures Manual 69 (July 24, 1989). This purpose is consistent with the parole release provisions of Alabama, Colorado, Hawaii, Massachusetts, **[\*100]** Michigan, New York, and the District of Columbia, to name just a few. See N. Cohen & J. Gobert, Law of Probation and Parole § 3.05, p. 109, and n. 103 (1983). It is difficult for me to reconcile the rationale of incapacitative incarceration, which underlies these regimes, with the opinion of the majority, which discounts its legitimacy.

I also have difficulty with the majority's emphasis on the conditions of petitioner's **_confinement_**. In line with JUSTICE O'CONNOR'S concurring opinion, see _ante_, at 87-88, the majority **[\*\*\*\*52]** emphasizes the fact that petitioner has been confined in a mental institution, see _ante_, at 77-78, 78-79, 82, suggesting that his incarceration might not be unconstitutional if undertaken elsewhere. The majority offers no authority for its suggestion, while JUSTICE O'CONNOR relies on a reading of _Vitek v. Jones, 445 U.S. 480, 63 L. Ed. 2d_

_552, 100 S. Ct. 1254 (1980)_, which was rejected by the Court in _Jones v. United States_. See _ante_, at 87-88, citing _Jones v. United States, supra, at 384-385_ (Brennan, J., dissenting). The petitioner did not rely on this argument at any point in the proceedings, and we have not the authority to make the assumption, as a matter of law, that the conditions of petitioner's **_confinement_** are in any way infirm. Ours is not a case, as in _Vitek v. Jones_, where the State has stigmatized petitioner by placing him in a mental institution when he should have been placed elsewhere. _Jones v. United States_ is explicit on this point: "A criminal defendant who successfully raises the insanity defense necessarily is stigmatized by the verdict itself, and thus the commitment **[\*\*\*462]** causes little additional harm in **[\*\*\*\*53]** this respect." _463 U.S. at 367, n. 16_. Nor is this a case, as in _Washington v. Harper, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990)_, in which petitioner has suffered some further deprivation of liberty to which independent **_due process_** protections might attach. Both the fact and conditions of **_confinement_** here are attributable to petitioner's criminal conduct and subsequent decision to plead insanity. To the extent the majority relies on the conditions of petitioner's **[\*101] _confinement_**, its decision is without authority, and most of its opinion is nothing more than confusing dicta.

I submit that today's decision is unwarranted and unwise. I share the Court's concerns about the risks inherent in requiring a committed person to prove what can often be imprecise, but as JUSTICE THOMAS observes in his dissent, this is not a case in which the period of **_confinement_** exceeds the gravity of the offense or in which there are reasons to believe the release proceedings are pointless or a sham. _Post_, at 114, n. 10. Petitioner has been incarcerated for less than one-third the statutory maximum for the offenses proved by the State. See _La. Rev. Stat. Ann. §§ 14:60_ (aggravated **[\*\*\*\*54]** burglary) and 14:94 (illegal use of a weapon) (West 1986). In light of these facts, the majority's repeated reference to "indefinite detention," with apparent reference to the potential duration of **_confinement_**, and not its lack of a fixed end point, has no bearing on this case. See _ante_, **[\*\*1797]** at 77, n. 4, 82, 83, n. 6; cf. _ante_, at 77, n. 4 (curious suggestion that **_confinement_** has been extended beyond an initial term of years). It is also significant to observe that this is not a case in which the incarcerated subject has demonstrated his nondangerousness. Within the two months before his release hearing, petitioner had been sent to a maximum security section of the Feliciana Forensic Facility because of altercations with another

patient. *563 So. 2d at 1141*. Further, there is evidence in the record which suggests that petitioner's initial claim of insanity may have been feigned. The medical panel that reviewed petitioner's request for release stated that "there is no evidence of mental illness," and indeed that there was "never any evidence of mental illness or disease since admission." App. 10. In sum, it would be difficult to conceive of a less compelling situation [****55] for the imposition of sweeping new constitutional commands such as the majority imposes today.

Because the majority conflates the standards for civil and criminal commitment, treating this criminal case as though [*102] it were civil, it upsets a careful balance relied upon by the States, not only in determining the conditions for continuing ***confinement***, but also in defining the defenses permitted for mental incapacity at the time of the crime in question. In my view, having adopted a traditional and well-accepted test for determining criminal insanity, and having complied with the rigorous demands of *In re Winship*, the State possesses the constitutional authority to incarcerate petitioner for the protection of society. I submit my respectful dissent.

[***463] JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The Louisiana statutory scheme the Court strikes down today is not some quirky relic of a bygone age, but a codification of the current provisions of the American Law Institute's Model Penal Code. Invalidating this quite reasonable scheme is bad enough; even worse is the Court's failure to explain precisely what is wrong with it. [****56] In parts of its opinion, the Court suggests that the scheme is unconstitutional because it provides for the continued ***confinement*** of insanity acquittees who, although still dangerous, have "recovered" their sanity. *Ante*, at 77 ("The committed acquittee is *entitled to release* when he has recovered his sanity *or* is no longer dangerous") (emphasis added; internal quotation marks omitted). In other parts of the opinion, the Court suggests — and the concurrence states explicitly — that the constitutional flaw with this scheme is *not* that it provides for the ***confinement*** of sane insanity acquittees, but that it (allegedly) provides for their "indefinite" ***confinement*** in a mental facility. *Ante*, at 82; *ante*, at 86-87 (O'CONNOR, J., concurring in part and concurring in judgment). Nothing in the Constitution, this Court's precedents, or our society's traditions authorizes the Court to invalidate the Louisiana scheme on either of these grounds. I would therefore affirm the judgment

of the Louisiana Supreme Court.

[*103] I

The Court errs, in large part, because it fails to examine in detail the challenged statutory scheme and its application in this case. Under [****57] Louisiana law, a verdict of "not guilty by reason of insanity" differs significantly from a verdict of "not guilty." A simple verdict of not guilty following a trial means that the State has failed to prove all of the elements of the charged crime beyond a reasonable doubt. See, e. g., *State v. Messiah, 538 So. 2d 175, 180 (La. 1988)* (citing *In re Winship, 397 U.S. 358, 25 L. Ed. 2d 368. 90 S. Ct. 1068 (1970))*; cf. *La. Code Crim. Proc. Ann., Art. 804(A)(1)* (West 1969). A verdict of not guilty by reason of insanity, in contrast, means that the defendant *committed the crime*, but established that he was "incapable of distinguishing between right and wrong" with respect to his criminal conduct. *La. Rev. Stat. Ann. § 14:14* (West 1986). Insanity, in other words, is an affirmative defense [**1798] that does not negate the State's proof, but merely "exempt[s the defendant] from criminal responsibility." *Ibid*. As the Louisiana Supreme Court has summarized: "The State's traditional burden of proof is to establish beyond a reasonable doubt all necessary elements of the offense. Once this rigorous burden of proof has been met, it having been shown that defendant [****58] *has committed a crime*, the defendant . . . bear[s] the burden of establishing his defense of insanity in order to escape punishment." *State v. Marmillion, 339 So. 2d 788, 796 (1976)* (emphasis added). See also *State v. Surrency, 148 La. 983, 88 So. 240, 244 (La. 1921)*.

Louisiana law provides a procedure for a judge to render a verdict of not guilty by reason of insanity upon a plea without a trial. See *La. Code Crim. Proc. Ann., Art. 558.1* (West Supp. 1991). The trial court apparently relied on this procedure when it committed Foucha. See *563 So. 2d 1138, 1139, [*104] n. 3 [***464] (La. 1990)*. [1] After ordering two experts to examine Foucha, the trial court issued the following judgment:

"After considering the law and the evidence

_____

[1] Under *La. Code Crim. Proc. Ann., Art. 558.1* (West Supp. 1991), a criminal defendant apparently concedes that he committed the crime, and advances his insanity as the sole ground on which to avoid conviction. Foucha does not challenge the procedures whereby he was adjudicated not guilty by reason of insanity; nor does he deny that he committed the crimes with which he was charged.

06/02/2020   12:14 Martin & Associates                    (FAX)8024795414         P.025/035
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 80 of 125

Page 23 of 33
504 U.S. 71, *104; 112 S. Ct. 1780, **1798; 118 L. Ed. 2d 437, ***464; 1992 U.S. LEXIS 2703, ****58

adduced in this matter, the Court finds that the accused, Terry Foucha, is unable to appreciate the usual, natural and probable consequences of his acts; that he is unable to distinguish right from wrong; that he is a menace to himself and to others; and that he was insane at the time of the commission of the above crimes and that he is presently insane." App. 6.

[****59]   After adjudicating a defendant not guilty by reason of insanity, a trial court must hold a hearing on the issue of dangerousness. The law specifies that "if the court determines that the defendant cannot be released without a danger to others or to himself, it shall order him committed to . . . [a] mental institution." *La. Code Crim. Proc. Ann., Art. 654* (West Supp. 1991). [2] "'Dangerous to others' means [*105] the condition of a person whose behavior or significant threats support a *reasonable expectation* that there is a *substantial risk* that he will inflict physical harm upon another person *in the near future*." *La. Rev. Stat. Ann. § 28:2(3)* (West 1986) (emphasis added). "'Dangerous to self' means the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person." *§ 28:2(4)*.

[****60]   After holding the requisite hearings, the trial court in this case ordered Foucha committed to the Feliciana Forensic Facility. After his commitment, Foucha was entitled, upon request, to another hearing six months later and at yearly intervals after that. See

*La. Code Crim. Proc. Ann., Art. 655(B)* (West [**1799] Supp. 1991). [3] [****61] [***465]  In addition, Louisiana law provides that a release hearing must be held upon recommendation by the superintendent of a mental institution. See Art. 655(A). [4] [****62]  In early 1988, Feliciana's superintendent recommended [*106] that Foucha be released, and a three-doctor panel met to review the case. On March 21, 1988, the panel issued a report pursuant to Article 656. [5] The panel concluded that "there is no evidence of mental illness." App. 10. In fact, the panel stated that there was "*never any evidence of mental illness or disease since admission.*" *Ibid.* (emphasis added). Although the panel did not discuss whether Foucha was dangerous, it recommended to the trial court that he be conditionally released.

As a result of these recommendations, the trial court scheduled a hearing to determine whether Foucha should be released. Under *La. Code Crim. Proc. Ann.,*

---

[2] Article 654 provides in pertinent part:

"When a defendant is found not guilty by reason of insanity in any [non-capital] felony case, the court shall remand him to the parish jail or to a private mental institution approved by the court and shall promptly hold a contradictory hearing at which the defendant shall have the burden of proof, to determine whether the defendant can be discharged or can be released on probation, without danger to others or to himself. If the court determines that the defendant cannot be released without danger to others or to himself, it shall order him committed to a proper state mental institution or to a private mental institution approved by the court for custody, care, and treatment. If the court determines that the defendant can be discharged or released on probation without danger to others or to himself, the court shall either order his discharge, or order his release on probation subject to specified conditions for a fixed or an indeterminate period. The court shall assign written findings of fact and conclusions of law; however, the assignment of reasons shall not delay the implementation of judgment."

[3] Article 655(B) provides:

"A person committed pursuant to Article 654 may make application to the review panel for discharge or for release on probation. Such application by a committed person may not be filed until the committed person has been confined for a period of at least six months after the original commitment. If the review panel recommends to the court that the person be discharged, conditionally or unconditionally, or placed on probation, the court shall conduct a hearing following notice to the district attorney. If the recommendation of the review panel or the court is adverse, the applicant shall not be permitted to file another application until one year has elapsed from the date of determination."

[4] Article 655(A) provides:

"When the superintendent of a mental institution is of the opinion that a person committed pursuant to Article 654 can be discharged or can be released on probation, without danger to others or to himself, he shall recommend the discharge or release of the person in a report to a review

504 U.S. 71, *106; 112 S. Ct. 1780, **1799; 118 L. Ed. 2d 437, ***465; 1992 U.S. LEXIS 2703, ****62

_Art. 657_ (West Supp. 1991), [6] [****64] Foucha had the burden at this hearing to prove [*107] that he could be released without danger to others or to himself. The court appointed two experts (the same doctors who had examined Foucha at the time of his original commitment) to evaluate his dangerousness. These [***466] doctors concluded that Foucha "is presently in remission from mental illness," but said that they could [****63] not "certify that he would not constitute a menace [**1800] to himself or to others if released." App. 12. On November 29, 1988, the trial court held the hearing, at which Foucha was represented by counsel. The court concluded that Foucha "is a danger to himself, and to others," _id._, at 24, and ordered that he be returned to Feliciana. [7]

II

The Court today concludes that Louisiana has denied Foucha both procedural and substantive _due process_. In my view, each of these conclusions is wrong. I shall discuss them in turn.

A

What the Court styles a "procedural" _due process_ analysis is in reality an equal protection analysis. The Court first asserts (contrary to state law) that Foucha cannot be held as an insanity acquittee once he "becomes" sane. _Ante_, at 78-79. [*108] That being the case, he is entitled to the same treatment as civil committees. "_If Foucha can no longer be held as an_

unconditionally, or placed on probation, the court shall conduct a contradictory hearing following notice to the district attorney."

[5] Article 656 provides:

"A. Upon receipt of the superintendent's report, filed in conformity with Article 655, the review panel may examine the committed person and report, to the court promptly, whether he can be safely discharged, conditionally or unconditionally, or be safely released on probation, without danger to others or to himself.

"B. The committed person or the district attorney may also retain a physician to examine the committed person for the same purpose. The physician's report shall be filed with the court."

[6] Article 657 provides:

"After considering the report or reports filed pursuant to Articles 655 and 656, the court may either continue the commitment or hold a contradictory hearing to determine whether the committed person can be discharged, or can be released on probation, without danger to others or to himself. At the hearing the burden shall be upon the committed person to prove that he can be discharged, or can be released on probation, without danger to others or to himself. After the hearing, and upon filing written findings of fact and conclusions of law, the court may order the committed person discharged, released on probation subject to specified conditions for a fixed or an indeterminate period, or recommitted to the state mental institution. Notice to the counsel for the committed person and the district attorney of the contradictory hearing shall be given at least thirty days prior to the hearing."

panel comprised of the person's treating physician, the clinical director of the facility to which the person is committed, and a physician or psychologist who served on the sanity commission which recommended commitment of the person. If any member of the panel is unable to serve, a physician or a psychologist engaged in the practice of clinical or counseling psychology with at least three years' experience in the field of mental health shall be appointed by the remaining members. The panel shall review all reports received promptly. After review, the panel shall make a recommendation to the court by which the person was committed as to the person's mental condition and whether he can be discharged, conditionally or unconditionally, or placed on probation, without being a danger to others or himself. If the review panel recommends to the court that the person be discharged, conditionally or

[7] The Louisiana Supreme Court concluded that the trial court did not abuse its discretion in finding that Foucha had failed to prove that he could be released without danger to others or to himself under _La. Code Crim. Proc. Ann., Art. 657_ (West Supp. 1991). See _563 So. 2d 1138, 1141 (1990)_. That issue is not now before us.

insanity acquittee," the Court says, "he is entitled to constitutionally adequate procedures [those afforded in civil commitment proceedings] to establish the grounds for his **confinement**." *Ante*, at 79 (emphasis [****65] added). This, of course, is an equal protection argument (there being no rational distinction between A and B, the State must treat them the same); the Court does not even pretend to examine the fairness of the release procedures the State has provided.

I cannot agree with the Court's conclusion because I believe that there is a real and legitimate distinction between insanity acquittees and civil committees that justifies procedural disparities. Unlike civil committees, who have *not* been found to have harmed society, insanity acquittees have been found in a judicial proceeding to have committed a criminal act.

That distinction provided the *ratio decidendi* for our most relevant precedent, *Jones v. United States, 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983)*. That case involved a man who had been *automatically* committed to a mental institution after being acquitted of a crime by reason of insanity in the District of Columbia (*i. e.*, he had not been given the procedures afforded to civil committees). We rejected both of his procedural **due process** challenges to his commitment. First, we held that an insanity acquittal justified automatic commitment [****66] of the acquittee (even though he might *presently* be sane), because Congress was entitled to decide that the verdict provided a *reasonable basis* for inferring dangerousness and insanity at the time of commitment. *Id., at 366*. The Government's interest in avoiding a *de novo* commitment hearing following every insanity acquittal, we said, outweighed [***467] the acquittee's interest in avoiding unjustified institutionalization. *Ibid.* Second, we held that the Constitution did not require, as a predicate for the indefinite commitment of insanity acquittees, proof of insanity by "clear and convincing" evidence, as [*109] required for civil committees by *Addington v. Texas, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979)*. There are, we recognized, "important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof." *Jones, 463 U.S. at 367*. In sharp contrast to a civil committee, an insanity acquittee is institutionalized only where "the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness," [****67] and thus "there is good reason for diminished concern as to the risk of error." *Ibid.* (emphasis in original). "More important, the proof that he committed a

criminal act . . . eliminates the risk that he is being committed for mere 'idiosyncratic [**1801] behavior.'" *Ibid.* Thus, we concluded, the preponderance of the evidence standard comports with **due process** for commitment of insanity acquittees. *Id., at 368*. "Insanity acquittees constitute a special class that should be treated differently from other candidates for commitment." *Id., at 370*.

The Court today attempts to circumvent *Jones* by declaring that a State's interest in treating insanity acquittees differently from civil committees evaporates the instant an acquittee "becomes sane." I do not agree. As an initial matter, I believe that it is unwise, given our present understanding of the human mind, to suggest that a determination that a person has "regained sanity" is precise. "Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness." *Ake v. Oklahoma, 470 U.S. 68, 81, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985)*. Indeed,

> "we [****68] have recognized repeatedly the 'uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment.' The lesson we have drawn is not that government may not act in the face of this uncertainty, but rather that courts should pay particular [*110] deference to reasonable legislative judgments." *Jones, supra, at 365, n. 13* (quoting *Greenwood v. United States, 350 U.S. 366, 375, 100 L. Ed. 412, 76 S. Ct. 410 (1956)*; citations omitted).

*In this very case*, the panel that evaluated Foucha in 1988 concluded that there was "*never* any evidence of mental illness or disease since admission," App. 10; the trial court, of course, concluded that Foucha was "presently insane," *id.*, at 6, at the time it accepted his plea and sent him to Feliciana.

The distinction between civil committees and insanity acquittees, after all, turns *not* on considerations of present sanity, but instead on the fact that the latter have "already unhappily manifested the reality of anti-social conduct," [****69] *Dixon v. Jacobs, [***468] 138 U.S. App. D.C. 319, 334, 427 F.2d 589, 604 (1970)* (Leventhal, J., concurring). "*The prior anti-social conduct* of an insanity acquittee justifies treating such a person differently from ones otherwise civilly committed for purposes of deciding whether the patient should be

06/02/2020  12:15 Martin & Associates                    (FAX)8024795414          P.028/035
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 83 of 125

Page 26 of 33
504 U.S. 71, *110; 112 S. Ct. 1780, **1801; 118 L. Ed. 2d 437, ***468; 1992 U.S. LEXIS 2703, ****69

released." *Powell v. Florida, 579 F.2d 324, 333 (CA5 1978)* (emphasis added); see also *United States v. Ecker, 177 U.S. App. D.C. 31, 50, 543 F.2d 178, 197 (1976),* cert. denied, *429 U.S. 1063, 50 L. Ed. 2d 779, 97 S. Ct. 788 (1977).* While a State may renounce a punitive interest by offering an insanity defense, it does not follow that, once the acquittee's sanity is "restored," the State is required to ignore his criminal act, and to renounce all interest in protecting society from him. "The state has a substantial interest in avoiding premature release of insanity acquittees, who have committed acts constituting felonies and have been declared dangerous to society." *Hickey v. Morris, 722 F.2d 543, 548 (CA9 1983).*

Furthermore, the Federal Constitution does not require a State to "ignore the danger of 'calculated abuse of the insanity defense.'" [****70] *Warren v. Harvey, 632 F.2d 925, 932 (CA2 1980)* (quoting *United States v. Brown, 155 U.S. App. D.C. 402, 407, 478 F.2d 606, 611 (1973)).* A State that decides to offer its criminal defendants an insanity defense, which the defendant himself is given the choice of invoking, is surely [*111] allowed to attach to that defense certain consequences that prevent abuse. Cf. *Lynch v. Overholser, 369 U.S. 705, 715, 8 L. Ed. 2d 211, 82 S. Ct. 1063 (1962)* ("Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity").

   " [**1802] In effect, the defendant, by raising the defense of insanity — and he alone can raise it — postpones a determination of his present mental health and acknowledges the right of the state, upon accepting his plea, to detain him for diagnosis, care, and custody in a mental institution until certain specified conditions are met. . . . Commitment via the criminal *process* . . . thus is more akin to 'voluntary' than '*involuntary*' civil commitment." Goldstein & Katz, Dangerousness and Mental Illness, Some Observations [****71] on the Decision to Release Persons Acquitted by Reason of Insanity, 70 Yale L. J. 225, 230 (1960) (footnote omitted).

A State may reasonably decide that the integrity of an insanity-acquittal scheme requires the continued commitment of insanity acquittees who remain dangerous. Surely, the citizenry would not long tolerate the insanity defense if a serial killer who convinces a jury that he is not guilty by reason of insanity is returned to the streets immediately after trial by convincing a different factfinder that he is not in fact insane.

As the American Law Institute has explained:

   "It seemed preferable to the Institute to make dangerousness the criterion for continued custody, rather than to provide that the committed person may be discharged or released when restored to sanity as defined by the mental hygiene laws. Although his mental disease may have greatly improved, [an insanity acquittee] may still be dangerous because of factors in his personality and background other than mental disease. [***469] Also, such a [*112] standard provides a means for the control of the occasional defendant who may be quite dangerous but who successfully feigned mental [****72] disease to gain an acquittal." Model Penal Code § 4.08, Comment 3, pp. 259-260 (1985). [8] [****73]

That this is a reasonable legislative judgment is underscored by the fact that it has been made by no fewer than 11 state legislatures, in addition to Louisiana's, which expressly provide that insanity acquittees shall not be released as long as they are dangerous, regardless of sanity. [9]

_____

[8] The relevant provision of the Model Penal Code, strikingly similar to Article 657 of the Louisiana Code of Criminal Procedure, see *supra*, n. 6, provides in part as follows:

"If the Court is satisfied by the report filed pursuant to Subsection (2) of this Section and such testimony of the reporting psychiatrists as the Court deems necessary that the committed person may be discharged or released on condition without danger to himself or others, the Court shall order his discharge or his release on such conditions as the Court determines to be necessary. If the Court is not so satisfied, it shall promptly order a hearing to determine whether such person may safely be discharged or released. Any such hearing shall be deemed a civil proceeding and the burden shall be upon the committed person to prove that he may safely be discharged or released." Model Penal Code § 4.08(3) (Proposed Official Draft 1962).

[9] See *Cal. Penal Code Ann. § 1026.2(e)* (West Supp. 1992) (insanity acquittee not entitled to release until court determines that he "will not be a danger to the health and safety of others, including himself"); *Del. Code Ann., Tit. 11, § 403(b)* (1987) (insanity acquittee shall be kept institutionalized until court "is satisfied that the public safety will not be endangered by his release"); *Haw. Rev. Stat. § 704-415* (1985) (insanity acquittee not entitled to release until court satisfied that acquittee "may safely be discharged or released"); Iowa Rule Crim. Proc. 21.8(e) (insanity acquittee not entitled to release as long as "court finds that continued custody and treatment are necessary to protect the safety of the [acquittee's] self or others"); *Kan. Stat. Ann. § 22-3428(3)* (Supp. 1990) (insanity

[****74] [*113] [***470] [**1803]    The Court suggests an alternative "procedural" *due process* theory that is, if anything, even less persuasive than its principal theory. "Keeping Foucha against his will *in a mental institution* is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." *Ante*, at 78 (emphasis added). The Court cites *Vitek v. Jones, 445 U.S. 480, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980)*, as support. There are two problems with this theory. First, it is illogical: Louisiana cannot possibly extend Foucha's incarceration by adding the procedures afforded to civil committees, since it is impossible to civilly commit

_____

acquittee not entitled to release until "the court finds by clear and convincing evidence that [he] will not be likely to cause harm to self or others if released or discharged"); *Mont. Code Ann. § 46-14-301(3)* (1991) (insanity acquittee not entitled to release until he proves that he "may safely be released"); *N. J. Stat. Ann. § 2C:4-9* (West 1982) (insanity acquittee not entitled to release or discharge until court satisfied that he is not "danger to himself or others"); *N. C. Gen. Stat. § 122C-268.1(i)* (Supp. 1991) (insanity acquittee not entitled to release until he "prove[s] by a preponderance of the evidence that he is no longer dangerous to others"); *Va. Code Ann. § 19.2-181(3)* (1990) (insanity acquittee not entitled to release until he proves "that he is not insane or mentally retarded *and* that his discharge would not be dangerous to the public peace and safety or to himself" (emphasis added)); *Wash. Rev. Code § 10.77.200(2)* (1990) ("The burden of proof [at a release hearing] shall be upon the [insanity acquittee] to show by a preponderance of the evidence that [he] may be finally discharged without substantial danger to other persons, and without presenting a substantial like-lihood of committing felonious acts jeopardizing public safety or security"); *Wis. Stat. § 971.17(4)* (Supp. 1991) (insanity acquittee not entitled to release where court "finds by clear and convincing evidence that the [acquittee] would pose a significant risk of bodily harm to himself or herself or to others of serious property damage if conditionally released").

The Court and the concurrence dispute this list of statutes. *Ante*, at 84-85, n. 6; *ante*, at 89 (O'CONNOR, J., concurring in part and concurring in judgment). They note that two of the States have enacted new laws, not yet effective, modifying their current absolute prohibitions on the release of dangerous insanity acquittees; that courts in two other States have apparently held that mental illness is a prerequisite to *confinement*; and that three of the States place caps of some sort on the duration of the *confinement* of insanity acquittees. Those criticisms miss my point. I cite the 11 state statutes above only to show that the legislative judgments underlying Louisiana's scheme are far from unique or freakish, and that there is no well-established practice in our society, either past or present, of automatically releasing sane-but-dangerous insanity acquittees.

someone who is not presently [*114] mentally ill. Second, the theory is not supported by *Vitek.* Stigmatization (our concern in *Vitek*) is simply not a relevant consideration where insanity acquittees are involved. As we explained in *Jones:* "A criminal defendant who successfully raises the insanity defense necessarily is stigmatized by the verdict itself, and thus the commitment causes little additional harm in this respect." *463 U.S. at 367, n. 16*; see also *Warren v. [****75] Harvey, 632 F.2d at 931-932.* (This is in sharp contrast to situations involving civil committees. See *Addington, 441 U.S. at 425-426*; *Vitek, supra, at 492-494.*) It is implausible, in my view, that a person who chooses to plead not guilty by reason of insanity and then spends several years in a mental institution becomes unconstitutionally stigmatized by continued *confinement* in the institution after "regaining" sanity.

In my view, there was no procedural *due process* violation in this case. Articles 654, 655, and 657 of the Louisiana Code of Criminal Procedure, as noted above, afford insanity acquittees the opportunity to obtain release by demonstrating at regular intervals that they no longer pose a threat to society. These provisions also afford judicial review of such determinations. Pursuant to these procedures, and based upon testimony of experts, the Louisiana courts determined not to release Foucha at this time because the evidence did not show that he ceased to be dangerous. Throughout these proceedings, Foucha was represented by state-appointed counsel. I see no plausible argument that these procedures denied Foucha a fair hearing on the issue involved or that [****76] Foucha needed additional procedural protections. [10] See *Mathews v. Eldridge, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976)*; *Patterson v. New York, 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977)*; cf. *Addington, supra, at 427-432*; [*115] *Jones, supra, at 363-368*; *Benham v. Ledbetter, [**1804] 785 F.2d 1480, 1486-1488 (CA11 1986).* [11]

_____

[10] Foucha has not argued that the State's procedures, *as applied*, are a sham. This would be a different case if Foucha had established that the statutory mechanisms for release were nothing more than window dressing, and that the State in fact confined insanity acquittees indefinitely without meaningful opportunity for review and release.

[11] As explained above, the Court's "procedural" *due process* analysis is essentially an equal protection analysis: The Court first disregards the differences between "sane" insanity acquittees and civil committees, and then simply asserts that Louisiana cannot deny Foucha the procedures it gives civil

504 U.S. 71, *115; 112 S. Ct. 1780, **1804; 118 L. Ed. 2d 437, ***470; 1992 U.S. LEXIS 2703, ****76

[****77] [***471]   B

The Court next concludes that Louisiana's statutory scheme must fall because it violates Foucha's *substantive due process* rights. Ante, at 80-83, and n. 6. I disagree. Until today, I had thought that the analytical framework for evaluating substantive *due process* claims was relatively straightforward. Certain substantive rights we have recognized as "fundamental"; legislation trenching upon these is subjected to "strict scrutiny," and generally will be invalidated unless the State demonstrates a compelling interest and narrow tailoring. Such searching judicial review of state legislation, however, is the exception, not the rule, in our democratic and federal system; we have consistently emphasized that "the Court has no license to invalidate legislation which it thinks merely arbitrary or unreasonable." _Regents of University of Michigan v. Ewing, 474 U.S. 214, 226, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985)_ (internal quotation marks omitted). Except in the unusual case where a fundamental right is infringed, then, federal judicial scrutiny of the substance of state legislation under the *Due Process Clause of the Fourteenth Amendment* is not exacting. See, [****78] e. g., _Bowers v. Hardwick, 478 U.S. 186, 191-196, 92 L. Ed. 2d 140, 106 S. Ct. 2841 (1986)._

In striking down Louisiana's scheme as a violation of substantive rights guaranteed by the *Due Process* Clause, the [*116] Court today ignores this well-established analytical framework. First, the Court never explains whether we are dealing here with a fundamental right, and, if so, what right. Second, the Court never discloses what standard of review applies. Indeed, the Court's opinion is contradictory on both these critical points.

As to the first point: The Court begins its substantive *due process* analysis by invoking the substantive right to "freedom from bodily restraint." Ante, at 80. Its discussion then proceeds as if the problem here is that Foucha, an insanity acquittee, continues to be *confined* after recovering his sanity, ante, at 80-81; thus, the Court contrasts this case to _United States v. Salerno, 481 U.S. 739, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987)_,

committees. A plurality repeats this analysis in its cumulative equal protection section. See ante, at 84-86. As explained above, I believe that there are legitimate differences between civil committees and insanity acquittees, even after the latter have "become" sane. Therefore, in my view, Louisiana has not denied Foucha equal protection of the laws. Cf. _Jones v. United States, 463 U.S. 354, 362, n. 10, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983)._

a case involving the *confinement* of pretrial detainees. But then, abruptly, the Court shifts liberty interests. The liberty interest at stake here, we are told, is *not* a liberty interest [****79] in being free "from bodily restraint," but instead the more specific (and heretofore unknown) "liberty interest under the Constitution *in being freed from [1] indefinite confinement [2] in a mental facility.*" Ante, at 82 (emphasis added). See also ante, at 86-87 (O'CONNOR, J., concurring in part and concurring in judgment). So the problem in this case is apparently *not* that Louisiana continues to confine insanity acquittees who have "become" sane (although earlier in the opinion the Court interprets [***472] our decision in *Jones* as having held that such *confinement* is unconstitutional, see ante, at 77-78), but that under Louisiana law, "sane" insanity acquittees may be held "indefinitely" "in a mental facility."

As to the second point: "A dispute regarding the appropriate standard of review may strike some as a lawyers' quibble over words, but it is not." _Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 610, 111 L. Ed. 2d 445, 110 S. Ct. 2997 (1990)_ (O'CONNOR, J., dissenting). [**1805] The standard of review determines when the *Due Process Clause of the Fourteenth Amendment* will override a State's substantive policy choices, as reflected [****80] in its laws. The Court initially says that "*due process* requires that the nature [*117] of commitment bear some *reasonable relation* to the purpose for which the individual is committed." Ante, at 79 (emphasis added). Later in its opinion, however, the Court states that the Louisiana scheme violates substantive *due process* not because it is not "reasonably related" to the State's purposes, but instead because its detention provisions are not "sharply focused" or "carefully limited," in contrast to the scheme we upheld in *Salerno. Ante,* at 81. Does that mean that the same standard of review applies here that we applied in *Salerno,* and, if so, what is that standard? The Court quite pointedly avoids answering these questions. Similarly, JUSTICE O'CONNOR does not reveal exactly what standard of review she believes applicable, but appears to advocate a heightened standard heretofore unknown in our case law. Ante, at 87-88 ("It might therefore be permissible for Louisiana to confine an insanity acquittee who has regained sanity if . . . the nature and duration of detention were *tailored* to reflect *pressing* public safety concerns related to the acquittee's [****81] continuing dangerousness" (emphasis added)).

To the extent the Court invalidates the Louisiana scheme on the ground that it violates some general

substantive *due process* right to "freedom from bodily restraint" that triggers strict scrutiny, it is wrong — and dangerously so. To the extent the Court suggests that Louisiana has violated some more limited right to freedom from indefinite commitment in a mental facility (a right, by the way, never asserted by Foucha in this or any other court) that triggers some unknown standard of review, it is also wrong. I shall discuss these two possibilities in turn.

1

I fully agree with the Court, *ante,* at 80, and with JUSTICE KENNEDY, *ante,* at 90, that freedom from *involuntary confinement* is at the heart of the "liberty" protected by the *Due Process* Clause. But a liberty interest *per se* is not the same thing as a fundamental right. Whatever the exact scope of the **[*118]** fundamental right to "freedom from bodily restraint" recognized by our cases, [12] **[****83]** it certainly cannot be defined **[***473]** at the exceedingly great level of generality the Court suggests today. There is simply no basis in our society's history or in the precedents **[****82]** of this Court to support the existence of a sweeping, general fundamental right to "freedom from bodily restraint" applicable to *all* persons in *all* contexts. If convicted prisoners could claim such a right, for example, we would subject all prison sentences to strict scrutiny. This we have consistently refused to do. See, e. g., *Chapman v. United States, 500 U.S. 453, 465, 114 L. Ed. 2d 524, 111 S. Ct. 1919 (1991).* [13]

---

[12] The Court cites only *Youngberg v. Romeo, 457 U.S. 307, 316, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982),* in support of its assertion that "freedom from bodily restraint has always been at the core of the liberty protected by the *Due Process* Clause from arbitrary governmental action," *ante,* at 80. What "freedom from bodily restraint" meant in that case, however, is completely different from what the Court uses the phrase to mean here. *Youngberg* involved the substantive *due process* rights of an institutionalized, mentally retarded patient who had been restrained *by shackles placed on his arms* for portions of each day. See *457 U.S. at 310,* and n. 4. What the Court meant by "freedom from bodily restraint," then, was quite literally freedom not to be physically strapped to a bed. That case in no way established the broad "freedom from bodily restraint" — apparently meaning freedom from all *involuntary confinement* — that the Court discusses today.

[13] Unless the Court wishes to overturn this line of cases, its substantive *due process* analysis must rest entirely on the fact that an insanity acquittee has not been *convicted* of a crime. Conviction is, of course, a significant event. But I am

**[**1806]** The critical question here, then, is whether *insanity acquittees* have a fundamental right to "freedom from bodily **[*119]** restraint" **[****84]** that triggers strict scrutiny of their *confinement.* Neither Foucha nor the Court provides any evidence that our society has ever recognized any such right. To the contrary, historical evidence shows that many States have long provided for the continued institutionalization of insanity acquittees who remain dangerous. See, e. g., H. Weihofen, Insanity as a Defense in Criminal Law 294-332 (1933); A. Goldstein, The Insanity Defense 148-149 (1967).

Moreover, this Court has *never* applied strict scrutiny to the substance of state laws involving *involuntary confinement* of the mentally ill, much less to laws involving the *confinement* of insanity acquittees. To the contrary, until today we have subjected the substance of such laws only to very deferential review. Thus, in *Jackson v. Indiana, 406 U.S. 715, 738, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972),* we held that Indiana's provisions for the indefinite institutionalization of incompetent defendants violated substantive *due process* because they did not bear any "reasonable" relation to the purpose for which the defendant was committed. Similarly, in *O'Connor v. Donaldson, 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 [****85] (1975),* we held that the *confinement* of a nondangerous mentally ill person was unconstitutional *not* because the State failed to show a compelling interest and narrow tailoring, but because the State had *no legitimate interest whatsoever* to justify such *confinement.* See *id., at 575-576.* See also *id., at 580* **[***474]** (Burger, C. J., concurring) ("Commitment must be justified on the basis of a *legitimate* state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, *confinement* must cease when those reasons no longer exist" (emphasis added)).

Similarly, in *Jones,* we held (in addition to the

---

not sure that it deserves talismanic significance. Once a State proves beyond a reasonable doubt that an individual has committed a crime, it is, at a minimum, not obviously a matter of federal constitutional concern whether the State proceeds to label that individual "guilty," "guilty but insane," or "not guilty by reason of insanity." A State may just as well decide to label its verdicts "A," "B," and "C." It is surely rather odd to have rules of federal constitutional law turn entirely upon the *label* chosen by a State. Cf. *Railway Express Agency, Inc. v. Virginia, 358 U.S. 434, 441, 3 L. Ed. 2d 450, 79 S. Ct. 411 (1959)* (constitutionality of state action should not turn on "magic words").

procedural *due process* holdings described above) that there was no substantive *due process* bar to holding an insanity acquittee beyond the period for which he could have been incarcerated if convicted. We began by explaining the standard for our analysis: "The *Due Process* Clause 'requires that the nature [*120] and duration of commitment bear some *reasonable* relation to the purpose for which the individual is committed.'" *463 U.S. at 368* (emphasis added) (quoting *Jackson, supra, at [****86] 738*). We then held that "*In light of the congressional purposes underlying commitment of insanity acquittees* [in the District of Columbia,]" which we identified as treatment of the insanity acquittee's mental illness and protection of the acquittee and society, "petitioner clearly errs in contending that an acquittee's hypothetical maximum sentence provides the constitutional limit for his commitment." *463 U.S. at 368* (emphasis added). Given that the commitment law was reasonably related to Congress' purposes, this Court had no basis for invalidating it as a matter of substantive *due process*.

It is simply wrong for the Court to assert today that we "held" in *Jones* that "'the committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous.'" *Ante*, at 77 (quoting *Jones, 463 U.S. at 368*). [14] We specifically noted in *Jones* that *no issue [**1807] regarding the standards for the release of insanity acquittees was before us. *Id., at 363, n. 11*. The question we were answering in the part of *Jones* from which the Court quotes was whether it is permissible to hold an insanity acquittee for a period longer than he could [****87] have been incarcerated if convicted, *not* whether it is permissible to hold him once he becomes "sane." As noted above, our substantive *due process* analysis in *Jones* was straightforward: Did the means chosen by Congress (commitment of insanity acquittees until [*121] they have recovered their sanity or are no longer dangerous) reasonably fit Congress' ends (treatment of the acquittee's mental illness and protection of society from his dangerousness)? [15]

[14] If this were really a "holding" of *Jones*, then I am at a loss to understand JUSTICE O'CONNOR's assertion that the Court today does *not* hold "that Louisiana may never confine dangerous insanity acquittees after they regain mental health." *Ante*, at 87. Either it is true that, as a matter of substantive *due process*, an insanity acquittee is "'entitled to release when he has recovered his sanity,'" *ante*, at 77 (quoting *Jones, 463 U.S. at 368*), or it is not. The Court apparently cannot make up its mind.

[15] As may be apparent from the discussion in text, we have not

[****88] [***475] In its arguments before this Court, Louisiana chose to place primary reliance on our decision in *United States v. Salerno, 481 U.S. 739, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987)*, in which we upheld provisions of the Bail Reform Act of 1984 that allowed *limited* pretrial detention of criminal suspects. That case, as the Court notes, *ante*, at 81-83, is readily distinguishable. Insanity acquittees, in sharp and obvious contrast to pretrial detainees, have *had* their day in court. Although they have not been convicted of crimes, neither have they been exonerated, as they would have been upon a determination of "not guilty" *simpliciter*. Insanity acquittees thus stand in a fundamentally different position from persons who have not been adjudicated to have committed criminal acts. That is what distinguishes this case (and what distinguished *Jones*) from *Salerno* and *Jackson v. Indiana, supra*. In *Jackson*, as in *Salerno*, the State had not proved beyond a reasonable doubt that the accused had committed criminal acts or otherwise was dangerous. See *Jones, supra, at 364, n. 12*. The Court disregards this critical distinction, and apparently [****89] deems applicable the same scrutiny to pretrial detainees [*122] as to persons determined in a judicial proceeding to have committed a criminal act. [16]

been entirely precise as to the appropriate standard of review of legislation in this area. Some of our cases (*e. g., O'Connor v. Donaldson, 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975)*) have used the language of rationality review; others (*e. g., Jackson v. Indiana, 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972)*) have used the language of "reasonableness," which may imply a somewhat heightened standard; still others (*e. g., Jones*) have used the language of both rationality and reasonableness. What *is* clear from our cases is that the appropriate scrutiny is highly deferential, not strict. We need not decide in this case which precise standard is applicable, since the laws under attack here are at the very least reasonable.

[16] The Court asserts that the principles set forth in this dissent necessarily apply not only to insanity acquittees, but also to convicted prisoners. "JUSTICE THOMAS' rationale for continuing to hold the insanity acquittee would surely justify treating the convicted felon in the same way, and if put to it, it appears that he would permit it." *Ante*, at 83, n. 6. That is obviously not so. If Foucha had been convicted of the crimes with which he was charged and sentenced to the statutory maximum of 32 years in prison, the State would not be entitled to extend his sentence at the end of that period. To do so would obviously violate the prohibition on *ex post facto* laws set forth in Art. I, § 10, cl. 1. But Foucha was not sentenced to incarceration for any definite period of time; to the contrary, he pleaded not guilty by reason of insanity and was ordered

06/02/2020    12:17 Martin & Associates    Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 88 of 125   P.033/035

[****90] If the Court indeed means to suggest that *all* restrictions on "freedom from bodily restraint" are subject to strict scrutiny, it has (at a minimum) wrought a revolution in the treatment of the mentally ill. Civil commitment as we know it would almost certainly be unconstitutional; only in the rarest of circumstances will a State be able [**1808] to show a "compelling interest," and one that can be served in no other way, in involuntarily institutionalizing a person. All procedures involving the **confinement** of insanity acquittees and civil committees would require revamping to meet strict scrutiny. Thus, to take one obvious example, the *automatic* commitment of insanity acquittees that we expressly upheld in *Jones* would be clearly unconstitutional, since it is inconceivable that such commitment of persons who may well *presently* be sane and [***476] nondangerous could survive strict scrutiny. (In *Jones*, of course, we applied no such scrutiny; we upheld the practice not because it was justified by a compelling interest, [*123] but because it was based on reasonable legislative inferences about continuing insanity and dangerousness.)

2

As explained above, [****91] the Court's opinion is profoundly ambiguous on the central question in this case: Must the State of Louisiana release Terry Foucha now that he has "regained" his sanity? In other words, is the defect in Louisiana's statutory scheme that it provides for the **confinement** of insanity acquittees who have recovered their sanity, or instead that it allows the State to confine sane insanity acquittees (1) indefinitely (2) in a mental facility? To the extent the Court suggests the former, I have already explained why it is wrong. I turn now to the latter possibility, which also is mistaken.

To begin with, I think it is somewhat misleading to describe Louisiana's scheme as providing for the "indefinite" commitment of insanity acquittees. As explained above, insanity acquittees are entitled to a release hearing every year at their request, and at any time at the request of a facility superintendent. Like the District of Columbia statute at issue in *Jones*, then, Louisiana's statute provides for "indefinite" commitment only to the extent that an acquittee is unable to satisfy

the substantive standards for release. If the Constitution did *not* require a cap on the acquittee's **confinement** in [****92] *Jones*, why does it require one here? The Court and JUSTICE O'CONNOR have no basis for suggesting that either this Court or the society of which it is a part has recognized some general fundamental right to "freedom from indefinite commitment." If that were the case, of course, *Jones* would have involved strict scrutiny and is wrongly decided.

Furthermore, any concerns about "indefinite" commitment here are entirely hypothetical and speculative. Foucha has been confined for eight years. Had he been convicted of the crimes with which he was charged, he could have been incarcerated [*124] for 32 years. See *La. Rev. Stat. Ann. §§ 14:60, 14:94* (West 1986). Thus, I find quite odd JUSTICE O'CONNOR's suggestion, *ante*, at 89, that this case might be different had Louisiana, like the State of Washington, limited **confinement** to the period for which a defendant might have been imprisoned if convicted. Foucha, of course, would be in precisely the same position today — and for the next 24 years — had the Louisiana statute included such a cap. Thus, the Court apparently finds fault with the Louisiana statute *not* because it has been applied to Foucha in an unconstitutional [****93] manner, but because the Court can imagine it being applied to *someone else* in an unconstitutional manner. That goes against the first principles of our jurisprudence. See, *e. g., Salerno, 481 U.S. at 745* ("The fact that [a detention statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine [***477] outside the limited context of the *First Amendment*"). [17]

Finally, I see no basis for holding that the **Due Process** Clause *per se* prohibits a State from continuing to confine in a "mental institution" — the [**1809] federal constitutional definition of which remains unclear — an insanity [****94] acquittee who has recovered his sanity. As noted above, many States have long provided for the continued detention of insanity acquittees who remain dangerous. Neither Foucha nor the Court present any evidence that these States have traditionally transferred such persons from mental

---

institutionalized *until he was able to meet the conditions statutorily prescribed for his release*. To acknowledge, as I do, that it is constitutionally permissible for a State to provide for the continued **confinement** of an insanity acquittee who remains dangerous is obviously quite different than to assert that the State is allowed to confine *anyone* who is dangerous for as long as it wishes.

---

[17] I fully agree with JUSTICE O'CONNOR, *ante*, at 88, that there would be a serious question of rationality had Louisiana sought to institutionalize a sane insanity acquittee for a period longer than he might have been imprisoned if convicted. But that is simply not the case here.

06/02/2020  12:17 Martin & Associates                    (FAX)8024795414        P.034/035
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 89 of 125

Page 32 of 33
504 U.S. 71, *124; 112 S. Ct. 1780, **1809; 118 L. Ed. 2d 437, ***477; 1992 U.S. LEXIS 2703, ****94

institutions to other detention facilities. Therefore, there is simply no basis for this Court to recognize a "fundamental right" for a sane insanity acquittee to be transferred out of a mental facility. "In an attempt to limit and guide interpretation of the [*Due Process*] Clause, we have insisted not merely that the interest **[*125]** denominated as a 'liberty' be 'fundamental' (a concept that, in isolation, is hard to objectify), but also that it be an interest traditionally protected by our society." *Michael H. v. Gerald D., 491 U.S. 110, 122, 105 L. Ed. 2d 91, 109 S. Ct. 2333 (1989)* (plurality opinion).

Removing sane insanity acquittees from mental institutions may make eminent sense as a policy matter, but the ***Due Process*** Clause does not require the States to conform to the policy preferences of federal judges. "The Court is most vulnerable and comes nearest to illegitimacy when it deals **[****95]** with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." *Bowers, 478 U.S. at 194.* I have no idea what facilities the Court or JUSTICE O'CONNOR believe the ***Due Process*** Clause mandates for the ***confinement*** of sane-but-dangerous insanity acquittees. Presumably prisons will not do, since imprisonment is generally regarded as "punishment." May a State designate a wing of a mental institution or prison for sane insanity acquittees? May a State mix them with other detainees? Neither the Constitution nor our society's traditions provide any answer to these questions. [18]

**[****96] 3**

"So-called 'substantive ***due process*** ' prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952)*, or interferes **[*126]** with rights 'implicit in the concept of ordered liberty,'

---

[18] *In particular circumstances*, of course, it may be unconstitutional for a State to confine in a mental institution a person who is no longer insane. This would be a different case had Foucha challenged specific conditions of ***confinement*** — for instance, being forced to share a cell with an insane person, or being involuntarily treated after recovering his sanity. But Foucha has alleged nothing of the sort — all we know is that the State continues to confine him in a place called the Feliciana Forensic Facility. It is by no means clear that such ***confinement*** is *invariably* worse than, for example, ***confinement*** in a jail or other detention center — for all we know, an institution may provide a quieter, less violent atmosphere. I do not mean to suggest that that is the case — my point is only that the issue cannot be resolved in the abstract.

*Palko v. Connecticut, 302 U.S. 319, 325-326, 82 L. Ed. 288, 58 S. Ct. 149 (1937).* **[***478]** " *Salerno, supra, at 746.* The legislative scheme the Court invalidates today is, at the very least, substantively reasonable. With all *due* respect, I do not remotely think it can be said that the laws in question "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts, 291 U.S. 97, 105, 78 L. Ed. 674, 54 S. Ct. 330 (1934).* Therefore, in my view, this Court is not entitled, as a matter of substantive ***due process***, to strike them down.

I respectfully dissent.

## References

*21 Am Jur 2d, Criminal Law 88-94*


8 Am Jur Pl & Pr Forms (Rev), Criminal Procedure, Forms 211, 212


8 Am Jur Proof of Facts 1, Mental Disorder and Incapacity; 28 Am Jur Proof of Facts **[****97]** 547, ***Confinement*** to Mental Institution


26 Am Jur Trials 97, Representing the Mentally Ill: Civil Commitment Proceedings; 27 Am Jur Trials 1, Representing the Mentally Disabled Criminal Defendant


USCS, *Constitution, Amendment 14*


L Ed Digest, Constitutional Law 528.3


L Ed Index, Hospitals and Asylums; Incompetent or Insane Persons


Index to Annotations, Incompetent and Insane Persons


Annotation References:


Supreme Court's views as to concept of "liberty" under *due process clauses of Fifth* and *Fourteenth Amendments. 47 L Ed 2d 975.*

504 U.S. 71, *126; 112 S. Ct. 1780, **1809; 118 L. Ed. 2d 437, ***478; 1992 U.S. LEXIS 2703, ****97

Validity of conditions imposed when releasing person
committed to institution as consequence of acquittal of
crime on ground of insanity. *2 ALR4th 934*.

Modern status of rules as to standard of proof required
in civil commitment proceedings. *97 ALR3d 780*.

Release of one committed to institution as consequence
of acquittal of crime on ground of insanity. *95 ALR2d
54*.

**End of Document**

Caution
As of: June 7, 2020 12:13 AM Z

# Melrose-Wakefield Hosp. v. H.S.

State of Massachusetts, Appellate Division, Northern District

November 24, 2010, Decided

No Number in Original

**Reporter**
2010 Mass. App. Div. LEXIS 73 *; 2010 Mass. App. Div. 247

Melrose-Wakefield Hospital vs. H.S.

**Prior History:** [*1] Opinion vacating order of commitment and dismissing petition for civil commitment. Action heard in the Malden Division by Nestor, J.

Melrose-Wakefield Hosp. v. H.S., 2010 Mass. App. Div. LEXIS 80 (2010)

## Core Terms

illness, psychiatric, scheduled

## Case Summary

**Procedural Posture**
Petitioner hospital brought a proceeding seeking the **_involuntary_** commitment of respondent patient. The Malden District Court (Massachusetts) civilly committed the patient to a psychiatric facility. The patient appealed.

but at that hearing, counsel for the hospital informed the court that the patient was not present because the hospital did not feel that it was safe to bring her. The trial court judge stated that the hearing had been formally commenced, and that it would be tentatively continued until the following day. The commitment order was entered the next day, which was beyond the five-day limit of § 7(c). The appellate court found that the patient was fundamentally entitled to a hearing conducted in compliance with statutory requirements and to be present during the course of that hearing. While the clerk called the matter for hearing, no witness presented testimony despite the fact that the patient's treating psychiatrist was present. Thus, a hearing was not "commenced" on the initial scheduled day within the meaning of § 7(c). No evidence was taken on the issue of whether the hospital's unilateral action in not causing the patient to be present was justified, so no extraordinary circumstances justifying a delay were shown.

**Outcome**
The order of commitment was vacated, and the petition for civil commitment was dismissed.

## LexisNexis® Headnotes

### Overview

The dispositive issue on appeal was the timeliness of the commitment hearing under _Mass. Gen. Laws ch. 123, § 7(c)_. The hearing was initially timely scheduled,

Civil Procedure > ... > Pleadings > Time Limitations > Computation of Time

Patricia Lazarus

2010 Mass. App. Div. LEXIS 73, *1

Family Law > Family Protection & Welfare > *Involuntary* Commitment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

**HN1[⤓] Time Limitations, Computation of Time**

See *Mass. Gen. Laws ch. 123, § 7(c)*.

Civil Procedure > ... > Pleadings > Time Limitations > Computation of Time

**HN2[⤓] Time Limitations, Computation of Time**

In determining time periods under *Mass. R.Civ.P. 6*, the first day of the period is not counted, and the last day cannot be a Saturday, Sunday, or holiday. *Mass. R.Civ.P. 6(a)*.

Civil Procedure > ... > Pleadings > Time Limitations > General Overview

Family Law > Family Protection & Welfare > *Involuntary* Commitment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

**HN3[⤓] Pleadings, Time Limitations**

*Mass. Gen. Laws ch. 123, § 7(c)* mandates mat a petition for *involuntary* commitment to a psychiatric facility shall be commenced within 5 days of the filing of the petition, unless a delay is requested by the person subject to the petition or his counsel.

Civil Procedure > ... > Pleadings > Time Limitations > General Overview

Family Law > Family Protection & Welfare > *Involuntary* Commitment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

**HN4[⤓] Pleadings, Time Limitations**

Pursuant to *Mass. Gen. Laws ch. 123, § 7(c)*, hearings

on initial petitions for *involuntary* civil commitment shall be commenced within 5 days of the filing of the petition, unless a delay is requested by the person or his counsel.

Governments > Legislation > Interpretation

**HN5[⤓] Legislation, Interpretation**

Construed in its ordinary sense, the statutory term "shall" designates a mandatory or imperative obligation.

Civil Procedure > ... > Pleadings > Time Limitations > General Overview

Family Law > Family Protection & Welfare > *Involuntary* Commitment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

**HN6[⤓] Pleadings, Time Limitations**

Confinement without legal justification is never innocuous, and the failure to conduct a commitment hearing within the time limits mandated by *Mass. Gen. Laws ch. 123, § 7(c)* should result in a dismissal of the commitment petition. The statute's deadlines are mandatory to protect a defendant's liberty interest, and any delay by the petitioner that results in a confinement exceeding five days is a violation of the statute. Dismissal is the appropriate remedy for any violation of the deadline, absent extraordinary circumstances that would justify a very brief delay.

Family Law > Family Protection & Welfare > *Involuntary* Commitment

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

**HN7[⤓] Family Protection & Welfare, Involuntary Commitment**

In the absence of the swearing of a witness, or of some evidence being taken, a hearing is not "commenced" within the meaning of *Mass. Gen. Laws ch. 123, § 7(c)*.

**Counsel:** John DiPietrantonio for the plaintiff.

Alice Whitehill Wiseberg for the defendant.

**Judges:** Present: Greco, P.J., Coven & Swan, JJ.

**Opinion by:** Coven

## Opinion

**COVEN, J.** H.S., civilly committed to a psychiatric facility pursuant to _G.L.c. 123, §§ 7_ and _8_, has appealed the order of commitment, asserting that the order must be vacated because the hearing on the petition for commitment was not commenced within the five-day period required by _G.L.c. 123, § 7(c)_, the petitioner lacked standing to file the petition, and the evidence was insufficient to warrant a finding beyond a reasonable doubt that the failure to hospitalize H.S. in a secure facility would create a substantial likelihood of serious harm.

On January 11, 2010, H.S. was voluntarily admitted to the inpatient psychiatric unit of the Melrose-Wakefield Hospital pursuant to _G.L.c. 123, §12_. She had been transferred from the Boston Memorial emergency room where she had been placed in restraints. Dr. Robert Welch ("Welch"), the Chief of Psychiatry at Melrose-Wakefield Hospital, was H.S.'s treating physician and the petitioner in this [*2] case. According to Dr. Welch, the medical staff at Boston Memorial observed that H.S. was agitated and tried to stabilize her with _**medication**_. At Melrose-Wakefield Hospital's psychiatric facility, H.S. was diagnosed as suffering from schizoaffective disorder, a major mental illness. [1] It was her third psychiatric hospitalization in a two-month period.

On January 14, 2010, Dr. Welch filed a petition for _**involuntary**_ commitment under _G.L.c. 123, §§ 7_ and _8_.

A hearing was scheduled for January 21, 2010 [2] at the Malden District Court On the scheduled date, Dr. Welch, counsel for Melrose-Wakefield Hospital, and counsel for H.S. were present It is unclear whether Dr. Welch was sworn as a witness. When the case was called for hearing, counsel for the Hospital informed the court that H.S. was not present, although she wished to be present, because the "hospital d[id] not feel that it [was] safe to bring her as the doctor isn't [present]." [3] The judge stated that the hearing had been formally commenced, and that it would be tentatively continued until the following day. Counsel for H.S. requested that the petition [*3] for commitment be dismissed because the hearing would not be held within the five-day period required by _G.L.c. 123, § 7(c)_. [4] Counsel informed the court that his client had neither waived her appearance, nor authorized him to assent to a continuance. The judge did not rule on H.S.'s counsel's request for the dismissal, stating that he would not decide the motion without H.S. being present.

An evidentiary hearing was, in fact, conducted the next day. Dr. Welch testified that H.S. had threatened him and that, when he asked her whether what he perceived to be threats were threats, H.S. stated, "I am threatening you." He informed the court that H.S. reported having psychotic symptoms, claiming to have been falsely imprisoned; and that she had been observed walking

[1] The sufficiency of the evidence to establish a major mental illness is not in dispute.

[2] The hearing was properly scheduled for January 21, 2010. _General Laws c. 123, § 7(c)_ provides that HN1[⬆] "[t]he periods of time prescribed or allowed under the provisions of this section shall be computed pursuant to _Rule 6 of the Massachusetts Rules of Civil Procedure._" HN2[⬆] In determining time periods under _Rule 6_, the first day of the period is not counted, and the last day cannot be a Saturday, Sunday, or holiday. _Mass. R. Civ. P., Rule 6(a)._ Between the filing of the petition and the scheduled hearing date, there was also an intervening weekend and holiday, which are also excluded in computation. _Id._

[3] The court, prior to the hospital's counsel's representation, acknowledged the presence of a doctor and later when scheduling a further hearing, referred to the presence of three parties present for the hearing. [*4] It is not clear what doctor was being referred to by counsel. H.S. does not dispute the representation made in the hospital's brief that Dr. Welch was present

[4] HN3[⬆] _Section 7(c) of G.L.c. 123_ mandates mat a petition for _**involuntary**_ commitment to a psychiatric facility "shall be commenced within 5 days of the filing of the petition, unless a delay is requested by the person [subject to the petition] or his counsel."


06/08/2020 09:07 Martin & Associates (FAX)8024795414 P.006/037
Case 1:20-cv-11266-WGY Document 1-2 Filed 07/02/20 Page 94 of 125

Page 4 of 5

2010 Mass. App. Div. LEXIS 73, *4

around talking to herself and talking on the telephone about an apparent conspiracy by the hospital staff. [5] In addition to this testimony, the record contains an affidavit from Dr. Welch that was submitted with his request to treat H.S. with antipsychotic *medication*. [6] In the affidavit, Dr. Welch states that, in addition to H.S. being "pressured, labile, disorganized, psychotic, and threatening to harm," she [*5] did not understand her condition, the risks and benefits of an ongoing treatment plan, and the significant impairment to her judgment caused by her illness. Dr. Welch further stated:

"It is also my opinion that as a result of [H.S.'s] mental illness, there exists a very substantial risk of physical impairment or injury to the person herself as a result of poor judgment and insight, and severe paranoid delusions. The circumstances leading to this hospitalization are as follows: [H.S.] presented in a psychotic state, reporting that people 'were trying to kill her.' She had recently discharged from Arbour Hospital, and had been non-adherent with outpatient treatment."

The dispositive issue on this appeal is the timeliness of the commitment hearing. The trial judge in dealing with that issue was confronted by a confluence of the parties' conflicting and not-easily-reconciled interests. The respondent was fundamentally entitled to a hearing conducted in compliance with statutory requirements and to be present during the course of that hearing. Conversely, the petitioner suggested in the trial court and on this appeal that the respondent was too dangerous or was otherwise physically or mentally unable to attend the first hearing that was scheduled in

---

[5] In the transcript of the commitment hearing, many portions of the testimony, particularly relevant to the sufficiency of the evidence regarding the danger H.S. posed to herself or others, are marked "indiscernible." As the docket entries do not reflect that the parties, pursuant to Dist/Mun. Cts. R. A. D. A., Rule 8C(c)(4), "use[d] reasonable efforts to stipulate their content" or presented the issue to the judge who conducted the hearing.

[6] The following exchange took place when the hearing judge addressed the issue of *involuntary* [*6] *medication* of H.S.:

The Court" All right. So there's no objection to incorporating all the testimony for the purpose of 8A; is that correct?

"[Counsel for H.S.]: Right That's correct.

"[Counsel for the hospital]: And also I understand the affidavit will be submitted into evidence.

"[Counsel for H.S.]: That's okay."

---

compliance with statutory time requirements. The conflict has not been addressed previously, and presents an issue that may well recur in mental health proceedings. See *Guardianship of Nolan, 441 Mass. 1012, 1013, 806 N.E.2d 426 (2004)*. For that reason, we proceed to address it.

In dealing with the statutory time [*7] requirement, we stated in *Matter of Molina, 2007 Mass. App. Div. 21* that *HN4*[↑] "[p]ursuant to *G.L. c. 123, § 7(c)*, hearings on initial petitions for *involuntary* civil commitment 'shall be commenced within 5 days of the filing of the petition, unless a delay is requested by the person or his counsel.' *HN5*[↑] Construed in its ordinary sense, *Commonwealth v. DeBella, 442 Mass. 683, 687, 816 N.E.2d 102 (2004)*, the statutory term 'shall' designates a 'mandatory or imperative obligation.' *Hashimi v. Kalil. 388 Mass. 607, 609, 446 N.E.2d 1387 (1983)*." *Id. at 22*. In *Matter of Molina*, because of the illness of petitioner's counsel, the court rescheduled the hearing for a time one day past what the statute allowed. We observed that "[c]learly. the judge could have granted a continuance for one day, until August 8, 2006, [7] to afford Petitioner's counsel an opportunity to recover from his illness or to seek substitute counsel from his law Firm or elsewhere. However appropriately sympathetic the judge was to counsel's request for a continuance based on illness, the court was not authorized to continue the commitment hearing past the deadline prescribed by *G.L.c. 123, § 7(c)*, The plain language of the statute limited the judge's discretion. [*8] See *Senior Hous. Props. Trust v. Healthsouth Corp., 447 Mass. 259, 272, 850 N.E.2d 1027 (2006)*." *Id.*

We further noted in *Matter of Molina* that *HN6*[↑] "'[c]onfinement without legal justification is never innocuous,' *Commonwealth v. Kennedy, 435 Mass. 527, 530, 762 N.E.2d 794 (2001)*, and the failure to conduct a commitment hearing within the time limits mandated by *G.L. c. 123, § 7(c)* should result in a dismissal of the commitment petition. *Id. at 530, n.3*." *Id.* "The statute's deadlines are mandatory to protect a defendant's liberty interest, and any delay by the [Petitioner] that results in a confinement exceeding [five] days is a violation of the statute.. . . [D]ismissal is the appropriate remedy for any violation of the . . . deadline, absent extraordinary

---

[7] In *Matter of Molina*, the hearing was scheduled for the day prior to the expiration of the five-Hay period allowed under CL. c. 123, § 7(c). August 8th was the last day. The hearing was rescheduled for August 9th.

circumstances that would justify a very brief delay." *Id.* quoting *Commonwealth v. Parra, 445 Mass. 262, 263, 836 N.E.2d 508 (2005).*

We did not address in *Matter of Molina* whether a hearing had been "commenced." While the clerk in this case called the matter for hearing, no witness [*9] presented testimony despite the fact that Dr. Welch, the treating psychiatrist for H.S., was present. We are not persuaded that, *HN7*[↑] in the absence of the swearing of a witness, or of some evidence being taken, a hearing is "commenced" within the meaning of *G.L. c. 123, § 7(c).*

Nor need we address in this case whether the rescheduling of a hearing because of some *extraordinary* circumstances, which may provide an exception to the statutory requirement that would comport with the statute and constitutional due process, was permissible. The petitioner herein claimed that H.S. was unable to attend the hearing because the "hospital d[id] not feel that it [was] safe to bring her as the doctor isn't [present]." Yet no evidence was taken on the issue of whether the hospital's unilateral action was justified. At a statutory and constitutional minimum, the court should have conducted a hearing in which the petitioner had the burden of proving, subject to cross-examination, that H.S. was incapable of attending the hearing. And the court should have stated its reasons for determining that the petitioner's unilateral action was justifiable. [8]

The order of commitment is vacated, and the petition for civil commitment is dismissed. [9]

---

[8] Hypothetically, a hospital's position as to the mental or [*10] physical stability of a patient could, in some extraordinary circumstance, warrant a finding that a delay in the hearing is justifiable. But we think that it would be extremely rare that circumstances involving only the ability of the hospital itself to comply with the statutory requirement, e.g., staffing or transportation, would justify the continuation of a hearing beyond the five days required under the statute.

[9] As to the remaining issues on this appeal, we note that Dr. Welch, as Chief of Psychiatry of the psychiatric unit, was a proper petitioner. See *G.L.c. 123, § 7(a)* (authorizing facility director to file petition) and *104 CMR 25.03* (defining facility director). See also *BayRidge Hosp. v. Jackson, 2010 Mass. App. Div. 12, 13-14.* Second, based on the state of the record before us, see note 5, the evidence consisting of Dr. Welch's testimony and his affidavit supported, however marginally, the required finding for commitment that a person be "placed in reasonable fear of violent behavior and serious harm to them." *G.L.c. 123, § 1.*

So ordered.

---

End of Document

Patricia Lazarus



**User Name:** Patricia Lazarus

**Date and Time:** Saturday, June 6, 2020 8:14:00 PM EDT

**Job Number:** 118444829

## Document (1)

1. *Melrose-Wakefield Hosp. v. H.S., 2010 Mass. App. Div. LEXIS 80*

   **Client/Matter:** -None-

   **Search Terms:** 'Involuntary medication'

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Court: State Courts > Massachusetts |



**A** Neutral
As of: June 7, 2020 12:14 AM Z

# *Melrose-Wakefield Hosp. v. H.S.*

### State of Massachusetts, Appellate Division, Northern District

### May 20, 2010, Decided

### NO. 10-ADMS-10025

**Reporter**
2010 Mass. App. Div. LEXIS 80 *

MELROSE-WAKEFIELD HOSPITAL v. H.S.

**Subsequent History:** Reported in full at, Petition dismissed by *Melrose-Wakefield Hosp. v. H.S., 2010 Mass. App. Div. 247, 2010 Mass. App. Div. LEXIS 73 (2010)*

**Prior History: [*1]** In the MALDEN DIVISION: Justice: Nestor, J. Docket No. 1050-MH-0005. Date of Decision Appealed: January 25, 2010. Date of Entry in the Appellate Division: May 20, 2010.

## Core Terms

illness, psychiatric, scheduled

## Case Summary

### Procedural Posture

Petitioner doctor filed a petition for *involuntary* commitment of respondent patient under *Mass. Gen. Laws Ann. ch. 123, §§ 7* and *8*. The trial court, Malden Division (Massachusetts) granted the petition. The patient appealed the order of commitment.

### Overview

The patient, who had been diagnosed as suffering from schizoaffective disorder, asserted that the order had to be vacated because the hearing on the petition for commitment was not commenced within the five-day period required by *Mass. Gen. Laws Ann. ch. 123, § 7(c)*, the petitioner lacked standing to file the petition, and the evidence was insufficient to warrant a finding beyond a reasonable doubt that the failure to hospitalize the patient would create a substantial likelihood of serious harm. The appellate court concluded that the five-day time period for filing a petition for *involuntary* commitment was mandatory and no hearing was conducted within that period. The clerk called the matter for hearing, but no witness presented testimony, despite the fact that the doctor, the treating physician, was present. In the absence of the swearing of a witness, or of some evidence being taken, no hearing was commenced within the meaning of *§ 7(c)*. While the doctor claimed the patient was unable to attend the hearing because it was not safe to bring her, no evidence was taken on whether that action was justified.

### Outcome

The order of commitment was vacated and the petition for civil commitment was dismissed.

## LexisNexis® Headnotes

06/08/2020   09:08 Martin & Associates                    (FAX)8024795414    P.010/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 98 of 125

Page 2 of 5

2010 Mass. App. Div. LEXIS 80, *1

Governments > Legislation > Statute of
Limitations > Time Limitations

Public Health & Welfare Law > ... > Mental Health
Services > Commitment > *Involuntary* Commitment
of Adults

*HN1*[⬇️] Statute of Limitations, Time Limitations

*Mass. Gen. Laws Ann. ch. 123, § 7* provides that the
periods of time prescribed or allowed under the
provisions of *§ 7* shall be computed pursuant to *Mass.
R.Civ.P. 6*. In determining time periods under *Rule 6*,
the first day of the period is not counted, and the last
day cannot be a Saturday, Sunday, or holiday. *Rule
6(a)*.

Governments > Legislation > Statute of
Limitations > Time Limitations

Public Health & Welfare Law > ... > Mental Health
Services > Commitment > *Involuntary* Commitment
of Adults

*HN2*[⬇️] Statute of Limitations, Time Limitations

*Mass. Gen. Laws Ann. ch. 123, § 7(c)* mandates that a
petition for *involuntary* commitment to a psychiatric
facility shall be commenced within 5 days of the filing of
the petition, unless a delay is requested by the person
subject to the petition or his counsel.

Governments > Legislation > Interpretation

Public Health & Welfare Law > ... > Mental Health
Services > Commitment > *Involuntary* Commitment
of Adults

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN3*[⬇️] Legislation, Interpretation

Pursuant to *Mass. Gen. Laws Ann. ch. 123, § 7(c)*,
hearings on initial petitions for *involuntary* civil
commitment shall be commenced within 5 days of the
filing of the petition, unless a delay is requested by the
person or his counsel. Construed in its ordinary sense,
the statutory term "shall" designates a mandatory or
imperative obligation.

Civil Procedure > Dismissal > *Involuntary*
Dismissals > General Overview

Governments > Legislation > Statute of
Limitations > Time Limitations

Public Health & Welfare Law > ... > Mental Health
Services > Commitment > *Involuntary* Commitment
of Adults

*HN4*[⬇️] Dismissal, Involuntary Dismissals

Confinement without legal justification is never
innocuous, and the failure to conduct a commitment
hearing within the time limits mandated by *Mass. Gen.
Laws Ann. ch. 123, § 7(c)* should result in a dismissal of
the commitment petition. The statute's deadlines are
mandatory to protect a defendant's liberty interest, and
any delay by a petitioner that results in a confinement
exceeding five days is a violation of the statute.
Dismissal is the appropriate remedy for any violation of
the deadline, absent extraordinary circumstances that
would justify a very brief delay.

**Counsel:** FOR PETITIONER: John DiPietrantonio,
Esq., Somerville, MA.

FOR RESPONDENT: Alice Whitehill Wiseberg, Esq.,
Melrose, MA.

**Judges:** Greco, P.J., Coven & Swan, JJ.

**Opinion by:** MARK S. COVEN

# Opinion

**COVEN, J.** H.S., civilly committed to a psychiatric
facility pursuant to *G.L. c. 123, §§ 7* and *8*, has
appealed the order of commitment, asserting that the

06/08/2020  09:08 Martin & Associates                    (FAX)8024795414      P.011/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 99 of 125

Page 3 of 5

2010 Mass. App. Div. LEXIS 80, *1

order must be vacated because the hearing on the petition for commitment was not commenced within the five-day period required by *G.L. c. 123, § 7(c)*, the petitioner lacked standing to file the petition, and the evidence was insufficient to warrant a finding beyond a reasonable doubt that the failure to hospitalize H.S. in a secure facility would create a substantial likelihood of serious harm.

On January 11, 2010, H.S. was voluntarily admitted to the inpatient psychiatric unit of the Melrose-Wakefield Hospital pursuant to *G.L. c. 123, § 12*. She had been transferred from the Boston Memorial emergency room where she had been placed in restraints. Dr. Robert Welch ("Welch"), the Chief of Psychiatry at Melrose-Wakefield [*2] Hospital, was H.S.'s treating physician and the petitioner in this case. According to Dr. Welch, the medical staff at Boston Memorial observed that H.S. was agitated and tried to stabilize her with *medication*. At Melrose-Wakefield Hospital's psychiatric unit, H.S. was diagnosed as suffering from schizoaffective disorder, a major mental illness. [1] It was her third psychiatric hospitalization in a two-month period.

On January 14, 2010, Dr. Welch filed a petition for *involuntary* commitment under *G.L. c. 123, §§ 7* and *8*. A hearing was scheduled for January 21, 2010 [2] at the Maiden District Court. On the scheduled date, Dr. Welch, counsel for Melrose-Wakefield Hospital, and counsel for H.S. were present. It is unclear where Dr. Welch was sworn as a witness. When the case was called for hearing, counsel for the Hospital informed the court that H.S. was not present, although she wished to be present, because the "hospital d[id] not feel that it [was] safe to bring her as the doctor isn't [present]." [3]

The judge stated that the hearing had been formally commenced, and that it would be tentatively continued [*3] until the following day. Counsel for H.S. requested that the petition for commitment be dismissed because the hearing would not be held within the five-day period required by *G.L. c. 123, § 7(c)*. [4] Counsel informed the court that his client had neither waived her appearance, nor authorized him to assent to a continuance. The judge did not rule on H.S.'s counsel's request for the dismissal, stating that he would not decide the motion without H.S. being present.

An evidentiary hearing was, in fact, conducted the next day. Dr. Welch testified that H.S. had threatened him and that, when he asked her whether what he perceived to be threats were threats, H.S. stated, "I am threatening you." He informed the court that H.S. reported having psychotic symptoms, claiming to have been falsely imprisoned; and that she had been observed walking around talking to herself and talking on the telephone about an apparent conspiracy by the hospital staff. [5] In addition to this testimony, the record contains an affidavit from Dr. Welch that was submitted with his request to treat H.S. with antipsychotic *medication*. [6] In

---

[1] The sufficiency of the evidence to establish a major mental illness is not in dispute.

[2] The hearing was properly scheduled for January 21, 2010. *General Laws c. 123, § 7(c) HN1[⬆]* provides that "[t]he periods of time prescribed or allowed under the provisions of this section shall be computed pursuant to *Rule 6 of the Massachusetts Rules of Civil Procedure*." In determining time periods under *Rule 6*, the first day of the period is not counted, and the last day cannot be a Saturday, Sunday, or holiday. *Mass. R. Civ. P. 6(a)*. Between the filing of the petition and the scheduled hearing date, there was also an intervening weekend and holiday, which are also excluded in computation. *Id.*

[3] The court, prior to the hospital's counsel's representation, acknowledged the presence of a doctor and later, when scheduling a further hearing, [*4] referred to the presence of

three parties present for the hearing. It is not clear what doctor was being referred to by counsel. H.S. does not dispute the representation made in the hospital's brief that Dr. Welch was present.

[4] *Section 7(c) of G.L. c. 123 HN2[⬆]* mandates that a petition for *involuntary* commitment to a psychiatric facility "shall be commenced within 5 days of the filing of the petition, unless a delay is requested by the person [subject to the petition] or his counsel."

[5] In the transcript of the commitment hearing, many portions of the testimony, particularly relevant to the sufficiency of the evidence regarding the danger H.S. posed to herself or others, are marked "indiscernible." The docket entries do not reflect that the parties, pursuant to Dist./Mun. Cts. R. A. D. A. 8C(c)(4), "use[d] reasonable efforts to stipulate their content" or presented the issue to the judge who conducted the hearing.

[6] The following exchange took [*6] place when the hearing judge addressed the issue of *involuntary medication* of H.S.:

"The Court: All right. So there's no objection to incorporating all the testimony for the purpose of 8A; is that correct?

"[Counsel for H.S.]: Right. That's correct.

"[Counsel for the hospital]: And also I understand the affidavit will be submitted into evidence.

"[Counsel for H.S.]: That's okay."

the affidavit, Dr. Welch states that, in addition to H.S. being "pressured, [*5] labile, disorganized, psychotic, and threatening to harm," she did not understand her condition, the risks and benefits of an ongoing treatment plan, and the significant impairment in her judgment caused by her illness. Dr. Welch further stated:

"It is also my opinion that as a result of [H.S.'s] mental illness, there exists a very substantial risk of physical impairment or injury to the person herself as a result of poor judgment and insight, and severe paranoid delusions. The circumstances leading to this hospitalization are as follows: [H.S.] presented in a psychotic state, reporting that people 'were trying to kill her.' She had recently discharged from Arbour Hospital, and had been non-adherent with outpatient treatment."

The dispositive issue on this appeal is the timeliness of the commitment hearing. The trial judge in dealing with that issue was confronted by a confluence of the parties' conflicting and not-easily-reconciled interests. The respondent was fundamentally entitled to a hearing conducted in compliance with statutory requirements and to be present during the course of that hearing. Conversely, the petitioner suggested in the trial court and on this appeal that the respondent was too dangerous or was otherwise physically or mentally unable to attend the first hearing that was scheduled in compliance with statutory time requirements. The conflict has not been addressed previously, and presents an issue that may well recur in mental health proceedings. See *Guardianship of Nolan, 441 Mass. 1012, 1013, 806 N.E.2d 426 (2004)*. For that reason, [*7] we proceed to address it.

In dealing with the statutory time requirement, we stated in *Matter of Molina, 2007 Mass. App. Div. 21* that HN3[↑] "[p]ursuant to *G.L. c. 123, § 7(c)*, hearings on initial petitions for *involuntary* civil commitment 'shall be commenced within 5 days of the filing of the petition, unless a delay is requested by the person or his counsel.' Construed in its ordinary sense, *Commonwealth v. DeBella, 442 Mass. 683, 687, 816 N.E.2d 102 (2004)*, the statutory term 'shall' designates a 'mandatory or imperative obligation.' *Hashimi v. Kalil, 388 Mass. 607, 609, 446 N.E.2d 1387 (1983)*." *Id. at 22*. In *Matter of Molina*, the court rescheduled the hearing for a time one day past what the statute allowed. We observed that "[c]learly, the judge could have granted a

continuance for one day, until August 8, 2006, [7] to afford Petitioner's counsel an opportunity to recover from his illness or to seek substitute counsel from his law firm or elsewhere. However appropriately sympathetic the judge was to counsel's request for a continuance based on illness, the court was not authorized to continue the commitment hearing past the deadline prescribed by *G.L. c. 123, § 7(c)*. The [*8] plain language of the statute limited the judge's discretion. See *Senior Hous. Props. Trust v. Healthsouth Corp., 447 Mass. 259, 272, 850 N.E.2d 1027 (2006)*." *Id.*

We further noted in *Matter of Molina* that HN4[↑] "'[confinement without legal justification is never innocuous,' *Commonwealth v. Kennedy, 435 Mass. 527, 530, 762 N.E.2d 794 (2001)*, and the failure to conduct a commitment hearing within the time limits mandated by *G.L. c. 123, § 7(c)* should result in a dismissal of the commitment petition. *Id. at 530, n.3*." *Id.* "The statute's deadlines are mandatory to protect a defendant's liberty interest, and any delay by the [Petitioner] that results in a confinement exceeding [five] days is a violation of the statute. . . . [D]ismissal is the appropriate remedy for any violation of the . . . deadline, absent extraordinary circumstances that would justify a very brief delay." *Id., quoting Commonwealth v. Parra, 445 Mass. 262, 263, 836 N.E.2d 508 (2005)*.

We did not address in *Matter of Molina* whether a hearing had been "commenced." While [*9] the clerk in this case called the matter for hearing, no witness presented testimony despite the fact that Dr. Welch, the treating psychiatrist for H.S., was present. We are not persuaded that, in the absence of the swearing of a witness, or of some evidence being taken, a hearing is "commenced" within the meaning of *G.L. c. 123, § 7(c)*.

Nor need we address in this case whether the rescheduling of a hearing because of some *extraordinary* circumstances, which may provide an exception to the statutory requirement that would comport with the statute and constitutional due process, was permissible. The petitioner herein claimed that H.S. was unable to attend the hearing because the "hospital d[id] not feel that it [was] safe to bring her as the doctor isn't [present]." Yet no evidence was taken on the issue

---

[7] In *Matter of Molina*, the hearing was scheduled for the day prior to the expiration of the five-day period allowed under *G.L. c. 123, § 7(c)*. August 8th was the last day. The hearing was rescheduled for August 9th.

06/08/2020  09:09 Martin & Associates                    (FAX)8024795414           P.013/037
Case 1:20-cv-11266-WGY  Document 1-2  Filed 07/02/20  Page 101 of 125

Page 5 of 5

2010 Mass. App. Div. LEXIS 80, *9

of whether the hospital's unilateral action was justified. At a statutory and constitutional minimum, the court should have conducted a hearing in which the petitioner had the burden of proving, subject to cross-examination, that H.S. was incapable of attending the hearing. And the court should have stated its reasons for determining that the petitioner's unilateral action was justifiable. [*10] [8]

The order of commitment is vacated, and the petition for civil commitment is dismissed. [9]

So [*11] ordered.

**HON. ROBERT V. GRECO, Presiding Justice**

**HON. MARK S. COVEN, Justice**

**HON. ALLEN G. SWAN, Justice**

---

End of Document

---

[8] Hypothetically, a hospital's position as to the mental or physical stability of a patient could, in some extraordinary circumstance, warrant a finding that a delay in the hearing is justifiable. But we think that it would be extremely rare that circumstances involving only the ability of the hospital itself to comply with the statutory requirement, e.g., staffing or transportation, would justify the continuation of a hearing beyond the five days required under the statute.

[9] As to the remaining issues on this appeal, we note that Dr. Welch, as Chief of Psychiatry of the psychiatric unit, was a proper petitioner. See _G.L. c. 123, § 7(a)_ (authorizing facility director to file petition) and *104 CMR 25.03* (defining facility director). See also _BayRidge Hosp. v. Jackson, 2010 Mass. App. Div. 12, 13-14._ Second, based on the state of the record before us, see note 5, the evidence consisting of Dr. Welch's testimony and his affidavit supported, however marginally, the required finding for commitment that a person be "placed in reasonable fear of violent behavior and serious harm to them." _G.L. c. 123, § 1._

 **LexisNexis**

**User Name:** Patricia Lazarus
**Date and Time:** Saturday, June 6, 2020 8:11:00 PM EDT
**Job Number:** 118444750

## Document (1)

1. *In re Guardianship of Roe, 383 Mass. 415*

   **Client/Matter:** -None-
   **Search Terms:** 'Involuntary medication'
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Court: State Courts > Massachusetts |

Caution
As of: June 7, 2020 12:11 AM Z

# *In re Guardianship of Roe*

### Supreme Judicial Court of Massachusetts

### October 9, 1980, Argued ; April 23, 1981, Decided

### No Number in Original

**Reporter**
383 Mass. 415 *; 421 N.E.2d 40 **; 1981 Mass. LEXIS 1205 ***

Guardianship of Richard Roe, Third

**Prior History:** [***1] Franklin.

Petition filed in the Franklin Division of the Probate and Family Court Department on April 1, 1980.

The case was heard by *Keedy*, J.

A motion to transfer the case to the Supreme Judicial Court was allowed by *Liacos*, J.

**Disposition:** *So ordered.*

## Core Terms

drugs, appointment, substituted judgment, antipsychotic, circumstances, cases, incompetent, permanent, antipsychotic *medication*, temporary guardian, factors, patient, mental illness, *medication*, forcible, beyond a reasonable doubt, guardian ad litem, medical treatment, side effect, emergency, judicial determination, standard of proof, mentally ill, guardianship, incapable, refuse treatment, probate judge, intrusive, treatment decision, reasons

## Case Summary

### Procedural Posture

Appellant guardian ad litem sought review of an order of the Franklin Division of the Probate and Family Court (Massachusetts), which appointed the father of a mentally ill person as both his temporary and permanent guardian and authorized the guardian to consent to the forcible administration of antipsychotic *medication*.

### Overview

Respondent father sought appointment as temporary and permanent guardian for his mentally ill son. The guardian ad litem in the proceeding challenged a portion of the probate court's order that allowed the father to authorize the forcible administration of anti-psychotic *medication*. On review, the court established that a guardian could be appointed for an individual upon a showing that it was more likely than not that the individual is unable to care for himself by reason of mental illness. In addition, the court held that, where no emergency existed, antipsychotic *medication* may be forcibly administered to a noninstitutionalized individual only in accordance with a court order. The court found that the constitutional right to privacy was a constitutional expression of the sanctity of individual free choice. Thus, the incompetent was entitled to choose by way of substituted judgment, either by the court or his guardian, whether or not to take such *medication*. The court established guidelines for the court to follow when making such determination.

### Outcome

The court vacated the probate court's order to the extent that it authorized the guardian to consent to the forcible administration of antipsychotic *medication*, and affirmed the remainder of the order.

Patricia Lazarus

383 Mass. 415, *415; 421 N.E.2d 40, **40; 1981 Mass. LEXIS 1205, ***1

# LexisNexis® Headnotes

Civil Procedure > Trials > Bench Trials

## *HN1*[🔽] Trials, Bench Trials

Proof beyond a reasonable doubt is required when a person (1) receives a stigma at least as great as that flowing from a criminal conviction, and (2) faces a potential loss of liberty.

Family Law > Guardians > General Overview

## *HN2*[🔽] Family Law, Guardians

A state must apply a standard of proof greater than a preponderance of the evidence in civil commitment proceedings in order to meet due process guarantees. Individual states remain free to establish standards of proof higher than this constitutional minimum.

Family Law > Guardians > Appointment

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > Institutionalization

Public Health & Welfare Law > ... > Mental Health Services > Commitment > *Involuntary* Commitment of Adults

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

Public Health & Welfare Law > ... > Mental Health Services > Commitment > General Overview

## *HN3*[🔽] Guardians, Appointment

The function of a standard of proof is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. The standard allocates the risk of error between the litigants and indicates the relative importance attached to the ultimate decision.

Family Law > Guardians > General Overview

## *HN4*[🔽] Family Law, Guardians

In considering what standard should govern in a guardianship proceeding, the court must assess both the extent of the proposed ward's interest in not being erroneously subjected to guardianship and the state's interest in protecting those who might erroneously be denied the benefits of guardianship under a more stringent standard of proof.

Family Law > Guardians > Removal & Termination

Family Law > Guardians > General Overview

## *HN5*[🔽] Guardians, Removal & Termination

If an individual is erroneously subjected to guardianship, then *Mass. Gen. L. ch. 201, § 13A*, allows such a ward to file a petition for the removal of his guardian.

Healthcare Law > ... > Actions Against Facilities > Standards of Care > General Overview

Healthcare Law > ... > Actions Against Facilities > Defenses > General Overview

## *HN6*[🔽] Actions Against Facilities, Standards of Care

The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical impressions drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient.

383 Mass. 415, *415; 421 N.E.2d 40, **40; 1981 Mass. LEXIS 1205, ***1

Family Law > Guardians > General Overview

**HN7[↧]  Family Law, Guardians**

A permanent guardian may be appointed pursuant to *Mass. Gen. L. ch. 201, § 6*, upon proof that it is more likely than not that an individual is unable to care for himself by reason of mental illness, and a temporary guardian may be appointed pursuant to *Mass. Gen. L. ch. 201, § 14*, upon proof that it is more likely than not that the welfare of a mentally ill person requires the immediate appointment of a temporary guardian.

Family Law > Guardians > Appointment

Family Law > Guardians > General Overview

**HN8[↧]  Guardians, Appointment**

*Mass. Gen. L. ch. 201, § 14*, conditions the appointment of a temporary guardian upon a finding that the welfare of a proposed ward requires the immediate appointment of a temporary guardian. The question to be addressed is whether an individual, for whom a guardian is proposed, is so incapable of handling his personal and financial affairs as to warrant the immediate appointment of a temporary guardian.

Family Law > Guardians > Appointment

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

Family Law > Guardians > General Overview

**HN9[↧]  Guardians, Appointment**

The appointment of a permanent guardian for a mentally ill person must be based upon findings that the ward (1) is incapable of taking care of himself, (2) by reason of mental illness. *Mass. Gen. L. ch. 201, § 6*. A finding that a person is in need of a guardian due to mental illness, is not sufficient. The requirement that a mentally ill person be found incapable of taking care of himself lies at the very heart of a guardianship proceeding. The statutory phrase "incapable of taking care of himself by reason of mental illness" is encompassing a general

inability on the part of an individual to manage his own person and financial affairs, such inability being caused by mental illness. The type of evidence necessary to support such a finding, apart from the evidence as to mental illness, should consist of facts showing a proposed ward's inability to think or act for himself as to matters concerning his personal health, safety, and general welfare, or to make informed decisions as to his property or financial interests.

Family Law > Family Protection & Welfare > Dependent & Disabled Adults > General Overview

Healthcare Law > Medical Treatment > Patient Consent > Right to Refuse Treatment

Public Health & Welfare Law > Healthcare > Mental Health Services > Treatment

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

Healthcare Law > Medical Treatment > Patient Consent > General Overview

**HN10[↧]  Family Protection & Welfare, Dependent & Disabled Adults**

If an incompetent individual refuses antipsychotic drugs, those charged with his protection must seek a judicial determination of substituted judgment. No medical expertise is required in such an inquiry, although medical advice and opinion is to be used for the same purposes and sought to the same extent that the incompetent individual would, if he were competent. The determination is not what is medically in the ward's best interests; a determination better left to those with extensive medical training and experience. The determination of what the incompetent individual would do if competent will probe the incompetent individual's values and preferences, and such an inquiry, in a case involving antipsychotic drugs, is best made in courts of competent jurisdiction.

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

06/08/2020 09:10 Martin & Associates (FAX)8024795414 P.018/037
Case 1:20-cv-11266-WGY Document 1-2 Filed 07/02/20 Page 106 of 125

Page 4 of 23

383 Mass. 415, *415; 421 N.E.2d 40, **40; 1981 Mass. LEXIS 1205, ***1

Healthcare Law > Medical Treatment > Patient Consent > General Overview

*HN11*[⤓] **Medical Treatment, Incompetent, Mentally Disabled & Minors**

The court has identified the factors to be taken into account in deciding when there must be a court order with respect to medical treatment of an incompetent patient. Among them are at least the following: the extent of impairment of the patient's mental faculties, whether the patient is in the custody of a state institution, the prognosis without the proposed treatment, the prognosis with the proposed treatment, the complexity, risk and novelty of the proposed treatment, its possible side effects, the patient's level of understanding and probable reaction, the urgency of decision, the consent of the patient, spouse, or guardian, the good faith of those who participate in the decision, the clarity of professional opinion as to what is good medical practice, the interests of third persons, and the administrative requirements of any institution involved.

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

Healthcare Law > Medical Treatment > Patient Consent > General Overview

*HN12*[⤓] **Medical Treatment, Incompetent, Mentally Disabled & Minors**

In determining whether an emergency exists in terms of requiring immediate action, the relevant time period to be examined begins when the claimed emergency arises, and ends when the individual who seeks to act in the emergency could, with reasonable diligence, obtain judicial review of his proposed actions.

Family Law > Guardians > General Overview

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

*HN13*[⤓] **Family Law, Guardians**

The factors the court identifies are to be considered by

the probate judge in order to identify the choice which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person. The determination must give the fullest possible expression to the character and circumstances of that individual. This is a subjective rather than an objective determination. All persons involved in such an inquiry will readily admit that the bounds of relevance therefor are exceedingly broad. In this search, procedural intricacies and technical niceties must yield to the need to know the actual values and preferences of the ward.

Family Law > Guardians > General Overview

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

Healthcare Law > Medical Treatment > Patient Consent > Right to Refuse Treatment

*HN14*[⤓] **Family Law, Guardians**

The court identifies the following relevant factors, cautioning that they are not exclusive, recognizing that certain of them may not exist in all cases, and declining to establish their relative weights in any individual case. They are: (1) the ward's expressed preferences regarding treatment; (2) his religious beliefs; (3) the impact upon the ward's family; (4) the probability of adverse side effects; (5) the consequences if treatment is refused; and (6) the prognosis with treatment.

Family Law > Guardians > General Overview

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

*HN15*[⤓] **Family Law, Guardians**

The difficulty encountered in applying substituted judgment doctrine in the cases of never-competent persons provides inadequate justification for denying its benefits in those cases wherein it is more feasible to utilize the doctrine. While it may thus be necessary to rely to a greater degree on objective criteria the effort to

Patricia Lazarus

No *Shepard's* Signal™
As of: June 7, 2020 12:16 AM Z

# *In re T.P.*

State of Massachusetts, Appellate Division, Western District

October 15, 2019, Decided

NOS. 18-ADMH-119WE; 18-ADMH-120WE

**Reporter**

2019 Mass. App. Div. LEXIS 32 *; 2019 Mass. App. Div. 123; 2019 WL 5699359

IN THE MATTER OF T.P.

**Prior History:** In the WORCESTER DIVISION: Justice: McGuiggan, J. Docket Nos. 1562MH0575; 1562MH0576. Date of Decision Appealed: July 5, 2018. Date of Entry in the Appellate Division: September 13, 2018. In the APPELLATE DIVISION: Justices: Hadley, P.J., McGill & D'Angelo, JJ.[1] [*1] Sitting in: Belchertown, Massachusetts. Date of Hearing: January 11, 2019. Date Opinion Certified: October 15, 2019.

## Core Terms

orders, patient, notice, *involuntary* commitment, void

**Counsel:** FOR PETITIONER: Lindsey H. Campbell, Esq., Joanne G. Hoban, Esq., Morrison Mahoney LLP, Worcester, MA.

FOR RESPONDENT: Jeffrey S. Raphaelson, Esq., Raphaelson, Attorneys at Law, Boston, MA.

**Judges:** HON. WILLIAM P. HADLEY, Presiding Justice. HON. ANDREW M. D'ANGELO, Justice.

---

[1] The Honorable Paul L. McGill participated in the review of this case but completed his Appellate Division service prior to the issuance of this opinion.

**Opinion by:** HADLEY

## Opinion

**DECISION AND ORDER**

This cause was before the Appellate Division for the Western District. It is hereby ordered that the Clerk of the Trial Court make the following entry on the docket of this case:

The trial court's denial of the respondent's motion for relief from the court's 2015 orders for *involuntary* commitment and *medication* is affirmed and the request that the 2015 orders be vacated is denied.

**HADLEY, P.J.** On September 14, 2015, the respondent, T.P., completed an application for care and treatment at St. Vincent Hospital Center for Psychiatry (the [*2] "facility") on a conditional voluntary basis pursuant to G.L. c. 123, §§ 10 and 11. A designated physician at the facility determined that T.P. had been diagnosed with mental illness; was in need of hospitalization for mental illness; and that the facility was suitable for such care and treatment. He also determined that T.P. understood that he was agreeing to stay and receive treatment at the facility; that he would be required to sign a three-day notice of his intention to leave the facility; and that he might not be allowed to leave without a court hearing. The physician accepted the application for conditional voluntary hospitalization.

On September 16, 2015, the petitioner, the Chief of Psychiatry for Behavioral Health at the facility, noted that T.P. was refusing treatment, and was making repeated demands to leave the facility, but was too disorganized to sign a three-day notice of his intention

06/08/2020  09:17 Martin & Associates                    (FAX)8024795414          P.004/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 108 of 125

Page 2 of 3

2019 Mass. App. Div. LEXIS 32, *2

to leave.

On September 17, 2015, the petitioner filed a petition for T.P.'s *involuntary* commitment under G.L. c. 123, §§ 7 and 8 in the Worcester District Court. The petition stated that T.P. was a patient at the facility pursuant to G.L. c. 123, § 12B. An accompanying affidavit stated that T.P. initially had been admitted pursuant to G.L. c. 123, §§ 10 and 11 [*3], but that his "current status" was "an *involuntary* admitted patient pursuant to M.G.L. c. 123 Sections 7 & 8, petition pending."

A hearing on the petition was held on September 23, 2015. Before any evidence was introduced, the hearing judge asked the parties' attorneys whether there were any preliminary matters to be addressed. Both attorneys said there were none, and opening statements were waived. The judge then heard testimony in support of the petition from T.P.'s treating psychiatrist. T.P. introduced no evidence. Counsel then made closing arguments addressing the question of whether the petitioner had met its burden of proof under G.L. c. 123, §§ 7 and 8. The judge allowed the petition and issued an order for *involuntary* commitment. He then heard additional testimony and authorized medical treatment. After five weeks of treatment, T.P. was discharged.

Almost three years later, in June, 2018, T.P. filed a motion for relief from the 2015 orders for commitment and medical treatment. In his motion, T.P. did not challenge the judge's findings of fact regarding T.P.'s mental illness, his lack of competence, and his need for hospitalization and *medication* pursuant to G.L. c. 123, § 8B. T.P. asserted, however, that the orders that were issued were [*4] void because the court lacked subject matter jurisdiction. T.P.'s motion was denied, and this appeal followed. For the following reasons, we affirm the 2018 order denying T.P.'s motion for relief from the 2015 orders for *involuntary* commitment and treatment.

In Acting Supt. of Bournewood Hosp. v. Baker, 431 Mass. 101, 725 N.E.2d 552 (2000) (Bournewood), the Supreme Judicial Court held that an *involuntary* commitment pursuant to G.L. c. 123, §§ 7 and 8 may not be maintained against a conditional voluntary patient who has not provided the three-day notice described in § 11. Id. at 104-105. The Court, moreover, stated that a facility is without authority to pursue such a petition and the District Court was "without jurisdiction to hear the commitment petition." Id. at 105.

More recently, the Northern District of the Appellate Division has noted that pursuant to regulations

promulgated by the Department of Mental Health, specifically, 104 Code Mass. Regs. § 27.11(4), a facility does have the authority to pursue a petition against a conditional voluntary patient pursuant to G.L. c. 123, §§ 7 and 8 when, following notice to the patient and a periodic review, a patient is believed no longer to be competent. Matter of M.C., 2015 Mass. App. Div. 174. Similarly, in another case involving the commitment of a conditional voluntary patient under §§ 7 and 8, this Western District of the Appellate Division affirmed [*5] an order of commitment where there was no periodic review, but where steps had been taken to revoke the patient's conditional voluntary status before the §§ 7 and 8 petition was filed. Matter of M.A., 2018 Mass. App. Div. 8, 11.

In this case, no evidence was introduced at the commitment hearing to demonstrate that, prior to the filing of the G.L. c. 123, §§ 7 and 8 petition, T.P. gave a three-day notice of his intention to leave the facility. There was no evidence indicating that a periodic review was conducted; nor was there any evidence that T.P. was provided prior notice of the facility's intent to conduct a competency evaluation on his ability to remain at the facility on a conditional voluntary status.

On this record, T.P. may be correct in his claim that the facility, like the hospital in Bournewood, failed to follow the procedural requirements set out in the regulations of the Department of Mental Health and was without authority to petition for T.P.'s commitment. If so, following Bournewood, the District Court judge may have been without jurisdiction to hear the commitment petition or order *medication*.

As stated above, however, T.P. did not raise this issue at the commitment hearing and did not file a timely notice of appeal to challenge the [*6] trial judge's determination that his orders could properly be entered. In Harris v. Sannella, 400 Mass. 392, 509 N.E.2d 916 (1987), the Supreme Judicial Court said in the context of a Mass. R. Civ. P. 60(b) motion, "While absence of subject matter jurisdiction may make a judgment void, such total want of jurisdiction must be distinguished from an error in the exercise of jurisdiction. A court has the power to determine its own jurisdiction, and an error in that determination will not render the judgment void. Only in the rare instance of a clear usurpation of power will a judgment be rendered void. An error in interpreting a statutory grant of jurisdiction is not . . . equivalent to acting with total want of jurisdiction and does not render the judgment a complete nullity" (internal quotations and citations omitted). Id. at 395.

06/08/2020 09:18 Martin & Associates (FAX)8024795414 P.005/037
Case 1:20-cv-11266-WGY Document 1-2 Filed 07/02/20 Page 109 of 125

Page 3 of 3

2019 Mass. App. Div. LEXIS 32, *6

In *Sarin v. Ochsner, 48 Mass. App. Ct. 421, 721 N.E.2d 932 (2000)*, the Appeals Court stated, "Whether the facts of a given case meet the standard for exercising jurisdiction . . . has been termed a 'quasi-jurisdictional' determination." *Id. at 424*, quoting *Lubben v. Selective Serv. Sys., 453 F.2d 645, 649 (1st Cir. 1972)*. "These facts do not go to the subject matter of jurisdiction, but to a preliminary fact necessary to be proven to authorize the court to act. While such a quasi-jurisdictional determination can be challenged *on appeal*, unless it is a clear usurpation of power, [*7] it is immune from attack under *rule 60(b)*" (emphasis in original; internal quotations and citations omitted). *Id.*

In conclusion, the 2015 orders may or may not have been lawful (a point that we need not decide), but they were not void, and a *Mass. R. Civ. P. 60(b)* motion is not a proper alternative to a timely appeal. See *Harris, supra at 395*. The judge's decision denying T.P.'s motion for relief from these orders is affirmed and the request that the 2015 orders for *involuntary* commitment and *medication* be vacated is denied.

**HON. WILLIAM P. HADLEY, Presiding Justice**

**HON. ANDREW M. D'ANGELO, Justice**

End of Document

Patricia Lazarus



**User Name:** Patricia Lazarus

**Date and Time:** Saturday, June 6, 2020 8:25:00 PM EDT

**Job Number:** 118445018

## Document (1)

1. _Commonwealth v. Louraine, 390 Mass. 28_

   **Client/Matter:** -None-

   **Search Terms:** 'Involuntary medication'

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Court: State Courts > Massachusetts |

Caution
As of: June 7, 2020 12:25 AM Z

# *Commonwealth v. Louraine*

Supreme Judicial Court of Massachusetts

March 8, 1983, Argued ; August 24, 1983, Decided

No Number in Original

**Reporter**
390 Mass. 28 *; 453 N.E.2d 437 **; 1983 Mass. LEXIS 1631 ***

Commonwealth v. Peter Louraine

**Prior History:** [***1] Hampden.

Indictment found and returned in the Superior Court Department on June 13, 1979.

A pretrial motion was heard by *Murphy*, J., and the case was tried before *Urbano*, J.

**Disposition:** *Judgment reversed.  Verdict set aside.*

## Core Terms

*medication*, demeanor, mental illness, unmedicated, confession, expert testimony, trial judge, insanity, murder, cases, insanity defense, new trial, instructions, amnesia, arrest, drugs, antipsychotic *medication*, defendant's sanity, time of the crime, premeditation, stabbed, doses, sane

## Case Summary

### Procedural Posture
Defendant sought review of the decision of the superior court (Massachusetts), which convicted him of murder in the first degree.

**Overview**
Defendant was indicted, convicted, and sentenced for murder in the first degree. On appeal, the court reversed the decision of the trial court, holding that because his mental competence was at issue, the right to offer testimony involved more than mere verbalization. It also included the right for defendant to offer his demeanor in a non-medicated state. Further, with regard to the voluntariness of defendant's confession, in light of the evidence of insanity before him at trial, the trial judge should have addressed the issue of whether the statements given were the product of a rational intellect. The judge also had a duty to make or file specific findings on voluntariness with unmistakable clarity. The court's reading of the judge's findings left the court unconvinced that he determined that defendant's confession was voluntary.

**Outcome**
The court reversed defendant's conviction for murder in the first degree.

## LexisNexis® Headnotes

Criminal Law &
Procedure > Defenses > Insanity > Insanity Defense

Criminal Law &
Procedure > Defenses > Insanity > General

Patricia Lazarus

390 Mass. 28, *28; 453 N.E.2d 437, **437; 1983 Mass. LEXIS 1631, ***1

Overview

*HN1*[⬇] Insanity, Insanity Defense

Few rights are more fundamental in our jurisprudence than that of an accused to present his version of the facts. This right is guaranteed not only by *U.S. Const. amends. VI, XIV,* but also by art. 12 of the *Massachusetts Declaration of Rights. Article 12* provides that every subject shall have a right to produce all proofs, that may be favorable to him. A defendant is entitled to place before the jury any evidence that is at all probative of his mental condition. Thus, any and all conduct of the defendant is admissible in evidence. The defendant's mental state both before and after the crime is admissible. Expert testimony is to be unrestricted in stating all that is relevant to the defendant's mental illness.

Criminal Law &
Procedure > Defenses > Insanity > Insanity Defense

*HN2*[⬇] Insanity, Insanity Defense

When the defendant's sanity is at issue, the trier of fact is entitled to consider the defendant's demeanor in court. When mental competence is at issue, the right to offer testimony involves more than mere verbalization, but includes the defendant's right to offer his demeanor in a non-medicated state.

Civil Procedure > Judicial
Officers > Judges > General Overview

Criminal Law &
Procedure > Defenses > Insanity > Insanity Defense

Evidence > ... > Testimony > Expert
Witnesses > Criminal Proceedings

Criminal Law &
Procedure > Defenses > Insanity > General
Overview

*HN3*[⬇] Judicial Officers, Judges

Proper respect for the role of the jury as the sole judges of the credibility and weight of all of the evidence on the issue of insanity, precludes the state from forcing a defendant to appear at trial in a severely medicated condition. Only where the defendant has had that opportunity can the court fairly and confidently rely upon the ability of the jury to apply their common experience to judge the defendant's sanity.

Civil Procedure > Judicial
Officers > Judges > General Overview

Criminal Law & Procedure > Commencement of Criminal
Proceedings > Interrogation > Voluntariness

*HN4*[⬇] Judicial Officers, Judges

Should the judge admit the confession, and if credible evidence of insanity at the time of the confession is presented to the jury, practice requires jury reconsideration as to the question of the defendant's rationality, likewise as part of the issue of voluntariness.

## Headnotes/Summary

### Headnotes

*Homicide. Insanity. Practice, Criminal,* Competency to stand trial, *Medication* of defendant during trial. *Evidence,* Sanity. *Constitutional Law,* Admissions and confessions.

## Syllabus

The defendant at a murder trial, who had raised an insanity defense, was entitled to have the jury observe his demeanor in an unmedicated condition, and, where the Commonwealth was permitted, over his objection, to administer antipsychotic *medication* to him which visibly affected his demeanor and mental processes at trial, he was denied his right to a fair trial as guaranteed by the *Sixth* and *Fourteenth Amendments to the United States Constitution* and *art. 12 of the Massachusetts Declaration of Rights.* [32-38]

At a murder trial in which the defendant had claimed

06/08/2020   09:18 Martin & Associates                    (FAX)8024795414                  P.009/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 113 of 125

Page 3 of 8

390 Mass. 28, *28; 453 N.E.2d 437, **437; 1983 Mass. LEXIS 1631, ***1

insanity, it was error for the judge to admit in evidence certain statements by the defendant to police, made at a time when he was neither in custody nor under suspicion, in the absence of [***2] findings by the judge that the statements were voluntary and were the product of a rational intellect. [38-40]

At the retrial of an indictment for murder in the first degree defense counsel would have the burden of requesting jury instructions concerning the effect of the defendant's drug use with respect to deliberate premeditation and extreme atrocity or cruelty. [40]

Evidence at a murder trial was sufficient to warrant the jury in finding the defendant guilty of first degree murder on the theory of premeditation, assuming that they found him to be legally sane. [40-41]

**Counsel:** *Myles D. Jacobson* (*Maureen B. Brodoff* with him) for the defendant.

*William T. Walsh, Jr.*, Assistant District Attorney, for the Commonwealth.

**Judges:** Hennessey, C.J., Wilkins, Liacos, Nolan, & O'Connor, JJ.

**Opinion by:** LIACOS

# Opinion

[*29]   [**439] On May 26, 1979, the defendant allegedly stabbed Albert Zalucki twenty-one times. Zalucki died, and the defendant was indicted for murder in the first degree. He was convicted by a jury on March 16, 1982, of murder in the first degree, and was sentenced to a term of life imprisonment. He now appeals his conviction pursuant to *G. L. [***3] c. 278, § 33E.*

The defendant alleges error on a number of grounds, but primarily relies on his claims that (1) he was deprived by a ruling of a motion judge of an opportunity

to present his demeanor in an unmedicated condition to the jury; (2) the trial judge failed to take appropriate steps during the trial to determine his continued competency to stand trial; (3) the trial judge failed to instruct the jury correctly; and (4) the trial judge neither ruled on the question of the voluntariness of certain statements made by the defendant nor submitted the issue to the jury. The defendant also asks us to exercise our power under *G. L. c. 278, § 33E*, to order a new trial or to mitigate the degree of guilt. We reverse the judgment of conviction.

There was evidence of the following facts. On May 26, 1979, at approximately 3 A.M., two police officers responded to a call to go to 23-B Van Buren Avenue in Springfield. When the officers proceeded inside, they found the body of Zalucki. They heard a voice from the second floor. Looking up, they saw at the top of a staircase the outline of a large male. When they identified themselves as police officers, the man responded, stating, [***4] "I called the police. I stabbed him. I'm Peter Louraine." At the trial, one of the arresting officers identified the man who spoke as the defendant. Several officers present at the scene testified that the defendant appeared calm, and recognized one of the officers as a high school classmate. A bloodied knife found by police officers near the body of Zalucki was placed in evidence.

Deborah Flebotte, a stepsister of the victim, testified that Louraine lived at 23-B Van Buren Avenue with a second [*30] stepbrother, John Regan. [1] She testified that [**440] Zalucki had visited Louraine and Regan at the apartment and that Louraine, several hours before the murder, told her that Zalucki would be stopping by later.

The Commonwealth presented expert medical testimony that the victim had been stabbed twenty-one times. The wounds were concentrated in the area of the neck, chest, [***5] and abdomen, and had been inflicted rapidly. There were also "defense wounds" on Zalucki's hands. Either one of two different wounds was sufficient to cause death. The expert testimony also established that Zalucki would have experienced pain from the wounds for a period of approximately thirty minutes before losing consciousness.

The defendant did not contest the facts as to the homicide, but instead relied on a defense of lack of

---

[1] Number 23-B Van Buren Avenue was the address of a mental health care facility for deinstitutionalized mentally ill persons.

06/08/2020  09:19 Martin & Associates                    (FAX)8024795414      P.010/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 114 of 125

Page 4 of 8

390 Mass. 28, *30; 453 N.E.2d 437, **440; 1983 Mass. LEXIS 1631, ***5

criminal responsibility. He introduced evidence which outlined a long history of mental illness, commencing in his early teens, which continued up to the day of the crime. The Commonwealth did not dispute that the defendant suffered from a mental illness at the time of the crime; rather it questioned the severity of the illness. [2] Strangely, neither the defendant nor the Commonwealth introduced expert medical testimony concerning the defendant's mental capacity at the time of the crime, although the fact of the defendant's various commitments to mental institutions was put before the jury.

[***6] The defendant's twin brother Philip Louraine, testified that his brother and he [3] held rather bizarre religious beliefs. He testified that they believed that they were prophets of God and had to defend themselves against demons. Philip [*31] recounted that the defendant had told him after the homicide that "Al [Zalucki] was the devil and that Al was going to hurt him, so he had to kill Al." Philip also testified that the defendant had reported experiencing hallucinations, had been committed to mental hospitals, had a history of ingesting drugs (including marihuana, lysergic acid diethylamide, and mescaline), [4] had acted in a strange and violent fashion on several occasions, and had attempted suicide several times.

[***7] Much of this testimony was corroborated by the testimony of the Reverend John A. Koonz, a Roman Catholic priest, Joel Louraine, the defendant's brother, and Peggy Louraine, the wife of a third brother. They confirmed Philip's testimony that the defendant had a long history of acting in a strange fashion and did hold bizarre religious beliefs, and that the defendant had suffered hallucinations and engaged in many violent episodes.

Hospital records concerning the defendant's admissions to Northampton State Hospital and other mental institutions were introduced. The Northampton records indicated that the defendant, at his own insistence, was admitted on January 24, 1979, after cutting his wrist with a razor blade. The records show that the defendant was experiencing "flashbacks" attributable to the ingestion of mescaline and that he was diagnosed as suffering from "[s]chizophrenia, chronic undifferential type." He was discharged on February 7, 1979. The defendant was readmitted on March 13, 1979, and a provisional diagnostic impression was entered that he was suffering from drug abuse. He was released the next day. The provisional diagnosis was changed to schizophrenia, but [***8] it was thought that there was no "need for [an] in-patient stay." He was released as an outpatient to the mental health care facility at 23-B Van Buren Avenue. A mental health assistant at Northampton State Hospital testified [*32] that the defendant's mood shifted greatly during the [**441] periods when he was admitted to the hospital.

A registered nurse assigned to the Hampshire County jail, Joseph Leonczyk, also testified concerning the defendant's behavior between September 14 and September 28, 1979, while he was awaiting trial. He testified that the defendant appeared to be nervous and that his hands trembled. He recalled the defendant's telling him that "inner forces were bombarding his mind" and that he had suicidal thoughts.

1. _Involuntary medication_ of the defendant during trial. There was no evidence that the defendant was taking any antipsychotic _medication_ at the time of the homicide. The defendant argues that, since his mental capacity to commit the crime charged was at issue, the Commonwealth should not have been permitted to administer drugs, over his objection, which visibly affected his demeanor and mental processes at trial. [5] He asserts that [***9] he was deprived of the opportunity to place his true demeanor before the jury on the crucial issue of mental capacity and, as a consequence, was denied a fair trial.

The defendant filed a pretrial motion requesting that, if he were found competent, he be permitted to attend the trial in an unmedicated condition. [6] After a hearing, a

---

[2] During its closing argument, the Commonwealth conceded that the defendant had been mentally ill since the age of sixteen, but noted that it was a matter of degree.

[3] The brother also testified that he was taking substantial doses of _medication_ to control his own schizophrenia.

[4] During rebuttal, the witness Flebotte also testified that one week before the crime she had observed the defendant acting strangely after he had ingested mescaline.

[5] The defendant was held at Bridgewater State Hospital for most of the time from his arrest on May 26, 1979, until the trial. The motion judge found that at all times since his arrest he was given antipsychotic _medications_ in various forms and various doses. Among the _medications_ administered were prolixin, thorazine, mellaril, and trilafon. Elavil and artane, which are not antipsychotic _medications_, were also administered. The administration of antipsychotic drugs to the defendant continued during the trial.

[6] The defendant also requested that any competency

06/08/2020  09:19 Martin & Associates                    (FAX)8024795414          P.011/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 115 of 125

Page 5 of 8

390 Mass. 28, *32; 453 N.E.2d 437, **441; 1983 Mass. LEXIS 1631, ***9

motion judge of the Superior Court denied the motion and later entered written findings. He found that the defendant suffered from a mental illness known as chronic paranoid [***10] schizophrenia and that, while in custody, he was receiving antipsychotic *medication* in various forms and doses. These [*33] doses had been increased gradually by State medical personnel and were considered to be "heavy." He found that the defendant's behavior and his symptoms of mental illness were "being controlled to some extent by the *medication*," but that the *medication* reduced the defendant's alertness and ability to concentrate. He also found that the defendant would not be competent to stand trial if the defendant did not receive *medication*. [7]

[***11] Evidence was offered at a competency hearing held one week before trial, which indicated that the defendant's condition remained unchanged. [8] After the hearing, the trial judge found that the defendant was psychotic and experienced psychotic episodes, during which he had "auditory and visual hallucinations" and "delusional and bizarre ideas." He also found that *medication*, while not eliminating the episodes, enabled the defendant "better to control himself and to cope with these episodes." Expert medical testimony at the pretrial hearing indicated that the defendant was then receiving "heavy" or "maximum" dosages of Stelazine, another antipsychotic *medication*.

[***12] We start with the proposition that HN1[⬆] few rights are more fundamental in our jurisprudence than that of an accused "to present . . . [his] version of the facts." *Washington v. Texas, 388 U.S. 14, 19 (1967)*. [**442] This right is necessary to ensure that the defendant is not deprived of a fair trial. *Chambers v. Mississippi, 410 U.S. 284, 302-303 (1973)*. This right is guaranteed not only by the *Sixth* and *Fourteenth* [*34]

---

examination occur while he was in an unmedicated condition.

[7] The motion judge ruled that the defendant was not entitled to be brought to trial in an unmedicated condition in order to present properly an insanity defense. He reasoned that the effects of the *medication* on the defendant could be brought to the attention of the jury through expert medical testimony. There was no such evidence offered either by the Commonwealth or by the defense.

[8] The defendant did not renew before the trial judge his motion that he be allowed to appear in an unmedicated condition. In these circumstances, we would usually examine only the record before the motion judge. *Commonwealth v. Cinelli, 389 Mass. 197, 206 n.12 (1983)*. Because of our obligation under *G. L. c. 278, § 33E*, we examine the entire record.

*Amendments to the Federal Constitution*, but also by *art. 12 of the Massachusetts Declaration of Rights*. Article 12 provides that "every subject shall have a right to produce all proofs, that may be favorable to him." A defendant is entitled to place before the jury any evidence which is at all probative of his mental condition. *United States v. Hartfield, 513 F.2d 254, 259-260 (9th Cir. 1975)*. See *United States v. Ives, 609 F.2d 930, 932-933 (9th Cir. 1980)*. Thus, "any and all conduct" of the defendant is admissible in evidence. 2 J. Wigmore, Evidence § 228, at 9 (Chadbourn rev. 1979). The defendant's mental state both before and after the crime is admissible. *Id.* at § 233. Expert testimony is to be "unrestricted [***13] in stating all that is relevant to the defendant's mental illness." *Commonwealth v. Callahan, 386 Mass. 784, 792 (1982)*, quoting *Commonwealth v. McHoul, 352 Mass. 544, 550 (1967)*. See *Commonwealth v. Schulze, 389 Mass. 735, 738-740 (1983)*.

Further, it is an established and universally accepted rule that, HN2[⬆] when the defendant's sanity is at issue, the trier of fact is entitled to consider the defendant's demeanor in court. *Commonwealth v. Devereaux, 257 Mass. 391, 395 (1926)*. *State v. Hayes, 118 N.H. 458, 462 (1978)*. *In re Pray, 133 Vt. 253, 257-258 (1975)*. *State v. Maryott, 6 Wash. App. 96, 101 (1971)*. Cf. *Commonwealth v. Clark, 292 Mass. 409, 415 (1935)*. 4 J. Wigmore, Evidence § 1160 (Chadbourn rev. 1972). See *United States v. Chandler, 72 F. Supp. 230, 238 (D. Mass. 1947)*. Thus, "[w]hen mental competence is at issue, the right to offer testimony involves more than mere verbalization," *State v. Maryott, supra at 101*, but includes the defendant's right to offer his demeanor in an unmedicated state. *Id. at 101-103. In re Pray, supra* (dictum). See *State v. Hayes, supra at 462*. See also [***14] *State v. Murphy, 56 Wash. 2d 761, 766-767 (1960)*.

In a case where an insanity defense is raised, the jury are likely to assess the weight of the various pieces of evidence before them with reference to the defendant's demeanor. Further, if the defendant appears calm and controlled at trial, the jury may well discount any testimony that the defendant [*35] lacked, at the time of the crime, substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. See *Commonwealth v. McHoul, supra at 546-547*. This tendency may render also valueless the defendant's right to testify on his own behalf. See *In re Pray, supra; State v. Murphy, supra at 766-767*.

06/08/2020  09:19 Martin & Associates  (FAX)8024795414  P.012/037
Case 1:20-cv-11266-WGY  Document 1-2  Filed 07/02/20  Page 116 of 125

Page 6 of 8

390 Mass. 28, *35; 453 N.E.2d 437, **442; 1983 Mass. LEXIS 1631, ***14

The ability to present expert testimony describing the effect of *medication* on the defendant is not an adequate substitute. At best, such testimony would serve only to mitigate the unfair prejudice which may accrue to the defendant as a consequence of his controlled outward appearance. It cannot compensate for the positive value to the defendant's case of his own demeanor in an unmedicated condition. Moreover, "[i]f the state may administer [***15] tranquilizers to a defendant who objects, the state then is, in effect, permitted to determine what the jury will see or not see of the defendant's case by medically altering the attitude, appearance and demeanor of the defendant, when they are relevant to the jury's consideration of his mental condition." *State v. Maryott, supra at 102.*

*HN3*[↑] Proper respect for the role of the jury as "the sole judges of the credibility and weight of all of the evidence on the issue of insanity," *Commonwealth v. Kostka, 370 Mass. 516, 536 (1976),* quoting *Commonwealth v. Smith, 357 Mass. 168, 178 (1970),* [**443] also precludes the Commonwealth from forcing the defendant to appear at trial in a severely medicated condition. We have permitted the jury to exercise broad discretion in determining a defendant's sanity. We have held that expert testimony is not necessary to prove a defendant sane beyond a reasonable doubt, even in the face of uncontradicted expert testimony that a defendant was insane under the standards of *Commonwealth v. McHoul, supra,* at the time of the crime. *Commonwealth v. Brown, 387 Mass. 220, 222-225 (1982). Commonwealth v. Shelley [***16] , 381 Mass. 340, 347 (1980). Commonwealth v. Walker, 370 Mass. 548, 582-583,* cert. denied, *429 U.S. 943 [*36] (1976). Commonwealth v. Kostka, supra at 537-539.* [9] The jury also may be instructed that they may infer that a defendant is sane from their knowledge gained from common experience that a great majority of people are sane and of the probability that any particular person is sane. *Commonwealth v. Brown, supra at 221-222.*

*Commonwealth v. O'Brien, 377 Mass. 772, 780 (1979). Commonwealth v. Kostka, supra at 525-537.* These rules assume, however, that the defendant has had an adequate opportunity to present all relevant evidence on his behalf. Only where the defendant has had that opportunity can we fairly and confidently rely upon the ability of the jury to apply their common experience to judge the defendant's sanity.

[***17] The view we take is consistent with cases from other jurisdictions which have considered the precise question before us. In *State v. Maryott, supra at 97,* the court reversed the conviction where the defendant had been forced to take *medication* which visibly affected his demeanor during trial. The court emphasized the importance of the defendant's demeanor in an unmedicated state to the presentation of an insanity defense. *Id. at 101-103.* [10] In *State v. Hayes, supra at 462,* the court held that the defendant could be compelled to take *medication* only "if the jury is instructed about the facts relating to the defendant's use of *medication* and if at some time during the trial, assuming the defendant [*37] so requests, the jury views him without *medication* for as long as he is found to have been without it at the time of the crime." In *In re Pray, supra,* the court reversed the conviction where the State had administered drugs to the defendant without fully disclosing to the defendant or his counsel what effect they had on the defendant. Chief Justice Barney, writing for the Vermont Supreme Court, stated that "[a]t the very least, [the jury] should [***18] have been informed that he was under heavy, sedative *medication*, that his behavior in their presence was strongly conditioned by drugs administered to him at the direction of the State, and that his defense of insanity was to be applied to a basic behavior pattern that was not the one they were observing. In fact, it may well have been necessary, in view of the critical nature of the issue, to expose the jury to [**444] the undrugged, unsedated Gary Pray, at least, insofar as safety and trial progress might permit." *Id. at 257-258.* These cases support the result we reach here. [11]

---

[9] We note that the defendant in this case, like the defendant in *Kostka*, had a long history of mental illness. Although the defendant failed to put forth live expert testimony on the issue of mental responsibility, there was extensive evidence in the hospital records and from lay witnesses of the defendant's mental illness. Indeed, the Commonwealth conceded the fact of mental illness. In this context, the failure of the Commonwealth to offer expert testimony (despite the many psychiatric examinations of the defendant by court order) is inexplicable. See *Commonwealth v. Kostka, supra at 539-540* (Hennessey, C.J., and Kaplan, J., dissenting).

[10] The decision in *State v. Maryott, 6 Wash. App. 96 (1971),* was based in part on the decision of the Washington Supreme Court in *State v. Murphy, 56 Wash. 2d 761 (1960).* In *Murphy,* the court granted a new trial because the defendant had been tried in a drugged condition. The court reasoned that the defendant's demeanor was relevant to the determination whether the death penalty should be imposed. *Id. at 766-767.*

[11] In *State v. Law, 270 S.C. 664 (1978),* the court held that the

06/08/2020 09:20 Martin & Associates (FAX)8024795414 P.013/037

Case 1:20-cv-11266-WGY Document 1-2 Filed 07/02/20 Page 117 of 125

Page 7 of 8

390 Mass. 28, *37; 453 N.E.2d 437, **444; 1983 Mass. LEXIS 1631, ***18

[***19] We do not suggest that "a new trial must be granted in every criminal case . . . where the appearance of the accused before the jury is marred by some mental, physical, or emotional impairment, regardless of the nature of the impairment, or the means by which it was brought about. Each case of this type must be decided on its own facts." *State v. Murphy, 56 Wash. 2d 761, 768 (1960).* See [*38] *Commonwealth v. Nickerson, 388 Mass. 246, 249-251 (1983).* Cf. *Commonwealth v. Lombardi, 378 Mass. 612, 616 (1979).* [12] [***20] Thus, in some cases, the defendant's demeanor in an unmedicated condition will not be relevant. [13]

We turn to consider those issues which may arise at a new trial.

2. *Voluntariness of confession.* Prior to trial, a hearing was held before the trial judge to determine whether certain statements made by the defendant to the police at the time of his arrest should be suppressed. The defendant's [***21] motion sought to suppress his statement, made just before his arrest, [*39] that he had stabbed the victim. [14] While the motion and hearing

focused on whether the defendant voluntarily and intelligently [**445] waived his rights under *Miranda v. Arizona, 384 U.S. 436 (1966),* the issue of voluntariness was raised by the motion. The judge entered written findings and ruled that the statement that he had stabbed the victim constituted a spontaneous exclamation at a time when the defendant was neither in custody nor under suspicion and therefore was admissible even though the defendant had not been informed yet of his Miranda rights.

We believe that, in light of the evidence of insanity before him at trial, the trial judge also should have addressed the issue whether the statements given were the product of a rational intellect. *Commonwealth v. Cole, 380 Mass. 30, 41 (1980). Commonwealth* [***22] whether the trial should proceed, including the nature of the crime, the extent to which the prosecution makes a full disclosure of its case and circumstances known to it, the degree to which the evidence establishes the defendant's guilt, the likelihood that an alibi or some other defense could be established but for the amnesia, and the extent and effect of the defendant's amnesia." A similar assessment of factors should occur in cases involving incompetency and insanity.

We note, however, that cases involving amnesia and insanity are not entirely equivalent. With amnesia, the potential for fraudulent claims is great. In contrast, this potential is minimal where the defendant, as is the case here, has a long history of mental illness and is being prescribed substantial doses of *medication* to enable him to control his illness. Further, the conduct of the Commonwealth is fundamentally different in the two types of cases. In cases involving incompetency and insanity, the Commonwealth is taking affirmative steps to bring the defendant to trial in an altered condition. See *State v. Maryott, supra at 102.*

---

administration of psychotropic *medication* to the defendant during trial did not undermine his insanity defense. The case is distinguishable. Under South Carolina law, the defendant's sanity was judged by the M'Naghten test. *Id. at 667.* Under that test, the jury were asked to decide whether the defendant had the mental capacity to distinguish moral or legal right from moral or legal wrong, and to recognize the particular act charged as morally or legally wrong. *Id.* The test we have adopted is much broader and relieves the defendant of criminal responsibility if, at the time of the conduct, as a result of mental disease or defect, he lacked substantial capacity to conform his conduct to the requirements of the law. *Commonwealth v. McHoul, 352 Mass. 544, 546-547 (1967).* The defendant's demeanor is most relevant to this broader element of our test. Further, we adopted this broader test in part because it permitted a wider range of testimony to be received. *Id. at 550.*

[12] In *Commonwealth v. Lombardi, 378 Mass. 612, 616-617 (1979),* we considered whether a defendant with amnesia could receive a fair trial. We said that "[w]here the amnesia is apparently permanent, the fairness of proceeding to trial must be assessed on the basis of the particular circumstances of the case. A variety of factors may be significant in determining

[13] We note that we are not deciding today whether the Commonwealth may administer *medication* to criminal defendants involuntarily to ensure their competence to stand trial. See *Guardianship of Roe, 383 Mass. 415, 432-455 (1981).* The defendant has not argued that issue before us and, as a consequence, it has been waived. *Mass. R. A. P. 16 (a) (4),* as amended, 367 *Mass. 919 (1975). Commonwealth v. Bertrand, 385 Mass. 356, 358 (1982).* We agree, however, with the Supreme Court of New Hampshire that if the defendant wishes to appear at trial in an unmedicated condition, even though *medication* might be necessary to maintain his mental competency, he may be held to have waived his right to be tried while competent. See *State v. Hayes, 118 N.H. 458, 462 (1978),* and authorities cited.

[14] The Commonwealth agreed not to introduce several statements made by Louraine after his arrest.

06/08/2020 09:20 Martin & Associates (FAX)8024795414 P.014/037
Case 1:20-cv-11266-WGY Document 1-2 Filed 07/02/20 Page 118 of 125

Page 8 of 8

390 Mass. 28, *39; 453 N.E.2d 437, **445; 1983 Mass. LEXIS 1631, ***22

*v. Chung, 378 Mass. 451, 457 (1979)*. *Commonwealth v. Johnston, 373 Mass. 21, 24 (1977)*. *Commonwealth v. Harris, 371 Mass. 462, 469-472 (1976)*. The judge also had a duty to make or file specific findings on voluntariness with "unmistakable clarity." *Commonwealth v. Brady, 380 Mass. 44, 52 (1980)*, quoting *Sims v. Georgia, 385 U.S. 538, 544 (1967)*. Our reading of the judge's findings leaves us unconvinced that he determined that the defendant's confession was voluntary. He made no finding that the confession was the product of a rational intellect. Neither the fact that the defendant made the confession spontaneously, *Commonwealth v. Chung, supra at 456 n.5*, nor the fact that he had not been taken yet in custody, *Commonwealth v. Johnston, supra*, is sufficient by itself to establish the voluntariness of the confession. At a new trial, the judge should conduct a voir dire on the voluntariness of the confession. That hearing should focus on the defendant's sanity at the time of the confession. *Commonwealth v. Chung, supra at 457*. HN4[⬆] "Should the judge admit the confession, and if credible evidence of insanity at the time of the [***23] confession is presented to the jury, our practice [*40] requires jury reconsideration as to the question of the defendant's rationality, likewise 'as part of the issue of voluntariness.'" *Id.*, quoting *Commonwealth v. Johnston, supra at 25*.

3. *Jury instructions*. We believe that, because of the trial tactics adopted by defense counsel, the judge did not deliver instructions concerning whether the jury could consider the defendant's drug use in deciding whether the murder was committed with deliberately premeditated malice aforethought or extreme atrocity or cruelty, *Commonwealth v. Gould, 380 Mass. 672, 680-686 (1980)*, or concerning the relation between drug abuse and the *McHoul* standard. See *Commonwealth v. Sheehan, 376 Mass. 765, 767-772 (1978)*. Defense counsel did not request such instructions and took the position that Louraine's acts could not have been the product of drug use.

In a case raising a defense of insanity, defense counsel is likely to be confronted with difficult decisions concerning trial tactics. Review under *G. L. c. 278, § 33E*, is not intended to relieve the defendant of the consequences of those decisions absent a substantial [***24] risk of a miscarriage of justice. At a new trial, the burden of requesting instructions in accordance with *Commonwealth v. Gould, supra*, and *Commonwealth v. Sheehan, supra*, will be on defense counsel. Provided that request is timely, the judge should deliver instructions in accordance with those opinions. [15]

[***25] [**446] 4. *Insufficiency of the evidence concerning premeditation*. The defendant also argues that the conviction of murder [*41] in the first degree should be reduced to murder in the second degree because of the insufficiency of the evidence concerning premeditation. The defendant did not object to those instructions which permitted the jury to convict the defendant of murder in the first degree on a theory of premeditation. Our review of the transcript reveals that there was sufficient evidence of premeditation produced during the Commonwealth's case-in-chief, assuming that the jury found the defendant to be legally sane.

*Judgment reversed.*

*Verdict set aside.*

---

**End of Document**

---

[15] The defendant makes much of the fact that an expert witness for the Commonwealth testified on voir dire to the difficulty of distinguishing between drug use and mental illness as the cause of Louraine's acts. The record does not disclose why this expert never testified before the jury. We note, however, that defense counsel's posture at trial was that the acts were caused by Louraine's mental illness and not by drug use.

The defendant also claims error in that the judge submitted to the jury the issue whether the defendant suffered from a mental disease or defect at the time of the act even though the Commonwealth had conceded the point. The defendant did not raise the point below. In any case, we perceive no error.

 **LexisNexis**

**User Name:** Patricia Lazarus
**Date and Time:** Sunday, June 7, 2020 8:31:00 AM EDT
**Job Number:** 118454488

## Document (1)

1. _ALM GL ch. 272, § 53_
   **Client/Matter:** -None-
   **Search Terms:** 'Involuntary medication'
   **Search Type:** Natural Language
   **Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| Cases | Court: State Courts > MassachusettsMass. Sup. Jud. Ct. |

## *ALM GL ch. 272, § 53*

Current through Chapters 1-80 of the 2020 Legislative Session of the 191st General Court.

*Annotated Laws of Massachusetts > PART IV CRIMES, PUNISHMENTS AND PROCEEDINGS IN CRIMINAL CASES (Chs. 263 - 280) > TITLE I CRIMES AND PUNISHMENTS (Chs. 263 - 274) > TITLE I CRIMES AND PUNISHMENTS (Chs. 263 — 274) > Chapter 272 Crimes Against Chastity, Morality, Decency and Good Order (§§ 1 — 107)*

## § 53. Common Night Walkers, Disorderly Persons and Disturbers of the Peace.

(a)Common night walkers, common street walkers, both male and female, persons who with offensive and disorderly acts or language accost or annoy another person, lewd, wanton and lascivious persons in speech or behavior, keepers of noisy and disorderly houses, and persons guilty of indecent exposure shall be punished by imprisonment in a jail or house of correction for not more than 6 months, or by a fine of not more than $200, or by both such fine and imprisonment.

(b)Disorderly persons and disturbers of the peace shall, for a first offense, be punished by a fine of not more than $150. For a second or subsequent offense, disorderly persons and disturbers of the peace shall be punished by imprisonment in a jail or house of correction for not more than 6 months or by a fine of not more than $200 or by both such fine and imprisonment; provided, however, that an elementary or secondary school student shall not be adjudged a delinquent child for a violation of this subsection for such conduct within school buildings or on school grounds or in the course of school-related events.

## History

CL 153, § 1; 1699-1700, 8, § 2; 1769-70, 19; 1787, 54, § 2; 1834, 151, §§ 2, 3; RS 143, §§ 5, 6; 1837, 157; 217; 1851, 346; 1856, 186; GS 165, §§ 28, 29; 1866, 235; 1874, 385, § 21; 1876, 118; 1878, 270, § 2; 1880, 114; 257; PS 207, §§ 29, 30; 1884, 258, § 1; 1885, 365, § 1; 1886, 323, § 1; 1898, 443, § 1; RL 85, § 30; 212, §§ 46, 48; 1914, 743; 1931, 239; 1943, 377; 1956, 715, § 21; 1959, 304, § 1; 1973, 1073, § 20; 1983, 66, § 1; *2009, 27, § 98*; *2014, 417*; *2018, 69, § 160*, effective April 13, 2018.

Annotations

## Notes

### Amendment Notes

The 1943 amendment struck out the words "Rogues and vagabonds, persons who use any juggling or unlawful games or plays, common pipers and fiddlers," formerly appearing at the beginning of this section, and made other changes.

The 1956 amendment struck out the words "common drunkards" formerly appearing near the beginning of the section, and the words "or by imprisonment at the state farm" formerly appearing near the end of the section.

Patricia Lazarus

06/08/2020  09:21 Martin & Associates                    (FAX)8024795414        P.017/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 121 of 125

Page 2 of 22

ALM GL ch. 272, § 53

**The 1959 amendment** inserted the word "prostitutes,".

**The 1973 amendment** made this section inapplicable to "stubborn children" and "runaways".

**The 1983 amendment** rewrote the section, adding the words "common streetwalkers", and deleting the word "prostitutes", formerly appearing after the words "disorderly persons".

**The 2009 amendment,** effective July 1, 2009, rewrote this section, which formerly read: "Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment." Section 161 provides:

SECTION 161. Except as otherwise specified, this act shall take effect on July 1, 2009.

**The 2014 amendment,** effective March 24, 2015, substituted "another person" for "persons of the opposite sex" in (a).

**The 2018 amendment,** effective April 13, 2018, rewrote (b), which formerly read: "Disorderly persons and disturbers of the peace, for the first offense, shall be punished by a fine of not more than $ 150. On a second or subsequent offense, such person shall be punished by imprisonment in a jail or house of correction for not more than 6 months, or by a fine of not more than $200, or by both such fine and imprisonment."

# Notes to Decisions

1. In general

1.5. Miscellaneous

2. Nightwalkers and prostitutes

3. —Constitutional issues

4. —Accusatory instrument

5. —Evidence

6. Common railers and brawlers

6.5. Indecent exposure

7. Profanity (offensive and disorderly act or language)

8. Lewd, wanton, or lascivious persons

9. —Constitutional issues

10. —Allegations; accusatory instrument

11. —Particular acts

06/08/2020   09:21 Martin & Associates                    (FAX)8024795414        P.018/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 122 of 125

Page 3 of 22

ALM GL ch. 272, § 53

**12.Idle or disorderly persons**

**13.—Constitutional issues**

**14.—Accusatory instrument**

**15.—Evidence**

**15.5.Sentencing**

**16.Disturbing the peace**

**17.—Constitutional issues**

**18.—Accusatory instrument**

**18.5.Voyeurism theory**

**19.Stubborn children, etc. (prior to 1973 amendment)**

**20.Common drunkards (prior to 1956 amendment)**

**21.Accosting or annoying person of opposite sex**


**1. In general**

Superior court has jurisdiction, on appeal, to try, upon complaint under this section, as idle and disorderly person, one arrested without warrant, whether his arrest was legal or illegal. *Commonwealth v. Tay (Mass. Jan. 8, 1898), 170 Mass. 192, 48 N.E. 1086, 1898 Mass. LEXIS 176.*

Conviction under instant section was reversed because of admission of evidence amounting to confession by defendant, without preliminary hearing held by trial judge in absence of jury as to voluntary nature of confession. *Commonwealth v. Marshall (Mass. Jan. 30, 1959), 338 Mass. 460, 155 N.E.2d 798, 1959 Mass. LEXIS 664.*

Court summarized decisions upon constitutionality of various provisions of instant section. *Commonwealth v. Brasher (Mass. June 7, 1971), 359 Mass. 550, 270 N.E.2d 389, 1971 Mass. LEXIS 854.*

Section does not create or define new crimes, but prescribes penalties for commission of acts previously recognized as criminal offenses. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Although public has no access to particular place, that place may be "public" if defendant intentionally exposes or recklessly disregards substantial risk of exposure to one or more persons. *Commonwealth v. Kelley (Mass. App. Ct. Dec. 22, 1987), 25 Mass. App. Ct. 180, 516 N.E.2d 1188, 1987 Mass. App. LEXIS 2363.*

With regard to the offense of disorderly conduct, the public element has been engrafted onto the "lewd, wanton and lascivious" offense of ALM GL c 272, § 53. *Commonwealth v. Mulvey (Mass. App. Ct. Mar. 14, 2003), 57 Mass. App. Ct. 579, 784 N.E.2d 1138, 2003 Mass. App. LEXIS 322.*

With regard to the offense of disorderly conduct, the public element of the offense is readily met in cases where the proscribed conduct takes place on public streets or by the side of a highway; it also may be satisfied where the disturbance takes place in a more secluded environment, but only if members of the public are likely to be affected. *Commonwealth v. Mulvey (Mass. App. Ct. Mar. 14, 2003), 57 Mass. App. Ct. 579, 784 N.E.2d 1138, 2003 Mass. App. LEXIS 322.*

06/08/2020    09:21 Martin & Associates                    (FAX)8024795414              P.019/037
Case 1:20-cv-11266-WGY    Document 1-2    Filed 07/02/20    Page 123 of 125

Page 4 of 22
ALM GL ch. 272, § 53

The definition of "disorderly" includes only those individuals who, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof (1) engage in fighting or threatening, or in violent or tumultuous behavior; or (2) create a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor; public" is defined as affecting or likely to affect persons in a place to which the public or a substantial group has access. *Commonwealth v. Mulvey (Mass. App. Ct. Mar. 14, 2003), 57 Mass. App. Ct. 579, 784 N.E.2d 1138, 2003 Mass. App. LEXIS 322.*

With regard to the offense of disorderly conduct, the public element may be satisfied where the actor's conduct takes place on private property that is frequented by the public, such as stores, apartment houses, or theaters; it also is possible that behavior occurring on purely private property may be shown to affect or be likely to affect persons in an adjacent or nearby place to which the public or a substantial group has access, such that a disorderly conduct charge would be appropriate. *Commonwealth v. Mulvey (Mass. App. Ct. Mar. 14, 2003), 57 Mass. App. Ct. 579, 784 N.E.2d 1138, 2003 Mass. App. LEXIS 322.*

Commonwealth presented insufficient evidence to prove that defendant's conduct was disorderly, as required for a conviction for accosting or annoying a person of the opposite sex under ALM GL c 272, § *53*; it was not reasonable to infer that defendant intended the victim to fear that harm would befall her where there was no aggressive or invasive move by defendant toward the victim. *Commonwealth v. Ramirez (Mass. App. Ct. May 10, 2007), 69 Mass. App. Ct. 9, 865 N.E.2d 1158, 2007 Mass. App. LEXIS 510.*

Instant section carries maximum penalty of six months in jail and $200 fine. *Le Clair v. O'Neil (D. Mass. Dec. 23, 1969), 307 F. Supp. 621, 1969 U.S. Dist. LEXIS 9488*, aff'd, *(U.S. 1971), 401 U.S. 984, 91 S. Ct. 1219, 28 L. Ed. 2d 524, 1971 U.S. LEXIS 2558.*

### 1.5. Miscellaneous

Officer properly effected a stop of defendant in a vehicle after seeing that defendant's was penis exposed, as this gave the officer probable cause to believe that defendant was committing the crime of indecent exposure; therefore, the motion judge properly denied defendant's motion to suppress evidence related to the stop. *Commonwealth v. Vick (Mass. App. Ct. Nov. 8, 2016), 90 Mass. App. Ct. 622, 62 N.E.3d 105, 2016 Mass. App. LEXIS 161.*

As an officer who saw that defendant's penis was exposed while he was sitting in a car had probable cause to arrest him for indecent exposure, the subsequent search for weapons was a valid search incident to arrest and the motion judge properly denied defendant's motion to suppress evidence related to that search. *Commonwealth v. Vick (Mass. App. Ct. Nov. 8, 2016), 90 Mass. App. Ct. 622, 62 N.E.3d 105, 2016 Mass. App. LEXIS 161.*

Regarding a disorderly conduct charge which was an underlying charge in a malicious prosecution claim, there were sufficient factual questions as to whether probable cause existed for that charge, namely, that a bicyclist had no legitimate reason for traveling in the middle of the roadway and either intended to cause or recklessly created a public inconvenience, annoyance, or alarm. *Damon v. Hukowicz (D. Mass. Aug. 9, 2013), 964 F. Supp. 2d 120, 2013 U.S. Dist. LEXIS 112551.*

### 2. Nightwalkers and prostitutes

1959 amendment added separate offence of prostitution to instant section. *Alegata v. Commonwealth (Mass. Nov. 17, 1967), 353 Mass. 287, 231 N.E.2d 201, 1967 Mass. LEXIS 723.*

Court recounts history of section insofar as it makes it offence to be common night walker. *Thomes v. Commonwealth (Mass. Jan. 9, 1969), 355 Mass. 203, 243 N.E.2d 821, 1969 Mass. LEXIS 765.*

06/08/2020   09:21 Martin & Associates   (FAX)8024795414   P.020/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 124 of 125

Page 5 of 22

## ALM GL ch. 272, § 53

"Common night walking" provision of GL c 272 § *53* is construed as punishing persons abroad at night who solicit others to illicit sexual acts, and is not unconstitutionally vague. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

"Prostitute" is one who permits common indiscriminate sexual activity for hire, in distinction from sexual activity confined exclusively to one person, and as so defined is not unconstitutionally vague. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

There are two grounds for conviction of prostitution: performance of indiscriminate sexual acts for hire, and indiscriminate solicitation or agreement to perform sexual acts for hire. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Solicitation is prostitution for purposes of GL c 272 § *53*. *Saxon Coffee Shop, Inc. v. Boston Licensing Bd. (Mass. 1980), 380 Mass. 919, 407 N.E.2d 311, 1980 Mass. LEXIS 1197.*

Deriving support or maintenance from prostitute is felony and sets much more severe penalty than does statute punishing prostitution. *Commonwealth v. Thetonia (Mass. App. Ct. Sept. 19, 1989), 27 Mass. App. Ct. 783, 543 N.E.2d 700, 1989 Mass. App. LEXIS 542.*

## 3. —Constitutional issues

While originally, term "night walker" in instant section, as appears from its statutory history, may have been broadly construed to apply to anyone abroad after 10 o'clock at night, and subsequently, by reference to c 277, § *79* prescribing form of complaint or indictment for offence, term may have been narrowed to apply to persons abroad at night to solicit, or intending to solicit, to illicit sexual intercourse, in order to avoid constitutional doubts statute in respect to night walkers should now be interpreted to apply only to persons abroad at night who are attempting to allure, or are soliciting, someone to have illicit sexual intercourse, and as so interpreted statute is not unconstitutionally vague nor does it violate arts 1, 12 and 14 of Declaration of Rights of State Constitution nor due process clause of Federal Constitution. *Thomes v. Commonwealth (Mass. Jan. 9, 1969), 355 Mass. 203, 243 N.E.2d 821, 1969 Mass. LEXIS 765.*

Record was factually insufficient to support defendants' argument that GL c 272 § *53* was unconstitutionally and discriminatorily applied against women by reason of police failure to prosecute male prostitutes; however, on appropriate showing that police or prosecutor's office followed unjustifiable policy of selective enforcement against female prostitutes and not male prostitutes, female charged with prostitution or night-walking would be entitled to dismissal of charges with prejudice. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Commonwealth cannot enforce GL c 272 § *53* against female prostitutes but not against male prostitutes unless it demonstrates compelling interest which requires such policy. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Prostitution provision of GL c 272 § *53* is not unconstitutional on equal protection grounds because of police failure to prosecute male prostitutes and male customers, since other criminal statutes may be employed to punish male conduct equivalent to female prostitution and since evidence on this issue was not fully developed at trial. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Principle of equal protection of law is not violated because GL c 272 § *53* prohibiting prostitution does not include conduct of persons who hire or seek to hire another to engage in sexual activity. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Section applies to male prostitutes as well as female prostitutes, and therefore does not violate equal protection of law. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

06/08/2020   09:22 Martin & Associates     (FAX)8024795414          P.021/037
Case 1:20-cv-11266-WGY   Document 1-2   Filed 07/02/20   Page 125 of 125

Page 6 of 22

## ALM GL ch. 272, § 53

Constitutional right of privacy not violated by convictions for prostitution, where evidence was that defendants in public places either offered or agreed to perform various sexual acts with other persons in exchange for money. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Terms "prostitutes" and "common night walkers" are not so vague as to violate constitutional principle of due process of law, in that terms do give sufficient warning and definition of proscribed conduct. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Prostitute provision of GL c 272 § *53* is not facially unconstitutional. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

Conviction of prostitution based on performance of sexual acts for hire in private does not violate constitutional right of privacy, because acts were performed for money and were not intimate, personal decisions of participants. *Commonwealth v. Walter (Mass. Mar. 14, 1983), 388 Mass. 460, 446 N.E.2d 707, 1983 Mass. LEXIS 1312.*

Language of GL c 272 § *53* and prior decisions of Supreme Judicial Court indicated to individual of common intelligence that genital massage for fee is prostitution, and statute is not unconstitutionally vague as applied to such conduct. *Commonwealth v. Walter (Mass. Mar. 14, 1983), 388 Mass. 460, 446 N.E.2d 707, 1983 Mass. LEXIS 1312.*

Contrary to defendant's contention, ALM GL c 272, § *53* sufficiently apprised defendant that his conduct, "peering" and exposing himself while urinating in the elementary school bathroom, created an offensive and uncomfortable situation for the victims; thus, the statute as applied to defendant was not unconstitutionally vague. *Commonwealth v. Swan (Mass. Super. Ct. Feb. 27, 2004), 17 Mass. L. Rep. 374, 2004 Mass. Super. LEXIS 38.*

## 4. —Accusatory instrument

Allegations of complaint that defendant gave full body massage, including act of masturbation of genitals, to undercover police officer for fee charged offense of common, indiscriminate sexual activity for hire or prostitution. *Commonwealth v. Walter (Mass. Mar. 14, 1983), 388 Mass. 460, 446 N.E.2d 707, 1983 Mass. LEXIS 1312.*

Judge properly dismissed prostitution complaints due to intentional discrimination in enforcing law between female prostitute and her male customers. *Commonwealth v. Unnamed Defendant (Mass. App. Ct. May 21, 1986), 22 Mass. App. Ct. 230, 492 N.E.2d 1184, 1986 Mass. App. LEXIS 1591.*

Dismissal of charge of being lewd, wanton and lascivious person precludes prosecution on same evidence for prostitution, on ground of prior jeopardy. *Commonwealth v. Juvenile (No. 2) (Mass. App. Ct. Mar. 30, 1978), 6 Mass. App. Ct. 194, 374 N.E.2d 335, 1978 Mass. App. LEXIS 572,* disapproved, *Commonwealth v. Sefranka (Mass. 1980), 382 Mass. 108, 414 N.E.2d 602, 1980 Mass. LEXIS 1396.*

Commonwealth rebutted any inference that female defendant was target of selective prosecution for prostitution. *Commonwealth v. Archer (Mass. App. Ct. Apr. 28, 2000), 49 Mass. App. Ct. 185, 727 N.E.2d 535, 2000 Mass. App. LEXIS 317.*

## 5. —Evidence

Conviction for common night walking can be sustained without proof of past convictions for prostitution. *Commonwealth v. King (Mass. Dec. 12, 1977), 374 Mass. 5, 372 N.E.2d 196, 1977 Mass. LEXIS 1219.*

"Sexual activity" necessary for offense of prostitution is not confined to coitus or oral-genital contact, but includes performing masturbation upon person's genitals by another's hands for fee. *Commonwealth v. Walter (Mass. Mar. 14, 1983), 388 Mass. 460, 446 N.E.2d 707, 1983 Mass. LEXIS 1312.*